In The
## United States Court of Appeals for the Eighth Circuit

PENGUIN RANDOM HOUSE LLC; *et al.*,

*Plaintiffs-Appellees,*

v.

JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education; *et al.*,

*Defendants-Appellants,*

JASON MENKE, in his official capacity as member of the Urbandale Community School District Board of Education; *et al.*,

*Defendants.*

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:23-cv-478
(The Honorable Stephen H. Locher)

## BRIEF OF DEFENDANTS-APPELLANTS

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

June 13, 2025

*Counsel for Defendants-Appellants*

**SUMMARY OF CASE AND STATEMENT ON ORAL ARGUMENT**

Last year, this Court vacated the first preliminary facial injunction entered in this case and gave the district court the standard to apply on remand. Citing school-sponsored-speech precedents, this Court said "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." *GLBT Youth v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024). The district court agreed a facial injunction is improper under this Court's standard.

But the district court did not apply that standard. It "continue[d] to apply the legal standards" from its vacated order—which do not apply in the school setting. And it misapplied *NetChoice*'s facial overbreadth analysis, flipping the burden onto defendants to use an as-applied analysis as the basis to renew its vacated facial injunction. This Court should vacate the injunction again.

The State asks for clarity on the proper standards. Iowa's law regulates its own speech—curating public-school libraries. And it keeps books describing sex acts off Iowa's public-school library shelves. Thus, the law is reasonably related to Iowa's pedagogical mission.

State Defendants request 15 minutes of oral argument time.

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND STATEMENT ON ORAL ARGUMENT .......................................................................... i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ................................................................. v

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUES FOR REVIEW ...................................... 1

INTRODUCTION ................................................................................ 3

STATEMENT OF THE CASE ............................................................... 5

      A.    Books Describing Sex Acts Circulate in Iowa Public School Libraries. ..................................... 5

      B.    Iowa's Legislature Passes Senate File 496. .................. 6

      C.    The Library Section. ....................................... 7

      D.    Plaintiffs' First Attempt to Facially Enjoin SF496 Results in Eighth Circuit Vacatur and Remand. ................................................. 8

      E.    Plaintiffs Amend Their Complaint and Make Renewed Request for a Preliminary Facial Injunction. ............................................. 9

      F.    District Court Applies the Same Standard and Grants Renewed Preliminary Facial Injunction. ................................................. 9

SUMMARY OF THE ARGUMENT ...................................................... 11

ARGUMENT .................................................................................... 15

      I.    STANDARD OF REVIEW. ................................... 16

II.   NO APPLICATION OF THE LIBRARY
      SECTION VIOLATES THE FIRST
      AMENDMENT UNDER THE SCHOOL-
      SPONSORED-SPEECH STANDARD .................................. 17

      A.   This Court Directed the District Court to
           Apply the School-Sponsored-Speech
           Standard on Remand. .................................... 18

      B.   If *Hazelwood/Henerey* Governs, a Facial
           Injunction Is Inappropriate. ......................... 27

III.  THE DISTRICT COURT MISAPPLIED
      *NETCHOICE* .......................................................... 32

      A.   At *NetChoice* Step One, the District Court
           Effectively Converted Plaintiffs' Facial
           Challenge to an As-Applied Challenge to
           School Districts' Removal of Certain Books. .............. 33

      B.   Under *NetChoice* Step Two, No Application
           of the Library Section Violates the First
           Amendment. .................................................. 37

      C.   Under *NetChoice* Step Three, the Library
           Section's Unconstitutional Applications—If
           Any—Are Dwarfed by the Law's Substantial
           Constitutional Applications. ......................... 51

      D.   Any Injunction Should Be Limited to the
           Law's Unconstitutional Applications and
           Apply Only to Named Defendants. ........................... 57

IV.   THE LIBRARY SECTION REGULATES
      GOVERNMENT SPEECH .................................................. 59

      A.   *GLBT Youth*'s Preliminary-Injunction-Stage
           Decision on Standing is Not Binding Here. ................. 59

      B.   When Iowa Curates Public-School Libraries,
           It Regulates its Own Speech. ............................. 60

V.    THE REMAINING PRELIMINARY-
      INJUNCTION FACTORS WEIGH AGAINST
      ENJOINING THE LIBRARY SECTION. .............................. 67

CONCLUSION ........................................................................... 71

CERTIFICATE OF COMPLIANCE ......................................... 72

CERTIFICATE OF SERVICE.................................................. 73

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Arkansas Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ........................................................ 61, 62

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) .................................... 36, 39, 44, 46, 65

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ................................................................ 67

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) ........................................ 29, 39, 41, 46

*Brockett v. Spokane Arcades, Inc.*,
  472 U.S. 491 (1985) ...................................... 2, 4, 16, 57

*Brown v. Entertainment Merch. Ass'n*,
  564 U.S. 786 (2011) ................................................................ 40

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ........................................... 65

*C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022) ............................. 68

*Cajune v. Ind. Sch. Dist. 194*,
  105 F.4th 1070 (8th Cir. 2024) ......................................... 22

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*,
   690 F.3d 996 (8th Cir. 2012) ............................................ 23

*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005) ............................................. 63

*Digit. Recognition Network, Inc. v. Hutchinson*,
  803 F.3d 952 (8th Cir. 2015) ............................................. 58

*Dixon v. City of St. Louis*,
  950 F.3d 1052 (8th Cir. 2020) ........................................... 16

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ................................................................ 40

*FCC v. Pacifica Foundation*,
  438 U.S. 726 (1978) ................................................................ 41

*Fleming v. Jefferson Cnty. Sch. Dist. R-1*,
  298 F.3d 918 (8th Cir. 2002) ............................................. 30

v

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ............................................................46

*Gerlich v. Leath*,
  861 F.3d 697 (8th Cir. 2017) ..............................................22

*Ginsberg v. New York*,
  390 U.S. 629 (1968) ......................................................40, 41

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
  114 F.4th 660 (8th Cir. 2024) ......................................*passim*

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ....................................................*passim*

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*,
  200 F.3d 1128 (8th Cir. 1999) ....................................*passim*

*Lacks v. Ferguson Reorganized Sch. Dist. R-2*,
  147 F.3d 718 (8th Cir. 1998) ...........................2, 29, 31, 45

*Lee v. York Cnty. Sch. Div.*,
  484 F.3d 687 (4th Cir. 2007) ..............................................20

*Lindell v. United States*,
  82 F.4th 614 (8th Cir. 2023) ..............................................69

*Little v. Llano Cnty.*,
  2025 WL 1478599 (5th Cir. May 23, 2025) ................*passim*

*Matal v. Tam*,
  582 U.S. 218 (2017) ............................................................66

*Miller v. California*,
  413 U.S. 15 (1973) ................................................39, 40, 45

*Mitchell v. JCG Indus., Inc.*,
  745 F.3d 837 (7th Cir. 2014) ..............................................38

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ....................................................*passim*

*Morgan v. Swanson*,
  659 F.3d 359 (5th Cir. 2011) ..............................................26

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ............................................................62

*NetChoice, LLC v. Paxton*,
  121 F.4th 494 (5th Cir. 2024) ......................................47, 49

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) ..........................................................70

*Ng v. Board of Regents of Univ. of Minn.*,
  64 F.4th 992 (8th Cir. 2023) ..........................................2, 69

*PETA, Inc. v. Gittens,*
  414 F.3d 23 (D.C. Cir. 2005) ............................................ 65
*Planned Parenthood Minn. v. Rounds,* 530 F.3d 724 (8th Cir. 2008) 1, 67
*Pleasant Grove City, Utah v. Summum,*
  555 U.S. 460 (2009) ............................... 2, 23, 59, 61, 62
*Pratt v. 831, Forest Lake,*
  670 F.2d 771 (8th Cir. 1982) ................................... 44, 45
*Reno v. ACLU,*
  521 U.S. 844 (1997) ............................................ 40, 45
*Robertson v. Anderson Mill Elementary Sch.,*
  989 F.3d 282 (4th Cir. 2021) ................................. 29, 30
*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
  515 U.S. 819 (1995) ................................................. 63
*Rust v. Sullivan,*
  500 U.S. 173 (1991) ................................................. 37
*Sessler v. City of Davenport,*
  990 F.3d 1150 (8th Cir. 2021) ................................... 68
*Sleep No. Corp. v. Young,*
  33 F.4th 1012 (8th Cir. 2022) ................................... 16
*United States v. Am. Library Ass'n, Inc.,*
  539 U.S. 194 (2003) ........................... 42, 45, 64, 65, 66
*United States v. Hansen,*
  599 U.S. 762 (2023) ................................................. 36
*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020) ................................................. 32
*Univ. of Texas v. Camenisch,*
  451 U.S. 390 (1981) ................................................. 60
*Ward v. Polite,*
  667 F.3d 727 (6th Cir. 2012) ................................... 63
*Whole Woman's Health v. Jackson,*
  141 S. Ct. 2495 (2021) ............................................ 58
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .................................................... 15
*Zykan v. Warsaw Cmty. Sch. Corp.,*
  631 F.2d 1300 (7th Cir. 1980) ................................. 63

**Statutes**

28 U.S.C. § 1292 ..................................................... 1

**Page(s)**

28 U.S.C. § 1331 ................................................................. 1

Iowa Code § 4.4 .................................................................17

Iowa Code § 4.12 ...........................................2, 4, 16, 17, 58

Iowa Code § 256.11 ...........................................................

Iowa Code § 279.50 .............................................................8

Iowa Code § 280.6 ...............................................................8

Iowa Code § 702.17 .............................................................8

**Regulations**

Iowa Admin. Code r. 281—12.2(256) ...........................8, 25, 34

**Other Authorities**

Samuel L. Bray, *The Purpose of the Preliminary Injunction*,
    78 Vand. L. Rev. (forthcoming 2025).....................................69

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and issued its order granting Plaintiffs' renewed motion for preliminary injunction on March 25, 2025. R.Doc.113. State Defendants timely appealed on April 22. R.Doc.115. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review an interlocutory order granting a preliminary injunction. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008).

## STATEMENT OF THE ISSUES FOR REVIEW

1. Whether the district court abused its discretion by failing to apply *GLBT Youth*'s *Hazelwood* and *Henerey* standards for school-sponsored-speech.

**Cases**:     *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024)

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128 (8th Cir. 1999)

**Statute**: Iowa Code § 256.11

2. Whether the district court abused its discretion by granting a preliminary facial injunction when it failed to consider the law's full scope.

**Cases**:     *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)

*Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718 (8th Cir. 1998)

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985)

**Statutes**: Iowa Code § 256.11; Iowa Code § 4.12

3. Whether the State's public-school library curation is government speech and therefore not subject to Free Speech challenge.

**Cases**:     *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009)

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)

*Little v. Llano Cnty.*, 2025 WL 1478599 (5th Cir. May 23, 2025)

**Statute**: Iowa Code § 256.11

4. Whether the equitable factors weigh against a preliminary facial injunction where Plaintiffs are unlikely to succeed on the merits and lack irreparable harm.

**Case**:     *Ng v. Board of Regents of Univ. of Minn.*, 64 F.4th 992 (8th Cir. 2023)

**INTRODUCTION**

The district court ruled that "in the absence of clearer guidance from the Eighth Circuit that this Court got it wrong the first time around—the Court will continue to apply the legal standards set forth in its December 2023 ruling." App.Vol.II.407, R.Doc.113 at 17; *but see GLBT Youth v. Reynolds*, 114 F.4th 660, 671 (8th Cir. 2024) ("Because the district court issued a preliminary injunction based on a flawed analysis of the law, we reverse its decision and vacate the preliminary injunction."). This Court should again vacate the same injunction enjoining enforcement of the same law.

This Court vacated an earlier facial injunction entered in this case against the same challenged law, relying on the Supreme Court's precedent governing limitations on school-sponsored speech.

Iowa's law, the Library Section of Senate File 496, ensures that books containing descriptions of sex acts will not be stocked on Iowa's public-school library shelves because such books are not age-appropriate and do not facilitate the pedagogical mission of Iowa's public schools. Applying the school-sponsored speech standard, the law should not be enjoined.

The district court recognized that were it to apply the school-sponsored-speech standard from *GLBT Youth*, then Plaintiffs would lose. App.Vol.II.428, R.Doc.113 at 38. But it did not apply that standard.

Even if the court's First Amendment standard was correct, the injunction still requires vacatur because the district court misapplied *Moody v. NetChoice*. The district court's reasoning suggested an as-applied challenge, yet it granted facial relief. And rather than require Plaintiffs to carry their factual burden of establishing a substantial number of unconstitutional applications, the court took judicial notice of some already-removed books of which it was aware. That turns *NetChoice*'s burden on its head.

At a minimum, the district court's injunction is overbroad. "[F]acial invalidation of the statute [is] . . . improvident" where a state statute—like Iowa Code § 4.12—imposes a severability requirement. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 & n.14 (1985). The court should have preserved every single constitutional application of the Library Section and should not apply the injunction against non-parties.

But this Court need not even get that far. The Library Section regulates government speech, so it is not subject to Free Speech

challenge. A plurality of the full Fifth Circuit recently held as much in the public-library context. *Little v. Llano Cnty.*, 2025 WL 1478599 (5th Cir. May 23, 2025) (en banc). That conclusion applies with force to school-library curation. This Court is not bound by its preliminary-injunction-stage decision on standing in *GLBT Youth*, which previewed its analysis of the government-speech question as applied to standing. And it need not split with the Fifth Circuit on this issue.

This Court should again vacate the injunction. If the Court does not apply the government speech doctrine, then it should give instructions for the proper First Amendment standard to apply on remand.

## STATEMENT OF THE CASE

### A. Books Describing Sex Acts Circulate in Iowa Public School Libraries.

Books that describe certain sex acts circulated in Iowa's public-school libraries. *See, e.g.*, App.Vol.II.426, R.Doc.113 at 36; R.Doc.45-1 at 22; R.Doc.45-1 at 93–106; R.Doc.45-1 at 20 (Waukee); R.Doc.45-1 at 50 (Urbandale). Some parents petitioned school boards to remove that explicit content, to no avail. *See, e.g.*, R.Doc.45-1 at 20–24; R.Doc.45-1 at 24 (Waukee Superintendent stating that *Lawn Boy* would remain on the shelves); R.Doc.45-1 at 59 (Urbandale Superintendent stating that *Lawn*

*Boy* and *Gender Queer* would remain on the shelves); Robin Opsahl, *State board rejects appeal that sought to pull 'Gender Queer' from school library*, Iowa Capital Dispatch (Aug. 4, 2022), https://perma.cc/EH3G-U7B2 ("The West Des Moines school board voted in March to keep '*Gender Queer*.'").

**B.    Iowa's Legislature Passes Senate File 496.**

In 2023 the Iowa Legislature passed, and the Governor signed, SF496 to address that controversy, and related problems, in Iowa's schools. *See* Bill History for SF496, https://perma.cc/WU74-P3A9 (accessed June 13, 2025).

As relevant here, SF496 enacted the Library Section to keep books with descriptions or visual depictions of sex acts from being stocked on Iowa's public-school library shelves. Before digging into what the Library Section does, here is what it does not do. It *does not*:

- ban Iowa students from reading any book;
- ban Iowa students from acquiring any book from a source outside of their school's library, including from their local public library;
- ban the sale or circulation of any book beyond school bookshelves;
- ban Iowa students from bringing their copy of any book to school;
- ban Iowa students from studying or writing reports on any book in school;

6

- ban Iowa students from sharing their copy of any book with friends or classmates; nor
- ban Iowa students from discussing any book at school during their free time.

## C. The Library Section.

SF496 requires that school libraries "contain[] only age-appropriate materials, and support[] the student achievement goals of the total school curriculum." Iowa Code § 256.11(9)(*a*)(2). "[A]ge-appropriate" means "topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." *Id.* § 256.11(19)(*a*)(1)). "[A]ge-appropriate "does not include any material with descriptions or visual depictions of a sex act." *Id.*

Because the term "sex act" is narrowly defined, the Library Section excludes from school libraries descriptions or visual depictions of:

1. Penetration of the penis into the vagina or anus.
2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 151, or 152.
4. Ejaculation onto the person of another.
5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

Iowa Code § 702.17.

SF496 does not exclude from school libraries "descriptions or visual depictions of a sex act" when used "for purposes of the human growth and development curriculum." Iowa Code § 256.11(19)(*a*)(2); *see also* Iowa Code § 279.50. Finally, just as before SF496's enactment, religious books like the Bible, Torah, and Koran are not allowed to "be excluded from any public school." Iowa Code § 256.11(9)(*a*)(2); Iowa Code § 280.6.

The Library Section's requirements took effect July 1, 2023.

The Iowa Department of Education promulgated a rule clarifying which books are considered "age-appropriate:" "A reference or mention of a sex act" is not a "description." Iowa Admin. Code r. 281—12.2(256). That rule took effect August 28, 2024.

### D. Plaintiffs' First Attempt to Facially Enjoin SF496 Results in Eighth Circuit Vacatur and Remand.

More than six months after SF496 became law, Plaintiffs sued and moved for a preliminary injunction against State Defendants' enforcement of SF496. R.Doc.1. The district court granted a preliminary facial injunction late December 2023. R.Doc.56.

This Court vacated that injunction and remanded because "the district court entered the injunction based on a flawed analysis of the law." *GLBT Youth*, 114 F.4th at 671. Relying on *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), this Court said "the district court did not perform the necessary inquiry." *Id.* at 670. "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." *Id.*

## E.  Plaintiffs Amend Their Complaint and Make Renewed Request for a Preliminary Facial Injunction.

On remand, Plaintiffs amended their complaint, adding plaintiffs and "narrow[ing] the claims and legal issues;" the factual allegations remained largely the same. R.Doc.86 at 2–4; App.Vol.I.20–27, R.Doc.88 at ¶¶ 11–30. Without developing the facts further, Plaintiffs moved for renewed preliminary injunction on only their First Amendment facial overbreadth claim. App.Vol.II.402, R.Doc.113 at 12 n.4; App.Vol.I.144, R.Doc.104 at 1.

## F.  District Court Applies the Same Standard and Grants Renewed Preliminary Facial Injunction.

State Defendants argued that *GLBT Youth*'s guidance meant that the Library Section should not be enjoined. The district court agreed that

"under the *Hazelwood* standard," Plaintiffs would not succeed. App.Vol.II.428, R.Doc.113 at 38. But the district court reasoned that the Eighth Circuit's vacatur opinion did not "overrul[e] the [district] Court's original analysis as to the governing legal standards." App.Vol.II.405, R.Doc.113 at 15. So it granted the facial preliminary injunction, "continu[ing] to apply the legal standards" it had applied in its vacated order. App.Vol.II.407, R.Doc.113 at 17.

The court reapplied its novel obscenity-light standard, this time reasoning that, because Iowa has a criminal law prohibiting the dissemination of obscene material to minors, the Library Section's only effect must be over and above that criminal law. App.Vol.II.419–422, R.Doc.113 at 29–32. So all applications of the Library Section are likely unconstitutional because the law applies only to materials that are not "pornographic or obscene." *Id.*

And the court again determined students have a "right to receive information," and that the Library Section likely violates that right because it does not further a "substantial and reasonable governmental interest." App.Vol.II.422–428, R.Doc.113 at 32–38.

Perhaps most oddly, the court found that the law exempting religious texts from being removed from school library shelves "reinforces the problem" with the law's constitutionality. App.Vol.II.424, R.Doc.113 at 34.

State Defendants argued that Plaintiffs' bare record did not allow the district court to conduct a proper *NetChoice* overbreadth analysis. The district court disagreed, reasoning that State Defendants bore the burden to avoid a facial injunction against enforcing its law. App.Vol.II.393, R.Doc.113 at 3.

State-Defendants' appeal followed.

## SUMMARY OF THE ARGUMENT

**I.** The district court abused its discretion by applying incorrect First Amendment standards. If the Library Section is not government speech, then it regulates school-sponsored speech under *Hazelwood/Henerey*. That standard requires limits on school-sponsored speech to be reasonably related to legitimate pedagogical concerns. Iowa may categorically prohibit books with descriptions of sex acts because "Iowa is not required to tolerate speech that undermines or is

inconsistent with its central mission of educating Iowa children." *GLBT Youth*, 114 F.4th at 670.

There are no unconstitutional applications of the Library Section under *Hazelwood/Henerey*. The district court agreed on that point—but declined to apply that standard.

**II.** Even if the Library Section violates the First Amendment in some applications, Plaintiffs have not shown that the law is substantially overbroad because there is a vast amount of sexually explicit content that the State can constitutionally decline to place in school libraries.

The district court abused its discretion by misapplying *NetChoice*'s three steps. For fear of *NetChoice*'s evidentiary burden being too harsh on Plaintiffs, the district court declined to apply the law's full scope. But Plaintiffs chose to litigate their claims as a facial challenge. That choice has consequences. The district court lowered the bar by effectively conducting an as-applied analysis yet granting facial relief.

The court should have considered the full scope of the law's constitutional applications compared to its unconstitutional applications as established by Plaintiffs' facts. On the former question, the Library Section governs placement and removal of books containing descriptions

of sex acts. The district court erred by analyzing the scope of the law as if it applied only to book removals—and then only to books with which he was familiar or that had already been removed.

On the latter question, Plaintiffs failed to meet their burden. Plaintiffs and the district court reference lists of books they say were unconstitutionally removed without specifying what passages trigger the Library Section. The district court instead concluded that what mattered is whether school districts removed the books at all. Filling in Plaintiffs' evidentiary deficiencies, the district court then improperly took judicial notice of books it was "independently aware" of and analyzed only those. App.Vol.II.420, R.Doc.113 at 30.

The district court then applied incorrect First Amendment standards. It reused its novel obscenity-light standard that no court has applied in the school setting. It upheld a "right to receive" information that does not exist. Then it reasoned that the State lacks a substantial and reasonable governmental interest supporting the law.

But the State's interest in ensuring an education suitable to students' age and in preventing minor students' exposure to inappropriate material is legitimate and substantial—even compelling.

Removing books from school library shelves that describe or depict "sex acts" is reasonably related to that interest.

More, the district court should have respected Iowa's severability law and preserved all constitutional applications of the law, enjoining only the unconstitutional ones. If upheld, this Court should clarify that the injunction applies only to named Defendants in this suit.

**III.** The Library Section is not subject to Free Speech challenge because it regulates government speech. Curation is the curator's own speech, *NetChoice*, 603 U.S. at 731, and "a public library's collection decisions are government speech," *Little*, 2025 WL 1478599, at *1. The Library Section's curation of third-party speech is itself an expressive act, and thus government speech.

The government may exercise editorial discretion—necessarily content-specific—to compile monuments or statues in a public park, art in a government museum, content on a public broadcast, hyperlinks on a website, textbooks for school curriculum, or—like with the Library Section—to place and remove books in a public-school library to advance school curriculum.

**IV.** The preliminary-injunction factors weigh against an injunction. Plaintiffs' lack of likelihood of success on the merits dooms their motion. And they can show no irreparable harm. Covered books remain in circulation outside of school library shelves and may even be brought to and discussed at school.

The balance of equities weighs against injunctive relief too. A preliminary injunction now disrupts the status quo. The Library Section had been enforceable during three of the last four school semesters. To the extent irreparable harm exists, it is the State's inability to enforce its laws.

This Court should vacate the preliminary facial injunction.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must show: (1) likely success on the merits; (2) threat of irreparable harm; (3) balance of equities; and (4) that the injunction is in the public interest. *Rounds*, 530 F.3d at 729 n.3.

And facial challenges are "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "Even in the First Amendment context, facial

challenges are disfavored." *Id.* at 744. They "raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Id.* at 777 (Alito, J., concurring) (cleaned up). "Invalidating a law on this basis should only be done as a last resort." *GLBT Youth*, 114 F.4th at 669 (quotation marks omitted).

In a First Amendment overbreadth challenge, "facial invalidation of the statute [is] . . . improvident" where a state statute imposes a severability requirement. *Brockett*, 472 U.S. at 506 & n.14; *see* Iowa Code § 4.12 (Iowa's laws are presumed severable).

## I.  STANDARD OF REVIEW.

This Court reviews a preliminary injunction for abuse of discretion, reviewing legal conclusions de novo and factual findings for clear error. *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). A district court abuses its discretion when it disregards "a relevant factor that should have been given significant weight." *Dixon v. City of St. Louis*, 950 F.3d 1052, 1055 (8th Cir. 2020).

When interpreting Iowa statutes, this Court applies Iowa's codified rules of construction. *See GLBT Youth*, 114 F.4th at 670–671 (applying Iowa Code ch. 4). "In enacting a statute, it is presumed that [c]ompliance

with the Constitutions of the state and of the United States is intended."

Iowa Code § 4.4(1). And Iowa's laws are presumed severable. *Id.* § 4.12.

## II. NO APPLICATION OF THE LIBRARY SECTION VIOLATES THE FIRST AMENDMENT UNDER THE SCHOOL-SPONSORED-SPEECH STANDARD.

This Court earlier invoked *Hazelwood* and *Henerey*'s school-sponsored-speech standard and directed the district court on remand "to bear in mind that Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." *GLBT Youth*, 114 F.4th at 670; *see Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1132 (8th Cir. 1999) ("[A] school need not tolerate speech that is inconsistent with its pedagogical mission." (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988))).

The district court declined to apply that standard—yet it still analyzed *Hazelwood*/*Henerey* for ease of appellate review. App.Vol.II.428–429, R.Doc.113 at 38–39. And it correctly determined Plaintiffs would not be entitled to a preliminary facial injunction if *Hazelwood*/*Henerey* applies. App.Vol.II.428, R.Doc.113 at 38 ("[U]nder the *Hazelwood* standard, it appears that schools (or, in this instance, a state legislature) can categorically prohibit sexual content or profanity in

schools without running afoul of the First Amendment."). This Court should vacate the injunction.

## A. This Court Directed the District Court to Apply the School-Sponsored-Speech Standard on Remand.

After determining that the district court applied the incorrect facial-injunction standard, this Court explained the standard to apply on remand. The "purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school." *GLBT Youth*, 114 F.4th at 670. Citing *Hazelwood* and *Henerey*, this Court stated: Given Iowa's "pedagogical mission and [] policy making authority," "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." *Id.* The district court abused its discretion in failing to apply that standard.

### 1. The district court misunderstood this Court's guidance.

The district court did not mince its words: "[I]n the absence of clearer guidance from the Eighth Circuit that this Court got it wrong the first time around—the Court will continue to apply the legal standards set forth in its December 2023 ruling." App.Vol.II.407, R.Doc.113 at 17. So the court applied the same standards on remand as it did in its since-

vacated order. The court gave four reasons for why it would not apply *Hazelwood/Henerey*. All are wrong.

*First*, the district court said State Defendants overread this Court's guidance—the district court homed in on *GLBT Youth*'s use of the word "tolerate" and said that "language emanates from *Tinker* [*v. Des Moines Independent Community School District*]." App.Vol.II.404; R.Doc.113 at 14. The court interpreted this Court's guidance as underscoring the "proposition that schools have greater latitude to limit First Amendment protections than would exist in non-school settings" rather than directing a standard for remand. App.Vol.II.405; R.Doc.113 at 15.

The guidance viewed in its fuller context, not isolated to one word, shows otherwise. Though this Court did not expressly say "apply *Hazelwood* and *Henerey*," those are the cases it invoked. *Compare GLBT Youth*, 114 F.4th at 670 ("Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children"), *with Henerey*, 200 F.3d at 1132 ("[A] school need not tolerate speech that is inconsistent with its pedagogical mission, even though the government could not suppress that speech outside of the schoolhouse.") *and Hazelwood*, 484 U.S. at 266 ("A school need not tolerate student

speech that is inconsistent with its basic educational mission." (quotation marks omitted)). Notably absent from this Court's analysis was *Tinker*. *See generally GLBT Youth*, 114 F.4th 660.

*Second*, the district court emphasized that *Hazelwood/Henerey* governs only student speech. App.Vol.II.393, R.Doc.113 at 3; App.Vol.II.405, R.Doc.113 at 15; App.Vol.II.428–429, R.Doc.113 at 38–39. That is wrong. *See, e.g.*, *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 698 (4th Cir. 2007) (collecting cases). The school-sponsored speech standard applies to any expressive conduct—whether a student's, a teacher's, or anyone else's—that is "supervised by faculty members" and "designed to impart particular knowledge or skills to student participants and audience," and that the public may "reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. There is no student-speech prerequisite.

*Third*, the district court reasoned that *Hazelwood/Henerey* applies only when speech "necessarily was (or would have been) disseminated to other students in captive settings." App.Vol.II.405; R.Doc.113 at 15. There is no compulsory-setting prerequisite. Indeed, the school-sponsored speech in *Henerey* involved a student "hand[ing] out in the

school hallways some eleven condoms attached to stickers bearing his campaign slogan." 200 F.3d at 1131. *Henerey*'s students were no more compelled to engage with the student-candidate's campaign than students are required to use school libraries. And unlike in *Henerey*, the schools here pay for and provide the libraries.

*Fourth*, the district court said *Hazelwood/Henerey* could not apply here because this Court already rejected State Defendants' government-speech argument (for purposes of standing only), and State Defendants' *Hazelwood/Henerey* argument "is premised upon school library books being viewed as government speech after all." App.Vol.II.405–407, R.Doc.113 at 15–17. The district court improperly blended the distinct standards for government speech and school-sponsored private speech. As a partial defense of that mistake, *GLBT Youth*'s reasoning applies well to affirming the Library Section on government speech grounds. 114 F.4th at 670 ("The purpose of public school libraries is to advance the school curriculum").

But this Court understands that there are three types of speech that might occur in the school setting. There is government speech—where the government itself is speaking—and the Free Speech Clause

does not regulate that speech. *Gerlich v. Leath*, 861 F.3d 697, 707 (8th Cir. 2017). Then there is purely individual expressive conduct that "happens to occur on the school premises," which is subject to a high degree of First Amendment protection. *See Henerey*, 200 F.3d at 1132 (discussing types of private speech in the school setting). And somewhere in between there is school-sponsored speech, which is private expression that the public might perceive "to bear the imprimatur of the school." *Id.* at 1133. That speech may be subject to "some limitation of expression." *GLBT Youth*, 114 F.4th at 670 (citing *Henerey* as a "school-sponsored" speech case).

The *Shurtleff* factors—which this Court applied in *GLBT Youth*— help courts analyze whether expressive conduct may be perceived as the government speaking. *See, e.g.*, *Cajune v. Ind. Sch. Dist. 194*, 105 F.4th 1070, 1079 (8th Cir. 2024). That is different from the school-sponsored speech inquiry, which considers whether the public might perceive certain private expression "to bear the imprimatur of the school"—that is, speech that may be interpreted not as the government speaking but as school-approved, school-supervised private expression. *Henerey*, 200 F.3d at 1133.

The district court instead reasoned that this Court "has treated 'government speech' and 'school-sponsored speech' as more-or-less synonymous." App.Vol.II.407, R.Doc.113 at 17. But the case on which it relied does not say that. That case considered a school district's Establishment Clause defense to an alleged Free Speech violation. *See Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1002–04 (8th Cir. 2012).

*Child Evangelism* answered whether some expression was private speech—obviating an Establishment Clause defense—or whether the expression at issue was government or school-sponsored speech—in which case the Establishment Clause defense would vindicate the district. *Id.*; *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) (Establishment Clause applies to government speech). So this Court could treat government speech and school-sponsored speech interchangeably because, for purposes of the Establishment Clause defense, the distinction carried no difference. But that fails here.

The district court conflated the distinction between the government speaking and the government approving certain private expression. This Court's preliminary analysis on standing does not resolve the merits.

The district court thus misapplied this Court's remand instructions. It should have applied *Hazelwood/Henerey*.

> **2. If the Free Speech Clause regulates the Library Section, then *Hazelwood/Henerey* is the correct standard to apply.**

1. First Amendment cases outside the school setting provide no guidance here. Restrictions on speech in schools are subject to different standards: "[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266 (quotation marks and citations omitted).

Limitations on school-sponsored speech "do not offend the First Amendment" so long as they "are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

*Henerey*, for example, held that a student's "hand[ing] out in the school hallways some eleven condoms attached to stickers bearing his campaign slogan" was school-sponsored speech. 200 F.3d at 1133. The activity was "curricular in a broad sense" because it was "supervised by a school administer" and "conducted for . . . pedagogical purposes." *Id.* at

1133. "[A]ny member of the public could reasonably have concluded that campaign materials were distributed with the implied approval of the school." *Id.*

Applying *Hazelwood*, *Henerey* held that the school's decision to discipline a student did not violate the First Amendment because it was reasonably related to legitimate pedagogical concerns of "divorcing its extracurricular programs from controversial and sensitive topics, such as teenage sex," *id.* at 1136, and of declining to promote speech "that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order." *Id.* at 1135 (quoting *Hazelwood*, 484 U.S. at 272).

2. The Library Section, at most, regulates school-sponsored speech. "The purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school." *GLBT Youth*, 114 F.4th at 670 (citing *Henerey*, 200 F.3d at 1133–36).

The Library Section and its implementing rule confirm that Iowa's public-school libraries' purpose is to "support[] the student achievement goals of the total school curriculum." Iowa Code § 256.11(9)(*a*)(2) (establishing that school libraries); *see also* Iowa Admin. Code r. 281—

12.2(256) (explaining that libraries shall provide "[s]upport of the overall school curricula"); *see GLBT Youth*, 114 F.4th at 670 (citing that implementing rule).

School library books are placed on shelves with the "implied approval of the school." *Henerey*, 200 F.3d at 1133; *Morgan v. Swanson*, 659 F.3d 359, 376 (5th Cir. 2011) (en banc). Schools do not blindly select books to place or retain on the shelves. "School librarians necessarily evaluate content when deciding what books to acquire." Brief of Amicus Curiae Foundation for Individual Rights and Expression at 11, *PRH v. Robbins*, No. 24-1082 (8th Cir. Apr. 23, 2024). Indeed, as one district librarian explained, "[m]aterials selected for the District's library program reflect the policies of the District as well as the goals set out by the Iowa Department of Education." App.Vol.I.7, R.Doc.34-10 ¶ 8.

When perusing books on Iowa's public-school library shelves, someone could reasonably conclude that the books on those shelves complied with Iowa's rules that books be appropriate for learning and age appropriate and thus serve the school's pedagogical goals. *See* Iowa Code § 256.11(9)(*a*)(2). That is no different than *Henerey*, where "students would most likely have assumed that" the disciplined student had

complied with school rules and had school approval. 200 F.3d at 1135–36.

Because Iowa's school libraries are school-sponsored and school-approved, "[t]he pedagogical mission of the school allows for tailoring to provide for the teaching of basic skills and ideas" and "may involve some limitation of expression." *GLBT Youth*, 114 F.4th at 670 (quotation marks omitted). The standard to apply here, when a school "lend[s] its name and resources to the dissemination of . . . expression," is thus different than when private student expression that happens to occur at school is involved. *Id.* (quoting *Hazelwood*, 484 U.S. at 272–273).

## B. If *Hazelwood/Henerey* Governs, a Facial Injunction Is Inappropriate.

### 1. The Library Section serves a valid educational purpose.

Limits on school-sponsored speech are constitutional if they are reasonably related to a legitimate pedagogical purpose. *Henerey*, 200 F.3d at 1131, 1133. "It is only when the decision to" regulate speech "has no valid educational purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention." *Hazelwood*, 484 U.S. at 273 (cleaned up). That deferential standard reflects the Supreme

Court's "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Id.*

The Library Section passes that test. The law confirms that young Iowans' interests are best served by distancing school libraries from materials containing descriptions of sexual contact. And it is reasonably related to legitimate pedagogical concerns over avoiding controversy associated with those sexually explicit materials in public schools. Those valid educational purposes mean that the Library Section does not violate the First Amendment.

1. Descriptions of sex acts in books available at school raise legitimate pedagogical concerns. That is especially true when those books are accessible to children of all ages. *See ISS v. Reynolds*, S.D. Iowa No. 4:23-cv-474, R.Doc.1 at 14 ¶ 48 ("[S]ome Iowa school districts do not maintain separate elementary and secondary school libraries."). *Hazelwood*, for example, held that there is a legitimate pedagogical interest in preventing circulation of a newspaper article containing descriptions of girls' "sexual histories and their use or nonuse of birth control." 484 U.S. at 274–275. Unlike the materials covered by the

Library Section, the article "did not contain graphic accounts of sexual activity." *Id.* at 274. And this Court considered it "too plain for argument" that a school had a legitimate pedagogical interest in preventing a student from reading "a poem that describe[d] sexual encounters in the most graphic detail." *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998). "Surely it is a highly appropriate function of public-school education to prohibit the use of vulgar and offensive terms." "Surely it is a highly appropriate function of public-school education to prohibit the use of vulgar and offensive terms." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).

Plaintiffs dispute the Library Section's pedagogical efficacy, but efficacy is not the standard. *Henerey* and other cases establish the State's legitimate pedagogical interest in regulating sexually explicit materials, and Plaintiffs' policy disagreement does not alter that precedent. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 289 (4th Cir. 2021) ("[W]hile reasonable minds could debate the pedagogical efficacy of shielding fourth graders from topics like sexuality and gender identity, it cannot be denied that maintaining the age-appropriateness of school-

sponsored expressive activities is a pedagogical concern that passes muster under *Hazelwood*.").

And even if this Court disagrees with the Library Section's efficacy, it should "give substantial deference to educators' stated pedagogical concerns." *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 925 (8th Cir. 2002). "[I]t is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom." *Robertson*, 989 F.3d at 289 (quotation marks omitted). Educating "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood,* 484 U.S. at 273.

2. Avoiding "controversial and sensitive topics" too is a legitimate pedagogical interest. *Henerey*, 200 F.3d at 1136. "[T]he pedagogical test is satisfied simply by the school district's desire to avoid controversy within a school environment." *Fleming*, 298 F.3d at 925–926; *see also Hazelwood*, 484 U.S. at 272 (the government "retain[s] the authority to refuse to . . . associate . . . school[s] with any position other than neutrality on matters of political controversy"). And there can be no doubt here that books containing descriptions of sex acts generate controversy—

regardless of whether those books have won awards. *See Henerey*, 200 F.3d at 1136.

The Library Section is reasonably related to State Defendants' pedagogical mission. And unlike other limitations on speech that this Court has approved, the Library Section does not prohibit students from bringing books into school, or from acquiring, possessing, discussing, or studying those books. *See Lacks*, 147 F.3d at 724 (approving a "flat prohibition on profanity").

### 2. The district court agreed that the Library Section satisfies the *Hazelwood*/*Henerey* standard.

Even though the district court erred in failing to apply *Hazelwood*/*Henerey*, it correctly determined that Plaintiffs are not likely to succeed under that standard. "[U]nder the *Hazelwood* standard, it appears that schools (or, in this instance, a state legislature) can categorically prohibit sexual content or profanity in schools without running afoul of the First Amendment." App.Vol.II.428, R.Doc.113 at 38.

The court recognized that *Hazelwood*/*Henerey* does not require schools to consider the "award winning" nature of a book or whether there is only "a single sentence describing a 'sex act.'" App.Vol.II.428, R.Doc.113 at 38. *Hazelwood*/*Henerey* considers only whether "the book

restrictions are 'reasonably related to legitimate pedagogical concerns.'" *Id.* (quoting *Hazelwood*, 484 U.S. at 273. And because "Supreme Court and Eighth Circuit precedent establish that schools have a legitimate pedagogical interest in prohibiting student speech involving sexual content," the Library Section survives scrutiny. *Id.*

## III.   THE DISTRICT COURT MISAPPLIED *NETCHOICE*.

Because Plaintiffs chose to litigate this as a facial challenge, they must meet a high burden to win. A facial overbreadth challenge is a "daunting, if not impossible, task," and "likely forces a court to bite off more than it can chew," whereas as-applied challenges "would enable courts to home in on" specific applications. *NetChoice*, 603 U.S. at 744–745 (Barrett, J., concurring).[1]

There are three steps to analyzing facial-overbreadth challenges. *See GLBT Youth*, 114 F.4th at 669 (applying *NetChoice*, 603 U.S. at 723–725). The first is to analyze the law's scope. *NetChoice*, 603 U.S. at 724.

---

[1] Though this Court cannot decide the question, because it is bound by Supreme Court precedent, the overbreadth doctrine should be set aside because it is not grounded "in the text or history of the First Amendment." *United States v. Sineneng-Smith*, 590 U.S. 371, 390 (2020) (Thomas, J., concurring).

The second is to determine which of the law's applications violate the First Amendment. *Id.* at 725. And the final step is to compare the unconstitutional applications against the constitutional applications. *Id.* at 725–726. Only if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," can the law be invalidated. *Id.* at 723.

Plaintiffs fail at each step.

## A. At *NetChoice* Step One, the District Court Effectively Converted Plaintiffs' Facial Challenge to an As-Applied Challenge to School Districts' Removal of Certain Books.

"The expression at issue is the placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. That is because the Library Section does not differentiate between placing and removing books.

The district court erred by defining the law's scope through the lens of how certain school districts applied the law, rather than through the statute's text. App.Vol.II.393, R.Doc.113 at 3 (analyzing "one-off book removal decisions").

### 1. The Library Section applies to book with descriptions of specific sex acts.

The Library Section does not apply to passing references to or mentions of sex acts. It covers materials that are not "age appropriate" because they contain "descriptions . . . of a sex act." Iowa Code § 256.11(19)(*a*)(1). A "sex act" is narrowly defined as including six specific acts. *See id.* (incorporating Section 702.17's definitions). So unless a passage in a book describes a covered sex act, the Library Section does not apply.

The Legislature's choice of the word "descriptions" is important. A "description" is "a statement or account giving the characteristics of someone or something." Description, *Merriam-Webster's Online Dictionary*, https://perma.cc/4J4D-C6EN (accessed June 13, 2025). The Legislature could have used "references" or "mentions." And that would cover more content. App.Vol.I.112–113, R.Doc.102 at 8–9 (analyzing differences between "mention" and "reference" compared to "description"). For example, a statement that two persons "made love" or "had sex" is too general because it does not give the characteristics of any covered conduct.

The district court agreed with this interpretation. App.Vol.II.415, R.Doc.113 at 25. And the implementing rule confirms this interpretation. *See* Iowa Admin. Code r. 281—12.2(256) (the law does not cover "[a] reference or mention of a sex act in a way that does not describe or visually depict a sex act").

Plaintiffs' arguments in the district court that the Library Section applies to mentions of sex acts therefore rests on inaccurate "speculation about the law's coverage and its future enforcement." *NetChoice*, 603 U.S. at 723 (quotation marks omitted).

### 2. The district court incorrectly limited the law's scope to removal of noncompliant books.

The Library Section does not limit its application to book removals—it sets out a standard governing both "placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. That makes sense: Schools both acquire and remove books given cost, space, and other considerations. The Library Section not only requires removing inappropriate books from school library shelves, it also prohibits schools from buying them to stock on library shelves.

Though Plaintiffs make a facial challenge, the district court analyzed the law as if it were an as-applied challenge to Iowa's ability to

"require[] school districts to remove" books. App.Vol.II.393, R.Doc.113 at 3; *see id.* ("Defendants have not shown a 'substantial and reasonable governmental interest' for the removal of those books.").

The district court did not interpret the statute's text to be limited to removals; it instead defined the law's scope based on how Plaintiffs attested the law had been applied by non-State Defendants across Iowa's school districts and based on what the court found "realistic." App.Vol.II.421, R.Doc.113 at 31.

But the overbreadth analysis begins with the statute's text. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 770–781 (2023) (analyzing text of statute, without regard for how the law has been applied, when considering First Amendment overbreadth challenge). Evidence of how the law is being applied could be relevant in a vagueness challenge, but Plaintiffs pursued injunctive relief here only on their overbreadth claim.

Perhaps the district court limited its analysis of the statute's scope to book removals because it understood the State cannot be required to acquire any books. *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 887 n.3 (1982) (Berger, C.J., dissenting) ("[I]t is perfectly clear that, unwise as it would be, a school board could

wholly dispense with the school library, so far as the First Amendment is concerned."); *cf. Rust v. Sullivan*, 500 U.S. 173, 201 (1991) ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected."). And there is no principled basis for "locating in the First Amendment a distinction between refusing to purchase certain books [] and removing them." *Little*, 2025 WL 1478599, at *28 (Ho, J., concurring).

That interpretive error misapplied *NetChoice*'s first step.

## B. Under *NetChoice* Step Two, No Application of the Library Section Violates the First Amendment.

Limitations on school-sponsored speech, like school libraries, are constitutional if they are reasonably related to a legitimate pedagogical purpose. The Library Section passes that test because it is reasonably related to legitimate pedagogical concerns over sexually explicit materials in public schools and over avoiding the controversy associated with those materials. But even if *Hazelwood*/*Henerey* do not apply, the district court was wrong to create a novel standard by applying in the school setting a modified version of *Ginsberg* and *Miller*'s obscenity standard. The Library Section would also pass scrutiny under *Pico*.

And under any standard, Plaintiffs failed to meet their burden to produce evidence establishing which applications of the law are unconstitutional. Though Plaintiffs claim the Library Section applies to more than 500 books that have been removed, App.Vol.I.209, R.Doc.104-5 (books reported removed by the *Des Moines Register*); App.Vol.I.220, R.Doc.104-6 (same), they produced no evidence that those books contain statements covered by the Library Section. Without knowing what those books say, the record is deficient.

Nor do Plaintiffs show if a book was properly removed why that book's removal violates the First Amendment. The district court was wrong to supplement Plaintiffs' deficiencies by taking judicial notice of books of which it "[wa]s independently aware." App.Vol.II.420, R.Doc.113 at 30; *see also Mitchell v. JCG Indus., Inc.*, 745 F.3d 837, 849 (7th Cir. 2014) (Wood, J., dissenting) ("I am startled, to say the least, to think that an appellate court would resolve such a dispute based on a post-argument experiment conducted in chambers by a judge.").

Plaintiffs bear the burden of showing that the sweep of unconstitutional conduct outweighs the constitutional applications of the

law. The bare record here is not enough and prevents courts from analyzing *NetChoice* step two.

### 1. A novel obscenity-light is inapplicable.

Courts first determine what First Amendment standard applies. The district court incorrectly applied both *Ginsberg* obscenity and the "right to receive" information under *Pico* and *Pratt*. App.Vol.II.408–414, R.Doc.113 at 18–24.

The district court first applied a "sort of 'obscenity-light' standard for minors." App.Vol.II.411–414, R.Doc.113 at 21–24. But an obscenity-light standard, derived from *Miller v. California*, 413 U.S. 15 (1973), is inappropriate and unworkable in the school setting. Schools often restrict otherwise protected speech. In *Fraser*, the Supreme Court upheld disciplining a high school student for giving a lewd speech at a school assembly. 478 U.S. at 684. *Fraser* acknowledged schools' interest in "protecting minors from exposure to vulgar and offensive" speech, which may be regulated when it is "indecent but not obscene." *Id.* at 684 (quotation marks omitted); *see Pico*, 457 U.S. at 871 (plurality op.).

Practically, schools cannot assess every indecent, lewd, violent, or otherwise inappropriate speech under *Miller*. For example, schools

heavily regulate students' use of school-issued laptop computers. Under the district court's theory, the State could not pass a law requiring schools to prevent students' access to sexually explicit material on those computers, unless the school first analyzed every website blocked to determine if it lacked "serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24.

The district court's novel standard imposes new, unworkable burdens on laws regulating obscenity in schools. The district court relied on *Ginsberg*, *Erznoznik*, *Reno*, and *Brown*, but each case concerned laws directly regulating private speech beyond the schoolhouse doors. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629 (1968) (challenging criminal statute prohibiting sale of obscene materials to minors); *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) (challenging ordinance prohibiting showing films visible from a public place when those films contain nudity); *Reno v. ACLU*, 521 U.S. 844 (1997) (challenging law protecting minors from inappropriate material on the internet); *Brown v. Entertainment Merch. Ass'n*, 564 U.S. 786 (2011) (challenging law restricting video game sales or rentals to minors). The Supreme Court has not applied those cases to schools.

None of *Henerey*, *Hazelwood*, and *Fraser* applied an obscenity-light standard. Indeed, no Supreme Court school-speech cases postdating *Miller* cite *Miller*. Indeed, no Supreme Court school-speech case postdating *Miller* cites *Miller*. Applying an obscenity-light standard here is tough to square with school-speech precedents.

Take *Fraser*. There, a student's speech during a school assembly referred to a student candidate "in terms of an elaborate, graphic, and explicit sexual metaphor." *Fraser*, 478 U.S. at 678. When analyzing whether the school could properly discipline the student, the dissent invoked "the policy of applying contemporary community standards in evaluating expression with sexual connotations," *id.* at 696 (Stevens, J., dissenting). But the majority did not consider *Miller*—nor the literary or political value of the speech.

Instead, the Court "held in *Fraser* that [the] student could be disciplined for having delivered a speech that was 'sexually explicit' but not legally obscene at an official school assembly," *Hazelwood*, 484 U.S. at 266–67 (quoting *Fraser*, 478 U.S. at 678); *see also Fraser*, 478 U.S. at 689 n.2 (Brennan, J., concurring in the judgment) (stating that the speech "does not even approach the sexually explicit speech regulated in

*Ginsberg v. New York*, 390 U.S. 629 (1968), or the indecent speech banned in *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978)"). Though obscenity was clearly on *Fraser*'s mind, it declined to import those principles into the school context.

So too with *Hazelwood* and *Henerey*. Both cases involved speech that could have implicated obscenity principles, yet neither invoked *Miller*. *See Hazelwood*, 484 U.S. at 266–76; *Henerey*, 200 F.3d at 1132–36.

More, Plaintiffs cannot show that authors and publishers have a First Amendment right for their books to be placed on public-school library shelves and remain there. In the context of public libraries, the Supreme Court has said library shelves are not forums for authors to speak. *See United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (plurality op.) (a public library "does not . . . collect[] books in order to provide a public forum for the authors of books to speak"); *see also Little*, 2025 WL 1478599, at *21 ("Library shelves are not a community bulletin board: they are not places set aside for public expression." (quotation marks omitted)). Even truer in public-school libraries, where

the State has even more control and the risk of adult rights being restricted is low.

The district court further erred stating that the Library Section had "almost no 'constitutional' applications" because Iowa law already criminalizes disseminating "obscene material" to minors, so "no books containing obscene material under the *Ginsberg*" obscenity standard "should have been in school libraries before the law was passed, and thus the law should not have resulted in the (constitutional) removal of any such books." App.Vol.II.420, R.Doc.113 at 30. Baked within that reasoning are two more key flaws: the court assumed the law applied only to removals; and the court assumed SF496—a law imposing educational standards and discipline—cannot impose discipline or penalties like those found elsewhere under Iowa law. But Iowa, of course, is not prohibited from passing one law imposing criminal punishment and another law imposing administrative punishment for similar conduct.

2. ***Pico* and *Pratt* are inapplicable yet still establish that there are no unconstitutional applications of the Library Section.**

The district court next applied *Pico*'s "substantial and reasonable governmental interest" standard to protect students' so-called "right to

receive information." App.Vol.II.422, R.Doc.113 at 32. Not only is that standard inapplicable but, applied here, it would vindicate the Library Section under this Court's and the Supreme Court's precedents.

There is no "right to receive" that would allow a student to force a public school to keep certain books on shelves. *Little*, 2025 WL 1478599, at *7–*8 (holding there is no *Pico*-derived "right to receive" that would allow library-goers to compel the government to keep certain books in the library). The district court determined that right derived in part from *Pico*. App.Vol.II.408–409, R.Doc.113 at 18–19. But *Pico*'s fractured opinions are "of no precedential value." *Little*, 2025 WL 1478599, at *7–*8. Not only is *Pico* non-binding, five justices in *Pico* rejected a First Amendment "right to receive" information. *See Pico*, 457 U.S. at 878–880 (Blackmun, J., concurring in part and in the judgment); *id.* at 885 (Burger, C.J., dissenting) (four-justice dissent).

Recognizing uncertainty post-*Pico*, App.Vol.II.409, R.Doc.113 at 19, the district court applied *Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670 F.2d 771 (8th Cir. 1982), which predated *Pico*. *Pratt* recognized a First Amendment claim when a school removes a book "to suppress an ideological or religious viewpoint with which the

local authorities disagreed." *Id.* at 776. This Court was concerned such decisions could impose a "'pall of orthodoxy' on classroom instruction" particularly eyeing religion and ideology. *Id.* To avoid violating students' right to receive information, a school "must establish that a substantial and reasonable governmental interest exists for interfering with" that right. *Id.* at 777. Besides predating *Pico*, *Pratt* also predates both the government speech doctrine and school-sponsored speech cases—it is not clear that it is still good law.

The district court should have also applied another of this Court's cases, *Lacks*, which held that the State has a legitimate interest in ensuring an education suitable to students' age and to the pedagogical mission of the school. 147 F.3d at 724. In *Lacks*, "the school board had a legitimate academic interest in prohibiting profanity." *Id.* That school's "flat prohibition on profanity in the classroom [wa]s reasonably related to the legitimate pedagogical concern of promoting generally acceptable social standards." *Id.*

The Supreme Court too has said that the interest in protecting minors from age-inappropriate materials is "legitimate, and even compelling." *Am. Libr. Ass'n*, 539 U.S. at 215 (Kennedy, J., concurring);

*see Reno*, 521 U.S. at 869–870 ("compelling" interest); *Miller*, 413 U.S. at 18 ("legitimate" interest); *see also Fraser*, 478 U.S. at 684 (noting that all justices in *Pico* agreed to allow schools to remove "vulgar" books); *Pico*, 457 U.S. at 871 (plurality op.) ("removal decision[s] based solely upon the 'educational suitability' of the books in question, then their removal would be 'perfectly permissible.'").

So too here. Iowa has a substantial and reasonable interest in limiting children's access to inappropriate books on school library shelves. Put differently, given Iowa's "pedagogical mission and [] policy making authority," "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." *GLBT Youth*, 114 F.4th at 670.

Two final points: (1) the premise of finding the law unconstitutional under *Pico* or *Pratt* requires finding a "pall of orthodoxy"—but this Court already held that Iowa's law is "viewpoint-neutral," *GLBT Youth*, 114 F.4th at 670; and (2) the district court's analysis found that exempting "the Bible and other religious texts" undermined its constitutionality. App.Vol.II.424, R.Doc.113 at 34. That turns *Fulton v. City of Philadelphia* on its head. 593 U.S. 522 (2021).

### 3. Plaintiffs did not meet their burden to establish unconstitutional applications.

Plaintiffs bear the burden of "develop[ing] a factual record to support their request for facial injunctive relief." *NetChoice, LLC v. Paxton*, 121 F.4th 494, 500 (5th Cir. 2024). They must present evidence that the books they claim should remain on school-library shelves are subject to the Library Section. *See NetChoice*, 603 U.S. at 744 ("The need for NetChoice to carry its burden on those issues is the price of its decision to challenge the laws as a whole."). Whatever the First Amendment standard, Plaintiffs fail to meet their burden.

1. Though Plaintiffs claim the Library Section caused the removal of over 500 books, they offer no evidence that those books contain descriptions of sex acts. Take *1984* by George Orwell. App.Vol.I.38, R.Doc.88 at 23. What passage brings that book within the law's scope? Plaintiffs never say.

Plaintiffs have not—and likely cannot—produce such evidence. That is, in part, because Plaintiffs and some schools have misinterpreted the Library Section, resulting in the unnecessary removal of books. Plaintiffs concede that their list of removed books includes "books that school districts erroneously removed under other provisions of SF496,

including a provision that concerns gender identity and sexual orientation in the context of grades K-6." App.Vol.I.150, R.Doc.104 at 7 n.4. Indeed, as Plaintiffs in the companion case noted, one of the removed books, *Melissa*, "does not contain a 'sex act.'" *ISS v. Reynolds*, S.D. Iowa No. 4:23-cv-474, R.Doc.113-2 at 38. In one school district, the "only reason given" for removing books was that they contained "LGBTQ+ themes or characters"—content the Library Section does not cover. *Id.* at R.Doc.115-2, at 5.

*NetChoice* illustrates the consequences of Plaintiffs' failure at *NetChoice* steps two and three. There, social-media platforms brought facial challenges to two State statutes regulating the platforms' ability to engage in content moderation. *See NetChoice*, 603 U.S. at 719–721. Though two courts of appeals reached the merits, the Supreme Court reversed because those courts failed to determine which aspects of the social media platforms the regulations applied to as a factual matter. *Id.* at 724–725.

On remand, the Fifth Circuit returned the case to the district court with instructions to find whether the algorithms used by the social-media platforms implicated the content-moderation regulations at issue. *See*

*NetChoice v. Paxton*, 121 F.4th at 500. Though the Supreme Court can engage in statutory interpretation and define the legal boundaries of the laws, it could not decide step two in *NetChoice* because there was insufficient record evidence.

Determining the Library Section's unconstitutional applications requires Plaintiffs to show that the removed books, as a matter of fact, fall within the scope of the law. And that a substantial number of the applications are unconstitutional as compared to the constitutional ones. That is their factual burden, and they have not met it. A preliminary injunction on their facial challenge is thus improper.

2. Atextual applications of the law cannot be evidence that the challenged law's applications are overwhelmingly unconstitutional to support facially enjoining the statute.

Rather than probe whether the removed books Plaintiffs focus on in this litigation are covered by the statute, the district court reasoned that "a school district's removal of a book—whether right or wrong—is literally an 'application' of the law and therefore should be part of the *NetChoice* balancing." App.Vol.II.416, R.Doc.113 at 26. To the district court, it did not matter whether the law required removing those books.

That approach effectively throws out the need for any textual analysis of the statute's scope in a facial overbreadth challenge. Even worse, such deference to how the law has been applied—rather than analyzing the statute's text—will morph facial injunctions into de facto as-applied challenges, except without the factual record required to substantiate an as-applied challenge. The district court's approach also recognizes that the status quo is that the law has been in effect—after all, he is judging school district's for how they apply the law. The consequences of such an approach are immense.

State Defendants have not directed removing any specific book. State Defendants do not know the content of each of the 500-plus books Plaintiffs claim were unconstitutionally removed. But Plaintiffs seek a facial injunction against State Defendants. The burden for such an extreme remedy is on Plaintiffs, not State Defendants.

The proper way for Plaintiffs to vindicate their claim that the Library Section was unconstitutionally applied to 500 books would have been to bring an as-applied challenge as to those 500 books. Those applications could be supported with evidence. But for a facial challenge, the burden is higher—it "means asking, as to every covered [book]"

whether there is an intrusion on First Amendment rights. *NetChoice*, 603 U.S. at 725. The law applies to any book a school library can buy. That is the proper denominator. Plaintiffs fail to meet their burden and that forecloses preliminary facial injunctive relief.

## C. Under *NetChoice* Step Three, the Library Section's Unconstitutional Applications—If Any—Are Dwarfed by the Law's Substantial Constitutional Applications.

The Library Section's constitutional applications substantially outweigh the few—if any—unconstitutional applications. The district court miscalculated both the numerator and the denominator in step three of the overbreadth analysis. Its error flowed from its incorrect interpretation of the law's scope under *NetChoice* step one and its failure to require Plaintiffs to meet their factual burden under *NetChoice* step two. Those errors were compounded by the application of incorrect First Amendment standards.

### 1. The district court underestimated the law's vast constitutional applications.

The denominator should have included "each thing covered" by the law. *NetChoice*, 603 U.S. at 725. Iowa's law applies to any book that describes sex acts, not just those books that are already on school library shelves. The district court's error at step one infected its analysis here.

The Library Section has a substantial number of constitutional applications. The Library Section requires removing books that are not age-appropriate, prohibits placing those books back on school shelves, and prohibits placing on shelves other not age-appropriate books in the first instance. *Cf. GLBT Youth*, 114 F.4th at 667 ("the expression at issue is the placement and removal of books in public school libraries"). That is a vast number of books.

For example, a search on Amazon Books for "Kama Sutra"—a book Plaintiffs likely agree schools may constitutionally prohibit from being placed on school shelves—yields over 5,000 results. Kama Sutra, Amazon.com, https://perma.cc/T8S9-HFWW (accessed June 13, 2025). And a search for "erotica" books, which "means works of art that show or describe sexual activity," Erotica, *Collins Advanced Learner's Dictionary Online*, https://perma.cc/C7E3-JE2C (accessed June 13, 2025), yields over 60,000 results, Erotica, Amazon.com, https://perma.cc/EFL8-82EN (accessed June 13, 2025).

The district court was concerned that analyzing the law's full scope would "flip[]" First Amendment principles on its head. App.Vol.II.420, R.Doc.113 at 30. The law's "breadth," the court reasoned, makes

analyzing a facial overbreadth challenge difficult, when broadly applicable laws instead should be "subject to greater constitutional scrutiny." *Id.* But that misunderstands *NetChoice*. Plaintiffs chose to litigate a facial challenge to a broad law; "the need for [Plaintiffs] to carry [their] burden on those issues is the price of its decision to challenge the laws as a whole." *NetChoice*, 603 U.S. at 744. An as-applied challenge "would enable courts to home in on" specific applications. *Id.* But courts should not turn the purposefully daunting facial analysis into a watered down as-applied analysis and then grant facial relief. That approach flips *NetChoice*'s analysis on its head.

Yet that is what the district court did. In assessing the scope of the law's applications (the denominator), the court considered "evidence" of only books Plaintiffs report as having been removed by various school districts. App.Vol.II.417–418, R.Doc.113 at 27–28; App.Vol.II.420–422, R.Doc.113 at 30–32; App.Vol.II.393, R.Doc.113 at 3 (The "law has been unconstitutionally applied in dozens (if not hundreds) of situations and constitutionally applied in one."). After considering how the law "has been" applied, App.Vol.II.422, R.Doc.113 at 32, the court skipped the rest of the law's possible applications. But "[c]laims of facial invalidity often

rest on speculation about the law's coverage and its future enforcement." *NetChoice*, 603 U.S. at 723 (quotation marks omitted).

Then the court faulted State Defendants for failing to put evidence in the record showing the law's constitutional application to books that were "ever made available to elementary school students in the first place." App.Vol.II.421, R.Doc.113 at 31. But that again assumes the denominator should include only books that were ever on school library shelves. Worse, it improperly shifts Plaintiffs' heavy burden onto State Defendants' burden. More troubling yet, it misleadingly describes affidavits at a preliminary injunction hearing as "evidence"—despite not being evidence under the Federal Rules of Civil Procedure nor the Federal Rules of Evidence.

The district court got the facial standard wrong by declining to consider the law's full scope. In a facial challenge, the scope of the challenge is not limited by Plaintiffs' cherry-picked evidence—it is defined by the law's text.

### 2. The law has few, if any, unconstitutional applications.

The numerator should have included only the subset of books that (1) Plaintiffs establish are covered by the law and (2) the First

Amendment requires to be placed on public-school library shelves. And under any standard—*Hazelwood*/*Henerey*, obscenity-light, or *Pratt*—the number of such unconstitutional applications would be few, if any.

The district court feared Plaintiffs' factual burden was too heavy. App.Vol.II.416, R.Doc.113 at 26; App.Vol.II.422, R.Doc.113 at 32. It might "require the parties (and Court) to read hundreds—if not thousands—of books to determine" (1) whether they fall within the scope of the law and (2) whether their removal would violate the applicable First Amendment standard. App.Vol.II.416, R.Doc.113 at 26. The district court correctly described Plaintiffs' burden—but dismissed meeting that burden as too onerous. But if it is a "daunting" task, that is by design. *NetChoice*, 603 U.S. at 744–745 (Barrett, J., concurring).

The court instead supplemented Plaintiffs' deficiencies by inappropriately taking judicial notice of some books' content to determine that each book, except one, was unconstitutionally removed. App.Vol.II.417–418, R.Doc.113 at 27–28. The court did not identify passages establishing any book contained a description of a sex act. It said only that it "is independently aware" that "many . . . of those books indeed contain descriptions of sex acts." App.Vol.II.420, R.Doc.113 at 30.

Nor did the court explain how any book's covered description of a sex act is "not obscene or pornographic." App.Vol.II.417–418, R.Doc.113 at 27–28; App.Vol.II.426, R.Doc.113 at 36. At no point did the State have any opportunity to rebut the district court's independent factfinding. App.Vol.II.342, R.Doc.112 at 39:3–15 (State "would appreciate the opportunity to brief that" if district court took post-briefing-and-hearing judicial notice of books).

The court instead faulted State Defendants for not "expand[ing] the factual record following remand." App.Vol.II.425, R.Doc.113 at 35. Once again, that improperly flipped the burden onto State Defendants. The record includes no evidence that the 500 books Plaintiffs invoke include descriptions of sex acts—nor why any book's removal is unconstitutional. *See, e.g.*, App.Vol.I.150, R.Doc.104 at 7 n.4. The district court disregarded knowledge that books with descriptions of sex acts were on school library shelves; the court deemed those applications of the law unconstitutional because "the books apparently sat passively and harmlessly on the shelves except as to students who wanted to read them." App.Vol.II.425, R.Doc.113 at 35. "[T]here is nothing in the record to suggest they were made available to anyone other than high school students or were part of

any compulsory curriculum." *Id.* The court did not explain why whether the books "sat passively and harmlessly" on library shelves is constitutionally relevant.

In short, the vast amount of sexually explicit materials that the properly interpreted law covers shows that the constitutional applications far outnumber any unconstitutional applications. At the very least, a facial injunction is not warranted on this record.

The district court's flawed analysis compounded at each step, resulting in an analysis that operates more like an as-applied challenge, yet awards facial injunctive relief. That flouts *NetChoice*'s clear instructions.

### D.  Any Injunction Should Be Limited to the Law's Unconstitutional Applications and Apply Only to Named Defendants.

Even if this Court determines a preliminary injunction is warranted, the scope of the district court's injunction is overbroad for two reasons.

*First*, in a First Amendment overbreadth challenge, "facial invalidation of the statute [is] . . . improvident" where a state statute imposes a severability requirement. *Brockett*, 472 U.S. at 506 & n.14.

Iowa's laws are presumed severable. Iowa Code § 4.12. The Court should sever and preserve all constitutional applications of the law, enjoining only the unconstitutional applications.

The district court did not consider constitutionality of the law as applied to book placements. By focusing its *NetChoice* analysis on book removals, the district court effectively severed discrete constitutional applications of the Library Section from its analysis—but it should have also severed those applications from the scope of its injunction. Any injunction should be limited to only those removals that are unconstitutional.

*Second*, the Court should clarify that the injunction runs only against named Defendants. Courts do not enjoin "laws themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2495, 2495 (2021). Courts enjoin defendants' enforcement of the laws. *See Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015). So even if Plaintiffs receive facial injunctive relief, that relief runs only against named parties. These Plaintiffs are not entitled to statewide relief—and they did not plead any facts to support otherwise.

## IV. THE LIBRARY SECTION REGULATES GOVERNMENT SPEECH.

The Free Speech Clause does not regulate government speech. *Summum*, 555 U.S. at 467. And the State's curation of public-school library books is government speech. *See Little*, 2025 WL 1478599, at *1 ("[A] library's collection decisions are government speech."); App.Vol.I.118, R.Doc.102 at 14 n.1 (State Defendants preserving government-speech argument). Plaintiffs are therefore unlikely to succeed on their Free Speech claim against the Library Section.

This Court's preliminary-injunction stage decision is not binding on this issue. The Court should hold that the Library Section regulates government speech and avoid splitting from the Fifth Circuit. *See Little*, 2025 WL 1478599, at *2, *25 (explaining its disagreements with *GLBT Youth*).

### A. *GLBT Youth*'s Preliminary-Injunction-Stage Decision on Standing Is Not Binding Here.

Before this Court vacated the earlier injunction, it said Plaintiffs likely had standing to pursue their First Amendment claim against the Library Section. *GLBT Youth*, 114 F.4th at 667–668. This Court analyzed

the *Shurtleff* factors and determined it was unlikely that placement and removal of books in public-school libraries was government speech. *Id.*

But a prior panel's preliminary-injunction stage decision is not binding on the later merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that it is "inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits"); *id.* ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on the merits.).

## B. When Iowa Curates Public-School Libraries, It Regulates Its Own Speech.

The expression at issue is not a publisher or author's speech nor is it a student's right to receive a publisher or author's speech. "[T]he expression at issue is the placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. And the government makes those decisions to "advance the school curriculum." *Id.* at 670. And as reasoned in *NetChoice*, curation itself is speech distinct from the third-party speech being curated. 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others.").

But this Court in *GLBT Youth* misapplied *Shurtleff* at the standing stage. 114 F.4th at 667–668. As the Fifth Circuit recently held, the *Shurtleff* factors "show that libraries' collection decisions have traditionally expressed libraries' own views about what constitutes worthwhile literature." *Little*, 2025 WL 1478599, at *26.

### 1. Curation of public-school libraries is government speech.

"Supreme Court precedent teaches that someone may engage in expressive activity by curating and presenting a collection of someone else's speech." *Id.* at *17. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product." *NetChoice*, 603 U.S. at 731.

So too for government speech. When the government curates its own compilation of private third-party speech, its curation decisions are its own expressive activity. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673–675 (1998). And when the government is the speaker, the Free Speech Clause does not restrict its decisions. *See Summum*, 555 U.S. at 468.

The Supreme Court's government speech cases color these principles. When the government exercises editorial discretion, be it in a newspaper or on a public broadcast or in a public university lecture series, the government speaks by facilitating some viewpoints over others, and some content over others. *Forbes*, 523 U.S. at 674. When the government makes "esthetic judgments" selecting art that is "inherently content-based," and sometimes arbitrary, the government speaks. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585–586 (1998). So too for selecting certain statues or monuments for public parks over others. *Summum*, 555 U.S. at 472.

Courts of appeals across the country show how those principles apply to a government's compilation of third-party speech. *See Little*, 2025 WL 1478599, at *17 (collecting cases). "By selecting, compiling, and presenting a collection of another person's speech, the government expresses its own views." *Id.* at *19.

Applying those principles, the Fifth Circuit recently held that the government's curation of a public library is government speech and thus not subject to Free Speech challenge. *Little*, 2025 WL 1478599, at *14–

*26. That makes sense: "[L]ibraries curate their collection for expressive purposes." *Id.* at *2.

That should be true for public-*school* libraries too. The State's authority to speak is at a zenith in public schools. When the State "determines the content of the education it provides," it speaks. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995); *see Ward v. Polite*, 667 F.3d 727, 732 (6th Cir. 2012); *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005). Schools need flexibility to support the State's educational mission by "providing materials that properly supplement the basic readings assigned through the standard curriculum." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980).

Curating public-school libraries is the government's own speech just like a social media company's decision regarding which third-party speech to place on or remove from its platform is the company's own speech. The "individual messages" in the books "may originate with third parties, but the larger offering"—the library's collection—"is the platform's" own speech. *NetChoice*, 603 U.S. at 738. And like a social media company's platform-curation decisions, the State's library-

curation "choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so)." *Id.* So like a social media company curating its platform, the State is "engage[d] in speech activity" when it curates its school libraries. *Id.* at 731 (quotation marks omitted).

## 2. *Shurtleff* confirms that curating public-school libraries is government speech.

*Shurtleff* provided factors to guide the government-speech inquiry: "(1) the history of the expression at issue; (2) the public's likely perception as to who is speaking; and (3) the extent to which the government has actively shaped or controlled the expression." *GLBT Youth*, 114 F.4th at 667. Each factor supports the conclusion that public-school library curation is government speech.

*First*, libraries have traditionally communicated third parties' written speech "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *Am. Libr. Ass'n, Inc.*, 539 U.S. at 206. That has been true since public libraries arose in the mid-nineteenth century. *See Little*, 2025 WL 1478599, at *22–*26. "In light of public libraries' avowed educational mission, content selection was critical." *Id.* at *23. At one point, novels were a popular

genre yet occupied only two percent of a public library's collection, because novels were viewed as "trashy." *Id.* The "public library's view on edifying literature was quintessential government speech." *Id.* That is even truer for public-*school* libraries. *See Pico*, 457 U.S. at 868 ("A school library, no less than any other public library, is a place dedicated to quiet, to knowledge, and to beauty." (quotation marks omitted)).

*Second*, the public does not reasonably perceive that publishers, authors, or students select school library materials. "The expression at issue is the placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. And it is "the government who conveys that message, nobody else." *Little*, 2025 WL 1478599, at \*26 (cleaned up).

Clarifying the nature of the "speech" at issue is key to avoiding confusion on this factor: When the government speaks by curating its school libraries, the State expresses a message about what materials it believes have the "requisite and appropriate quality." *Am. Libr. Ass'n, Inc.*, 539 U.S. at 206; *see PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("[T]he government speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (The

government speaks when it "compil[es]" the "speech of third parties" in a public library.). The speech at issue is not the words in the books themselves—it is the overall pedagogical message relayed by the State's curation decisions.

The content of the curated third-party speech does not become the speech of the curator, so government speech applying here would not mean "the State 'is babbling prodigiously and incoherently.'" *GLBT Youth*, 114 F.4th at 668 (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)); *see Little*, 2025 WL 1478599, at *19–*20, *25–*26 (*Matal* is inapplicable to public libraries: if *Matal* applied, then in *Summum*, "when the City of Pleasant Grove displayed the Ten Commandments, it was speaking as God."). Instead, applying government-speech principles here means Iowa thinks books describing sex acts lack the "requisite and appropriate quality," *Am. Libr. Ass'n*, 539 U.S. at 206, to "facilitate the pedagogical mission of the school." *GLBT Youth*, 114 F.4th at 670.

*Third*, this factor "follows from the first." *Little*, 2025 WL 1478599, at *26. This is "what libraries have been doing for two centuries: decide which books they want in their collections." *Id.* at *2. "That is what it means to *be* a library—to make judgments about which books are worth

reading and which are not." *Id.* Resolving this case on government-speech grounds provides the cleanest and most straightforward rule for legislators and libraries going forward.

* * *

This Court should not split from *Little*'s plurality. "The speaker is the one who selects, compiles, and presents." *Id.* at *15. Here, the State— not any publisher, author, or student—"speaks by selecting some books over others and presenting that collection to the public." *Id.* at *2. That compilation of third-party speech to curate a message facilitating the pedagogical mission of Iowa's public schools is the epitome of government speech. The Library Section codifies government speech and thus is not subject to Free Speech challenge.

## V. THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH AGAINST ENJOINING THE LIBRARY SECTION.

Plaintiffs' failure to show they are "likely to prevail on the merits" dooms their motion. *Rounds*, 530 F.3d at 732. Even if Plaintiffs are likely to succeed on the merits, courts "must also consider" the other factors. *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). Those factors weigh against an injunction.

Plaintiffs have not shown irreparable harm. Lack of irreparable harm presents "independently sufficient" reason "to deny a preliminary injunction." *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (citation omitted).

The district court found irreparable harm because the law "depriv[es] students of the ability to read those books and authors and publishers of the ability to reach their intended audiences." App.Vol.II.430, R.Doc.113 at 40. But that is wrong—the Library Section does not ban any books, nor does it prohibit students from otherwise reading any books.

As a district court in this circuit found in a similar book-removal case, even with a chance of merits success, Plaintiffs' "harm would not be especially great, at least compared to a prototypical First Amendment violation." *C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022). The law there—like the Library Section— "does not stop any student from reading or discussing the book, which surely would raise a more serious issue." *Id.* Plaintiffs thus fail to establish any threat of irreparable harm.

Plaintiffs' delay in seeking preliminary injunction undercuts any irreparable-harm argument. SF496 took effect July 1, 2023. Plaintiffs waited five months to sue. R.Doc.1. Then after this Court vacated the first injunction, Plaintiffs waited months to renew their request. App.Vol.I.95, R.Doc.94. Such delays "undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." *Ng v. Board of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (quotation marks omitted).

Nor do equities support a preliminary injunction. This Court "has repeatedly recognized that the purpose of injunctive relief is to preserve the status quo; it is not to give the movant the ultimate relief he seeks." *Lindell v. United States*, 82 F.4th 614, 618 (8th Cir. 2023); *see also* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. at *39 (forthcoming 2025), https://perma.cc/8AAG-VB3Z.

The status quo leaves the Library Section enforceable. Between SF496's enactment and the second preliminary facial injunction, the Library Section has been in effect for Fall Semester 2023, Fall Semester 2024, and most of Spring Semester 2025—about 13 months total. The

balance of the equities does not support a preliminary injunction two years after enactment.

Finally, an injunction is not in the public interest. "[A]ny time a State is enjoined by a court from" enforcing its statutes, "it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

## CONCLUSION

For these reasons, this Court should vacate the preliminary facial injunction with instructions to the district court for the proper First Amendment standard—if any—to apply on remand.

June 13, 2025          Respectfully submitted,

                            */s/ Eric Wessan*

BRENNA BIRD            ERIC WESSAN
Attorney General of Iowa    *Solicitor General*

                            PATRICK C. VALENCIA
                            *Deputy Solicitor General*

                            Hoover State Office Building
                            1305 East Walnut Street
                            Des Moines, Iowa 50319
                            (515) 823-9117 / (515) 281-5191
                            (515) 281-4209 (fax)
                            eric.wessan@ag.iowa.gov
                            patrick.valencia@ag.iowa.gov

                            *Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,999 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

June 13, 2025

/s/ Eric Wessan
ERIC WESSAN
Solicitor General

Counsel for Defendants-Appellants

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on June 13, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


June 13, 2025

/s/ Eric Wessan
ERIC WESSAN
*Solicitor General*

*Counsel for Defendants-Appellants*