No. 25-1819

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

PENGUIN RANDOM HOUSE LLC, *et al.*,
*Plaintiffs-Appellees,*

v.

JOHN ROBBINS, in his official capacity as President of the Iowa State
Board of Educations, *et al.,*
*Defendants-Appellants*,

JASON MENKE, in his official capacity as member of the Urbandale
Community School District Board of Education, *et al.*,
*Defendants.*

On Appeal from the United States District Court
for the Southern District of Iowa
No. 4:23-cv-478 (Hon. Stephen H. Locher)

**Brief of *Amici Curiae* Arkansas, Alabama, Alaska, Florida,
Georgia, Idaho, Indiana, Kansas, Louisiana, Mississippi,
Missouri, Montana, Nebraska, Oklahoma, South Carolina, South
Dakota, Tennessee, Texas, Utah, and West Virginia Supporting
Appellants and Reversal**

TIM GRIFFIN
  Arkansas Attorney General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-2700
autumn.patterson@arkansasag.gov

AUTUMN HAMIT PATTERSON
  Solicitor General

NOAH P. WATSON
  Deputy Solicitor General

*Counsel for Amicus Curiae State of Arkansas*

# TABLE OF CONTENTS

Table of Authorities.................................................................................ii

Statement of Interests of Amici Curiae ................................................... 1

Summary of the Argument ....................................................................... 2

Argument.................................................................................................. 3

    I.    Curation Decisions for Public-School Libraries Are
        Government Speech, Which Cannot Violate the Free
        Speech Clause ................................................................................ 3

        A.  Senate File 496's Library Section regulates
            government speech............................................................... 3

        B.  Although there are some restrictions on government
            speech, the Free Speech Clause does not constrain
            the government's curation decisions................................... 11

        C.  Binding precedent does not prevent the Court
            from holding that public-school libraries' curation
            decisions are government speech........................................ 19

    II.   The First Amendment Does Not Compel a State to
        Provide Certain Books in Its Libraries ...................................... 19

Conclusion ............................................................................................. 21

Certificate of Compliance...................................................................... 23

Certificate of Service ............................................................................. 24

i

# TABLE OF AUTHORITIES

**Cases**

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) ................................................................ 20

*Bd. of Educ., Island Trees Union Free Sch.*
*Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ..................................... 13, 15-16, 18-19

*Bryant v. Gates*,
    532 F.3d 888 (D.C. Cir. 2008) ........................................ 5, 18

*Cajune v. Indep. Sch. Dist. 194*,
    105 F.4th 1070 (8th Cir. 2024) ............................................ 8

*CBOCS W., Inc. v. Humphries*,
    553 U.S. 442 (2008) ............................................................. 18

*Denver Area Ed. Tele. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) ............................................................... 4

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
    709 F. Supp. 3d 664 (S.D. Iowa 2023) ............................. 15

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
    114 F.4th 660 (8th Cir. 2024) .................................... 9, 14-15

*Griswold v. Driscoll*,
    616 F.3d 53 (1st Cir. 2010) ......................................... 16, 18

*Jones v. Jegley*,
    947 F.3d 1100 (8th Cir. 2020) .......................................... 16

*K.C. 1986 Ltd. P'ship v. Reade Mfg.*,
    472 F.3d 1009 (8th Cir. 2007) ........................................... 17

ii

*Little v. Llano County,*
103 F.4th 1140 (5th Cir. 2024) .......................................... 5, 12

*Little v. Llano County*
138 F.4th 834 (5th Cir. 2024) (en banc) ..................... 5, 7, 15-16, 19-20

*Matal v. Tam,*
582 U.S. 218 (2017) ...................................................... 9

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) .......................................... 2, 4-5, 15

*Muir v. Ala. Educ. Television Comm'n,*
688 F.2d 1033 (Former 5th Cir. 1982) (en banc) ................................ 16

*Nat'l Endowment for the Arts v. Finley,*
524 U.S. 569 (1998) .................................................... 12, 20-21

*Penguin Random House LLC v. Robbins,*
No. 4:23-CV-00478, 2025 WL 1156545
(S.D. Iowa Mar. 25, 2025) ........................................... 14-15

*People for the Ethical*
*Treatment of Animals, Inc. v. Gittens,*
414 F.3d 23 (D.C. Cir. 2005) ........................................... 4-5,

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) .................................................... 5, 11-12

*Pratt v. Indep. Sch. Dist. No. 831,*
670 F.2d 771 (8th Cir. 1982) ........................................... 15-18

*Pulphus v. Ayers,*
249 F. Supp. 3d 238 (D.D.C. 2017) ....................................... 9

*Raven v. Sajet,*
334 F. Supp. 3d 22 (D.D.C. 2018) ....................................... 9

iii

*Raven v. United States,*
  No. 18-5346, 2019 WL 2562945
  (D.C. Cir. May 17, 2019) ........................................................ 9

*Regan v. Tax'n with Representation of Wash.,*
  461 U.S. 540 (1983) .............................................................. 20

*Rust v. Sullivan,*
  500 U.S. 173 (1991) .......................................................... 16-17

*Shurtleff v. City of Boston,*
  596 U.S. 243 (2022) ...................................................... 5, 11, 12

*Sutliffe v. Epping Sch. Dist.,*
  584 F.3d 314 (1st Cir. 2009) ................................................... 4

*United States v. Am. Libr. Ass'n, Inc.,*
  539 U.S. 194 (2003) ......................................................... 4, 6, 9

*United States v. Anderson,*
  771 F.3d 1064 (8th Cir. 2014) ............................................... 17

*United States v. Taylor,*
  803 F.3d 931 (8th Cir. 2015) (per curiam) ............................ 17

*Walker v. Tex. Div., Sons of Confederate
Veterans, Inc.,*
  576 U.S. 200 (2015) ........................................... 2, 5-6, 9-12

*Walls v. Sanders,*
  733 F. Supp. 3d 721 (E.D. Ark. 2024) .................................. 17

*Walls v. Sanders,*
  760 F. Supp. 3d 766 (E.D. Ark. 2024) ............................. 17-18

## Rules, Statutes & Constitutional Provisions

Fed. R. App. P. 29(a)(2) .............................................................. 1

iv

Iowa Code § 256.11(9)(a)(2) .................................................................. 3

Iowa Code § 256.11(19)(a) ................................................................... 3

Iowa Code § 702.17 ............................................................................. 3

**Miscellaneous**

Wayne Carter, *Parents Face-Off Over Graphic Content and LGBTQ Books in School Libraries*, NBC DFW (Nov. 16, 2021) https://www.nbcdfw.com/news/local/carter -in-the-classroom/parents-face-off-over-graphic-content-and- lgbtq-books-in-school-libraries/2817649/ ................................................ 10

F. Drury, Book Selection (1930) ........................................................... 6-7

*Freedom of Expression, Collection Management, and Ethical Decision-Making: Censorship of the Good, the Bad, the Ugly, and Our Obligations to Preserve a Culture's Story*, 117 Law Libr. J. 191 (2025) ........................................ 5

Carleton Bruns Joeckel, *The Government of the American Public Library* (1935) .................................................................. 21

W. Katz, *Collection Development: The Selection of Materials for Libraries* (1980) ............................................................................ 6-7

Alex Murashko, *Explicit books removed from K-12 school libraries but only after a public reading at school board*, Wash. Times (Aug. 31, 2023) https://www.washington times.com/news/2023/aug/31/books-too-explicit-k-12- school-board-removed/ ............................................................................ 10

Jesse H. Shera, *Foundations of the Public Library: The Origins of the Public Library Movement in New England 1629–1855* (1949) .................................................... 7

U.S. Dep't of Interior, *Public Libraries in the United States: Their History, Condition, and Management* (1876) .................... 8

v

*Waukee Resident Blasts Sexually Explicit Books at Northwest High School Library*, Iowa Torch, https://www.youtube.com/watch?v=-KBrvXyJVcE ................................. 10

Appellate Case: 25-1819   Page: 7   Date Filed: 06/25/2025 Entry ID: 5530900

## STATEMENT OF INTERESTS OF AMICI CURIAE

Arkansas and 19 States file this amicus brief under Rule 29(a)(2) of the Federal Rules of Appellate Procedure. The *amici* States have a strong interest in the proper interpretation of the First Amendment, especially when courts misconstrue the Free Speech Clause to restrict the States' own speech. The Free Speech Clause has no application when States and their political subdivisions make editorial choices about what materials to include and what materials to omit from public-school libraries. Reaching the contrary conclusion has grave consequences, not just for *amici* States but also for our constitutional structure.

Refusing to recognize that public-library curation decisions are government speech subverts the democratic process. Rather than having democratically accountable officials decide the content of public-school libraries, unelected federal courts will become the decisionmakers forced to referee countless disputes between students, parents, publishers, and various associations over what books should and should not be in schools. This case therefore also implicates *amici* States' interest in preserving our constitutional structure.

1

Iowa passed a law prohibiting books that describe sex acts from lining the shelves of public-school libraries.[1]  Selecting what books belong in public-school library collections necessarily involves making editorial decisions about which books—out of millions—are age-appropriate, educational, and worthy of expending taxpayer funds.  Because exercising "editorial discretion" is "speech activity," *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024), those curation decisions are speech.  And because the curator of the public-school library collection is the government, those curation decisions are *government* speech.  That resolves this appeal because the government "is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).  Accordingly, the district court was wrong to conclude Plaintiffs were likely to succeed on their First Amendment challenge to Senate File 496's Library Section.

Even apart from the government-speech doctrine, the district

---

[1] As Appellants do, *amici* States refer to the challenged provisions of Senate File 496 as "the Library Section."

Appellate Case: 25-1819    Page: 9    Date Filed: 06/25/2025 Entry ID: 5530900

court's analysis is flawed.  A person's right to *receive* information under the First Amendment is not a right to *compel* information at taxpayer expense.  There is no First Amendment right to compel public-school libraries to furnish certain books—much less to require public schools to stock library shelves with graphic depictions of sex acts that elementary students can access without their parents' knowledge or consent.  The Court should therefore vacate the preliminary injunction and hold that Plaintiffs are unlikely to succeed on their First Amendment claims.

## ARGUMENT

I. **CURATION DECISIONS FOR PUBLIC-SCHOOL LIBRARIES ARE GOVERNMENT SPEECH, WHICH CANNOT VIOLATE THE FREE SPEECH CLAUSE.**

### A. Senate File 496's Library Section regulates government speech.

The Library Section restricts how government entities (public schools and public-school boards) make curation decisions—namely, it prohibits them from buying (or retaining) books for public-school libraries that describe sex acts.  *See* Iowa Code §§ 256.11(9)(a)(2), (19)(a); 702.17.  The law reflects the Iowa Legislature's judgment that books describing sex acts are not age-appropriate materials worthy of study and

3

its desire to avoid promoting such books to K-12 children through its public-school library shelves.

Iowa's law is an exercise of "editorial discretion," which "itself is an aspect of speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (quoting *Denver Area Ed. Tele. Consortium, Inc. v. FCC*, 518 U.S. 727, 737 (1996) (plurality opinion)). That is because a decision regarding "the third-party speech that will be included in or excluded from a compilation . . . is expressive activity." *Id.* Library curation decisions are speech because they necessarily involve editorial choices and the "exercise of judgment in selecting the material" provided to library patrons. *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality).

When a government entity or official (whether a State, local government, or public-library staff) is making those curation decisions, it is government speech. *See Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 330 (1st Cir. 2009) (explaining *American Library Association* "appl[ied] the government speech doctrine"). As the D.C. Circuit has put it: "With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C.

4

Cir. 2005).[2] That is exactly right. "'[G]overnment speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as *libraries*, broadcasters, newspapers, museums, schools, and the like." *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (emphasis added). That means the Library Section's regulation of what books will be part of public-school libraries' collections is government speech. This commonsense conclusion is compelled by *NetChoice*, along with other Supreme Court precedent regarding editorial decisions, and by the Supreme Court's government-speech precedent.

In *Pleasant Grove City v. Summum*, 555 U.S. 460, 470–72 (2009), *Walker*, 576 U.S. at 209–10, and *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022), the Supreme Court outlined three indicia of government

---

[2] *See Little v. Llano County*, 103 F.4th 1140, 1185 (5th Cir. 2024) (Duncan, J., dissenting) ("[T]he government speaks by choosing certain books over others for the library's collection."), *vacated*, 138 F.4th 834 (5th Cir. 2024) (en banc); Caroline L. Osborne, *Freedom of Expression, Collection Management, and Ethical Decision-Making: Censorship of the Good, the Bad, the Ugly, and Our Obligations to Preserve A Culture's Story*, 117 Law Libr. J. 191, 221 (2025) (explaining that "government speech is evident through the selection process" of a public library and that "[t]he decision to acquire, exclude, or deaccession . . . is thus government speech").

5

speech: (1) history of the expression, (2) likely perception regarding the speaker, and (3) government control. All three demonstrate that the government's public-library curation decisions, including the Library Section, which regulates such decisions, are government speech.

*First*, public libraries have a long history of making curation decisions to "provide materials that would be of the greatest direct benefit or interest to the community." *Am. Library Ass'n*, 539 U.S. at 204 (plurality). The fact that private parties write the books in the library collection or that the books express differing opinions does not change the fact that the government speaks through its editorial choices. *See Walker*, 576 U.S. at 216 (rejecting argument that license plates are a limited public forum despite private parties' designing the plates); *id.* at 221–22 (Alito, J., dissenting) (discussing the 350 plate designs that feature competing schools and different views). Public libraries do *not* "collect[] books in order to provide a public forum for the authors of the books to speak." *Am. Library Ass'n*, 539 U.S. at 207 (plurality). Instead, public libraries "collect only those materials" they "deem[] to have 'requisite and appropriate quality,'" which will "give the public, not everything it wants, but the best that it will read or use to advantage." *Id.* at 204 (quoting W.

6

Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980), and F. Drury, Book Selection xi (1930)). Public libraries' selection of books expresses a view "about which books are worth reading and which are not, which ideas belong on the shelves and which do not." *Little v. Llano County*, 138 F.4th 834, 838 (5th Cir. 2025) (en banc) (plurality). And this has been true throughout American history. Public libraries have long shaped their collections to express the government's view regarding what materials are "edifying" and would be likely to promote morality and civil virtue. *See id.* at 861–63 (discussing the history of public libraries).

Indeed, a prominent advocate arguing in support of an 1851 Massachusetts law authorizing public libraries touted that public libraries would "be favorable to all the moral reforms of the day" by encouraging the reading of worthwhile books and drawing young people away from "low and immoral publications." Jesse H. Shera, *Foundations of the Public Library: The Origins of the Public Library Movement in New England 1629–1855* 239 (1949).[3] And this view appears widespread in

---

[3] This text is available at https://archive.org/details/foundationsof the012037mbp/page/n5/mode/ 2up.

Appellate Case: 25-1819    Page: 14    Date Filed: 06/25/2025 Entry ID: 5530900

the 1800s: public libraries were expected to be managed in such a way that they would "draw young readers away from merely frivolous reading" and provide "that which will do them good"—books that are "instructive and stimulating to the better nature." U.S. Dep't of Interior, *Public Libraries in the United States: Their History, Condition, and Management* 412, 416 (1876).[4] Moreover, there is a history of public libraries, even ones outside of a school, being "viewed as an adjunct of the public school system" that would help "direct the reading of the young." *Id.* at 417–18. Curation decisions are thus unlike public-library meeting rooms, which are sometimes limited public forums, or school walls that might be a limited public forum if a school district decides to "create[] a limited public forum" by allowing private persons to display their posters. *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1075–76, 1083 (8th Cir. 2024).

*Second*, the public's likely perception is that public-school libraries' curation decisions are government speech—that the government is

---

[4] This text is available at https://babel.hathitrust.org/cgi/pt?id= coo1.ark:/13960/t6nz8rg88&seq=5.

8

expressing its views regarding what materials are worthwhile.[5]  The
government promotes its collection as containing materials with
educational and literary value for K-12 students, *cf. Am. Library Ass'n*,
539 U.S. at 203–04, and stamps, affixes a sticker, or uses another method
to physically mark the books as being its property, *compare Walker*, 576
U.S. at 218 (noting the license plate is "stamped with the imprimatur of
Texas"), *with Matal v. Tam*, 582 U.S. 218, 236–37 (2017) (explaining a
trademark is not owned by the State like license plates and "it is unlikely"

---

[5] When considering standing in an earlier appeal, this Court
suggested that the public would not consider a public-school library to be
speaking because the books express diametrically opposed ideas.  *See
GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th
Cir. 2024).  But the public understands that the government's speech is
the editorial decisions about what materials are included on the
bookshelves, *not* the messages in the books themselves.  If including
diverse viewpoints meant editorial decisions could not be government
speech, then *Walker* would have come out the other way.  *See* 576 U.S. at
221–22 (Alito, J., dissenting) (describing diverse messages on license
plates, such as rival universities).  So too would cases concluding that
government art competitions are government speech that "convey a kind
of message about the government's support for art—or at least the art
the government chooses to sponsor."  *Pulphus v. Ayers*, 249 F. Supp. 3d
238, 248 (D.D.C. 2017); *see Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C.
2018), *aff'd sub nom. Raven v. United States*, No. 18-5346, 2019 WL
2562945 (D.C. Cir. May 17, 2019).  Notably, the fact that the government
thinks books with different messages are worth including on public-
library shelves shows that Plaintiffs' concerns about viewpoint
discrimination are overblown.

Appellate Case: 25-1819     Page: 16     Date Filed: 06/25/2025 Entry ID: 5530900

that most of the public knows any more about federal "trademark registrations" than "about legal title to the land and buildings [they] pass[]" (quotation omitted)).  It has thus always been apparent that the government is the editor of a public library's collection.

But if there was ever any confusion about who has been speaking, there no longer is.  That is because there has been widespread media coverage and heated discussions at school-board meetings the past several years regarding the materials that are in public libraries and public-school libraries.[6]  This controversy has made it increasingly apparent that the government—whether a State, county officials, public-school boards, or public-library administrators—is the one deciding what books are worth adding and retaining in their library collections.

---

[6] *See, e.g.*, *Waukee Resident Blasts Sexually Explicit Books at Northwest High School Library*, Iowa Torch, https://www.youtube.com/watch?v=-KBrvXyJVcE; Alex Murashko, *Explicit books removed from K-12 school libraries but only after a public reading at school board*, Wash. Times (Aug. 31, 2023), https://www.washingtontimes.com/news/2023/aug/31/books-too-explicit-k-12-school-board-removed/; Wayne Carter, *Parents Face-Off Over Graphic Content and LGBTQ Books in School Libraries*, NBC DFW (Nov. 16, 2021), https://www.nbcdfw.com/news/local/carter-in-the-classroom/parents-face-off-over-graphic-content-and-lgbtq-books-in-school-libraries/2817649/.

Appellate Case: 25-1819     Page: 17     Date Filed: 06/25/2025 Entry ID: 5530900

*Third*, public libraries and governing bodies actively "maintain[]" control over the selection" of materials in the public-library collection. *See Walker*, 576 U.S. at 210. Unlike the City of Boston's approach to flags, Iowa's public-school libraries do not have a "come-one-come-all attitude" to books. *See Shurtleff*, 596 U.S. at 256. Iowa schools do not buy every book in existence with taxpayer funds, nor do they accept and place every donated book to place on their shelves. And like the monuments in *Summum*, the government is the owner of the books in the library collection. *See id.* at 257 (distinguishing *Summum*). All government-speech factors thus point the same way: the Library Section regulates government speech.

## B. Although there are some restrictions on government speech, the Free Speech Clause does not constrain the government's curation decisions.

Because the Library Section regulates government speech, Plaintiffs' First Amendment claim fails right out of the gate. That is because "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 576 U.S. at 207. Nor is the government required to "maintain viewpoint neutrality." *Summum*, 555 U.S. at 479. It is instead "the very business

Appellate Case: 25-1819    Page: 18    Date Filed: 06/25/2025 Entry ID: 5530900

of government to favor and disfavor points of view." *Id.* at 468 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment)). To put it simply, the Free Speech Clause "does not regulate government speech," so the Library Section's instruction about how the government will speak through public-school libraries cannot violate it. *See Summum*, 555 U.S. at 467.

That conclusion, however, does not mean "that a government's ability to express itself is without restriction." *Walker*, 576 U.S. at 208. Indeed, other "[c]onstitutional and statutory provisions" may provide significant limits. *Id.* For example, "government speech must comport with the Establishment Clause." *Summum*, 555 U.S. at 467.

The "first and foremost" guardrail on government speech, however, is "the democratic electoral process." *Walker*, 576 U.S. at 207. Our Constitution relies "on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff*, 596 U.S. at 252. It is therefore the "good sense of the citizens" who provide the main check on the State and on local governments. *Little*, 103 F.4th at 1185 (Duncan, J., dissenting). That is how our structure of

12

government works; democratically accountable officials are supposed to be the decisionmakers.

If every student, publisher, and association can bring a First Amendment challenge when they disagree with a public-library curation decision, unelected judges will effectively replace democratically accountable state and local officials as the curators. They will be forced to decide which books should go on public-school library shelves and which should be removed. *See id.* at 1160–61, 1186 (warning the federal judiciary against becoming "the Library Police" and pointing out that the judges in the majority in the overruled panel disagreed about whether half of the challenged books could be removed); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 885 (1982) (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.) (warning that expanding the First Amendment's scope and weighing into "a school board's decision concerning what books are to be in the school library," "an area traditionally left to the states," would turn the Supreme Court into "a 'super censor' of school board library decisions").

13

Fortunately, that is not the law because public-library curation decisions are government speech.

### C. Binding precedent does not prevent the Court from holding that public-school libraries' curation decisions are government speech.

The district court seems to have believed it did not need to analyze Defendants' likelihood of success on their government-speech argument because this Court already ruled that the selection of books in a public-school library is not government speech in *GLBT Youth*. *See Penguin Random House LLC v. Robbins*, No. 4:23-CV-00478, 2025 WL 1156545, at *8 (S.D. Iowa Mar. 25, 2025). That belief is mistaken.

In *GLBT Youth*, this Court only held that plaintiffs had *standing* to assert a First Amendment claim despite Defendants' argument that the speech at issue was government speech. *See* 114 F.4th at 667–68. This Court emphasized the "forgiving" nature of "[t]he First Amendment standing inquiry" and cautioned against conflating the standing analysis with the merits of potential causes of action. *Id.* at 667. That Plaintiffs can allege "future conduct" that is "*arguably* affected with a constitutional interest" does not tell us whether—on the merits—there is likely an *actual* First Amendment violation or whether the speech at

14

issue is likely government speech. *Id.* (citation modified) (emphasis added). And the Court did not address the government-speech argument when considering Plaintiffs' likelihood of success on the merits because the district court misunderstood how facial challenges work. *See id.* at 670 ("The district court did not perform the necessary inquiry set forth in *NetChoice*."). This Court should conduct that merits analysis here and conclude that the government's curation decisions for public-school libraries are likely government speech and the Supreme Court's repeated (and recent) recognition that editorial decisions are speech. *See supra* pp. 4–5.

The district court also seems to have thought that other cases—*Pico* and *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir. 1982)—preclude holding that the government's curation decisions for public-school libraries are likely government speech. *See GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 709 F. Supp. 3d 664, 696 (S.D. Iowa 2023), *rev'd and vacated*, 114 F.4th 660 (8th Cir. 2024); *Penguin Random House*, 2025 WL 1156545, at *12. That is wrong. *Pico* has "no binding holding of the Court on the critical constitutional issue presented." 457 U.S. at 886 n.2 (Burger, C.J., dissenting, joined by Powell, Rehnquist,

15

and O'Connor, JJ.); *see Little*, 138 F.4th at 843 (en banc) (reaffirming what the "en banc court ruled long ago": "*Pico* is of no precedential value as to the application of the First Amendment to these issues" (quoting *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc))). That is because the "narrowest [opinion] in support of the judgment"—Justice White's concurring opinion, which is binding under *Marks*, *Jones v. Jegley*, 947 F.3d 1100, 1106 n.3 (8th Cir. 2020)—"concurred in the judgment without announcing any position on the substantive First Amendment claim," *Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir. 2010) (Souter, J.).

*Pratt* also does not stand in the way of Defendants' government-speech argument. In that 43-year-old decision, this Court held that a school district could not remove a film from the curriculum of high-school literature course because board members "object to the films' religious and ideological content and wish to prevent the ideas contained in the material from being expressed in the school." *Pratt*, 670 F.2d at 773. But that decision does not bind this Court.

For one, it is no longer good law. That decision pre-dated the Supreme Court's first application of the government-speech doctrine in

Appellate Case: 25-1819     Page: 23     Date Filed: 06/25/2025 Entry ID: 5530900

*Rust v. Sullivan*, 500 U.S. 173 (1991), by nearly a decade, so it never considered whether the government's public-school curricular decisions are government speech. And applying the indicia of government speech, the government's decisions about what to include and exclude from public-school curricula constitute government speech. *See supra* pp. 5–11; *Walls v. Sanders*, 733 F. Supp. 3d 721, 746 n.196 (E.D. Ark. 2024) ("States have a long history of running public schools, the public is likely to believe that the government is speaking when it selects and implements curricula, and the state actively shapes and controls the selection and implementation of curricula."). Because "intervening Supreme Court precedent . . . undermines or casts doubt on the earlier panel decision," a subsequent panel "may disregard [it]." *K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1022 (8th Cir. 2007); *see United States v. Taylor*, 803 F.3d 931, 933 (8th Cir. 2015) (per curiam) ("[A] prior panel ruling does not control 'when the earlier panel decision is cast into doubt by an intervening Supreme Court decision.'" (quoting *United States v. Anderson,* 771 F.3d 1064, 1067 (8th Cir. 2014)). This panel thus should disregard *Pratt* or, even better, "acknowledge [its] demise" or

Appellate Case: 25-1819    Page: 24    Date Filed: 06/25/2025 Entry ID: 5530900

"overrule it" to provide needed clarity to lower courts. *See Walls v. Sanders*, 760 F. Supp. 3d 766, 776 (E.D. Ark. 2024).

In any event, *Pratt* involved a different context (public-school curriculum for courses at a senior high school) than the one here (K-12 public-school library shelves). And "erroneous precedents need not be extended to their logical ends." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 469 (2008) (Thomas, J., dissenting); *cf. Griswold*, 616 F.3d at 59 (noting "the developing body of law recognizing the government's authority to choose viewpoints when the government itself is speaking" and deciding "against extending the *Pico* plurality's" reasoning to a new context).

The Court should therefore hold that Plaintiffs are unlikely to succeed on the merits because Iowa's curation decisions regarding public-school libraries are government speech. Not only is caselaw making it increasingly "clear" that the "compilation of the speech of third parties by government entities such as libraries" is government speech, *Bryant*, 532 F.3d at 898 (Kavanaugh, J., concurring) (citation modified), but applying the government-speech doctrine is a simple way to resolve this appeal.

18

## II. THE FIRST AMENDMENT DOES NOT COMPEL A STATE TO PROVIDE CERTAIN BOOKS IN ITS LIBRARIES.

Plaintiffs are also unlikely to succeed because deciding that books describing sex acts cannot be in public-school libraries does not implicate the First Amendment's right to receive information. It does not prevent or prohibit students from receiving those books from their parents (or any source other than public-school libraries), nor does it restrict student speech. *See* Appellants' Br. 6–7. It simply prohibits age-inappropriate books describing sex acts from being in K-12 public-school libraries at taxpayer expense.

The Supreme Court's right-to-receive-information cases "h[o]ld that the First Amendment limits the government's power to prevent one person from receiving another's speech"; they do not hold that a person has "a right to receive information from the *government*." *Little*, 138 F.4th at 836. As Chief Justice Burger put it, "the right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Pico*, 457 U.S. at 888 (Burger, C.J., dissenting) (citation modified); *see Little*, 138 F.4th at 844 & n.15 (noting "[t]hree Justices (Powell, Rehnquist, and O'Connor) joined Burger's opinion in full, and a fourth (Blackmun) agreed

19

with this point"). The First Amendment does not force "public broadcasters to allow third parties access to their programming," *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 675 (1998), and it does not "require[] a library to shelve particular books" or allow publishers or children to "tell the government what books it must keep in the library," *Little*, 138 F.4th at 844–45.

This is common sense. Prohibiting books that describe sex acts from elementary- , middle- , and high-school libraries "does not prevent anyone from 'receiving' the information in [them]," but rather prevents children from accessing those books at public schools—without their parents' knowledge—"at taxpayer expense," which is "not a right guaranteed by the First Amendment." *Id.* at 848. The Supreme Court has repeatedly (and rightly) "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540, 546 (1983) (citation modified). Those who wish to read or write books describing sex acts "are as unconstrained now as they were before the enactment of the statute"; "they are merely deprived of the additional satisfaction of having [Iowa citizens] taxed to pay for it." *Finley*, 524 U.S.

20

at 595–96 (Scalia, J., concurring).  So no First Amendment right of students or publishers is infringed by Iowa's decision that it will not subsidize inappropriate books about sex acts in their public-school libraries.[7]  This is yet another basis for concluding that the Library Section creates no First Amendment problems.

## CONCLUSION

The Court should therefore vacate the preliminary injunction and provide needed guidance regarding the proper interpretation of the First Amendment.  Doing so helps ensure that important decisions regarding the education of children and the contents of public-school libraries remain with the constitutionally appropriate decisionmakers: democratically accountable state and local officials.

---

[7] This is not the first time that public libraries have had to take a stand against publishers that seek to use public libraries as cash cows to subsidize their businesses.  *See* Carleton Bruns Joeckel, *The Government of the American Public Library* 11–12 (1935) (noting that book selection "presented many difficulties" and describing how the libraries "provided a rich harvest" for publishers, which necessitated laws "forbidding school commissioners" from acting as publishers' agents and requiring "the superintendent of public instruction to make lists of books suitable for the district libraries" (citation modified)).

21

Respectfully submitted,

Tim Griffin
    Arkansas Attorney General

Autumn Hamit Patterson
    Solicitor General

Noah P. Watson
    Deputy Solicitor General

Office of the Arkansas
    Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-2700
autumn.patterson@arkansasag.gov

*Counsel for Amicus Curiae State of Arkansas*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

TREG TAYLOR
Alaska Attorney General

JAMES UTHMEIER
Florida Attorney General

CHRIS CARR
Georgia Attorney General

RAÚL LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

KRIS W. KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

ANDREW BAILEY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General

KEN PAXTON
Texas Attorney General

DEREK BROWN
Utah Attorney General

JOHN B. MCCUSKEY
West Virginia Attorney General

Appellate Case: 25-1819    Page: 30    Date Filed: 06/25/2025 Entry ID: 5530900

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7))(B) because it contains 4,186 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Century Schoolbook, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Autumn Hamit Patterson*
Autumn Hamit Patterson

Appellate Case: 25-1819    Page: 31    Date Filed: 06/25/2025 Entry ID: 5530900

CERTIFICATE OF SERVICE

I certify that on June 24, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Autumn Hamit Patterson*
Autumn Hamit Patterson

Appellate Case: 25-1819    Page: 32    Date Filed: 06/25/2025 Entry ID: 5530900