# In the United States Court of Appeals for the Eighth Circuit

Penguin Random House, LLC; Hachette Book Group, Inc.; HarperCollins Publishers, LLC; Macmillan Publishing Group, LLC; Simon & Schuster, LLC; The Authors Guild, Inc.; Laurie Halse Anderson; John Green; Malinda Lo; Jodi Picoult; Meggan Van Gundy, Next friend Grace Van Gundy; Iowa State Education Association; Lisa Petrie; Emily House,

*Plaintiffs-Appellees*,

v.

John Robbins, in his official capacity as President of the Iowa State Board of Education; McKenzie Snow, in her official capacity as Director of the Iowa State Board of Education; Chad Janzen, in his official capacity as Chair of the Iowa State Board of Educational Examiners,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Iowa
Case No. 4:23-cv-00478-SHL-SBJ

## Brief Of Amicus Curiae America First Legal Foundation In Support Of Defendants-Appellants Seeking Reversal

Daniel Z. Epstein
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721 (phone)
daniel.epstein@aflegal.org

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Amicus Curiae*

# DISCLOSURE STATEMENT

Counsel for amicus certifies that (1) amicus does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in amicus. *See* Fed. R. App. P. 26.1.

Appellate Case: 25-1819    Page: 2    Date Filed: 06/25/2025 Entry ID: 5530903

# TABLE OF CONTENTS

Disclosure statement...................................................................................i

Table of contents .......................................................................................ii

Table of authorities ...................................................................................iii

Interest of amici curiae ............................................................................. 1

Statement of compliance with Rule 29 .................................................... 1

Summary of argument ............................................................................... 1

Argument ................................................................................................... 4

    I.  The Speech Clause is inapplicable to school-library curation decisions......... 4

       A. A school library's curation decisions are government speech................... 5

       B. A School district does not "abridge" the freedom of speech by excluding books from its libraries............................................................ 13

    II.  The district court misapplied the overbreadth doctrine at every turn......... 16

    III. The district court was obligated to enforce Iowa's state-law severability requirement ....................................................................... 21

    IV. The preliminary injunction will not protect those who violate Senate File 496 if the injunction is eventually narrowed or vacated ...................... 23

Conclusion ............................................................................................... 26

Certificate of compliance ........................................................................ 27

Certificate of service ............................................................................... 28

Appellate Case: 25-1819    Page: 3    Date Filed: 06/25/2025 Entry ID: 5530903

# TABLE OF AUTHORITIES

## Cases

*Board of Trustees of State University of New York v. Fox*,
492 U.S. 469 (1989) ........................................................... 19

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985) ......................................... 4, 23

*Califano v. Yamasaki*, 442 U. S. 682 (1979) ............................................................. 20

*Charles Wolff Packing Co. v. Court of Industrial Relations of Kansas*,
267 U.S. 552 (1925) ......................................................... 21–22

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................ 14

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ...................... 14

*Dorchy v. Kansas*, 264 U.S. 286 (1924) ................................................................... 22

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) .................................................... 4, 24, 25

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ......................................................... 3

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ................................................. 1–2, 11, 12

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .......................................................... 20

*Jones v. Vilsack*, 272 F.3d 1030 (8th Cir. 2001) ................................................... 23

*Lake v. HealthAlliance Hospital Broadway Campus*,
738 F. Supp. 3d 208 (N.D.N.Y. 2024) ..................................................... 24

*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc) ............... 2, 7, 8, 13, 16

*Matal v. Tam*, 582 U.S. 218 (2017) ...................................................................... 12

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................................. 14

*Missourians for Fiscal Accountability v. Klahr*,
892 F.3d 944 (8th Cir. 2018) ..................................................... 22–23

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ..................................... 1, 9, 10, 11, 12

*Morey v. Doud*, 354 U.S. 457 (1957) .................................................................. 21

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...................................... 5

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) ....................................... 24

iii

Appellate Case: 25-1819     Page: 4     Date Filed: 06/25/2025 Entry ID: 5530903

*Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 514 (1990) ............ 16–17

*PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005) ........................................................ 9

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ......................................... 5, 6

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983) ............................................................................... 2

*Renne v. Geary*, 501 U.S. 312 (1991) ..................................................................... 19

*Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009) .................................................... 23

*Rosenberger v. Rector and Visitors of the University of Virginia*,
    515 U.S. 819 (1995) ............................................................................... 6, 7

*Rust v. Sullivan*, 500 U.S. 173 (1991) ........................................................ 5, 6, 13, 16

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ................................................ 6, 7

*Stanley v. Georgia*, 394 U.S. 557 (1969) ............................................................... 2, 3

*Tuffendsam v. Dearborn County Board of Health*,
    385 F.3d 1124 (7th Cir. 2004) ................................................................... 3

*United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) ................ 7, 8, 10

*United States v. Hansen*, 599 U.S. 762 (2023) ......................... 16, 17, 18, 19, 21, 22

*U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993) ........................................ 21

*Village of Schaumburg v. Citizens for a Better Environment*,
    444 U.S. 620 (1980) ............................................................................... 19

*Virginia v. Hicks*, 539 U.S. 113 (2003) .............................................................. 4, 21

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ............................................................................... 5, 6

*Webster v. Reproductive Health Services*, 492 U.S. 490 (1989) ........................ 15

*Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021) .............................. 24

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) ..................................... 24

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ..................................................... 22

*Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353 (2009) .............. 2, 3, 13, 14, 15

iv

## Statutes

Iowa Code § 4.12 .......................................................................... 4, 22, 23

Iowa Code § 256.11(19)(a)(1) ................................................................ 17

Iowa Code § 256.11(9)(a)(2) ...............................................................8, 17

Iowa Code § 256.11(9)(b) ..................................................................... 7

Iowa Code § 728.2 ........................................................................18, 19

## Constitutional Provisions

U.S. Const. amend. I ....................................................................... 2, 13

## Rules

Fed. R. App. P. 26.1 ..........................................................................i

## Other Authorities

David P. Currie, *Positive and Negative Constitutional Rights*,
53 U. Chi. L. Rev. 864 (1986)............................................................ 3

Jack Goldsmith, et al., *Hart and Wechsler's The Federal Courts and the
Federal System* (8th ed. 2025) ........................................................22

Daryl J. Levinson, *Framing Transactions in Constitutional Law*,
111 Yale L.J. 1313 (2002)............................................................... 15

Thomas W. Merrill, *Judicial Opinions as Binding Law and as
Explanations for Judgments*, 15 Cardozo L. Rev. 43 (1993) ...................25

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
104 Va. L. Rev. 933 (2018) .............................................................25

Frederick F. Schauer, *Principles, Institutions, and the First Amendment*,
112 Harv. L. Rev. 84 (1998) .............................................................9

Mitch Smith, *Federal Judge Blocks Iowa Law Restricting Sexually Explicit
School Books*, New York Times (March 25, 2025)...............................24

v

## INTEREST OF AMICI CURIAE

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law and defending individual rights guaranteed under the Constitution and federal statutes. America First Legal has a substantial interest in this case because it believes that a proper understanding of those rights must be informed by reference to constitutional text, and that rights not expressly mentioned must be deeply rooted in this nation's history and tradition. And further, America First Legal believes that a proper understanding of the law must include a coherent, consistent understanding of the role of federal courts in deciding cases or controversies.

## STATEMENT OF COMPLIANCE WITH RULE 29

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the amicus curiae, its members, or its counsel financed its preparation or submission.

## SUMMARY OF ARGUMENT

The Court should vacate the preliminary injunction for many reasons.

1. A public-school library is engaged in government speech when it adds or removes library materials. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), holds that curation decisions are speech of the curator—even when the curator is compiling works created by others. So a library engages in speech of its own when it culls or weeds materials from its collections, and a government-owned library is engaged in government speech when it decides to add or exclude a book. The panel opinion in *GLBT Youth in Iowa Schools Task Force v.*

1

*Reynolds*, 114 F.4th 660 (8th Cir. 2024), erred by rejecting the state's government-speech argument and by conflating the speech that appears inside the library books with the speech of those who curate the library's collection. *See Little v. Llano County*, 138 F.4th 834, 864–65 (5th Cir. 2025) (en banc) (plurality).

2. The Speech Clause prohibits only laws that "abridge" the freedom of speech. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech"). The Supreme Court has interpreted the "freedom of speech" to encompass the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). But the Speech Clause does not require the government to subsidize or assist other people's efforts to access information and ideas. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 355 (2009) ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government . . . mechanisms for the purpose of obtaining funds for expression."); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). The First Amendment does not require Iowa to provide public-school libraries, and it does not require school libraries to include any particular book in their collection. That is because the Constitution (as a general matter) protects only negative rights and not posi-

2

tive rights.[1] *See Ysursa*, 555 U.S. at 358 ("[T]he government . . . is not required to assist others in funding the expression of particular ideas, including political ones."); *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties. . . . It limits the powers of government but does not give people legally enforceable rights to demand public services and to obtain damages or other legal relief if the government fails to provide them."); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986). The Speech Clause prevents the government from punishing or penalizing a person for accessing information or ideas, *see Stanley*, 394 U.S. at 564, but it does not require the government to help a person access information or ideas by providing the sought-after materials in a library.

3. The district court misapplied the overbreadth doctrine by disregarding the full scope of Senate File 496, which not only compels the removal of sexually explicit materials in school libraries but also prohibits school districts from acquiring those materials in the first place. So Senate File 496 applies to every sexually explicit publication currently in existence, regardless of whether that publication can be found on a school library shelf. The plaintiffs and the district court needed to show that Senate File 496 violates the First

---

1. One notable exception is *Gideon v. Wainwright*, 372 U.S. 335 (1963), but *Gideon* has never been extended to the First Amendment.

3

Amendment as applied to a "substantial number" of all sexually explicit publications in existence, and they did not make this showing.

4. The district court was obligated to enforce the severability requirements of Iowa Code § 4.12, which compel reviewing courts to sever and preserve *all* constitutional applications of an allegedly unconstitutional statute. *See Virginia v. Hicks*, 539 U.S. 113, 121 (2003) ("Severab[ility] is of course a matter of state law."); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 506 & n.14 (1985) (enforcing an application-severability requirement in a state statute that contained an overbroad definition of prurience, holding that "facial invalidation of the statute was . . . improvident").

5. Regardless of whether this Court vacates or affirms the preliminary injunction, it should make clear that Senate File 496 remains in effect, even if its enforcement is temporarily enjoined, and that state officials may enforce the statute against anyone who violates it during the preliminary injunction if the injunction is eventually vacated or narrowed. *See Edgar v. MITE Corp.*, 457 U.S. 624, 648–53 (1982) (Stevens, J., concurring in part and concurring in the judgment).

## ARGUMENT

## I. THE SPEECH CLAUSE IS INAPPLICABLE TO SCHOOL-LIBRARY CURATION DECISIONS

The Court should vacate the preliminary injunction and hold that the Speech Clause is inapplicable to a school library's curation decisions. This is so for two separate and independent reasons. First, a school library's cura-

4

tion decisions are government speech. Second, even apart from the government-speech doctrine, a school library does not and cannot "abridge" anyone's freedom of speech by failing to include a particular book in its collection.

### A.    A School Library's Curation Decisions Are Government Speech

When the government joins or assists others in propagating a message, it is engaged in government speech. In these situations, the government may choose the speech that it will subsidize or support without encountering rules against content or viewpoint discrimination. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda." (citation omitted)); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view" (citation and internal quotation marks omitted)); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 590–600 (1998) (Scalia, J., concurring in the judgment); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." (citation omitted)).

Appellate Case: 25-1819    Page: 11    Date Filed: 06/25/2025 Entry ID: 5530903

That remains the case even when the government-supported speech is created by private citizens[2] or delivered by private citizens.[3] The government may choose the artwork that hangs on the walls of government buildings, the quotations that appear on national monuments, the license-plate designs proposed by members of the public that appear on state-issued license plates, and the books housed in a government-owned library. All of these are creations of private citizens—the artwork, the quotations, the license-plate designs, and the books. But the use of government resources to promote and convey these ideas and messages is government speech, and it remains government speech even when it is boosting or propagating another person's handiwork.

The only exception to this principle arises when the government's assistance or subsidies create a "forum" for private speech. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995). In these situations, the courts will not allow the government to characterize its facilitation or funding of private speakers as its own speech, because the benefits are so broadly conferred that the selective withholding of these perks from a disfavored speaker seems more akin to a penalty that "abridges" the freedom of speech, rather than the government acting as a participant in the marketplace of ideas. *See Shurtleff*,

---

2.    *See Walker*, 576 U.S. at 217 (license-plate designs created and proposed by private citizens); *Summum*, 555 U.S. at 470–72.

3.    *See Rust*, 500 U.S. at 179–81.

Appellate Case: 25-1819   Page: 12   Date Filed: 06/25/2025   Entry ID: 5530903

596 U.S. at 248 ("The city did not deny a single request to raise a flag until, in 2017, Harold Shurtleff, the director of a group called Camp Constitution, asked to fly a Christian flag."); *Rosenberger*, 515 U.S. at 830 ("'[I]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and childrearing except those dealing with the subject matter from a religious standpoint.'" (quoting *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 393 (1993)).

But a public-school library does not and cannot serve as a "forum" for private speech. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) (plurality) ("[F]orum analysis and heightened judicial scrutiny are . . . incompatible with the discretion that public libraries must have to fulfill their traditional missions."); *Little*, 138 F.4th at 859 (plurality) ("[I]t makes no sense to apply forum analysis to a library's collection. . . . Forum analysis has no place on a library's bookshelves."). A school library does not seek to accumulate as many publications as possible, and it does not allow its collection to serve as a dumping ground for any author or publisher who wants to propagate their intellectual property. Quite the opposite: A school library is *supposed* to curate its collection and retain only the materials that are useful, relevant, and appropriate for the students that it serves. *See* Iowa Code § 256.11(9)(b) ("[S]chool district library programs . . . shall be designed to provide for methods to improve library collections to meet student needs, include a current and diverse collection of fiction and nonfiction ma-

7

terials in a variety of formats to support student curricular needs, and include a plan for annually updating and replacing library materials and equipment."). And school libraries are supposed to exclude pornography, sexually explicit material, and other publications that are inappropriate for minors or that fail to promote the school district's educational objectives. *See* Iowa Code § 256.11(9)(a)(2) ("Each school district shall establish a kindergarten through grade twelve library program that . . . contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum.").

School librarians must also provide quality control when selecting or retaining materials. They are supposed to weed books with poor content, mediocre writing style, inaccurate information, or biased, racist, or sexist terminology or views. *See also American Library Ass'n*, 539 U.S. at 204 (plurality) ("'The librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything'" (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)); *Little*, 138 F.4th at 863 (plurality) (quoting from library weeding manuals that instruct librarians to remove books with "[b]iased, racist, or sexist terminology or views" and "[o]utdated philosophies on ethics and moral values"). This compels librarians to discriminate not only on the basis of content, but also against *viewpoints* and *ideas* that are inaccurate, biased, racist, or sexist. *See id.* at 859 (plurality) ("Libraries choose certain viewpoints (or range of viewpoints) on a given topic. But they may exclude others. A library can have books on Jew-

8

ish history without including the Nazi perspective."); Frederick F. Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 106 (1998) ("[One] would hardly disagree . . . with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence."). Libraries and librarians must separate "the gold from the garbage," and the "garbage" will include materials with disreputable viewpoints and ideas, such as discredited scientific theories, as well as viewpoints and ideas that may not have been considered racist or offensive when originally published but are no longer compatible with modern sensibilities. *See PETA v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005) ("The government . . . . may run museums, libraries, television and radio stations, primary and secondary schools, and universities. In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech.").

More importantly, a public-school library's selection and weeding decisions are government speech *by definition*. A library's curation decisions are no less "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the Supreme Court explained in *NetChoice*:

> An entity "exercis[ing] editorial discretion in the selection and presentation" of content is "engage[d] in speech activity." *Ar-*

9

*kansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666 (1998). And that is as true when the content comes from third parties as when it does not. (Again, think of a newspaper opinion page or, if you prefer, a parade.) Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product.

*Id.* at 731. And "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 732; *see also id.* at 738 ("That those platforms happily convey the lion's share of posts submitted to them makes no significant First Amendment difference."). Most libraries are willing to carry the vast majority of available books, but that does not mean that they are no longer engaged in "speech" when they decide to exclude certain materials from their collections. *See American Library Ass'n*, 539 U.S. at 204 (plurality) ("[L]ibraries collect only those materials deemed to have 'requisite and appropriate quality.'").

And a library's acquisition and weeding decisions remain its own "speech" even though a library is conveying the speech of others when deciding whether to include materials in its collection. Like a social-media platform, a library is "in the business . . . of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice*, 603 U.S. at 738. As *NetChoice* explains:

> The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a

10

set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* So too with a library. The "individual messages" originate with the authors, but "the larger offering" is the library's speech. *See id.* And a library's acquisition and weeding decisions "rest on a set of beliefs about which [materials] are appropriate" to include in the library's collection and "which [materials] are not." *Id.* Finally, the aggregate of the library's curation decisions gives the collection "a particular expressive quality" unique to that library. A library is "engage[d] in speech activity"[4] when it curates its collection, and that means that a government-owned library's acquisition and weeding decisions qualify as government speech.[5]

This Court's previous opinion in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), purported to reject the state's government-speech argument, but the opinion erred by treating the government-speech issue as a component of Article III standing. *See id.* at 667 ("Defendants argue that all Plaintiffs lack standing because the removal of books from public school libraries constitutes government speech."). Government speech is a merits question and has nothing to do with whether a plaintiff has

---

4. *NetChoice*, 603 U.S. at 731 (quoting *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

5. A government-speech holding will not immunize public-library weeding decisions from *all* forms of constitutional attack, and it may still be possible to challenge book-removal decisions on Establishment Clause or Equal Protection grounds.

11

suffered injury in fact. The opinion in *GLBT Youth* went further off track by claiming that the state's government-speech argument would make the content of the library books into government speech. *See id.* at 668 ("[I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)). That is untrue, as *NetChoice* and the *Little* plurality opinion establish that the act of curation is speech distinct from the speech that appears within the curated materials. *See* pp. 9–11, *supra*. No one is claiming that the content of school-library books is government speech. But whenever a public or private library selects or removes books from its collection, those curation decisions are the speech of the library—and that speech is distinct from the speech of the authors that appears inside the library books. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the plurality in *Little* cogently explained:

> The Eighth Circuit misunderstood the government "speech" at issue. It is not the words of the library books themselves. . . . Rather, the government speaks through its *selection* of which books to put on the shelves and which books to exclude.

> The Eighth Circuit also misapplied *Summum*. . . . The city's message was its *selection and display* of the monuments, not the monuments themselves. That maps precisely onto a library collection: the library conveys its *own* message (which books are worth reading) by collecting third-party speech (books). But the Eighth Circuit's reasoning makes *Summum* impossible: the only "speech" the court saw was by the books' *authors*, not the li-

brary's *choosing* some books over others. By that reasoning, when the City of Pleasant Grove displayed the Ten Commandments, it was speaking as God.

*Little*, 138 F.4th at 864–65 (plurality) (citations and some internal quotation marks omitted) (footnotes omitted).

Finally, *GLBT Youth* makes no attempt to reconcile its stance with *NetChoice*, which holds that curation decisions are speech of the curator— even when the curator is compiling the speech of others. The Court should disavow the discussion in *GLBT Youth* and hold that school-library curation decisions are government speech.

### B. A School District Does Not "Abridge" The Freedom Of Speech By Excluding Books From Its Libraries

If this Court rejects the government-speech argument, it should *still* hold that a school library's book removals are categorically immune from scrutiny under the Speech Clause. That is because a school district does not and cannot "abridge"[6] a constitutional right by withholding assistance from those seeking to exercise a constitutional prerogative. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 359–60 & n.2 (state law that "removes politically related deductions from an existing system" is not an "abridgment of the unions' speech," even though it revokes assistance that the state had previously been providing to the unions' speech activities); *Rust*, 500 U.S. at 200 ("[T]he Government may choose not to subsidize speech"); *id.* at 201 ("The

---

6. U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech").

Appellate Case: 25-1819     Page: 19     Date Filed: 06/25/2025 Entry ID: 5530903

Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected").

Suppose that Iowa decided to open and operate a state-owned gun store that allows its residents to borrow weapons in the same way that they borrow library books—by checking them out for a few weeks and promising to return them. The government-speech doctrine would not apply to the state's decisions to stock and shelve weaponry in this store, as assembling a collection of firearms is conduct rather than the propagation of a government-sponsored message. Yet if the state decided to remove handguns from this government-owned store, that would not "infringe" the right to keep and bear arms—even though the Second Amendment protects the right to "receive" handguns as much as the First Amendment protects the right to "receive" information and ideas.[7] The removal of handguns from this government-owned store is constitutionally permissible not because the state is engaged in "government speech," but because a state does not "infringe" the right to keep and bear arms (or any other right) by removing handguns from a government-owned store that it had no obligation to open or operate in the first place. *See Ysursa*, 555 U.S. at 359.

Or suppose that Iowa had operated a public hospital before *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), that offered abortions and other medical procedures to its residents. None of these services qualify

---

7.  *See District of Columbia v. Heller*, 554 U.S. 570, 628–32 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Appellate Case: 25-1819     Page: 20     Date Filed: 06/25/2025 Entry ID: 5530903

as "government speech," yet the state could still remove abortion services from the menu without "abridging" or violating the erstwhile right to abortion. *See Webster v. Reproductive Health Services*, 492 U.S. 490, 510 (1989) ("Nothing in the Constitution requires States to enter or remain in the business of performing abortions."). This prerogative comes not from the government-speech doctrine, but from the fact that the Constitution does not require the government to assist or facilitate efforts to exercise a constitutional right.[8] *See Ysursa*, 555 U.S. at 359–60 & n.2.

The analysis is no different when a school district excludes books from its libraries. A public school does not (and cannot) "abridge" the right to receive information and ideas by excluding a book from its library collection, even though its actions make it slightly more difficult for students to access the excluded materials. *See Ysursa*, 555 U.S. at 359–60 & n.2; *see generally* Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1313 (2002). Students remain free to access the removed books from other sources (such as Amazon.com or private bookstores) without fear of punishment or penalty from the government. And although the school district is no longer *facilitating* efforts to obtain those books at its libraries, that does not violate or even implicate anyone's constitutional rights, any more than a decision to exclude handguns from a government-owned store or withdraw abortion ser-

---

8. The right to counsel for criminal defendants is one notable exception to this rule. *See* note 1, *supra*.

Appellate Case: 25-1819    Page: 21    Date Filed: 06/25/2025 Entry ID: 5530903

vices from government-owned hospitals. As the en banc Fifth Circuit explained in *Little*:

> [P]laintiffs cannot invoke the right to receive information to challenge the library's removal of the challenged books. . . . It is one thing to tell the *government* it cannot stop *you* from receiving a book. The First Amendment protects your right to do that. It is another thing for *you* to tell the *government* which books it must keep in the library. The First Amendment does not give you the right to demand that.

*Little*, 138 F.4th at 845 (majority). The Court cannot affirm the preliminary injunction without creating a split with the Fifth Circuit on this point.

## II. The District Court Misapplied The Overbreadth Doctrine At Every Turn

An overbreadth remedy permits a court to categorically enjoin a statute's enforcement in *all* of its applications, even when the statute can be constitutionally enforced in discrete situations. This departs from the judiciary's normal approach to facial challenges, which will not be entertained unless the plaintiff shows that the disputed statute will violate the Constitution in every single one of its applications. *See United States v. Hansen*, 599 U.S. 762, 769 (2023) ("[L]itigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[9] For this

---

9.  *See also Rust v. Sullivan*, 500 U.S. 173, 183 (1991) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." (citation and internal quotation marks omitted)); *Ohio v. Akron Center for Reproductive Health*,

reason, the Supreme Court has warned that an overbreadth remedy is "strong medicine" that is "not to be casually employed." *Id.* at 770 (citations and internal quotation marks omitted).

The district court displayed no such caution in deploying the overbreadth remedy, and it flouted the Supreme Court's instructions in numerous respects. The first and most obvious problem is that the district court's overbreadth analysis improperly truncates the scope of the Senate File 496. *See Hansen*, 599 U.S. at 770 ("To judge whether a statute is overbroad, we must first determine what it covers."). Senate File 496 does more than simply require the removal of age-inappropriate books that currently sit on school-library shelves; it also prohibits school districts from *adding* these materials to their libraries. *See* Iowa Code § 256.11(9)(a)(2) ("Each school district shall establish a kindergarten through grade twelve library program that . . . contains only age-appropriate materials . . . ."). So Senate File 496 "covers" not only the age-inappropriate books that have already found their way into a school library; it covers every publication in existence that contains "descriptions or visual depictions of a sex act," regardless of whether that publication can be found on a school-library shelf. *See* Iowa Code § 256.11(19)(a)(1) ("'Age-appropriate' does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17."). So the district court

_____

497 U.S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that 'no set of circumstances exists under which the Act would be valid.'" (quoting *Webster v. Reproductive Health Services*, 492 U.S. 490, 524 (1989) (O'Connor, J., concurring)).

17

grossly understated the scope of Senate File 496, and it ignored the applications of Senate File 496 that prevent school officials from adding sexually explicit materials from outside their existing library collections. To prevail on an overbreadth challenge, the plaintiffs and the district court were required to show that the First Amendment requires school districts to place a "substantial number" of all sexually explicit publications currently in existence on their library shelves. *See Hansen*, 599 U.S. at 770 (overbreadth challenger must "demonstrate that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep" (citation and internal quotation marks omitted)). They did not even attempt to make this showing.

The district court was equally off base in disregarding applications of Senate File 496 that are covered by other laws such as Iowa Code § 728.2, which criminalizes the knowing dissemination of "obscene material" to minors. *See* Iowa Code § 728.2 ("Any person, other than the parent or guardian of the minor, who knowingly disseminates or exhibits obscene material to a minor, including the exhibition of obscene material so that it can be observed by a minor on or off the premises where it is displayed, is guilty of a public offense and shall upon conviction be guilty of a serious misdemeanor."). Senate File 496 *still* applies to obscene material, even though the knowing dissemination of obscene material to minors is independently criminalized by section 728.2. And Senate File 496 establishes a separate regime of sanctions that does not require proof beyond a reasonable doubt and does not trigger any of the constitutional protections that the criminally accused enjoy, so its

18

applications to obscene material are not redundant of existing law. The district court had no basis for carving out these applications of Senate File 496 from the denominator of the overbreadth fraction.[10]

The Supreme Court has also instructed lower courts to eschew overbreadth remedies when as-applied relief will fully redress the plaintiff's alleged injuries. In *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989), the Court wrote:

> It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied. . . . [F]or reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first.

*Id.* at 484–85; *see also Renne v. Geary*, 501 U.S. 312, 324 (1991) (same). Overbreadth analysis should occur only when a litigant's desired conduct is *unprotected* by the First Amendment, because as-applied relief cannot be used to restrain government officials from enforcing a statute against constitutionally unprotected conduct. *See Hansen*, 599 U.S. at 769 (considering overbreadth claim raised by litigant who conceded that his speech was constitutionally unprotected); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) (overbreadth doctrine allows "a litigant whose own activities are unprotected" to "nevertheless challenge a statute by showing that

---

10. Would Senate File 496 suddenly become constitutional (on the district court's view) if the Iowa legislature repealed Iowa Code § 728.2?

it substantially abridges the First Amendment rights of other parties not before the court.").

The district court never cites *Fox* or acknowledges its existence. But the district court's obstinance or willful blindness to the Supreme Court's instructions does not allow courts to issue overbreadth remedies when as-applied relief is adequate for the job. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (emphasis added)); *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) ("[A]s-applied challenges are the basic building blocks of constitutional adjudication." (citation and internal quotation marks omitted)). The plaintiffs refused to seek an as-applied remedy and demanded that the district court choose between total facial invalidation or bust. R. Doc. 113 at 11 n.3. But they made no attempt to show or explain how as-applied relief would be inadequate or insufficient to fully redress their Article III injuries. That alone warrants reversal of the district court's overbreadth remedy.

Finally, *Hansen* requires litigants seeking overbreadth remedies to prove a "lopsided ratio" when comparing a law's "unconstitutional applications" to the statute's "lawful sweep":

> Because it destroys some good along with the bad, invalidation for overbreadth is strong medicine that is not to be casually employed. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful

Appellate Case: 25-1819     Page: 26     Date Filed: 06/25/2025 Entry ID: 5530903

sweep. *In the absence of a lopsided ratio*, courts must handle un-
constitutional applications as they usually do—case-by-case.

*Hansen*, 599 U.S. at 770 (emphasis added) (citations and internal quotation
marks omitted); *see also id.* at 784 ("[T]he ratio of unlawful-to-lawful applica-
tions is *not lopsided enough* to justify the 'strong medicine' of facial invalida-
tion for overbreadth." (emphasis added)). The plaintiffs failed to demon-
strate a "lopsided ratio" when comparing the supposedly unconstitutional
applications of Senate File 496 with its legitimate sweep, and the district
court never cited *Hansen* nor made the required "lopsided ratio" finding.
The court should vacate the preliminary injunction and require overbreadth
challengers to demonstrate that the ratio of a disputed statute's unconstitu-
tional applications to its constitutional applications is not only "substantial"
but "lopsided," in accordance with *Hansen*.

## III. The District Court Was Obligated To Enforce Iowa's State-Law Severability Requirement

The severability of a state statute is a matter of state law, and state-law
severability provisions are binding on federal courts. *See Virginia v. Hicks*, 539
U.S. 113, 121 (2003) ("Severab[ility] is of course a matter of state law." (cit-
ing *Leavitt v. Jane L.,* 518 U.S. 137, 139 (1996) (per curiam)); *U.S. Dep't of
Treasury v. Fabe*, 508 U.S. 491, 510 (1993) ("[A]ny issue of severability . . . is a
question of state law"); *Morey v. Doud*, 354 U.S. 457, 470 n.16 (1957) ("As the
question of severability is a question of state law, the judgment of the Su-
preme Court of Illinois is binding here." (overruled on other grounds by *City
of New Orleans v. Dukes*, 427 U.S. 297 (1976)); *Charles Wolff Packing Co. v.*

21

*Court of Industrial Relations of Kansas*, 267 U.S. 552, 562 (1925) ("As the question of separability was a state question, the decision of that court thereon is conclusive here."); *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) ("[T]he state court['s] . . . . decision as to the severability of a provision is conclusive upon this Court."). The law of Iowa requires courts to sever and preserve *all* constitutional applications of an Iowa statute:

> If any provision of an Act or statute or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act or statute which can be given effect without the invalid provision or application, and to this end the provisions of the Act or statute are severable.

Iowa Code § 4.12; *see also Wyoming v. Oklahoma*, 502 U.S. 437, 460–61 (1992) ("Severability clauses may easily be written to provide that if application of a statute to some classes is found unconstitutional, severance of those clauses permits application to the acceptable classes."); Jack Goldsmith, et al., *Hart and Wechsler's The Federal Courts and the Federal System* 234 (8th ed. 2025) ("[T]he premise that statutes are typically 'separable' or 'severable', and that invalid applications can somehow be severed from valid applications without invalidating the statute as a whole . . . is deeply rooted in American constitutional law."). The district court was obligated to enforce this state-law severability requirement and preserve *every* constitutional application of Senate File 496, even if it believed that Senate File 496 prohibited a "substantial amount" of constitutionally protected speech when compared to its "plainly legitimate sweep." *Hansen*, 599 U.S. at 770; *see also Missourians for Fiscal Ac-*

*countability v. Klahr*, 892 F.3d 944, 953 (8th Cir. 2018) ("This court 'look[s] to state law to determine the severability of a state statute.'" (quoting *Phelps-Roper v. Koster*, 713 F.3d 942, 953 (8th Cir. 2013)); *Roach v. Stouffer*, 560 F.3d 860, 870 (8th Cir. 2009) ("We look to state law to determine the severability of a state statute."); *Jones v. Vilsack*, 272 F.3d 1030, 1038–39 (8th Cir. 2001) (noting that "'[s]everability is of course a matter of state law'" and enforcing the severability requirements of Iowa Code § 4.12).

Federal courts must enforce state-law severability provisions even when a litigant brings an overbreadth challenge. In *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985), the Supreme Court enforced an application-severability requirement in a statute that contained an overbroad definition of prurience, holding that "facial invalidation of the statute was . . . improvident" in light of the severability clause. *Id.* at 501 & n.14. The district court's facial over-breadth remedy violates both Iowa Code § 4.12 and the Supreme Court's ruling in *Brockett*, which it never cites.

## IV. The Preliminary Injunction Will Not Protect Those Who Violate Senate File 496 If The Injunction Is Eventually Narrowed Or Vacated

If the district court's preliminary injunction is ever narrowed or vacated, either by this Court or by an entry of final judgment, then the state may enforce Senate File 496 against anyone who violated the statute while the erst-while injunction was in effect. A vacated injunction provides no shield to those who chose to violate a statute in reliance on that erroneous ruling. *See*

*Edgar v. MITE Corp.*, 457 U.S. 624, 651 (1982) (Stevens, J., concurring in part and concurring in the judgment); *Lake v. HealthAlliance Hospital Broadway Campus*, 738 F. Supp. 3d 208, 220 n.14 (N.D.N.Y. 2024) ("[I]f an injunction is dissolved the State may enforce the statute against violators for conduct that occurred while the injunction was in place.").

A preliminary injunction does not enjoin or suspend the disputed statute; it merely tells the enjoined officials not to initiate enforcement action while the injunction remains in effect. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) ("[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves."); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("[N]o court may . . . purport to enjoin challenged laws themselves" (citations and internal quotation marks omitted)); *Okpalobi v. Foster*, 244 F.3d 405, 426, n.34 (5th Cir. 2001) (en banc) ("An injunction enjoins a defendant, not a statute."). But that hasn't stopped the media from reporting that the district court's preliminary injunction has "blocked" the underlying statute, implying that Senate File 496 is formally suspended and that anyone can flout the law without consequence—even if the preliminary injunction is later vacated or narrowed. *See* Mitch Smith, *Federal Judge Blocks Iowa Law Restricting Sexually Explicit School Books*, New York Times (March 25, 2025), available at https://tinyurl.com/2e7845av ("A federal judge in Iowa blocked on Tuesday the portion of a Republican-backed law that banned libraries in public schools from stocking books that described sex acts.").

24

Senate File 496 remains on the books and continues to exist as the law of Iowa, despite the district court's preliminary injunction. *See* Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations for Judgments*, 15 Cardozo L. Rev. 43, 64 (1993) ("[J]udicial opinions do not result in any change in the codification of enacted law. . . . [S]tatutory provisions that have been declared unconstitutional remain part of the code unless or until repealed by the legislature."). The preliminary injunction is nothing more than a temporary non-enforcement policy imposed on the defendants, which leaves lawbreakers subject to subsequent enforcement actions if the judgment is vacated or reversed on appeal. *See id.* ("[I]f a provision is not repealed by the legislature, and the court later changes its mind about the meaning of the Constitution, the provision in question becomes again as fully effective and enforceable in court as if it had never been questioned."); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 938–42, 986–1000 (2018). The federal judiciary has no authority to confer preemptive pardons on those who knowingly violate statutes in reliance on court decisions that wrongly declare laws unconstitutional or wrongly enjoin their enforcement. *See Edgar*, 457 U.S. at 653 (Stevens, J., concurring in part and concurring in the judgment) ("There simply is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law."). The Court should make this clear regardless of whether it affirms or vacates the preliminary injunction.

Appellate Case: 25-1819     Page: 31     Date Filed: 06/25/2025 Entry ID: 5530903

## CONCLUSION

The preliminary injunction should be vacated.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 

Daniel Z. Epstein
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721 (phone)
daniel.epstein@aflegal.org

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: June 24, 2025

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

3. This brief and accompanying addendum have been scanned for viruses and are virus-free.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amicus Curiae*

Dated: June 24, 2025

27

# CERTIFICATE OF SERVICE

I certify that on June 24, 2025, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Eighth Circuit and served through CM/ECF upon:

Kirstie Ann Brenson
Adam J. Diederich
Meera Sarina Gorjala
Frederick J. Sperling
Arent & Fox
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5638 (phone)
kirstie.brenson@afslaw.com
adam.diederich@afslaw.com
meera.gorjala@ afslaw.com
frederick.sperling@afslaw.com

Mark E. Weinhardt
Todd M. Lantz
Jason R. Smith
Weinhardt & Lantz
2600 Grand Avenue, Suite 450
Des Moines, Iowa 50312
(515) 244-3100 (phone)
mweinhardt@weinhardtlantz.com
tlantz@weinhardtlantz.com
jsmith@weinhardtlantz.com

*Counsel for Plaintiffs-Appellees*

Eric Wessan
Solicitor General
Patrick C. Valencia
Deputy Solicitor General
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 (phone)
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Defendants-Appellants*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Amicus Curiae*

28