No. 25-1819

Penguin Random House, LLC, et al.,
Plaintiffs-Appellees
v.
John Robbins, in his official capacity as President
of the Iowa State Board of Education, et al.,
Defendants-Appellants

Appeal from the United States District Court for the
Southern District of Iowa
Case No. 4:23-cv-478
The Honorable Stephen H. Locher

## PLAINTIFFS-APPELLEES' AMENDED BRIEF

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
Devin K. Ross
ARENTFOX SCHIFF LLP
233 South Wacker Drive
Suite 7100
Chicago, Illinois 60606
(312) 258-5500

Mark E. Weinhardt
Todd M. Lantz
Jason R. Smith
WEINHARDT & LANTZ, P.C.
2600 Grand Avenue, Suite 450
Des Moines, Iowa 50312
(515) 244-3100

Christy A.A. Hickman
Becky S. Knutson
Katherine E. Schoolen
Iowa State Education Association
777 Third Street
Des Moines, Iowa 50309
(515) 471-8004

*Counsel for Plaintiffs-Appellees*

**ORAL ARGUMENT REQUESTED**

# SUMMARY OF THE CASE

This case is about the "Library Restriction"—an unprecedented statewide mandate that requires Iowa schools and their librarians to remove hundreds of books from school libraries without regard to their value as a whole or the age of the reader as the First Amendment requires. These are library books that schools selected based on their literary value, educational objectives, and community standards.

Consistent with this Court's prior decision, the district court recognized that schools have greater authority to limit First Amendment rights than the government has in non-school settings. Plaintiffs do not dispute that educators and schools have broad discretion to make decisions concerning their students. But the Library Restriction replaces "what has traditionally been the prerogative of local officials regarding the contents of school libraries" with an inflexible, across-the-board prohibition. App. 407; R. Doc. 113, at 17.

The district court followed this Court's instructions in applying the overbreadth test from the Supreme Court's recent *NetChoice* decision. Based on the unrebutted evidence, the district court correctly concluded that Plaintiffs are likely to succeed on the merits of their claim that the Library Restriction is unconstitutionally overbroad.

This case raises important First Amendment issues. Plaintiffs request 20 minutes to present their oral argument.

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Plaintiff-Appellees make the following disclosures:

Penguin Random House LLC is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately held company. No publicly held corporation owns ten percent or more of the stock of Penguin Random House LLC.

Hachette Book Group, Inc. is a wholly-owned subsidiary of Hachette Livre USA, Inc. Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc. Lagardère North America Inc. is a wholly-owned subsidiary of Lagardère Media. Lagardère Media is a wholly-owned subsidiary of Lagardère SA, which is a wholly-owned subsidiary of Louis Hachette Group, which is traded on the Paris stock exchange. More than ten percent of Louis Hachette Group's outstanding stock is owned by Bolloré SE, which is traded on the Paris stock exchange.

The ultimate parent corporation of HarperCollins Publishers LLC is News Corporation. Based on current public filings, no publicly held company owns ten percent or more of News Corporation's Class B voting stock, and T. Rowe Price Associates Inc. is the only publicly held company that owns ten percent or more of News Corporation's Class A non-voting stock.

4935-0780-9367, v. 1

Macmillan Publishing Group, LLC's parent company is Macmillan Holdings, LLC. No publicly held company holds ten percent or more of the stock of either legal entity.

Simon & Schuster, LLC, a non-governmental corporate party, is indirectly wholly owned by (i) certain of its and its affiliates' directors, officers, and employees and (ii) certain investment vehicles advised by Kohlberg Kravis Roberts & Co. L.P., an indirect subsidiary of KKR & Co. Inc. (NYSE: KKR).

The Authors Guild has no parent corporation and no publicly held corporation owns ten percent or more of The Authors Guild's shares.

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE.................................................................................i

CORPORATE DISCLOSURE STATEMENT ......................................................ii

TABLE OF CONTENTS..................................................................................iv

TABLE OF AUTHORITIES ...........................................................................vi

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE..........................................................................3

    I.    Factual Background..............................................................................3

        A.    Before The Library Restriction, Iowa Parents And Schools Controlled Students' Access To School-Library Books.............................................................................................3

        B.    The Library Restriction Requires The Widespread Removal Of School-Library Books. .........................................4

    II.    Procedural History...............................................................................7

        A.    This Court's Prior Decision Confirmed Plaintiff's Standing And Rejected The State's Government-Speech Argument. ..........................................................................................7

        B.    The District Court Followed This Court's Instructions And Entered A Preliminary Injunction Against The State. .......8

SUMMARY OF THE ARGUMENT ....................................................................10

STANDARD OF REVIEW ..............................................................................14

ARGUMENT ...............................................................................................15

    I.    The District Court Applied The Correct First Amendment Standards. ..........................................................................................15

        A.    School Libraries Are Unique. .................................................15

        B.    The Library Restriction Should Be Evaluated In Light Of The Purpose Of School Libraries.............................................17

        C.    The School-Sponsored Speech Doctrine Does Not Support The Library Restriction. ............................................21

    II.    The Library Restriction Is Unconstitutionally Overbroad. ................25

A.    The State Misapplies The *NetChoice* Decision. ......................27

B.    Step One: The Library Restriction Applies To School-Library Books. ........................................................................30

C.    Step Two: The Library Restriction Has Limited, If Any, Constitutional Applications. ....................................................37

D.    Step Three: The Library Restriction's Unconstitutional Applications Substantially Outweigh Its Constitutional Applications. ...........................................................................40

III.   The Library Restriction Is Not Government Speech. ........................45

IV.   The State's Brand-New Severability Argument Has No Merit. ........52

V.   The Remaining Factors Support Affirming The Preliminary Injunction............................................................................................53

CONCLUSION ........................................................................................54

4935-0780-9367, v. 1

# TABLE OF AUTHORITIES

## Cases

*Am. Booksellers Ass'n, Inc. v. Virginia*,
   882 F.2d 125 (4th Cir. 1989),
   *cert. denied*, 494 U.S. 1056 (1990) ....................................................21

*Americans for Prosperity Foundation v. Bonta*,
   594 U.S. 595 (2021) .........................................................11, 26, 27, 45

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) .............................................................11, 20, 26

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982) ..................................................................... passim

*Bethel Sch. Dist. No. 403 v. Fraser*,
   478 U.S. 675 (1986) ................................................................. 23, 25

*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985) ................................................................. 52, 53

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) .........................................................................33

*Burnham v. Ianni*,
   119 F.3d 668 (8th Cir. 1997) ..........................................................19

*Carson v. Simon*,
   978 F.3d 1051 (8th Cir. 2020) ........................................................14

*Cigna Corp. v. Bricker*,
   103 F.4th 1336 (8th Cir. 2024) ......................................................14

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) ................................................................. 18, 19

*Counts v. Cedarville Sch. Dist.*,
   295 F. Supp. 2d 996 (W.D. Ark. 2003)............................................17

*D.M. by Bao Xiong v. Minn. State High Sch. League*,
   917 F.3d 994 (8th Cir. 2019) ..........................................................53

*Dakotans for Health v. Noem,*
 52 F.4th 381 (8th Cir. 2022) ..................................................27

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
 640 F.2d 109 (8th Cir. 1981) ..................................................14

*Erznoznik v. City of Jacksonville,*
 422 U.S. 205 (1975) .................................................... 19, 21

*Fayetteville Public Library v. Crawford Cnty.,*
 684 F. Supp. 3d 879 (W.D. Ark. 2023) ....................................15

*Fleming v. Jefferson Cnty. Sch. Dist. R-1,*
 298 F.3d 918 (10th Cir. 2002) ..............................................22

*Free Speech Coal., Inc. v. Paxton,*
 No. 23-1122, 2025 WL 1773625 (U.S. June 27, 2025)....................20

*Free Speech Coal., Inc., v. Rokita,*
 2024 WL 5055864 (S.D. Ind. July 25, 2024) ............................ 27, 28

*FW/PBS, Inc. v. City of Dallas,*
 493 U.S. 215 (1990) ...........................................................20

*Gerlich v. Leath,*
 861 F.3d 697 (8th Cir. 2017) ................................................48

*Ginsberg v. State of New York,*
 390 U.S. 629 (1968) ...............................................11, 19, 20

*Glickert v. Loop Trolley Transp. Dev. Dist.,*
 792 F.3d 876 (8th Cir. 2015) ............................................ 46, 52

*Hazelwood School Dist. v. Kuhlmeier,*
 484 U.S. 260 (1988) ..................................................... passim

*Heartland Acad. Cmty. Church v. Waddle,*
 335 F.3d 684 (8th Cir. 2003) ................................................14

*Henerey ex rel. Henerey v. City of St. Charles Sch. Dist.,*
 200 F.3d 1128 (8th Cir. 1999)......................................... passim

4935-0780-9367, v. 1

*Heuton v. Ford Motor Co.*,
   930 F.3d 1015 (8th Cir. 2019) ...................................................... 46, 52

*Interactive Digital Software Ass'n v. St. Louis Cnty.*,
   329 F.3d 954 (8th Cir. 2003) ...............................................................21

*Jet Midwest Intl. Co., Ltd v. Jet Midwest Group, LLC*,
   953 F.3d 1041 (8th Cir. 2020) .............................................................14

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) ................................................................... 15, 33

*Lacks v. Ferguson Reorganized Sch. Dist. R-2*,
   147 F.3d 718 (8th Cir. 1998) ....................................................... 23, 25

*Larken, Inc. v. Wray*,
   189 F.3d 729 (8th Cir. 1999) ....................................................... 46, 52

*Legal Servs. Corp. v. Velazquez*,
   531 U.S. 533 (2001). ...........................................................................51

*Little v. Llano Cnty.*,
   138 F.4th 834 (5th Cir. 2025) .............................................................50

*Matal v. Tam*,
   582 U.S. 218 (2017) ............................................................... passim

*Matsumoto v. Labrador*,
   122 F.4th 787 (9th Cir. 2024) .............................................................29

*Miller v. California*,
   413 U.S. 15 (1972) .......................................................................11, 19

*Minarcini v. Strongsville City Sch. Dist.*,
   541 F.2d 577 (6th Cir. 1976) ..............................................................17

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
   692 F.3d 864 (8th Cir. 2012) ....................................................... 13, 53

*Minn. Voters All. v. Mansky*,
   585 U.S. 1 (2018) ...............................................................................19

viii

*Missourians for Fiscal Accountability v. Klahr*,
    892 F.3d 944 (8th Cir. 2018) ................................................................27

*Moody v. NetChoice*,
    603 U.S. 707 (2024) ................................................................ passim

*NetChoice, LLC v. Griffin*, 5:23-CV-5105,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025).......................................45

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)...................................................28

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ............................................................................47

*Poling v. Murphy*,
    872 F.2d 757 (6th Cir. 1989) ....................................................... 22, 23

*Pope v. Illinois*,
    481 U.S. 497 (1987) ............................................................................19

*Powell v. Noble*,
    798 F.3d 690 (8th Cir. 2015) ..............................................................53

*Reno v. Am. C.L. Union*,
    521 U.S. 844 (1997) ............................................................................32

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................................41

*Roth v. United States*,
    354 U.S. 476 (1957) ............................................................................20

*Searcey v. Harris*,
    888 F.2d 1314 (11th Cir. 1989)...........................................................24

*Shipley Inc. v. Long*,
    454 F. Supp. 2d 819 (E.D. Ark. 2004) ................................................21

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022) .............................................................. 47, 48, 49

4935-0780-9367, v. 1

*Singleton v. City of Montgomery*,
   No. 23-11163, 2025 WL 1042101 (11th Cir. Apr. 8, 2025)..................................29

*Tinker v. Des Moines Ind. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ......................................................................21

*United States v. Am. Library Ass'n, Inc.*,
   539 U.S. 194 (2003) ......................................................................15

*United States v. Hansen*,
   599 U.S. 762 (2023) ......................................................................29

*United States v. Stevens*,
   559 U.S. 460 (2010) ......................................................... 12, 29, 45

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ......................................................... 34, 45

*Virgil v. Sch. Bd. of Columbia Cnty.*,
   862 F.2d 1517 (11th Cir. 1989)..........................................................17

*Virginia v. Am. Booksellers, Inc.*,
   488 U.S. 383 (1988) ......................................................................21

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ................................................................11, 26

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ......................................................... 47, 49

*Walls v. Sanders*,
   No. 24-1990, 2025 WL 1948450 (8th Cir. July 16, 2025) ..................................16

*Willson v. City of Bel-Nor*,
   924 F.3d 995 (8th Cir. 2019) ......................................................... 27, 29

**Statutes**

Iowa Code § 256.11 ......................................................... 4, 5, 30, 41

Iowa Code § 728.1 ......................................................................3

Iowa Code § 728.2 ......................................................................3

**Other Authorities**

Iowa Admin. Code r. 281—12.2(256) ....................................................................32

# STATEMENT OF THE ISSUES

1.      Did the district court err in determining that the school-sponsored speech doctrine does not apply to the Library Restriction, where that doctrine requires deference to the discretion of schools and their educators and the Library Restriction removes that discretion?

Cases:

    *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)

    *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128 (8th Cir. 1999)

    *Poling v. Murphy*, 872 F.2d 757 (6th Cir. 1989)

    Iowa Code § 256.11

2.      Did the district court err in concluding that the Library Restriction, which prohibits schools and school librarians from considering the value of library books as a whole or the age of the student-reader, is likely overbroad in violation of the First Amendment?

Cases:

    *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)

    *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021)

    *Miller v. California*, 413 U.S. 15 (1972)

    *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)

    Iowa Code § 256.11

U.S. Const. amend. I

**3.     Did the district court err in determining that the government-speech doctrine, which would render the Free Speech Clause inapplicable, does not apply to the Library Restriction?**[1]

Cases:

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024)

*Matal v. Tam*, 582 U.S. 218 (2017)

*Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243 (2022)

U.S. Const. amend. I

**4.     Having found that Plaintiffs are likely to prevail on the merits, did the district court abuse its discretion by finding that the equitable factors weigh in favor of a preliminary injunction?**

Cases:

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012)

*Powell v. Noble*, 798 F.3d 690 (8th Cir. 2015)

---

[1] Plaintiffs submit that the State has waived its government-speech argument and submit this issue only if this Court determines otherwise.

4935-0780-9367, v. 1

# STATEMENT OF THE CASE

## I.    Factual Background.

### A.    Before The Library Restriction, Iowa Parents And Schools Controlled Students' Access To School-Library Books.

Before the Library Restriction was enacted as part of Senate File 496 ("SF496"), school librarians and other educators curated school libraries based on educational objectives, community standards, their professional judgment, and the First Amendment.[2]  Moreover, Iowa law has long prohibited school libraries from having books that are obscene as to minors.  *See* Iowa Code §§ 728.1(5), 728.2.  Consistent with the Supreme Court's standard for obscenity as to minors, Iowa's definition of "obscene material" requires consideration of the value of a book *as a whole*.

The "unrebutted evidence shows that school officials already limited the access of younger readers to unsuitable books before the enactment" of SF496.  App. 421; R. Doc. 113, at 31.  Iowa teachers and school librarians are trained to give students access to a broad array of authors, perspectives, and topics, and they seek guidance from professional journals and standards and Iowa's professional teaching standards in making those decisions.  App. 183, 185-86; R. Doc. 104-1, at ¶¶ 9, 15.  When deciding which books to include in their school libraries, educators consider

---

[2] The term "school libraries" encompasses both traditional school libraries and classroom collections of books, which are essentially classroom libraries.

the populations who are likely to read the books because no two communities are identical. App. 183; R. Doc. 104-1, at ¶ 13.

Before SF496, Iowa school districts had procedures for parents and community members to challenge school-library books at the school or district level. *See*, *e.g.*, App. 12-13; R. Doc. 34-10 at ¶ 20; App. 187-88; R. Doc. 104-1, at ¶ 19. Iowa school districts also had procedures that enabled parents to limit their own children's access to any or all school-library books. *See*, *e.g.*, App. 183; R. Doc. 104-1, at ¶ 13; App. 196; R. Doc. 104-2, at ¶ 14.

### B. The Library Restriction Requires The Widespread Removal Of School-Library Books.

SF496 contains a provision that requires the removal of *any* book containing *any* "description" of a "sex act" for students in *every* grade (the "Library Restriction"). The statute purports to describe the Library Restriction as "age-appropriate," *see* Iowa Code §§ 256.11(9)(a)(2), (19)(a)(1), but that is a misnomer: it is actually age-indifferent. Although SF496 acknowledges the importance of considering the "developing cognitive, emotional, and behavioral capacity typical for the age or age group," *id.* § 256.11(19)(a)(1), the Library Restriction prohibits consideration of students' different development levels with respect to their access to school-library books, *id.* It requires schools and their educators to apply exactly the same standard to books for high-school seniors as it does to books for third graders and prohibits educators from considering the value of a book as a whole.

4

There is one exception to the Library Restriction's requirement that any book that contains a single description of a sex act be removed from school libraries. Certain religious books, such as the Bible, are exempt from removal under the Library Restriction. Iowa Code §§ 256.11(9)(a)(2), 280.6. The law recognizes the value of these religious books, regardless of whether they contain a description of a sex act.

The Library Restriction incorporates the definition of "sex act" from Iowa's criminal code, which defines the term as "any sexual contact between two or more persons" and includes examples. Iowa Code §§ 256.11(19)(a)(1), 702.17. Because the Library Restriction does not define the word "description" in relation to the term "sex act," it is unclear what level of detail is necessary for a book to implicate the Library Restriction. App. 189-90; R. Doc. 104-1, at ¶ 21. Defendant John Robbins, President of the Iowa State Board of Education, stated that "there's a lot of confusion" about the scope of the Library Restriction and that people "in the field" hoped that the Iowa Department of Education "provides direction because right now, we're kind of either guessing what is right or wrong, and not being in violation of the law." App. 238-40; R. Doc. 104-7. Educators repeatedly requested guidance from the State regarding how to implement the Library Restriction, App. 205-208; R. Doc. 104-4, but the State has not provided any meaningful guidance.

5

SF496 empowers the State and school districts to enforce the Library Restriction against educators through a harsh system of penalties, including loss of licensure and termination of employment. Because of the broad and ambiguous scope of the Library Restriction, schools have been required to remove a wide variety of protected literature. Educators understandably erred on the side of caution to avoid penalties. *See* App. 196; R. Doc. 104-2, at ¶ 10. Many teachers "reduc[ed] book collections in their classrooms or eliminat[ed] them altogether out of fear of retaliation or discipline." *See*, *e.g.*, App. 253; R. Doc. 104-10, at ¶ 11.

Schools across the State have removed award-winning and classic books that have been in libraries for decades, including books that are commonly addressed on Advanced Placement exams. App. 209-19; R. Doc. 104-5; App. 220-37; R. Doc. 104-6. A small selection of the books removed under the Library Restriction includes George Orwell's *1984*, Aldous Huxley's *Brave New World*, Toni Morrison's *Beloved*, William Faulkner's *As I Lay Dying*, Kurt Vonnegut's *Slaughterhouse-Five*, Alice Walker's *The Color Purple*, Richard Wright's *Native Son*, and Maya Angelou's *I Know Why the Caged Bird Sings*. *Id.* According to the State, these books and hundreds of others have all been properly removed under the Library Restriction: "Every book removed from library shelves because of the Library [Restriction] included at least some material that was [prohibited] under the law." *See* App. 416; R. Doc. 113, at 26. *See also* Appellants' Op. Br. at 59, *GLBT Youth in Iowa Schools*

6

*Task Force v. Reynolds*, No. 24-1074 (8th Cir. Mar. 11, 2024). "[T]he record is unrebutted in showing that hundreds of books already have been removed from school libraries across the state."[3] App. 393; R. Doc. 113, at 3.

Plaintiffs challenge only the Library Restriction. They do not challenge provisions of SF496 concerning curriculum or instruction.

## II. Procedural History.

### A. This Court's Prior Decision Confirmed Plaintiff's Standing And Rejected The State's Government-Speech Argument.

This is the second time this case is before this Court. In the prior appeal, this Court concluded that Plaintiffs—a group of book publishers, authors, a student, and educators—had standing because many books that they published, wrote, or sought to check out and read had been removed under the Library Restriction. *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667-68 (8th Cir. 2024). This Court also rejected the State's argument that the Library Restriction is exempt from the First Amendment as "government speech." *Id.* at 667.

This Court vacated the district court's prior preliminary injunction, finding that the district court "did not perform the necessary inquiry" concerning overbreadth challenges. *Id.* at 670. The Court stated that, on remand, Plaintiffs "are

---

[3] The record includes lists of books that Iowa school districts determined are prohibited by the Library Restriction. App. 209-219; R. Doc 104-5; App. 220-37; R. Doc. 104-6.

4935-0780-9367, v. 1

free to pursue injunctive relief in the manner required" under the Supreme Court's recent decision in *Moody v. NetChoice*, 603 U.S. 707 (2024) ("*NetChoice*"). *Reynolds*, 114 F.4th at 671. The Court's prior decision did not address the district court's substantive analysis of the Library Restriction.

## B. The District Court Followed This Court's Instructions And Entered A Preliminary Injunction Against The State.

Following this Court's prior decision, Plaintiffs filed a renewed motion for preliminary injunction, which the district court granted. The district court found that Plaintiffs again had standing. App. 399-401; R. Doc. 113, at 9-11. The parties' briefing and the district court's decision focused on identifying the proper First Amendment standard and applying the overbreadth test as set forth in *NetChoice*. The State did not again argue that the Library Restriction is government speech, instead limiting its "conten[tion] that library curation is government speech" to a single footnote. App. 118; R. Doc. 102, at 14.

The district court recognized that the Library Restriction is different than typical cases involving school-library book restrictions because it "impose[s] statewide restrictions on what has traditionally been the prerogative of local officials regarding the contents of school libraries." App. 407; R. Doc. 113, at 17. Consistent

4935-0780-9367, v. 1

with this Court's decision and the *Hazelwood* and *Henerey* decisions that it cited,[4]

*Reynolds*, 114 F.4th at 670, the district court also recognized "that schools have greater latitude to limit First Amendment protections than would exist in non-school settings." App. 405; R. Doc. 113, at 15. It explained that "there is no single standard of scrutiny that applies to restrictions on First Amendment rights in the school setting; instead, there is a sliding scale that varies according to context." App. 402; R. Doc. 113, at 12. The district court's analysis is consistent with the non-public forum standard, which assesses whether a restriction on speech (such as the Library Restriction) is reasonable in light of the purpose of the forum (here, school libraries). The district court concluded that the standard from *Hazelwood*—a case about a *school's* restriction on student speech in a school newspaper for a journalism class—does not apply to the Library Restriction. App. 407, 428-29; R. Doc. 113, at 17, 38-39.

The district court held that Plaintiffs were likely to prevail in establishing that the unconstitutional applications of the Library Restriction substantially outweigh the constitutional applications under the *NetChoice* overbreadth test. App. 422; R. Doc. 113, at 32.

---

[4] *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Henerey ex rel. Henerey v. City of St. Charles Sch. Dist.*, 200 F.3d 1128 (8th Cir. 1999).

9

# SUMMARY OF THE ARGUMENT

The Library Restriction requires the removal of every school-library book containing any description of a sex act for students in every grade in every Iowa school—without regard to the value of the book as a whole or the age of the student as the First Amendment requires. School libraries are unique in that they are places of voluntary learning, in contrast to the compulsory nature of most other aspects of public schools. Typical school-library cases involve the removal of a small number of books from a school library by educators or local school officials. In those cases, courts generally defer to the discretion of schools and educators but prohibit book removals that reflect an intent to impose a pall of orthodoxy or censor disfavored ideas.

The Library Restriction is much more extreme than the removal of a few books from one school's library. It is a statewide mandate that bars schools and their educators from exercising their traditional discretion concerning school libraries, prohibiting school-library books without regard to their value as a whole or the age of the reader. Consistent with the nonpublic forum standard, the Library Restriction must be evaluated in light of the purpose of school libraries. While the State has a legitimate interest in prohibiting obscene books in school libraries, a book in a high-school library is not obscene merely because it contains a single description of a sex act. A statewide library restriction must account for the value of a book as a whole,

10

which the Library Restriction fails to do. App. 412; R. Doc. 113, at 22 (citing *Miller v. California*, 413 U.S. 15, 24 (1972), and *Ginsberg v. State of New York*, 390 U.S. 629, 646 (1968))

The State's attempt to salvage the Library Restriction under the school-sponsored speech doctrine flips that doctrine upside down. The Supreme Court's *Hazelwood* decision (from which courts derived this doctrine) emphasizes the discretion of educators and schools to make decisions for their students. *Hazelwood*, 484 U.S. at 272 n.7. Courts applying the school-sponsored speech doctrine defer to the discretion of educators and schools because they are best positioned to make decisions concerning their students. But the Library Restriction is a statewide mandate that removes this discretion. The school-sponsored speech doctrine does not support the Library Restriction.

The Library Restriction is unconstitutional under the overbreadth doctrine. As the Supreme Court has repeatedly held, overbreadth challenges are an important tool to protect First Amendment rights when a law restricts and chills a substantial amount of protected speech. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Overbreadth challenges are particularly important where the facts "are the same across the board"—as they are in this case. *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 618 (2021) (finding provision facially unconstitutional). The overbreadth test requires

11

the court to analyze a law's applications based on categories of expression as shown through examples or reasonable hypotheticals. *See*, *e.g.*, *United States v. Stevens*, 559 U.S. 460, 475-77 (2010) (analyzing categories of examples). Contrary to the State's argument, the Supreme Court's *NetChoice* decision does not require plaintiffs to litigate an overbreadth challenge as a mass-scale as-applied challenge.

Under the three-part overbreadth test, the Library Restriction is unconstitutionally overbroad. First, the scope of the law is school-library books that contain a description of a sex act, regardless of the value of the book as a whole or the age of the reader. Educators have struggled to determine what level of detail is necessary for a book to implicate the Library Restriction, and this vagueness exacerbates the law's overbreadth. Second, the Library Restriction has virtually no constitutional applications because Iowa has long prohibited the distribution of obscene materials to minors, and school-library books are selected by school librarians based on their professional judgment, educational objectives, and the First Amendment. It would be a rare circumstance for a school-library book to be obscene. Third, the Library Restriction's unconstitutional applications are substantial because it prohibits schools and their educators from considering the value of the book as a whole or the age of the reader. It prohibits school libraries from including hundreds of library books that schools had determined were appropriate and valuable, including classic literature, modern award-winners,

12

history books, and books that address bullying, racism, and sexual assault. Therefore, the Library Restriction is substantially overbroad in comparison to any plainly legitimate sweep.

The Library Restriction is not government speech. As this Court previously explained, "the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries." *Reynolds*, 114 F.4th at 667. Following this Court's prior decision rejecting the State's government-speech argument, the State did not make that argument again before the district court, merely mentioning in a footnote its contention that the Library Restriction is government speech. Therefore, that argument is waived on this appeal. In any event, the State fails to satisfy the Supreme Court's test for government speech. It remains the case that this doctrine "is susceptible to dangerous misuse," which is why the Supreme Court has warned that courts "must exercise great caution" when considering whether to apply it. *Matal v. Tam*, 582 U.S. 218, 235 (2017).

Because Plaintiffs have shown a likely violation of their First Amendment rights, the other requirements for a preliminary injunction are deemed satisfied. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). The other factors also independently favor Plaintiffs. The district court did not abuse its discretion in granting Plaintiffs' motion.

4935-0780-9367, v. 1

## STANDARD OF REVIEW

In reviewing the district court's grant of a motion for preliminary junction, this Court reviews the district court's "material factual findings for clear error, its legal conclusions *de novo*, and the court's equitable judgment—the ultimate decision to grant the injunction—for an abuse of discretion." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 689–90 (8th Cir. 2003).

In determining whether to issue a preliminary injunction, the district court considers the movant's probability of success on the merits, which is the "most significant" factor, as well as the threat of irreparable harm to the movant, the balance between that harm and any injury to the other parties of granting the injunction, and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020). The district court has "broad discretion" when ruling on a motion for preliminary injunction. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1343 (8th Cir. 2024). *Accord Jet Midwest Intl. Co., Ltd v. Jet Midwest Group, LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) ("The district court is accorded deference because of its greater familiarity with the facts and the parties.").

14

**ARGUMENT**

## I. The District Court Applied The Correct First Amendment Standards.

### A. School Libraries Are Unique.

School libraries are places of voluntary learning in which student participation is optional. Critical to the purpose of libraries is the lack of "any kind of authoritative selection" of ideas by the State. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–604 (1967). In contrast, most other aspects of the educational experience, such as curriculum and instruction, are compulsory and require participation.

School libraries serve a unique purpose. As the Supreme Court has recognized, a school library is a place where students "can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868–69 (1982) (plurality). A school library is meant to be a "regime of voluntary inquiry," affording students "an opportunity at self-education and individual enrichment that is wholly optional." *Id.* at 869. Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-functioning democracy." *Fayetteville Pub. Library v. Crawford County, Arkansas*, 684 F. Supp. 3d 879, 891 (W.D. Ark. 2023) (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003)).

15

The discretion afforded to librarians in overseeing their library collections is crucial to well-functioning libraries. "The vocation of a librarian requires a commitment to freedom of speech." *Id.* Librarians must have "broad discretion to decide what material to provide to their patrons," and librarians are "afforded significant professional responsibility and deference with respect to their area of expertise." *Id.* at 890–91. Authors, publishers, students, and parents rely on school librarians to facilitate voluntary book discovery through individualized consideration of a student's maturity, reading level, interests, and life experiences.

Students are not compelled to read any particular library book or any library book at all. The State's mandate to remove books from school libraries "must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter." *See Pico*, 457 U.S. at 868–870 (comparing the "compulsory environment of the classroom" to "the school library and the regime of voluntary inquiry that there holds sway"). *See also Hazelwood*, 484 U.S. at 269 (concerning a school newspaper that was part of the school's "curriculum"); *Walls v. Sanders*, No. 24-1990, 2025 WL 1948450, at *4 (8th Cir. July 16, 2025) (distinguishing between school-library books and curricular materials, stating "we deal not with books in a library, but instead with in-classroom instruction and materials in a high school"); *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517,

16

1522–25 (11th Cir. 1989) (distinguishing between removal of curricular and school-library books).

### B. The Library Restriction Should Be Evaluated In Light Of The Purpose Of School Libraries.

Courts agree that the government cannot require the content-based removal of library books to impose orthodoxy or to rid school libraries of messages with which they disagree. *See* App. 408; R. Doc. 113, at 18 (citing *Pico*, 457 U.S. at 871). *See also Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 580 (6th Cir. 1976); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004-1005 (W.D. Ark. 2003) (quoting *Pico*). While the sole Supreme Court decision concerning the removal of school-library books—*Board of Education v. Pico*—was a plurality decision, it provides useful guidance regarding the First Amendment implications of removing school-library books, which other courts have relied upon. Even the dissenting justices in *Pico* agreed that the First Amendment limits the authority of the government to remove school-library books.[5]

---

[5] The plurality opinion in *Pico* states that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866 (plurality opinion). *Pico*'s concurrences and dissents articulate that limit in different ways and to different extents. *Id*. at 879–880 (Blackmun, J., concurring) ("[S]chool officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved" (emphasis in original)); *id.* at 907 (Rehnquist, J., Burger, C.J., Powell, J. dissenting) (recognizing that "significant discretion to determine the content" of "school libraries" may not be "exercised in a narrowly partisan or political manner"

17

*Pico* also involved a much less extreme situation than that presented by the Library Restriction. There, the Court considered whether a local school board's decision to remove nine books from a school library violated the First Amendment rights of students. *Id*. at 858. In contrast, the Library Restriction is a statewide mandate requiring schools and their educators to remove hundreds of books that they had already determined to be valuable and appropriate for their students. App. 424; R. Doc. 113, at 34. As the district court stated, the State "ha[s] not identified, nor has the [district court] been able to locate, a single case upholding school library restrictions as broad as those found" in the Library Restriction. App. 411; R. Doc. 113, at 21. The Library Restriction eliminates the discretion of schools and school librarians by prohibiting books without regard to the value of each book as a whole, the age of the student, and all the other factors librarians consider in exercising their professional judgment to curate school libraries.

When the government restricts speech on government property, courts assess those restrictions based on the nature of the forum and the type of speech that is restricted. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). The standard that courts apply to assess the removal of library books is consistent with the standard courts use to assess speech restrictions in

_____

or "motivated by racial animus" and that the Constitution "does not permit the official suppression of *ideas*" (emphasis in original)).

4935-0780-9367, v. 1

nonpublic forums. Within nonpublic forums, content-based restrictions must be (1) reasonable in light of the purpose of the forum and (2) viewpoint-neutral. *Id.* at 806. *Accord Minn. Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018) (holding that the state must "articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]" inside a polling place); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (holding that "the suppression of exactly [the] type of information" the forum was created for "was simply not reasonable"). Therefore, an application of the Library Restriction is constitutional only if it is reasonable in light of the purpose of a school library.

While the State has a legitimate interest in prohibiting students from accessing books that are obscene for minors, a book is not obscene for older minors merely because it contains a description of a sex act. Obscenity is "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. The first and second parts of the *Miller* obscenity test require application of "contemporary community standards." *Pope v. Illinois*, 481 U.S. 497, 500 (1987). When applied to minors, the *Miller* obscenity standard accounts for the age of the reader. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 n.11 (1975) ("[T]he age of a minor is a significant factor."). *See also Ginsberg*, 390 U.S. at 646; App. 413; R.

19

Doc. 113, at 23 ("[T]he *Ginsberg* standard is a sort of 'obscenity-light' standard for minors that must be applied when a First Amendment challenge is made to a law with sweeping implications on the ability of minors to access books or other materials."); *Free Speech Coal., Inc. v. Paxton*, No. 23-1122, 2025 WL 1773625, at *7 (U.S. June 27, 2025) ("When regulating minors' access to sexual content, the State may broaden *Miller*'s 'definition of obscenity' to cover that which is obscene from a child's perspective.").

Restrictions on books must account for the value of a book as a whole. As Justice Scalia explained, the Supreme Court has "rejected the approach previously adopted by some courts, which would permit the banning of an entire literary work on the basis of one or several passages that in isolation could be considered obscene." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 250 (1990) (Scalia, J., concurring) (explaining that "the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest" (quoting *Roth v. United States*, 354 U.S. 476, 488 (1957))). *See also Ashcroft*, 535 U.S. at 244 ("This is inconsistent with an essential First Amendment rule: The artistic merit of a work does not depend on the presence of a single explicit scene.").

The State's interest in protecting minors from obscene materials is not "an unbridled license to governments to regulate what minors read and view."

20

*Interactive Dig. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 959–960 (8th Cir. 2003). A book is not obscene as to all minors if it has serious value for a legitimate minority of minors, such as older minors.[6] The State cannot suppress "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription" solely "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. These First Amendment principles apply in public schools, modified "in light of the special characteristics of the school environment." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 511 (1969) ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.").

### C. The School-Sponsored Speech Doctrine Does Not Support The Library Restriction.

Under the school-sponsored speech doctrine, courts defer to decisions that educators and schools make for their students at their schools, not to statewide, one-size-fits-all speech restrictions that eliminate the discretion of educators and schools. *See, e.g.*, *Hazelwood*, 484 U.S. at 270-73, n.7 (deference to "educators' decisions").

---

[6] *See Virginia v. Am. Booksellers, Inc.*, 484 U.S. 383, 394-95 (1988); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127–28 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990). *See also Shipley Inc. v. Long*, 454 F. Supp. 2d 819, 829–830 (E.D. Ark. 2004) (holding that the State cannot "effectively stifle[] the access" of "older minors to communications and material they are entitled to receive and view" just because such material may be "harmful to the youngest of the minors").

In *Hazelwood*, from which other courts have derived this doctrine, the Supreme Court begins by stating, "This case concerns the extent to which *educators* may exercise editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum." *Id.* at 262 (emphasis added). But the Library Restriction is a statewide mandate that *removes* educators' and schools' discretion to curate their school libraries for their students. The State twists the school-sponsored speech doctrine to argue the opposite of what it means.

The school-sponsored speech doctrine is based on the recognition that schools and their educators are in the best position to evaluate their students' needs. *See*, *e.g.*, *id.* at 271-72 ("a school must be able to take into account the emotional maturity of the intended audience"); *Henerey*, 200 F.3d at 1131, 1135 (citing *Hazelwood* and *Poling v. Murphy*, 872 F.2d 757 (6th Cir. 1989)); *Poling*, 872 F.2d at 762-63 (explaining that "[j]udgments on how best to balance [conflicting] values may well vary from school to school" and noting that "[l]ocal control over the public school, after all, is one of this nation's most deeply rooted and cherished traditions"); *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 925 (10th Cir. 2002) ("[L]ike the *Hazelwood* Court, we give substantial deference to educators' stated pedagogical concerns."). The court in *Poling* succinctly identified reasons for judicial deference to the discretion of educators and other local school officials: "We are not steeped in the culture of the place where the events occurred, moreover, and we have no

22

firsthand knowledge of the atmosphere of the school or of the sense of propriety of those who work and study there." *Poling*, 872 F.2d at 761.[7]

The State's cases concerning this doctrine all address *educators' and schools'* regulation of school-sponsored speech—often the speech of students in a compulsory or captive audience environment. *See*, *e.g.*, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) (concerning the authority of educators and schools); *Hazelwood*, 484 U.S. at 269 (same); *Henerey*, 200 F.3d at 1132 (same); *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998) (same). *See also Poling*, 872 F.2d at 762 ("They made attendance compulsory for everyone."). None of these cases support applying this doctrine to limit the discretion of educators and schools.[8]

The State ignores the fundamental distinction between deference to the discretion of educators and schools (for which Plaintiffs advocate) and a statewide

---

[7] *See also Milliken v. Bradley*, 418 U.S. 717, 741-42 (1974) (explaining that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," because "local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence'").

[8] None of the State's school-sponsored speech cases involve library books, likely because—unlike the expression in those cases—the content of library books is not reasonably understood "to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271.

4935-0780-9367, v. 1

mandate that removes that discretion (the Library Restriction), which is not entitled to deference. For example, the State argues that the Court "should give substantial deference to educators' stated pedagogical concerns." Appellants' Br. at 30. Plaintiffs agree. The Court should restore the traditional deference to educators' and schools' decisions regarding school libraries and affirm the district court's decision.[9]

The State mischaracterizes *Hazelwood* and its progeny in another way. Contrary to the State's assertion, *Hazelwood* did not establish a rigid rule, devoid of any consideration of context. Rather, *Hazelwood* concerns the application of the nonpublic forum standard in the particular context of that case—educators' regulation of student speech in a journalism course. *Hazelwood*, 484 U.S. at 273. *See also Henerey*, 200 F.3d at 1132 ("school facilities are traditionally deemed nonpublic fora"); *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989) ("*Hazelwood* therefore does not alter the test for reasonableness in a nonpublic forum such as a school but rather provides the context in which the reasonableness of regulations should be considered."). If *Hazelwood* were interpreted broadly to apply to this case, it would require that the Library Restriction be reasonable in relation to the unique purpose of a school library—which it is not.

---

[9] Plaintiffs do not argue that courts become "the Library Police" or "the decisionmakers forced to referee countless disputes" over school-library books. *See* Arkansas Amicus Br., at 1, 13. Rather, Plaintiffs argue that it is improper for the State to deprive school librarians of their traditional discretion.

24

There is a material difference between (a) decisions made by educators and schools concerning inappropriate public statements or behavior by their students and (b) the Library Restriction. *Hazelwood* involved sensitive stories about people in the school community in a school newspaper that was part of a journalism class. *Hazelwood*, 484 U.S. at 274-75. *Fraser* involved "an elaborate, graphic, and explicit sexual metaphor" at a school assembly of hundreds of students. *Fraser*, 478 U.S. at 678. *Henerey* involved a student distributing condoms in school, contrary to school policy, while campaigning for a student election. *Henerey*, 200 F.3d at 1133. *Lacks* involved a teacher who allowed "students to use profanity repetitiously and egregiously in their written work." *Lacks*, 147 F.3d at 719. In contrast, the Library Restriction mandates that every Iowa school remove numerous library books that the schools had already identified as valuable and appropriate for students who voluntarily seek to read them and whose parents allow them to access those books. The State's school-sponsored speech cases undermine their arguments and advance Plaintiffs' arguments.

## II.     The Library Restriction Is Unconstitutionally Overbroad.

The Library Restriction is the epitome of a statute for which an overbreadth challenge is appropriate. This statewide mandate prohibits school-library books with no consideration of a book's value as a whole and no consideration of the age of the reader. Plaintiffs are likely to succeed on the merits of their First Amendment

overbreadth claim because the unconstitutional applications of the Library Restriction vastly outweigh any constitutional applications.

A statute that burdens otherwise-protected speech is invalid as overbroad if a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 603 U.S. at 723 (citing *Bonta*, 594 U.S. at 615). In assessing an overbreadth claim, a court "must [1] evaluate the full scope of the law's coverage[,] [2] decide which of the law's applications are constitutionally permissible and which are not, and [3] finally weigh the one against the other." *Id.* at 744.

As the Supreme Court has recognized, overbreadth challenges are an important tool to protect First Amendment rights when a law restricts and chills a substantial amount of protected speech. *See, e.g., Ashcroft*, 535 U.S. at 244 ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."); *Hicks*, 539 U.S. at 119 (Scalia, J.) (explaining that facial challenges are important because "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech[,] harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas"). Overbreadth challenges are

26

particularly appropriate and important where, as here, the "pertinent facts … are the same across the board." *Bonta*, 594 U.S. at 618.

This Court has repeatedly applied the overbreadth standard to invalidate state statutes that restrict speech. *See*, *e.g.*, *Dakotans for Health v. Noem*, 52 F.4th 381, 388 (8th Cir. 2022) (affirming preliminary injunction on facial challenge to statute restricting speech); *Willson v. City of Bel-Nor*, 924 F.3d 995, 1002–1003 (8th Cir. 2019) (reversing denial of motion for preliminary injunction because plaintiff was likely to succeed on the merits of his First Amendment facial challenge); *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 948 (8th Cir. 2018) (affirming grant of summary judgment on First Amendment facial challenge).

## A. The State Misapplies The *NetChoice* Decision.

Both this case and the cases at issue in the Supreme Court's *NetChoice* decision involve overbreadth challenges, but the similarities end there. In *NetChoice*, the Court applied the overbreadth doctrine to state laws whose scope was far from clear.[10] Those laws regulate technology companies' numerous types of content moderation—filtering, altering, prioritizing, and labeling—of certain user posts (messages, videos, and other content) on platforms such as Facebook, Twitter,

---

[10] "The Supreme Court's opinion in *Moody* [*NetChoice*] … did not break new ground; the Court has long espoused these requirements for a facial overbreadth challenge." *Free Speech Coal., Inc., v. Rokita*, No. 1:24-cv-00980-RLY-MG, 2024 WL 5055864, at *3 (S.D. Ind. July 25, 2024) (citing cases).

4935-0780-9367, v. 1

YouTube, Gmail, and TikTok. *NetChoice*, 603 U.S. at 717. The laws also require individualized explanation to users if a platform removes or alters their post. *Id.* The Supreme Court remanded for discovery to identify evidence of how the regulated websites and apps function, whether content moderation of each type of function "creates an expressive product," and whether the individualized explanation requirement would unduly burden expression. *Id.* at 724-26.

Whether and to what extent the scope of the laws at issue in *NetChoice* encompassed expressive activities was a threshold issue because the First Amendment generally protects expressive activities, not nonexpressive activities. *See id.* at 725-26. Here, the scope of the Library Restriction is readily apparent: it prohibits expression in the form of school-library books that contain a description of a sex act.[11] Unlike in *NetChoice*, no additional evidence is needed to determine how school-library books function.

In cases in which courts find laws to be overbroad—both before and after the *NetChoice* decision—the court's analysis of a law's applications is based on categories of expression that are shown either through examples or reasonable

---

[11] Other courts have similarly found that, unlike in *NetChoice*, the scope of the challenged laws in their cases was clear. *See Rokita*, 2024 WL 5055864, at *3 (finding that, unlike in *NetChoice*, there were "no potentially unknown applications of the [challenged] statute"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1121 n.92 (D. Utah 2024) (finding that, unlike in *NetChoice*, the scope of a challenged statute was easily determined).

28

hypotheticals. *See United States v. Hansen*, 599 U.S. 762, 783, n.5 (2023) ("Overbreadth doctrine traffics in hypotheticals"); *Stevens*, 559 U.S. at 475-77 (analyzing categories of protected speech swept up in the overbroad statute, such as depictions of hunting and livestock slaughter); *Willson*, 924 at 1002 (stating that plaintiff's "examples of expressive conduct that are prohibited" by the law illustrate that the law is overbroad); *Singleton v. City of Montgomery*, No. 23-11163, 2025 WL 1042101, at *3 (11th Cir. Apr. 8, 2025) (analyzing categories of protected "pedestrian solicitation" and affirming summary judgment under *NetChoice*); *Matsumoto v. Labrador*, 122 F.4th 787, 814–15 (9th Cir. 2024) (analyzing example categories of protected "recruiting" and holding statute is overbroad under *NetChoice*).

Contrary to the State's attempt to distort the overbreadth standard, *NetChoice* does not require Plaintiffs to litigate their overbreadth challenge as a mass-scale as-applied challenge. *See* Appellants' Br. at 50 (asserting that the "proper way" for Plaintiffs to challenge the Library Restriction would be "to bring an as-applied challenge as to [] 500 books"). Just as the parties in *NetChoice* are not required to provide evidence of the technology companies' content moderation of every post by specific users on various platforms (amounting to "millions of [] decisions each day"), *NetChoice*, 603 U.S. at 716, Plaintiffs are not required to provide evidence as to "every covered book" under the Library Restriction, *see* Appellants' Br. at 50.

29

Plaintiffs identify examples of books that have been prohibited under the Library Restriction to illustrate that the law prohibits numerous categories of non-obscene books without regard to their value as a whole—everything from classic novels and histories to books about how to avoid being victimized by gun violence (Plaintiff Jodi Picoult's *Nineteen Minutes*) or sexual assault (Plaintiff Laurie Halse Anderson's *Speak*). *See* section II(D) below. The State concedes that the Library Restriction prohibits a library book within these categories if it contains merely a single description of a sex act. And the State has admitted that every school-library book that has been removed under the Library Restriction was required to be removed. App. 416; R. Doc. 113, at 26. Under *NetChoice* and all other relevant overbreadth precedent, this is more than sufficient evidence for a finding of overbreadth.

## B. Step One: The Library Restriction Applies To School-Library Books.

The Library Restriction prohibits school library materials that contain any "descriptions" of a "sex act." Iowa Code §§ 256.11(9)(a)(2), (19)(a)(1).[12] By its plain language, the scope of the Library Restriction is school-library books that contain a description of a sex act.

---

[12] Those materials primarily consist of books, but may also include magazines, newspapers, and audiobooks. App. 183; R. Doc. 104-1, at ¶ 19.

The Library Restriction applies to *any* school-library book that contains even a *single* description of a sex act, regardless of the value of the book as a whole and the age of the reader. These are books—both fiction and nonfiction—that were specifically selected for school-library shelves by professionals who consider educational appropriateness, literary value, and the First Amendment in making curation decisions and who match students with developmentally appropriate books that are relevant to them. App. 187-88; R. Doc. 104-1, at ¶ 19. The scope of the Library Restriction includes award-winning and other educationally valuable books, classics, books that have been on school library shelves for years, and even books that are commonly addressed on Advanced Placement exams. App. 423; R. Doc. 113, at 33. Contrary to the State's arguments, the scope of the Library Restriction is not narrow, and its "plainly legitimate sweep" does not include absurd examples such as "Kama Sutra" and "erotica books." *See* Appellants' Br. at 51.

### 1. The Library Restriction Is Broad And Vague.

The Library Restriction does not explain what constitutes a description in relation to a sex act or what level of detail is necessary for the law to apply. Defendant John Robbins has admitted that the law is anything but narrow and specific. He stated, "there's a lot of confusion" about the Library Restriction and that educators hope that the Iowa Department of Education "provides direction because right now, we're kind of either guessing what is right or wrong, and not

31

being in violation of the law." App. 239; R. Doc. 104-7, at 2. The State does not even attempt to reconcile its position that the meaning of the Library Restriction is clear with the law's real-world application or the confusion expressed by Defendant Robbins.

The State asserts that the Library Restriction is narrow because "description" is not as broad as "reference[]" or "mention[]," which the Iowa Legislature could have used instead. Appellants' Br. at 34. But the State makes no attempt to define the line between a "reference" or "mention" of a sex act on the one hand and a "description" of a sex act on the other hand. The administrative rule upon which the State relies does not limit the scope of the Library Restriction in any way. This rule provides only that a "reference or mention" of a sex act that "does not describe" is not a description of a sex act. Iowa Admin. Code r. 281—12.2(256). This is circular: it says something that does not describe is not a description. This confusing language also implies that there may be some references or mentions of a sex act that also "describe," which would be prohibited under the Library Restriction.

The vagueness of the Library Restriction exacerbates its overbreadth. *See*, *e.g.*, *Reno v. Am. C.L. Union*, 521 U.S. 844, 871-72 (1997) (explaining that a vague regulation of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech"); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786,

32

807 (2011) (Alito, J., concurring) (same). One Iowa school librarian has explained how the law is difficult to understand and apply:

> Despite the fact that the other Teacher Librarians in my District and I have spent hundreds of hours reading and reviewing books in order to establish a common understanding of the law, we are left with uncertainty in many cases. We are sometimes uncertain as to whether or not a passage in a book is a definition or a description of a sex act, particularly when it comes to informational text. Books like [certain examples] answer important questions about reproduction and sex, but do they define sex or describe it, and are those the same thing?

App. 189; R. Doc. 104-1, at ¶ 21. The district court found that this educator and other school officials "engaged in a diligent and good faith" attempt to apply the Library Restriction. App. 422, 423; R. Doc. 113, at 32, 33 (finding also that "unrebutted evidence shows that th[is] experience … is representative of what is occurring elsewhere" in Iowa).

Iowa educators must err on the side of caution because if they fail to divine what the Library Restriction requires, they risk "termination, loss of licensure, or other consequences." App. 430; R. Doc. 113, at 40. As the Supreme Court has explained,

> When one must guess what conduct or utterance may lose him his position, one necessarily will steer far wider of the unlawful zone. For the threat of sanctions may deter almost as potently as the actual application of sanctions. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against ….

*Keyishian*, 385 U.S. at 604. In this way, the vagueness of the Library Restriction expands its reach. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,

33

455 U.S. 489, 495 (1982) (explaining that courts "should evaluate the ambiguous as well as the unambiguous scope" of a law, as "the vagueness of a law affects overbreadth analysis").

Under any construction, the Library Restriction unconstitutionally prohibits schools and educators from considering the age of the reader and the value of each book as a whole. Consequently, high-school juniors or seniors cannot access in their school library any book that contains a single description of a sex act, including (1) a novel or memoir about dealing with trauma from a sexual assault as a teenager, (2) a book about avoiding or treating sexually transmitted diseases, or (3) a history book about the impeachment of former President Bill Clinton or *The Rape of Nanking: The Forgotten Holocaust of World War II*. Contrary to the State's assertions, the Library Restriction is not narrow. It not only blocks authors' ideas from being communicated to their intended—and willing—audience; it erases facts and history from school libraries.

### 2. The Scope Of The Library Restriction Does Not Include Absurd Hypotheticals.

In an attempt to stretch the law's "plainly legitimate sweep," the State asserts that the scope of school-library books to consider is not the types of books that are *actually* in Iowa school libraries, but rather the universe of all books that describe sex acts, including erotica. Appellants' Br. at 51-52. But the Library Restriction

34

regulates school-library books—not books that have never been and never would be in school libraries.

School-library books are books that have been (or plausibly could be) selected by schools and their educators, who exercise their professional training and judgment to ensure that library books are "age-appropriate, appropriate for learning, and reflect the policies of [their school districts]" such as ensuring students have "[a]ccess to a diverse and appropriate library." App. 123; R. Doc. 102, at 19. As the State recognizes, "[s]chools do not blindly select books to place or retain on the shelves." App. 123; R. Doc. 102, at 19. *See also* App. 187-88; R. Doc. 104-1, at ¶ 19 ("Our professional training requires books that are appropriate and valuable for high school students but that may be too mature for elementary school students not be made available to elementary school students.") While the State is correct that the Library Restriction applies both to current and future school-library books, the State ignores that the types of books that school libraries will include in the future are exactly the same as the types of books that they currently include—books selected by librarians based on their professional judgment and experience, educational objectives, and the First Amendment. And while the State is also correct that the Library Restriction applies both to "placement" and "removal," Appellants'

Br. at 35, this observation has no impact on the law's scope: books that have been or plausibly could be included in school libraries.[13]

The State's assertion that the "Kama Sutra" and "erotica" books are included within the scope of school-library books is baseless and absurd. *See* Appellants' Br. at 51 (referring to "a search on Amazon Books for 'Kama Sutra'" that "yields over 5,000 results" and a "search for 'erotica' books" that "yields over 60,000 results"). Those books do not exist—and have never existed—in Iowa school libraries. Similarly, the State has no support for its suggestion that books made available to high-school students were ever made available to elementary-school students. App. 421; R. Doc. 113, at 31. Rather, the "unrebutted evidence shows that school officials already limited the access of younger readers to unsuitable books before" the Library Restriction was enacted. *Id.* The district court did not err in rejecting the State's attempt to extend the law's scope to include "unrealistic applications." *Id.*

---

[13] Plaintiffs have not claimed a right to have school districts acquire any particular book. As a practical matter, acquisition decisions are unlikely to be subject to judicial review because there are literally millions of books from which to choose, countless factors that schools and their librarians consider in deciding which books to acquire, and limited resources. *See Pico*, 457 at 853 n.1 (Blackmun, J., concurring in part and concurring in the judgment) ("There is a profound practical and evidentiary distinction between the two actions: removal, more than failure to acquire, is likely to suggest that an impermissible political motivation may be present. There are many reasons why a book is not acquired, the most obvious being limited resources, but there are few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity." (quotation modified)).

36

**C.      Step Two: The Library Restriction Has Limited, If Any, Constitutional Applications.**

The Library Restriction's constitutional applications are few, if any, because it mandates the removal of school-library books without regard for the age of the student, the value of each book as a whole, or the discretion of schools and their educators.  As the district court found, "The record shows that the law requires school districts to remove dozens (if not hundreds) of books that have tremendous pedagogical value."  App. 393; R. Doc. 113, at 3.  The district court also made the following findings about these books:

- the books "are not part of any mandatory curriculum";

- the books "have tremendous literary, political, artistic, and/or scientific value";

- the books "are only directed toward or made available to students for whom they are suitable"; and

- the books "are subject to check-out restrictions that give control to parents over whether their children will read or otherwise be exposed to."

App. 429; R. Doc. 113, at 39.  There is no reasonable justification for an across-the-board, statewide law that prohibits schools from making these types of books available to students who want to read them.  The Library Restriction is inconsistent with the purpose of school libraries.

4935-0780-9367, v. 1

The State contends that no application of the Library Restriction violates the First Amendment.[14]  According to the State, a statewide law that bars school libraries from making non-obscene, pedagogically valuable books available to their high-school students is justified as "school-sponsored speech."  That argument turns the school-sponsored speech doctrine upside down, using it to restrict the discretion of schools and their educators instead of deferring to their discretion.

The State mischaracterizes the district court's decision, suggesting that the district court held that schools must assess "every indecent, lewd, violent, or otherwise inappropriate speech" using the Supreme Court's obscenity standard.  *See* Appellants' Br. at 39.  That is not true.  The district court did not limit the discretion of schools and educators in any way.  To the contrary, they retain their discretion to curate school libraries based on traditional considerations such as educational suitability, contemporary community standards, and the value of the book as a whole.

The State also claims that the district court created "a novel standard" to apply in the "school setting," Appellants' Br. at 39-40, ignoring the fact that it is the Library Restriction that is novel.  As the district court stated, the State has "not identified," nor has the district court located, "a single case upholding school library restrictions as broad as" the Library Restriction.  App. 411; R. Doc. 113, at 21.  None

---

[14] Most of the State's argument is based on its mischaracterization of the First Amendment standard, which Plaintiffs address in section I above.

of the cases cited by the State involved a statewide prohibition like the Library Restriction. Appellants' Br. at 41-42. Rather, those cases all involved a straightforward application of the school-sponsored speech doctrine to educators' and schools' regulation of student speech. *See id.* Due to the unprecedented nature of the Library Restriction, which "imposes a far greater burden" on speech than individualized decisions made by schools concerning particular library books, App. 411; R. Doc. 113, at 21, the district court applied "precedent recognizing that laws imposing statewide, content-based restrictions on the availability of materials for minors should be tethered to" the obscenity standard "as adjusted for minors." App. 412; R. Doc. 113, at 22. This standard requires that schools and their educators be allowed to consider the value of each book as a whole and the age of their students when curating school libraries.

In asserting that it would be "unworkable" for schools to apply a standard that considers the value of library books as a whole based on the age of their students, the State completely ignores what school libraries are and what school librarians do and have always done. Appellants' Br. at 39-40. Schools are not powerless to remove inappropriate books from school libraries (or to refuse to add inappropriate books to their libraries). Even as to books that are not obscene, schools may consider pervasive vulgarity and educational suitability, among other factors, when considering which books should be on school library shelves. *See Pico*, 475 U.S. at

39

871. And—consistent with the test for obscenity—different schools may have different community standards.

The only constitutional applications of the Library Restriction are any school-library books that are obscene for minors in light of the age of the student. Those applications are necessarily extremely limited (if they exist at all) because books that are selected for Iowa school libraries are selected by librarians and other educators who exercise their professional training and judgment to ensure that school-library books are age-appropriate and educationally suitable. Moreover, the distribution of obscene materials to children has long been prohibited in Iowa. Consequently, only rarely, if ever, would a school library contain a book that would be obscene, and the constitutional applications of the Library Restriction are very few, if any.

**D. Step Three: The Library Restriction's Unconstitutional Applications Substantially Outweigh Its Constitutional Applications.**

The unconstitutional applications of the Library Restriction are vast and substantially outweigh any potential constitutional applications. The Library Restriction prohibits schools and their educators from considering the value of the book as a whole, resulting in a blanket prohibition. It also makes no attempt to differentiate, as it constitutionally must, between high-school seniors and elementary-school students.

40

The Library Restriction is indifferent to the educational and literary qualities of the hundreds of books that it prohibits in school libraries. The law requires Iowa schools to remove a book regardless of its value if it contains a single sentence describing a sex act, even if it was an impetus for legislation concerning sexual assault; was historically significant, such as in an impeachment, presidential campaign, or international event; or was central to character development in an award-winning work of fiction. In an implicit admission that books that contain a description of a sex act may have value for Iowa students, the Library Restriction expressly exempts religious books from its prohibition. Those books "shall not be excluded from any public school or institution in the state." Iowa Code §§ 256.11(9)(a)(2), 280.6.[15]

The Library Restriction requires the removal of numerous categories of non-obscene books, many of which have been in school libraries in Iowa and throughout the nation for decades:

- Historical classics (*e.g.*, *As I Lay Dying* by William Faulkner; *Brave New World* by Aldous Huxley; *1984* by George Orwell; *Native Son* by Richard Wright; *Slaughterhouse-Five* by Kurt Vonnegut);

- Modern award-winners or highly acclaimed books (*e.g.*, *I Know Why the Caged Bird Sings* by Maya Angelou; *Song of Solomon*, *Beloved*, and *The*

---

[15] Just as "discriminating against religious speech [i]s discriminating on the basis of viewpoint," discriminating against nonreligious books is discriminating on the basis of viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 832 (1995).

*Bluest Eye* by Toni Morrison; *The Kite Runner* by Khaled Hosseini; *Nineteen Minutes* by Jodi Picoult; *Speak* and *Shout* by Laurie Halse Anderson; *Looking for Alaska* and *The Fault in Our Stars* by John Green; *Last Night at the Telegraph Club* by Malinda Lo);

- Books addressed on Advanced Placement exams or that serve important educational purposes (*e.g.*, *The Color Purple* by Alice Walker; *Native Son* by Richard Wright; *The Handmaid's Tale* by Margaret Atwood; *As I Lay Dying* by William Faulkner; *Beloved* by Toni Morrison; *1984* by George Orwell; *Brave New World* by Aldous Huxley);

- Non-fiction history books about important historical events (*e.g.*, *Night* by Elie Wiesel; *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa* by Mark Mathabane; *The Rape of Nanking* by Iris Chang; *The Freedom Writers Diary* by Erin Gruwell);

- Non-fiction books to help minors avoid being victimized by sexual assault (*e.g.*, *Sexual Predators* edited by Laurie Willis; *The Truth About Rape* edited by Robert Golden);

- Non-fiction books about health and anatomy (*e.g.*, *Urinary Tract Infections* by Krista West; *Endometriosis* by Stephanie Watson);

- Books that address bullying, racism, and sexual assault (*e.g.*, *Last Night at the Telegraph Club* by Malinda Lo; *Looking for Alaska* by John Green; *Nineteen Minutes* by Jodi Picoult; *I Know Why the Caged Bird Sings* by Maya Angelou; *Speak* and *Shout* by Laurie Halse Anderson; *The Truth About Rape* edited by Robert Golden; *Rape and Sexual Assault* by Rebecca T. Klein); and

- Books that address trauma and grief (*e.g.*, *The Fault in Our Stars* by John Green; *Speak* and *Shout* by Laurie Halse Anderson).

App. 209-219; R. Doc 104-5; App. 220-37; R. Doc. 104-6. The books that the Library Restriction prohibits exemplify and confirm its overbreadth. A law that prohibits schools and their educators from determining that books in these categories are worthy of inclusion in their school libraries for their high-school students who

42

seek to read them (and whose parents do not restrict their own children's access to them) has an overwhelming number of unconstitutional applications.

Although findings of overbreadth are often based on reasonable hypotheticals (*see* section II(A)), it is not necessary to hypothesize about the broad reach of the Library Restriction. The record includes declarations from school librarians and other educators, authors, students, parents, a publishing executive, the President of the Iowa State Education Association, and the CEO of the Author's Guild, App. 180-204; R. Docs. 104-1-104-3; App. 251-287; R. Docs. 104-10-104-17, and the district court made numerous factual findings based on the record:

- Hundreds of library books have been prohibited from Iowa school libraries under the Library Restriction. App. 393; R. Doc. 113, at 3.

- Educators are "attempting in good faith to interpret and apply" the Library Restriction. App. 417; R. Doc. 113, at 27.

- Books that were removed under the Library Restriction "are not pornographic or obscene despite containing description of sex acts." *Id.*

- Prior to the Library Restriction, schools "limited the access of younger readers to unsuitable books." App. 421; R. Doc. 113, at 31.

- "Many of the books that have been removed are popular and award-winning books that help students participate in Advanced Placement courses and prepare for college." App. 423; R. Doc. 113, at 33.

- Several dozen books that are prohibited under the Library Restriction "have undeniable political, artistic, literary, and/or scientific value." App. 426; R. Doc. 113, at 36.

4935-0780-9367, v. 1

Although the State contends that the record is "bare," Appellants' Br. at 11, 39, the district court's thorough analysis and the record itself show otherwise.

For several reasons, the State's argument that Plaintiffs must produce evidence that the prohibited books "contain statements covered by" the Library Restriction is baseless. Appellants' Br. at 38. First, as shown above, Plaintiffs produced extensive evidence, which the State ignores. Second, in a prior appeal before this Court concerning the Library Restriction, the State admitted that "[e]very book removed from library shelves because of the Library [Restriction] included at least some material that was not 'age-appropriate' under the law." App. 416; R. Doc. 113, at 26. Although the State now attempts to retract this concession, the district court found that "unrebutted evidence" shows that school officials have not "gone overboard in removing books." App. 420; R. Doc. 113, at 30. Third, the unrebutted evidence also shows that educators have applied the Library Restriction in good faith, App. 422; R. Doc. 113, at 32, notwithstanding the vagueness of the prohibition and the lack of guidance from the State.[16] App. 205-208; R. Doc. 104-4; App. 189-90; R. Doc. 104-1, at ¶ 21; App. 8-9; R. Doc. 34-10, at ¶ 12. Because courts "should evaluate the ambiguous as well as the unambiguous scope" and

---

[16] In addition to these reasons, the district court also properly took judicial notice of the contents of the books with which the court was familiar, although it noted that it was primarily relying upon "the factual record." App. 416-17; R. Doc. 113, at 26-27.

vagueness exacerbates overbreadth, *see Hoffman Estates*, 455 U.S. at 495, the State's attempt to blame educators and schools lacks merit.

The "pertinent facts" in this case "are the same across the board"—the Library Restriction is a statewide prohibition that disregards the value of the book as a whole, the age of the student-reader, and the discretion of schools and their educators. *See Bonta*, 594 U.S. at 618. These fundamental flaws are "categorical—present in every case." *Id.* at 615. *See also NetChoice, LLC v. Griffin*, 5:23-CV-5105, 2025 WL 978607, at *14 (W.D. Ark. Mar. 31, 2025) ("By barring access to all content on regulated platforms, including that which is neither unprotected nor harmful, based on the content and speakers represented on those platforms, the Act is unconstitutional in all conceivable applications."). Because any permissible applications of the Library Restriction are "dwarfed" by its numerous "impermissible applications," the law is "substantially overbroad, and therefore invalid" under the First Amendment. *See Stevens*, 559 U.S. at 481–82.

## III. The Library Restriction Is Not Government Speech.

This Court rejected the State's government-speech argument in the prior appeal, and nothing in this case has changed with respect to government speech since then. The State has not presented new evidence, nor is there new Supreme Court or Eighth Circuit authority. Moreover, the State did not even make a government-speech argument in opposing Plaintiffs' motion for preliminary injunction, merely

45

stating in a single footnote that the State "continue[s] to contend that library curation is government speech." App. 118; R. Doc. 102, at 14. The district court cannot reasonably be faulted for not analyzing the State's "likelihood of success on their government-speech argument" when the State did not make that argument before the district court. *See* Brief for the State of Arkansas as Amicus Curiae, Entry ID 5530900 ("Arkansas Amicus Br."), at 21. Rather, the State has waived this government-speech argument because it "did not raise it before the district court." *See Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1022 (8th Cir. 2019). *See also Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 883 (8th Cir. 2015) (finding that an argument mentioned in a footnote in a district court brief was not sufficiently raised); *Larken, Inc. v. Wray*, 189 F.3d 729, 735 (8th Cir. 1999) (declining to address arguments on appeal that the party did not make "with sufficient particularity" before the district court).

As the Supreme Court explained and this Court recognized in the prior appeal, because the government-speech doctrine is a "doctrine that is susceptible to dangerous misuse," courts "must exercise great caution" when considering whether to "extend[] government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017) (Alito, J.). The doctrine is a limited exception to the First Amendment: when the government speaks for itself, the First Amendment does not apply.

4935-0780-9367, v. 1

The Supreme Court has instructed that, to determine whether the government-speech doctrine applies, courts should consider whether (1) the State has historically "communicated messages" through the medium; (2) the medium is "closely identified in the public mind" with the State such that it "has endorsed that message," and (3) the State directly controls "the messages conveyed" through that medium. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–213 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460, 472–73 (2009); *Matal*, 582 U.S. at 238 (applying the "three factors [*Walker*] distilled from *Summum*"). *See also Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022) (conducting inquiry based on *Walker*, *Summum*, and *Matal*). Based on these considerations, the Library Restriction is not government speech.

First, school libraries have not historically communicated messages from the State. Instead, school libraries have long served as vehicles to expose students to a broad array of ideas from authors and publishers who express unique, varied, and personal points of view. App. 195; R. Doc 104-2, at ¶ 9; App. 278-79; R. Doc 104-15, at ¶ 8; App. 281-83; R. Doc 104-16, at ¶¶ 2, 9; App 286; R. Doc. 104-17, at ¶ 2. It would make no sense for a library book, written by an independent author and selected for school-library shelves by schools and their educators, to be understood as communicating a message from the State. As this Court explained, "school libraries do not share the characteristics of monuments in a park." *Reynolds*, 114

47

F.4th at 667. Whereas monuments in a public park "are meant to convey and have the effect of conveying a government message," school libraries do not have that purpose or effect. *See id.* (quoting *Matal*).

Second, messages conveyed in school-library books are diverse and often contradictory—not endorsed by the State, as government speech must be. As Justice Alito explained in rejecting the application of the government-speech doctrine to trademarks, the doctrine does not extend to speech that expresses "contradictory views." *See Matal*, 582 U.S. at 236. *See also Shurtleff*, 596 U.S. at 272–73 (Alito, J., concurring) (explaining that "flags flown [from a city flagpole] reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message" of the government). Similarly, as this Court recognized,

> A well-appointed school library could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*…. [I]f placing these books on the shelf of public school libraries constitutes government speech, the State "is babbling prodigiously and incoherently."

*Reynolds*, 114 F.4th at 668 (quoting *Matal*). *See also Gerlich v. Leath*, 861 F.3d 697, 708–709 (8th Cir. 2017) (holding that a university program was not government speech because it "was capable of accommodating a large number of public speakers without defeating [its] essential function" and permitting speech by hundreds of organizations did not "communicate any message to the public" from the university).

48

Third, the State does not "maintain[] direct control over the messages conveyed" in school-library books. *See Walker*, 576 U.S. at 213. Rather, authors and publishers control the contents of their books. The State does not "dream up" the books or "edit [books] submitted for" inclusion in school libraries. *See Matal*, 582 U.S. at 235. *See also Shurtleff*, 596 U.S. at 256 (explaining that the "most salient feature" of the case was the defendant's failure to "control[] the flags' content and meaning"). As this Court previously explained, the State historically "has not asserted extensive control" over school-library books. *Reynolds*, 114 F.4th at 668. In contrast, in *Walker*, the "Texas specialty license plates" were government speech because Texas's control over the plates extended to "the design, typeface, color, and alphanumeric pattern for all license plates," the license plates served as "government-issued IDs," and the state "place[d] the designs directly below the large letters identifying 'TEXAS' as the issuer of the IDs." *Walker*, 576 U.S. at 213, 214. And *Walker* "likely marks the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at 238.

No court has held that a school-library collection is government speech. The State claims that "the Fifth Circuit recently held that the government's curation of a public library is government speech." Appellants' Br. at 62. That is untrue. Only seven of the seventeen judges on the en banc panel—a minority—joined the section of the opinion concerning government speech. *Little v. Llano Cnty.*, 138 F.4th 834

49

(5th Cir. 2025) (en banc).  Like the minority in *Little*, the State attempts to rewrite the government-speech doctrine by claiming that it speaks through schools' collections of books on library shelves without regard to the messages in the books themselves.  This argument applies the doctrine at such a high level of generality that it eviscerates what it means for the government to speak.

The holding in *Little* that readers in public libraries lack First Amendment rights is an outlier, contrary to countless other cases that have addressed this issue.  This Court has already held that Plaintiffs have standing to challenge the Library Restriction based on their rights under the First Amendment.  Moreover, even the dissenting justices in *Pico* agreed that the First Amendment limits the authority of the government to remove school-library books.  *See supra* footnote 5.  If library curation were government speech, then—contrary to even the dissent in *Pico*—the First Amendment would "permit the official suppression of *ideas*" in school libraries.  *Pico*, 457 U.S. at 907 (Rehnquist, J dissenting) (emphasis in original).

Although a private actor "presenting a curated compilation of speech" is protected by the First Amendment, *NetChoice*, 603 U.S. at 728, that is not the test for government speech.  Contrary to the State's assertion, the government's exercise of discretion over speech on its property does not by itself mean that the government-speech doctrine applies.  Appellants' Br. at 62.  The doctrine applies only when the Supreme Court's three-part test has been satisfied.  The State's position would

4935-0780-9367, v. 1

eviscerate that test and "constitute a huge and dangerous extension of the government-speech doctrine." *See Matal*, 582 U.S. at 219.

The State's position would also contradict precedents applying the nonpublic forum standard when the government creates a forum to share certain information with particular persons consistent with the purpose of the forum.[17] In furtherance of the purpose of such a forum, significant autonomy and discretion is afforded to professionals, which insulates them from interference (1) from the public (such as through a lawsuit demanding that a particular school-library book be acquired or removed) and (2) from regulations of political actors that are contrary to the purpose of the forum or that "distort its usual functioning." *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001).

The State cannot demonstrate that the government-speech doctrine applies to school-library books because library books are fundamentally different than the limited media that constitute government speech. Application of this doctrine to school-library books would drastically expand its reach. It would also fundamentally distort the purpose and function of school libraries, over which

---

[17] For example, under the State's position, the student newspaper in *Hazelwood* would have been government speech, which is contrary to the Supreme Court's analysis in that case.

4935-0780-9367, v. 1

schools and their educators traditionally are afforded significant discretion and deference.

## IV. The State's Brand-New Severability Argument Has No Merit.

The State did not make a severability argument before the district court. Therefore, its severability argument is waived. *See Heuton*, 930 F.3d at 1022; *Glickert*, 792 F.3d at 883; *Larken*, 189 F.3d at 735.

The Library Restriction is only a small portion of SF496, which contains other provisions that are separate from the Library Restriction. The district court's preliminary injunction applies only to the Library Restriction, so it is not necessary to sever any other portion of SF496 from the Library Restriction as the State urges.

The State also argues that any constitutional applications of the Library Restriction should be severed from its unconstitutional applications, but it does not even attempt to explain which portion of the Library Restriction could be preserved. The only case that the State cites in support of this new argument does not help it. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985). That case addresses a state law that was modeled after the Supreme Court's obscenity standard, except it contained a flawed (unconstitutionally broad) definition of "lust." *Id.* at 504. The Court explained that if the term were construed not to include protected activity or were "excised … from the statute entirely," the statute would then "pass constitutional muster and would validly reach the whole range of obscene

52

publications." *Id.* at 505. Here, in contrast, there is no term that could be excised or construed to render any portion of the Library Restriction constitutional.

## V.     The Remaining Factors Support Affirming The Preliminary Injunction.

The district court did not abuse its discretion in finding that the remaining preliminary injunction factors also favor Plaintiffs. Where, as here, a plaintiff shows the "likely violation" of "First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). Even so, the remaining factors favor Plaintiffs.

As the district court held, the irreparable harm factor favors Plaintiffs because the Library Restriction violates their First Amendment rights. App. 430; R. Doc. 113, at 40 (citing *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) ("It is well-established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation modified))).

The balance of the equities and the public interest also decidedly favor injunctive relief. *See Fayetteville*, 2023 WL 4845636, at *21 (explaining that those factors "merge" "when the government opposes the issuance of a preliminary injunction"). It is "always in the public interest to prevent the violation of a party's constitutional rights." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted).

53

In contrast, injunctive relief does not harm the State. Existing Iowa laws and school-district procedures protect minors from accessing obscene materials in school libraries, while permitting evaluation of a book's value as a whole and avoiding the sweeping removal of non-obscene books. The State has no legitimate interest in enforcing the Library Restriction.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's decision to preliminarily enjoin the Library Restriction.

4935-0780-9367, v. 1

Dated: July 22, 2025

By: /s/ *Frederick J. Sperling*
Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
Devin K. Ross
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com
devin.ross@afslaw.com

Christy A.A. Hickman
Becky S. Knutson
Katherine E. Schoolen
Iowa State Education Association
777 Third Street
Des Moines, Iowa 50309
Telephone: (515) 471-8004
christy.hickman@isea.org
becky.knutson@isea.org
katie.schoolen@isea.org

*Attorneys for Plaintiffs-Appellees*
*ISEA, Lisa Petrie, and Emily House*

Mark E. Weinhardt
Todd M. Lantz
Jason R. Smith
Weinhardt & Lantz, P.C.
2600 Grand Avenue, Suite 450
Des Moines, Iowa 50312
Telephone: (515) 244-3100
mweinhardt@weinhardtlantz.com
tlantz@weinhardtlantz.com
jsmith@weinhardtlantz.com

*Attorneys for Plaintiff-Appellees*

4935-0780-9367, v. 1

**CERTIFICATE OF TYPE-VOLUME COMPLIANCE**

I hereby certify that this brief complies with (1) the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 12,759 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font in the text and footnotes.

Dated: July 22, 2025                              /s/ *Adam J. Diederich*
                                                  Adam J. Diederich

                                                  *Counsel for Plaintiffs-Appellees*

**CERTIFICATION OF ELECTRONIC SUBMISSION**

I hereby certify that this brief complies with Eighth Cir. R. 28A(h) because it is in PDF format and the brief has been scanned for and is free of viruses.

Dated: July 22, 2025                              /s/ *Adam J. Diederich*
                                                  Adam J. Diederich

                                                  *Counsel for Plaintiffs-Appellees*

4935-0780-9367, v. 1

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2025, I caused a true and correct copy of the foregoing brief to be electronically filed with the Clerk of the Court by using the Court's CM/ECF system, which will send notification of the filing to all registered users of the CM/ECF system.

Dated: July 22, 2025

/s/ *Mark E. Weinhardt*
Mark E. Weinhardt

*Counsel for Plaintiffs-Appellees*

4935-0780-9367, v. 1