No. 25-1819

# United States Court of Appeals
## for the
# Eighth Circuit

———— • ————

PENGUIN RANDOM HOUSE LLC, ET AL.,

*Plaintiffs-Appellees,*

*v.*

JOHN ROBBINS, ET AL.,

*Defendants-Appellants,*

On Appeal from the United States District Court
for the Southern District of Iowa, 4:23-cv-00478,
Honorable Stephen H. Locher, Presiding

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

GREG HAROLD GREUBEL*
HANNAH ABBOTT
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street
Suite 900
Philadelphia, PA 19106
greg.greubel@thefire.org
(215) 717-3473

ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473

*Counsel of Record

*Attorneys for* Amicus Curiae *Foundation for Individual Rights and Expression*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

i

Appellate Case: 25-1819    Page: 2    Date Filed: 08/01/2025 Entry ID: 5544002

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................iii

INTEREST OF *AMICUS CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT................................................................. 2

ARGUMENT....................................................................................... 5

I. Banning Books Ignores the Lessons of History and is Incompatible with our National Commitment to Free Expression. ............................................................................ 5

    A. The Founders understood that the free exchange of ideas is necessary for an informed citizenry.......................... 7

    B. The long road to freedom. .................................................. 10

II. The First Amendment Limits the Arbitrary Political Control of Libraries. ............................................................... 14

    A. The First Amendment recognizes a distinction between a school library and curriculum. ........................................ 16

    B. The First Amendment protects the right to receive information and ideas. ......................................................... 22

III. The Court Should Again Reject Defendants' Government Speech Argument. ................................................................ 25

    A. The rich history of public libraries serving an informed public weighs against government speech........................... 26

    B. The public does not perceive the government as speaking through the diverse and divergent array of books at a public library. ...................................................... 28

    C. Iowa does not actively control public library shelves to shape its messages.............................................................. 30

CONCLUSION ................................................................................. 32

Appellate Case: 25-1819    Page: 3    Date Filed: 08/01/2025 Entry ID: 5544002

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States,*
250 U.S. 616 (1919) ........................................................................ 6

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. 853 (1982) .................................................................. passim

*Bethel Sch. Dist. No. 403 v. Fraser,*
478 U.S. 675 (1986) ...................................................................... 23

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ...................................................................... 25

*Butler v. Michigan,*
352 U.S. 380 (1957) ...................................................................... 25

*Campbell v. St. Tammany Parish Sch. Bd.,*
64 F.3d 184 (5th Cir. 1995) ............................................................ 3

*Commonwealth v. Am. Booksellers Ass'n, Inc.,*
236 Va. 168 (1988) ........................................................................ 24

*Community-Service Broad. of Mid-America, Inc. v. FCC,*
593 F.2d 1102 (D.C. Cir. 1978) ..................................................... 21

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ...................................................................... 23

*Fayetteville Pub. Libr. v. Crawford County,*
684 F. Supp. 3d 879 (W.D. Ark. 2023) ......................................... 19

*FCC v. League of Women Voters of Cal.,*
468 U.S. 364 (1984) ...................................................................... 21

*GLBT Youth in Iowa Sch. Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024) .................................................. passim

*Interactive Digital Software Ass'n v. St. Louis County,*
329 F.3d 954 (8th Cir. 2003) ........................................................ 23

Appellate Case: 25-1819   Page: 4   Date Filed: 08/01/2025 Entry ID: 5544002

*Kincaid v. Gibson,*
236 F.3d 342 (6th Cir. 2001) ................................................................. 21

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) .............................................................................. 22

*Little v. Llano County,*
138 F.4th 834 (5th Cir. 2025) ........................................................ passim

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
594 U.S. 180 (2021) ................................................................................ 5

*Matal v. Tam,*
582 U.S. 218 (2017) ................................................................. 25, 27, 32

*Mishkin v. New York,*
383 U.S. 502 (1966) .............................................................................. 24

*Moody v. NetChoice,*
144 S. Ct. 2383 (2024). ........................................................................ 31

*Penguin Random House LLC v. Robbins,*
774 F. Supp. 3d 1001 (S.D. Iowa 2025) ................................................. 2

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) ........................................................................ 15, 27

*Pope v. Illinois,*
481 U.S. 497 (1987) .............................................................................. 27

*Regina v. Hicklin,*
L.R. 3 Q.B. 360 (1868) .......................................................................... 12

*Roth v. United States,*
354 U.S. 476 (1957) .............................................................................. 14

*Rust v. Sullivan,*
500 U.S. 173 (1991) .............................................................................. 15

*Shurtleff v. Boston,*
596 U.S. 243 (2022) .............................................................................. 26

Appellate Case: 25-1819    Page: 5    Date Filed: 08/01/2025 Entry ID: 5544002

*Stanley v. Georgia,*
   394 U.S. 557 (1969) ................................................................ 22

*Stanley v. Magrath,*
   719 F.2d 279 (8th Cir. 1983) .................................................. 21

*United States v. 12 200-Foot Reels of Super 8mm. Film,*
   413 U.S. 123 (1973) ................................................................ 12

*United States v. American Library Association, Inc.,*
   539 U.S. 194 (2003) ................................................................ 16

*United States v. Bennett,*
   24 F. Cas. 1093 (2d Cir. 1879) .............................................. 12

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ................................................................ 25

*Velazquez v. Legal Services Corp.,*
   531 U.S. 533 (2000) .................................................... 15, 20, 21

*Virgil v. Sch. Bd. of Columbia Cnty.,*
   862 F.2d 1517 (11th Cir. 1989) ............................................. 20

*W. Va. St. Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) .................................................................. 6

*Walls v. Sanders,*
   No. 24-1990, 2025 WL 1948450 (8th Cir. July 16, 2025) .. 18, 19, 29, 30

*Whitney v. California,*
   274 U.S. 357 (1927) ................................................................ 26

**Constitutional Amendments, Statutes, and Regulations**

U.S. Const. amend. I ..................................................................... 3

Iowa Admin. Code r. 281-12.3(12)(a) ........................................ 16, 22, 30

Iowa Admin. Code r. 281-12.3(12)(b)(6) ..................................... 31

Iowa Admin. Code r. 281-12.3(12)(c) .......................................... 31

Appellate Case: 25-1819    Page: 6    Date Filed: 08/01/2025 Entry ID: 5544002

Iowa Code § 256.11(19)(a)(1)..................................................................... 4

Iowa Code § 256.11(9)(b) .............................................................. 16, 22, 26

Iowa Code § 274.3 ...................................................................................... 30

Iowa Code § 277.1 ...................................................................................... 30

Iowa Code § 702.17 ..................................................................................... 4

Iowa Code § 274.1 ...................................................................................... 30

**Other Authorities**

Amy Sohn,
*The Man Who Hated Women: Sex, Censorship, & Civil Liberties
in the Gilded Age* (2021)...................................................................... 13

Benjamin Franklin,
*The Autobiography of Benjamin Franklin* ............................................. 8

Doug Linder,
*The Trial of John Peter Zenger: An Account* (2001)............................ 10

Erin Blakemore,
*The history of book bans—and their changing targets—in the
U.S.*, Nat'l Geographic (Apr. 24, 2023)................................................ 11

Frederick Schauer,
*Principles, Institutions and the First Amendment*, 112 Harv. L.
Rev. 84 (1998) ....................................................................................... 15

*History of the Libr. of Congress*, Libr. of Congress ............................... 8, 9

*History*, Libr. Co. of Phila ......................................................................... 8

*Jefferson's Libr.*, Libr. of Congress ........................................................... 9

John Locke,
*An Essay Concerning Human Understanding*........................................ 8

John Milton,
*Areopagitica* ........................................................................................... 7

Appellate Case: 25-1819    Page: 7    Date Filed: 08/01/2025 Entry ID: 5544002

John O. McGinnis,
*The Once and Future Property-Based Vision of the First Amendment*, 63 U. Chi. L. Rev. 49 (1996) ............................................... 7

John S. Tanner & Justin Collings,
*How Adams and Jefferson Read Milton and Milton Read Them*, 40 Milton Q. (2006) ............................................................................ 7

*Letter from James Madison to W.T. Barry*, National Archives
(Aug. 4, 1822) ......................................................................................... 9

Michael Kent Curtis, *The 1859 Crisis Over Hinton Helper's Book, The Impending Crisis: Free Speech, Slavery, and Some Light on the Meaning of the First Section of the Fourteenth Amendment*, 68 Chi.-Kent L. Rev. 1113 (1993) ........................................................ 11

*Pieces of Iowa's Past: Spaulding's Library Bill of Rights*,
Legislative Service Agency (Apr. 4, 2018) ........................................... 28

Randall P. Bezanson & William G. Buss,
*The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377 (2001) ..................................................................................................... 15

Robert Corn-Revere, *The Mind of the Censor and the Eye of the Beholder: The First Amendment and the Censor's Dilemma* (Cambridge Univ. Press 2021) ..................................................... 12, 13

*The Perils of Reading: Samuel Green and Harriet Beecher Stowe's Uncle Tom's Cabin*, Md. St. Archives .................................................. 11

Thomas Jefferson,
*Letter to William Roscoe* (Dec. 27, 1820), Founders Online, Nat'l Archives & Records Comm'n ............................................................... 9

Appellate Case: 25-1819    Page: 8    Date Filed: 08/01/2025 Entry ID: 5544002

# INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment, regardless of the speakers' views. Founded in 1999, FIRE's sole focus before the expansion of its mission in 2022 was defending student and faculty rights at our nation's colleges and universities. Given our decades of experience combating campus censorship, FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing minority or dissenting viewpoints. FIRE strongly opposes attempts to restrict access to information—both on and off campus. Informed by our unique history, FIRE has a keen interest in ensuring the censorship we fight on campus is not fostered in our public K-12 schools.

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person other than *amicus*, its counsel, and its members contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

1

Appellate Case: 25-1819    Page: 9    Date Filed: 08/01/2025 Entry ID: 5544002

## SUMMARY OF ARGUMENT

Before the enactment of SF496, local school boards and librarians in Iowa decided for decades what books to put on their shelves. Students could read those books, or not. Parents could also ask their local school boards to remove books or limit their children's access to books in the library. Politicians, however, believed they knew better than local boards, parents, and students and enacted the law at issue to compel local educators to eliminate hundreds of books—629 in one school district alone[2]—not through a thorough review process, but based on the inclusion of content that fit the law's broad definition of a sex act.

To save their censorial law, Defendants ask this Court to overturn its previous ruling that curation of a public-school library is not government speech, *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667–668 (8th Cir. 2024), so that politicians may remove books in the kind of "narrowly partisan or political manner" against which the Supreme Court warned. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op.). This

---

[2] *Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1010 (S.D. Iowa 2025).

2

Appellate Case: 25-1819    Page: 10    Date Filed: 08/01/2025 Entry ID: 5544002

Court should again reject this argument because "[o]ur Constitution does not permit the official suppression of ideas." *Id.*

The Founders would be offended by politicians' desire to meddle in the local control of libraries by imposing a top-down, content-based mandate to remove books because of a single mention of sex. While the government may choose to establish a library in the first place (or not), that power does not authorize transient officeholders to impose their personal political, religious, or philosophical preferences on the community. Thus, "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all [library] books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books." *Id.*

Public libraries' role as nonpolitical repositories of public knowledge emerged out of hard lessons of history. Censorship was the norm for millennia, and as civilizations rose and fell, censorship of the works of religious and political enemies was a constant. Our Founders endeavored to end this vicious cycle. They adopted a Bill of Rights with a First Amendment guarantee that "Congress shall make no law … abridging the freedom of speech, or of the press," U.S. Const. amend. I,

3

and created libraries to ensure widespread dissemination of information on all subjects. To be sure, book censorship continued after the Constitution's ratification, including a period when the government empowered puritanical zealots like Anthony Comstock to enforce Victorian-era standards of obscenity. But over time, First Amendment jurisprudence arose from those controversies to preclude the type of censorship now occurring in Iowa and elsewhere.

Here, Defendants ask this Court to return America to the days of Comstock's government-sponsored, indiscriminate purge of literary classics for even the slightest sexual content. Specifically, SF496 forces local educators to exclude "any material with descriptions or visual depictions of a sex act," which is in turn defined as a number of forms of "sexual contact between two or more persons." Iowa Code §§ 256.11(19)(a)(1), 702.17. This categorical ban applies to all public-school libraries *regardless* of the age of the students they serve, leaving local officials no discretion to determine if a novel meeting its criteria is appropriate even for 18-year-old high school seniors.

Attempting to comply with the law's broad reach, school librarians have been forced to purge their shelves of classic works of fiction by

4

George Orwell, Walt Whitman, William Faulkner, and James Joyce. Pls.-Appellees' Br. 41–42. Librarians have also had to remove non-fiction books meant to educate and protect minors from sexual assault. *Id.* SF496 incentivizes over-compliance through a drastic scheme of penalties, threatening local educators not only with job loss but also with the loss of their professional license if they fail to comply. Pls.-Appellees' Br. 6. All of this adds up to the removal of hundreds of books without any consideration for the overall value of those books to a public-school library's collection.

The First Amendment, however, does not permit such top-down, content-based restrictions on local educators, and this Court should again affirm the district court's preliminary injunction.

## ARGUMENT

### I. Banning Books Ignores the Lessons of History and is Incompatible with our National Commitment to Free Expression.

The history of the First Amendment teaches that laws like SF496, which remove local control of public schools and impose top-down, content-based restrictions, are antithetical to the Founders' vision for an educated citizenry. "America's public schools are the nurseries of democracy." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180,

5

190 (2021). The state's role in "educating the young for citizenship" is all the more reason for "scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). No principle of our government is more basic than the repudiation of censorship.

The Founders were lovers of learning who recognized the democratic necessity of an informed citizenry. They placed profound faith in the then-radical notion that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). Upon that faith rests "the theory of our Constitution." *Id.* This was not just some utopian vision. As students of history, the Founders were acutely aware that arbitrary government authority over expression was the root of tyranny, so they designed the Constitution "to avoid these ends by avoiding these beginnings." *Barnette*, 319 U.S. at 641. And as practical men, they built libraries to help realize their vision.

Appellate Case: 25-1819     Page: 14     Date Filed: 08/01/2025 Entry ID: 5544002

When government officials like Defendants abuse their power by imposing top-down, content-based restrictions on local educators and students, they betray the Founders' plan. In fact, Defendants' scheme to force the removal of books that contain even the slightest sexual content harkens back to Victorian England and a test for obscenity that the Supreme Court rejected decades ago.

## A. The Founders understood that the free exchange of ideas is necessary for an informed citizenry.

The Constitution's framers rejected state censorship. Instead, they believed in letting truth and falsehood "grapple"—because, in the English poet John Milton's classic formulation, "who ever knew Truth put to the wors[e], in a free and open encounter"?[3] Milton's paean to the freedom to write, publish, and read had scant impact in Caroline England, but it found an eager audience a century later across the Atlantic in readers like John Adams and Thomas Jefferson.[4] So too did John Locke—a foundational influence on James Madison, author of the First

---

[3] John Milton, *Areopagitica*, https://milton.host.dartmouth.edu/reading_room/areopagitica/intro/text.shtml.

[4] *See, e.g.*, John S. Tanner & Justin Collings, *How Adams and Jefferson Read Milton and Milton Read Them*, 40 Milton Q., no. 3, 207–19 (2006).

Appellate Case: 25-1819    Page: 15    Date Filed: 08/01/2025 Entry ID: 5544002

Amendment.[5] Locke recognized the humbling, enriching power of what he called the "necessary diversity of opinions" and urged humanity to "commiserate our mutual ignorance, and endeavor to remove it in all the gentle and fair ways of information."[6] Madison enshrined Locke's understanding of the power of free expression in our Bill of Rights.

"Books and libraries were essential to America's founding generation," and the Founders demonstrated their commitment to the free flow of information—and libraries in particular—in both word and deed.[7] Benjamin Franklin, for one, founded America's first successful lending library[8] in Philadelphia because, as he put it, "there was not a good bookseller's shop in any of the colonies to the southward of Boston."[9]

---

[5] *See, e.g.*, John O. McGinnis, *The Once and Future Property-Based Vision of the First Amendment*, 63 U. Chi. L. Rev. 49, 60–71 (1996).

[6] John Locke, *An Essay Concerning Human Understanding*, https://www.gutenberg.org/cache/epub/10616/pg10616-images.html.

[7] *History of the Libr. of Congress*, Libr. of Congress, https://www.loc.gov/ about/history-of-the-library (last visited July 24, 2025).

[8] *History*, Libr. Co. of Phila., https://librarycompany.org/about-lcp (last visited July 24, 2025).

[9] Benjamin Franklin, *The Autobiography of Benjamin Franklin*, https://www.gutenberg.org/files/20203/20203-h/20203-h.htm.

Appellate Case: 25-1819    Page: 16    Date Filed: 08/01/2025 Entry ID: 5544002

Madison believed such improvement necessary for our democratic experiment to succeed. "A popular Government, without popular information, or the means of acquiring it, is but a prologue to a Farce or a Tragedy; or, perhaps, both," he wrote in 1822.[10]

To that end, President John Adams signed legislation creating the Library of Congress in 1800. After the British torched the Library and its 3,000 volumes during the War of 1812, Thomas Jefferson—who named the first two Librarians of Congress and recommended works for inclusion—sold his personal collection of 6,487 books to Congress to restart it.[11] Jefferson's commitment to maintaining a diversity of accessible knowledge still guides the Library's broad principle of acquisition.[12] Jefferson was similarly dedicated to establishing a system of public education that would "be based on the illimitable freedom of the

---

[10] *Letter from James Madison to W.T. Barry*, National Archives (Aug. 4, 1822), https://founders.archives.gov/documents/Madison/04-02-02-0480.

[11] *History of the Libr. of Congress, supra* note 7.

[12] *Jefferson's Libr.*, Libr. of Congress, https://www.loc.gov/exhibits/jefferson/jefflib.html (last visited July 24, 2025).

Appellate Case: 25-1819    Page: 17    Date Filed: 08/01/2025 Entry ID: 5544002

human mind. For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left free to combat it."[13]

Franklin, Adams, Jefferson, Madison, and their fellow Founders would readily recognize the threat that governmental restrictions on the free flow of knowledge present. They were intensely familiar, for example, with the jailing, trial, and ultimate acquittal of the proto-revolutionary printer John Peter Zenger for criticizing New York's colonial governor.[14] They would be no more tolerant of politicians suppressing books than of the historical examples of censorship that helped inspire the Revolution.

### B.    The long road to freedom.

The Constitution's promise of protecting free expression was not fulfilled overnight. Before the Civil War—and decades before the emergence of First Amendment jurisprudence—some states banned abolitionist literature, with harsh punishments for violating the law. The

---

[13] Thomas Jefferson, *Letter to William Roscoe* (Dec. 27, 1820), Founders Online, Nat'l Archives & Records Comm'n, https://founders.archives.gov/documents/Jefferson/03-16-02-0404 (last visited July 18, 2025).

[14] Doug Linder, *The Trial of John Peter Zenger: An Account* (2001), http://law2.umkc.edu/faculty/projects/ftrials/zenger/zengeraccount.html

10

1851 publication of Harriet Beecher Stowe's *Uncle Tom's Cabin* sparked book-burnings in slave-holding states.[15] Merely owning a copy could lead to ten years in jail, as it did for Samuel Green, a free black man living in Maryland.[16] In 1857, three men in Arkansas were hanged simply for possessing Hinton R. Helper's *The Impending Crisis of the South: How to Meet It*.[17]

The First Amendment likewise posed little obstacle when the moralist crusaders of the nineteenth century gained power. Far from "the age when Benjamin Franklin wrote his 'Advice to a Young Man on Choosing a Mistress'" and "Madison admonished against any 'distinction between the freedom and licentiousness of the press,'" a new breed of

---

[15] Erin Blakemore, *The history of book bans—and their changing targets—in the U.S.*, Nat'l Geographic (Sep. 20, 2024), https://www.nationalgeographic.com/culture/article/history-of-book-bans-in-the-united-states.

[16] *Id.*; *see also The Perils of Reading: Samuel Green and Harriet Beecher Stowe's Uncle Tom's Cabin*, Md. St. Archives, https://msa.maryland.gov/msa/stagser/s1259/121/6180/html/0000.html (last visited July 24, 2025).

[17] Eric Berkowitz, *Dangerous Ideas: A Brief History of Censorship in the West, from the Ancients to Fake News* 155 (2021); *see also* Michael Kent Curtis, *The 1859 Crisis Over Hinton Helper's Book, The Impending Crisis: Free Speech, Slavery, and Some Light on the Meaning of the First Section of the Fourteenth Amendment*, 68 Chi.-Kent L. Rev. 1113 (1993).

Appellate Case: 25-1819     Page: 19     Date Filed: 08/01/2025 Entry ID: 5544002

puritanical censor emerged. *United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 133–34 (1973) (Douglas, J., dissenting). It was only in this Victorian age that the first obscenity test was formally developed.

Courts in the U.S. adopted the *Hicklin* test, named for *Regina v. Hicklin*, L.R. 3 Q.B. 360 (1868), in the late nineteenth century to govern the emerging law of obscenity.[18] It was borrowed from Victorian England, drawn from a prosecution under Britain's 1857 Obscene Publications Act.[19] *Hicklin* set forth an expansive standard under which an entire work could be condemned based on a single passage, or even a book's title.[20] No amount of value, even for the greatest works of literature, could offset the danger of its tendency to "corrupt and deprave."[21]

The *Hicklin* test provided an ideal vehicle for Comstock, who, as founder of the New York Society for the Suppression of Vice and as a

---

[18] *United States v. Bennett*, 24 F. Cas. 1093 (2d Cir. 1879).

[19] Robert Corn-Revere, *The Mind of the Censor and the Eye of the Beholder: The First Amendment and the Censor's Dilemma* 23 (Cambridge Univ. Press 2021).

[20] *Id.*

[21] *Id.*

Appellate Case: 25-1819     Page: 20     Date Filed: 08/01/2025 Entry ID: 5544002

government agent, made it his life's work to stamp out vice.[22] Describing *Hicklin* as "one of the most remarkable cases on record," Comstock saw to the entrenchment of this capacious test in case law through prosecutions he spearheaded.[23] At the end of Comstock's four-decade-long career, he boasted of having seized over *160 tons* of literature, jailing more than 3,600 people, and driving at least fifteen to commit suicide.[24] The government's war on "evil reading" continued long after Comstock's death in 1915.[25]

One byproduct of this repression was the emergence of strong First Amendment jurisprudence. The excesses of Comstock and the "anti-vice societies" forced free speech advocates to sharpen their arguments, and courts began to respond.[26] The Supreme Court ultimately abandoned the *Hicklin* rule in 1957, making clear that "sex and obscenity are not synonymous." It explained that sex is "a great and mysterious motive

---

[22] *Id.* at 20.

[23] *Id.* at 23.

[24] *Id.* at 19–20.

[25] *See generally* Amy Sohn, *The Man Who Hated Women: Sex, Censorship, & Civil Liberties in the Gilded Age* (2021).

[26] Corn-Revere, *supra* note 19, at 68–78.

Appellate Case: 25-1819     Page: 21     Date Filed: 08/01/2025 Entry ID: 5544002

force in human life [that] has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Roth v. United States*, 354 U.S. 476, 487 (1957).

By making any hint of sex an automatic on/off switch for the acceptability of library books, SF496 conjures the spirit of *Hicklin*. It forces schools to remove books that have even the slightest sexual content without regard to the works' overall literary or educational value. Unsurprisingly, local educators have removed classic works like William Faulkner's *As I Lay Dying*, Aldous Huxley's *Brave New World*, and George Orwell's *1984* to comply with the law. Pls.-Appellees' Br. 41–42. This highlights that SF496 goes too far in its purge of all sexual content from school libraries, violating well-established First Amendment principles prohibiting the government from arbitrarily censoring materials based on the tastes of those currently holding office.

## II. The First Amendment Limits the Arbitrary Political Control of Libraries.

When the government creates institutions vested with a purpose to make information widely available to the public or to exercise independent editorial judgment, the First Amendment limits its ability

14

to arbitrarily limit access to information "necessary to the proper functioning of those systems." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 544 (2001). Government involvement in expressive activities can take many forms—as speaker, regulator, custodian of a public forum, or sponsor of independently chartered speech enterprises—and that form determines the applicable constitutional rule. *See generally* Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377, 1384–87 (2001). Where the government is delivering its own message, the First Amendment does not constrain "government speech." *E.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 481 (2009); *Rust v. Sullivan*, 500 U.S. 173, 193–94 (1991). But certain government institutions—such as public universities, public museums, public media, and public libraries—are imbued with a "First Amendment aura" that limits political interference. Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 116 (1998).

Public-school libraries are "the principal locus" of students' freedom to explore the world of ideas beyond the curriculum, *Pico*, 457 U.S. at 868–69, and courts have historically recognized the First Amendment's application to school libraries. *See, e.g.*, Pls.-Appellees' Br.

15

Appellate Case: 25-1819     Page: 23     Date Filed: 08/01/2025 Entry ID: 5544002

at 15–17 (collecting cases). Because school libraries are designed to foster thought by exposing students to a wide range of materials that are not included in the required curriculum, state legislators overstep their bounds by imposing arbitrary restrictions on local schools.

### A. The First Amendment recognizes a distinction between a school library and curriculum.

School libraries in Iowa exist to promote the dissemination of knowledge, free from political interference. State law provides that the collections "include a current and diverse collection of fiction and nonfiction materials," Iowa Code § 256.11(9)(b), the selection of which is entrusted to "teacher librarian[s]" who bring "special expertise in identifying resources and technologies to support teaching and learning." Iowa Admin. Code r. 281-12.3(12)(a). Libraries were not created, as the State now suggests, to deliver a government message under partisan control. Defendants' error on this point is crystalized in their reliance on the plurality opinion in *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 205–06 (2003), and the Fifth Circuit's decision in *Little v. Llano County*, 138 F.4th 834, 859 (5th Cir. 2025) (en banc). Neither of these cases are applicable here.

16

*American Library Association* is inapt because it dealt with initial acquisition decisions for *inclusion* of materials, not the issue presented here—decisions to *remove* books already acquired (*i.e.,* censorship decisions). *See Am. Libr. Ass'n*, 539 U.S. at 205 (addressing "a public library's exercise of judgment in selecting the material it provides to its patrons"). As Justice Brennan explained in his plurality opinion in *Pico*, acquisition and book removal decisions are materially different. *Pico*, 457 U.S. at 871–72 ("[W]e are concerned … with the suppression of ideas, [and] our holding today affects only the discretion to remove books."). The only purpose of SF496, the law at issue here, is to *remove* books from libraries.

*Little* is inapposite because it erroneously treated libraries as examples of government speech. Seven judges of the seventeen judges on the Fifth Circuit's *en banc* panel embraced the government speech theory, 138 F.4th at 859, which the State now adopts as its own position. Defs.-Appellants' Br. 59. But that approach is foreclosed in the Eighth Circuit because this Court has rejected the argument that either the placement or removal of books in public school libraries transforms their

17

collections into the government's speech. *See Reynolds*, 114 F.4th at 668; *see also* Section III, *infra.*

Defendants likewise misapply Supreme Court precedent in asking this Court to withdraw the First Amendment's protections from public school libraries. They ask the Court to ignore the historic purpose and function of libraries and cases like *Pico* that directly address book removal. They invoke *Little* to claim *Pico* is "of no precedential value" because Justice Brennan spoke for only three justices, and Justice White, author of the narrowest concurring opinion, "said nothing about the First Amendment." *Little*, 138 F.4th at 844. And it is true that, in deciding a case involving classroom *curriculum*, this Court recently concluded "*Pico* lacks any holding as to the First Amendment because the narrowest grounds for the judgment was the opinion of Justice White who declined to decide any constitutional questions." *Walls v. Sanders*, No. 24-1990, 2025 WL 1948450, at *4 (8th Cir. July 16, 2025).

But while *Pico* did not speak to the First Amendment right of students in *curricular* matters, the case remains instructive here, where the government argues that forcing librarians to remove books based on disfavored content does not implicate any First Amendment right. As the

18

dissent in *Little* noted, Justice White's *Pico* concurrence "agreed with the plurality, affirming the Second Circuit, that the motivation inquiry presented an issue of fact that was *material to the constitutional analysis*, precluding summary judgment." 138 F.4th at 878 (Higginson, J., dissenting) (emphasis added). If Justice White's concurrence had nothing to do with the First Amendment, then the reasons for the removals would have been irrelevant. *See Fayetteville Pub. Libr. v. Crawford County*, 684 F. Supp. 3d 879, 909 (W.D. Ark. 2023) ("The majority of justices in *Pico* agreed that the state's censorship power could not be exercised 'in a narrowly partisan or political manner'—*even in a school library setting*.") (quoting *Pico*, 457 U.S. at 870 (plurality op.)).

In fact, of the nine Justices deciding *Pico*, eight agreed that removal of books from library shelves to silence disfavored ideas implicates the Speech Clause. *Id.* This Court's discussion of *Pico* in *Walls* is not to the contrary, as it focused on the state's power over *curricular* decisions as an example of government speech, but acknowledged *Pico's* persuasive force regarding the removal of books from public school libraries. 2025 WL 1948450 at *4 (noting *Pico's* applicability to the school library context and distinguishing classroom curriculum). To say *Pico* is of no value here

19

is simply incorrect, and *Walls'* treatment of it illustrates the unique status of public-school libraries, where students freely explore ideas outside of the mandatory curriculum.

For decades, courts have recognized this distinction between public-school libraries and the state-prescribed curriculum. *See Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1522–25 (11th Cir. 1989) (distinguishing between removal of curricular and school-library books). School libraries are simply not like "the compulsory environment of the classroom," where state officials control the curriculum. *Pico*, 457 U.S. at 869. Rather, they have traditionally been places where "a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Id.*

Put another way: Libraries are governed by constitutional doctrine defined by their purpose. As the Supreme Court observed in *Velazquez*, 531 U.S. at 543, "[w]here the government uses or attempts to regulate a particular medium, we have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations." The First Amendment does not

20

permit the government "to suppress speech inherent in the nature of the medium" or to "distort its usual functioning." *Id.*

This First Amendment principle generally governs expressive institutions created to provide independent voices. Applying it, courts have held the government cannot censor print publications it has vested with independent editorial judgment. *See, e.g.*, *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983) (cutting student newspaper's funding because of disfavored content violates the First Amendment); *Kincaid v. Gibson*, 236 F.3d 342, 355 (6th Cir. 2001) (*en banc*) (confiscation of student yearbook violated the First Amendment). And it is why the government may not prohibit public media from running editorials, *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 375–76 (1984), nor second-guess programming choices, *Community-Service Broad. of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1108–09 (D.C. Cir. 1978) (*en banc*).

Here, subjecting school library collections to a political veto without regard to pedagogical value conflicts with their usual function of providing "a current and diverse collection of fiction and nonfiction materials" curated by professional librarians with "special expertise in identifying resources and technologies to support teaching and learning."

21

Iowa Code § 256.11(9)(b); r. 281-12.3(12)(a). The system is designed to rely on the expertise of educators, not the changing whims of politicians.

Today's political victors may not subvert the purpose of public-school libraries—institutions meant to enrich the learning environment for students by offering a broad spectrum of ideas free of censorship—just because they hold temporary positions of power.

### B.  The First Amendment protects the right to receive information and ideas.

By interfering with Iowa public school libraries' institutional purpose, Defendants short-change students' "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). As Milton and Locke knew, the free exchange of ideas generates knowledge and cultivates understanding—and as Madison and Jefferson recognized, it is vital for democratic governance. "The First Amendment means that Government has no power to thwart the process of free discussion, to 'abridge' the freedoms necessary to make that process work." *Kleindienst v. Mandel*, 408 U.S. 753, 776 (1972) (Marshall, J., dissenting).

The fact that Defendants here assert control over public *school* libraries makes this point more pressing, not less. The State has a legitimate interest in "teaching students the boundaries of socially

22

Appellate Case: 25-1819    Page: 30    Date Filed: 08/01/2025 Entry ID: 5544002

appropriate behavior," to be sure. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). But that interest does not provide "an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis County,* 329 F.3d 954, 959–60 (8th Cir. 2003). And while the sensitive nature of discussions of human sexuality means schools may ensure student access to library materials involving sexuality is age-appropriate, those individual determinations are best made by librarians, parents, and local school boards, not state legislatures imposing one-size-fits-all bans. *See, e.g., Fraser*, 478 U.S. at 683 (1986) (noting authority to regulate exposure to "inappropriate" expression "properly rests with the school board").

"[G]uided by the Supreme Court's recognition that '[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them,'" this Court has squarely held "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *IDSA*, 329 F.3d at 960 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975)). Iowa has an interest in ensuring public-school library materials are age

23

Appellate Case: 25-1819    Page: 31    Date Filed: 08/01/2025 Entry ID: 5544002

appropriate, but SF496's across-the-board ban on a broad category of content does not serve that interest because it requires schools to apply the same standards for a high school senior and elementary school student.

When courts evaluate restrictions intended to shield minors from sexually oriented material inappropriate for their level of development, "the focus of the inquiry is not upon the youngest members of the class, not upon the most sensitive members of the class, and not upon the majority of the class." *Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168, 176 (1988); *see also Mishkin v. New York*, 383 U.S. 502, 508–09 (1966) (rejecting the "inadequacy of the most-susceptible-person facet of the *Hicklin* test"). Instead, "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." *Am. Booksellers Ass'n, Inc.*, 236 Va. at 177.

The fact that SF496 required local educators to remove such essential works of the literary canon like Orwell's *1984* from high school libraries is a quintessential case of "burn[ing] the house to roast the pig."

24

*Butler v. Michigan*, 352 U.S. 380, 383 (1957). From comic books to video games, dime novels to heavy metal, blaming artistic expression for society's ills and the perceived corruption of children is an old trope. *See Brown v. Ent. Merchs. Ass'n,* 564 U.S. 786, 797–98 (2011). But as the Supreme Court has explained, "It is through speech that our convictions and beliefs are influenced, expressed, and tested. It is through speech that we bring those beliefs to bear on Government and on society. It is through speech that our personalities are formed and expressed. The citizen is entitled to seek out or reject certain ideas or influences without Government interference or control." *United States v. Playboy Ent. Grp., Inc.,* 529 U.S. 803, 817 (2000). That is the promise that school libraries fulfill.

## III.  The Court Should Again Reject Defendants' Government Speech Argument.

This Court has already rejected Defendants' argument that the placement and removal of books in public school libraries is government speech, wisely heeding the Supreme Court's "directive to 'exercise great caution before extending our government-speech precedents.'" *Reynolds,* 114 F.4th at 668 (quoting *Matal v. Tam,* 582 U.S. 218, 235 (2017)). Undeterred, Defendants again ask the Court to ignore precedent and

25

extend the government speech doctrine in a manner that offends our national commitment to free expression.

Under the Supreme Court's "holistic inquiry" for whether expression is government speech, the history of public-school libraries, the public perception of who is speaking through their shelves, and the extent to which Iowa uses school libraries to send a message all show that they do not engage in government speech. *See Shurtleff v. Boston*, 596 U.S. 243, 252 (2022). This Court should thus not take Defendants up on their invitation to revisit its recent conclusion that "the Supreme Court has not extended the government speech doctrine to the placement and removal of books in public school libraries." *Reynolds*, 114 F.4th at 667.

### A. The rich history of public libraries serving an informed public weighs against government speech.

The Founders strove to prevent an ignorant public—especially one force-fed government-approved ideas. *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). This is implicit in Iowa law which recognizes that public-school libraries should not be confined to books communicating a message from the State. Instead, it ensures that public-school libraries "include a current and diverse collection of fiction and nonfiction materials." Iowa Code § 256.11(9)(b). A public-school

26

library cannot fulfill its objective of giving students access to a wide range of ideas and perspectives if the government proscribes or limits materials "in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870.

As Justice Blackmun observed, "the First Amendment does not permit a majority to dictate to discrete segments of the population—be they composed of art critics, literary scholars, or scientists—the value that may be found in various pieces of work." *Pope v. Illinois*, 481 U.S. 497, 506 (1987) (Blackmun, J., concurring). Yet, SF496 does exactly that by usurping the power historically assigned to local school boards to control the content of their libraries.

As this Court correctly observed in *Reynolds*, a historical distinction exists between a city selecting monuments for a park, with "governments hav[ing] used monuments to speak to the public since ancient times," and public school libraries, which have not usually served as government messengers. 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 238 and distinguishing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)). This Court should reaffirm this obvious distinction.

27

## B. The public does not perceive the government as speaking through the diverse and divergent array of books at a public library.

Defendants also ignore our history and libraries' purpose to claim they exist for the government to communicate "its own speech." Defs.-Appellants' Br. 60. In making this argument, Defendants rely on the Fifth Circuit's statement that "libraries' collection decisions have traditionally expressed libraries' own views about what constitutes worthwhile literature." *Id.* at 61 (quoting *Little*, 138 F.4th at 857–58)). This claim collapses when confronted by history and common sense.

Des Moines Public Library Director Forrest Spaulding's refusal to remove Adolf Hitler's *Mein Kampf* from library shelves in the early years of the Second World War[27] was not—as Defendants' argument suggests—governmental endorsement of *Mein Kampf* as worthy reading material. *Little*, 138 F.4th at 854. Rather, in declining to bend to the censors' wishes, Spaulding demonstrated the principles he laid out in the Library Bill of Rights would not suddenly become flexible when they became

---

[27] *Pieces of Iowa's Past: Spaulding's Library Bill of Rights*, Iowa Legislative Services Agency (Apr. 4, 2018), https://www.legis.iowa.gov/docs/publications/TB/961350.pdf.

Appellate Case: 25-1819　　Page: 36　　Date Filed: 08/01/2025 Entry ID: 5544002

uncomfortable.[28] His principled stand was the "fulfillment of [a library's] responsibility to provide information and enlightenment" on all terms, not just when it suited him.[29]

Defendants effectively view each book in a school library as having the government stamp of approval. But as this Court already noted, if placing books like Barack Obama's *The Audacity of Hope* and *Mein Kampf* means the government is attributing worthiness to both books, then "the State 'is babbling prodigiously and incoherently.'" *Reynolds*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 219 and highlighting the divergent political science books found at school libraries).

This Court's *Walls* decision provides further support for the proposition that the selection of books in a library is not government speech. 2025 WL 1948450, at *4. In *Walls,* this Court dealt "not with books in a library, but instead with in-classroom instruction and materials in a high school" and held the latter is government speech. *Id.* In reaching this conclusion, this Court noted the Supreme Court in *Pico* "distinguished the school library from the classroom and recognized that

---

[28]  *Id.*

[29]  *Id.*

Appellate Case: 25-1819   Page: 37   Date Filed: 08/01/2025 Entry ID: 5544002

the government has a 'claim of absolute discretion in matters of *curriculum*' and 'the compulsory environment of the classroom' to carry out its 'duty to inculcate community values.'" *Id.* (quoting *Pico*, 457 U.S. at 862, 868–69).

This distinction between books assigned in class and those available for voluntary perusal in a library is a matter of common sense. A high school teacher assigning a book as part of a mandatory curriculum implies that the school believes the book is worthwhile. In contrast, a school librarian placing a book on a school library shelf is simply communicating that the book is *available*. As this Court explained, "it is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking." *Reynolds*, 114 F.4th at 668.

### C. Iowa does not actively control public library shelves to shape its messages.

Iowa law does not subject school libraries to the whims of partisan control. As discussed in Section II.A., each school district is its own corporation, with a locally elected board of directors, Iowa Code §§ 274.1, 274.3, 277.1, tasked with establishing a K–12 library program. Iowa Admin. Code r. 281-12.3(12)(a). It is the local school board that regularly

reviews the library program to ensure it "include[s] a current and diverse collection of fiction and nonfiction materials in a variety of formats to support student and curricular needs." *Id.* r. 281-12.3(12)(b)(6). And it is the local board that must "adopt policies to address selection and reconsideration of school library materials." *Id.* r. 281-12.3(12)(c).

Notably absent from this system is any requirement that the school board or librarian select books approved by politicians. That is why this Court previously noted that "this factor favors Plaintiffs as historically the government of Iowa has not asserted extensive control over removing books from public school libraries." *Reynolds*, 114 F.4th at 668.

Defendants' reliance *Moody v. NetChoice* is misplaced. Nothing in *NetChoice* supports the proposition that public library book decisions can be classified as "government speech." Defs.-Appellants' Br. 14, 60–63. *NetChoice* says nothing whatsoever about the government speech doctrine. To the contrary, it reaffirmed strong First Amendment protections for *private* actors "compiling and curating others' speech" against *government* attempts to regulate their editorial discretion. 603 U.S. 707, 731–32 (2024).

31

As Madison explained, "the great object" of a bill of rights was "to limit and qualify the powers of government." PENNSYLVANIA PACKET, June 16, 1789 (reporting on congressional session). That includes limiting the power to control ideas. Yet Defendants ask the Court to discard that foundational principle and condone a system in which the government can turn protection for private speech on its head to justify censorship.

At bottom, if public institutions that exist to promote knowledge and ideas "could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235. That result cannot be squared with the First Amendment, let alone our historical understanding of public libraries. But passing off arbitrary censorship at public libraries as "government speech" is what Defendants and the *amici* states are trying to sell. This Court should, once again, uphold the individual rights of Iowans and reject this argument.

## CONCLUSION

This Court's role in safeguarding libraries against censorship is paramount to preserving the fundamental principles of free expression

32

and access to information. History has shown us the dangers of allowing political whims to dictate what ideas are permissible. Public school libraries must remain sanctuaries of knowledge, where students can explore ideas simply because they are interested in them, not because they are assigned to do so in a class. The Court should affirm the importance of these institutions as bastions of free thought, protecting them from arbitrary censorship and reaffirming our commitment to the free exchange of ideas.

Dated: July 25, 2025

*/s/ Greg H. Greubel*
GREG HAROLD GREUBEL*
HANNAH ABBOTT
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street
Suite 900
Philadelphia, PA 19106
greg.greubel@thefire.org
(215) 717-3473

ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473

*Counsel of Record*

33

Appellate Case: 25-1819   Page: 41   Date Filed: 08/01/2025 Entry ID: 5544002

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 6,053 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: July 25, 2025

*/s/ Greg H. Greubel*
Greg Harold Greubel
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION


# CERTIFICATION OF COMPLIANCE
# WITH EIGHTH CIRCUIT RULE 28A(h)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of *Amicus Curiae* Foundation for Individual Rights and Expression in Support of Appellees and Affirmance has been scanned for viruses and is virus-free.

Dated: July 25, 2025

*/s/ Greg Harold Greubel*
Greg Harold Greubel
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION

# CERTIFICATE OF SERVICE

The undersigned certifies that on July 25, 2025, an electronic copy of the Brief of *Amicus Curiae* Foundation for Individual Rights and Expression in Support of Appellees and Affirmance was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: July 25, 2025

*/s/ Greg Harold Greubel*
Greg Harold Greubel
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION