# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

No. 25-1819

PENGUIN RANDOM HOUSE, LLC, ET AL., *Plaintiffs-Appellees,*

v.

JOHN ROBBINS, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE IOWA STATE BOARD OF EDUCATION, ET AL., *Defendants-Appellants*

---

On Appeal from the United States District Court for the
Southern District of Iowa, No. 4:23-cv-478,
Hon. Stephen H. Locher, presiding

---

## BRIEF OF PEN AMERICAN CENTER, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES & AFFIRMANCE

---

Diane Elizabeth Brinkley
PEN AMERICAN CENTER, INC.
120 Broadway, 26th North Floor
New York, NY 10271
Telephone: 646-989-3883
ebrinkley@pen.org
*Attorney for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* PEN American Center, Inc. ("PEN America") states that it does not have a parent corporation and that no publicly held company owns 10% or more of its stock.

Dated: July 25, 2025

<u>/s/ *Diane Elizabeth Brinkley*</u>
Diane Elizabeth Brinkley

## <u>RULE 29(a)(4)(E) STATEMENT</u>

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *Amicus Curiae* states that counsel for neither party contributed to the writing of this brief and that counsel for neither party nor any other person contributed money that was intended to fund the preparation or submission of this brief.

i

Appellate Case: 25-1819     Page: 2     Date Filed: 08/01/2025 Entry ID: 5544013

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

RULE 29(a)(4)(E) STATEMENT ...............................................i

TABLE OF CONTENTS ...................................................ii

TABLE OF AUTHORITIES...................................................iii

STATEMENT OF INTEREST ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................2

ARGUMENT ................................................................ 4

 I. SF496 is part of a troubling national trend of educational censorship and has already caused substantial harm. ........................................................ 4

 II. Students have a First Amendment right to receive information in public schools. ..................................... 8

 III. SF496 will have a chilling effect on writers and fails to abide by the obscenity doctrine. ........................................ 14

  A. SF496 will negatively impact writers' ability to reach their intended audiences..................................... 14

  B. SF496 may lead authors to abstain from writing age-appropriate material. ........................................... 17

  C. SF496 completely disregards the obscenity doctrine as to minors.................................................... 19

  D. The standards in SF496 fail to account for *Miller*'s required consideration of the literary value of the books....................................................... 24

CONCLUSION ........................................................... 27

Appellate Case: 25-1819 Page: 3 Date Filed: 08/01/2025 Entry ID: 5544013

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.,*
 557 F.3d 1177 (11th Cir. 2009) ...................................................... 11

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ................................. 11, 12

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S.
 853  (1982) ........................................................................ 10, 11, 12, 18

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ................. 22, 23, 27

*Brown v. Louisiana*, 383 U.S. 131 (1966) .......................................... 13

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005)........................................ 11

*Cohen v. California*, 403 U.S. 15 (1971) ................................................. 25

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ............................................. 11

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .............. 21, 23, 27

*Ginsberg v. State of N. Y.*, 390 U.S. 629 (1968) .............. 20, 21, 22, 23, 27

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*, No. 4:23-CV-00474,
 2023 WL 9052113 (S.D. Iowa Dec. 29, 2023)................................... 3

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589
 (1967)  ........................................................................ 3, 9, 12

*Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992) ................... 11

*Mahanoy Area Sch. Dist. v. B. L. ex. rel. Levy*, 594 U.S. 180 (2021)...... 12

*Miller v. California*, 413 U.S. 15 (1973)........................................... 20-27

*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976)
 ........................................................................................ 12-13

Appellate Case: 25-1819   Page: 4   Date Filed: 08/01/2025 Entry ID: 5544013

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) ...................................................................................... 11

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997)............. 21, 23, 27

*Right to Read Defense Comm. v. Sch. Comm.*, 454 F.Supp. 703 (Mass. 1978) ................................................................................. 12

*Shelton v. Tucker*, 364 U.S. 479 (1960) ............................................... 9, 12

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) ...................................................................... 16

*Thornburgh v. Abbott.*, 490 U.S. 401 (1989) ........................................ 16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .. 9, 12

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ........................ 23

*Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985) ......................................................... 22, 23

*U.S. v. One Book Called "Ulysses"*, 5 F.Supp. 182, 183 (S.D.N.Y. 1933), aff'd sub nom., *U.S. v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934) ............................................................. 25

*Virginia v. Hicks*, 539 U.S. 113 (2003) .................................................. 19

*Walls v. Sanders*, No. 24-1990, 2025 WL 1948450 (8th Cir. July 16, 2025) ...................................................................................... 12

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ......... 8, 10, 12

iv

Appellate Case: 25-1819   Page: 5   Date Filed: 08/01/2025 Entry ID: 5544013

## Statutes

Iowa Code Ann. § 256.11 ................................................................... passim

Iowa Code Ann. § 280.6 ............................................................................. 6

Iowa Code Ann. § 702. 17 ......................................................................... 6

Appellate Case: 25-1819     Page: 6     Date Filed: 08/01/2025 Entry ID: 5544013

## Other Authorities

*Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories Close to the  Heart*, Cynsations: Celebrating Children's & Young Adult Literature (November 2023), https://cynthialeitichsmith.com/2023/11/guest-post-author-tamara-ellis-smith-illustrator-nancy whitesides-on-tackling-stories-close-to-the-heart/...............................................14

Sabrina Baêta, et al., *Banned in the USA: Narrating the Crisis*, PEN America (Apr. 16, 2024), https://pen.org/report/narrating-the-crisis/...........................................5

Marlaina Cockcroft, *Book Challenges Are Having a Chilling Effect on School Librarians Nationwide*, SLJ (Aug. 24, 2023), https://www.slj.com/story/Book-Challenges-Are-Having-a-Chilling-Effect-on-School-Librarians-Nationwide-SLJ-Survey....................5

Althea Cole, *Iowa's 'book ban' blocked for now. Now what?*, The Gazette (Jan. 7, 2024), https://www.thegazette.com/staff-columnists/iowas-book-ban-blocked-for-now-now-what/ ............................................5

Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas  book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list.  ..........................................................15

EveryLibrary, *How Do Authors Feel About Libraries?* (Aug. 17, 2023), MPR News (November 11, 2021), https://action.everylibrary.org/how_do_authors_feel_about_libraries...........................................16

Appellate Case: 25-1819     Page: 7     Date Filed: 08/01/2025 Entry ID: 5544013

Samantha Hernandez et. al., *Iowa book ban's toll: 3,400 books, including "1984" and "To Kill a Mockingbird"*, The Des Moines Reg. (Updated December 30, 2024), https://www.desmoinesregister.com/story/news/education/2024/06/06/books-banned-in-iowa-3400-include-to-kill-a-mockingbird-and-1984/73643557007/. ................................................................. 6, 7

Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492 ................................ 15

Samantha LaFrance, *These Books Are Banned in Urbandale*, PEN America (Aug. 3, 2023), https://pen.org/iowa-book-bans/. ........... 3, 7

Madison Markham & Tasslyn Magnusson, *Banned in the USA: Cover to Cover*, PEN America (Feb. 27, 2025), http://pen.org/report/cover-to-cover/ ................................................................................ 4

Kasey Meehan, et. al., *Banned in the USA: Beyond the Shelves*, PEN America (November 1, 2024), https://pen.org/report/beyond-the-shelves/ ................................................................................ 4, 5

PEN America, *Book Bans*, https://pen.org/issue/book-bans/. ................... 2

PEN America, *PEN America Index of Educational Gag Orders*, https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yod7101o0TCk/viw6VOxbSUYd5nXM?blocks=hide/ ................. 2

Lisa Tolin, PEN America, *These 450 Books Were Banned in Iowa* (Oct. 19, 2023), https://pen.org/books-banned-in-iowa/. ......................... 26

Tim Webber & Samantha Hernandez, *Library books removed in Iowa school districts*, The Des Moines. Reg. (Dec. 20, 2023), https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/ ........................................... 3

Appellate Case: 25-1819    Page: 8    Date Filed: 08/01/2025 Entry ID: 5544013

## STATEMENT OF INTEREST

*Amicus Curiae* submits this brief pursuant to Fed. R. App. P. 29(b). All parties consent to the filing of the brief pursuant to Fed. R. App. P. 29(a)(2).

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights. PEN America advocates for free expression and the interests of writers in the United States and abroad. Its membership includes more than 5,000 writers, literary professionals, and readers, including nearly 300 members in the states comprising the Eighth Circuit.

As an advocate for free expression and the interests of writers, PEN America has a particular interest in opposing the suppression of ideas in literature. Thus, as educational censorship has ballooned in recent years, PEN America has actively monitored efforts like Senate File 496 ("SF496") to remove books from Iowa school libraries, believing that any such effort is damaging to a flourishing democracy. With this brief, *Amicus Curiae* explains the unlawful and deleterious consequences of

1

Appellate Case: 25-1819   Page: 9   Date Filed: 08/01/2025 Entry ID: 5544013

SF496 to PEN America and its constituencies if the preliminary injunction issued by the district court is lifted.

## INTRODUCTION AND SUMMARY OF ARGUMENT

PEN America has been at the forefront of tracking the proliferating book bans nationwide and state legislation enacted to codify them.[1] Legislation requiring book bans, such as Iowa's statewide mandate, SF496,[2] undermines public education systems in violation of the First Amendment by denying students' rights to receive information, infringing on authors' free speech rights, and misapplying the obscenity doctrine.

This brief focuses on the sections of SF496 limiting school libraries to "age-appropriate materials" which "do[] not include any…descriptions or visual depictions of a sex act." Iowa Code Ann. § 256.11(9) ("Library Restriction Program"). The law requires the removal of hundreds of books from public school libraries regardless of the age of the student reader or

---

[1] *See, e.g.,* PEN America, *Book Bans*, https://pen.org/issue/book-bans/.
[2] *See PEN America Index of Educational Gag Orders*, https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yod7l01o0TCk/viw6VOxb6SUYd5nXM?blocks=hide/.

Appellate Case: 25-1819    Page: 10    Date Filed: 08/01/2025 Entry ID: 5544013

the books' value as a whole—both of which considerations are required by the First Amendment.

The Library Restriction Program has led to sweeping book bans across Iowa[3] and "imposed a puritanical 'pall of orthodoxy' over school libraries." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 2023 WL 9052113, at \*19 (S.D. Iowa Dec. 29, 2023) (quoting *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967)). SF496 has superseded the discretion and judgment of educators and schools, and the application of community standards. Its restrictions constitute grave government overreach that has caused substantial harm to Iowan students, the writers who aim to reach them, and the larger culture of free expression. It is essential that the law continue to be enjoined until the case can be adjudicated on its merits in order to prevent further intrusions upon constitutionally protected freedoms and to stop the dangerous spread of an environment of fear and self-censorship in public

---

[3] *See* Tim Webber & Samantha Hernandez, *Library books removed in Iowa school districts*, The Des Moines Reg. (Dec. 20, 2023), https://www.desmoinesregister.com/story/news/education/2023/10/16/database-banned-books-removed-from-iowa-school-libraries-under-new-state-law-senate-file-496/70995919007/; Samantha LaFrance, PEN America., *These Books Are Banned in Urbandale* (Aug. 3, 2023), https://pen.org/iowa-book-bans/.

Appellate Case: 25-1819    Page: 11    Date Filed: 08/01/2025 Entry ID: 5544013

schools, as well as to avoid the chilling effect on writers' creative expression. Indeed, the consequences that would follow lifting the injunction would cause further serious and widespread harm fundamentally at odds with the First Amendment.

Accordingly, PEN America urges the Court to affirm the district court's preliminary injunction of the Library Restriction Program on the grounds that: (1) it violates students' right to receive information and (2) the restrictions will chill authors' speech and are prohibited under the obscenity doctrine.

## ARGUMENT

### I. SF496 is part of a troubling national trend of educational censorship and has already caused substantial harm.

Since 2021, state efforts to ban books in public school libraries have proliferated. Indeed, from July 2021 to June 2024, PEN America's Index of School Book Bans recorded nearly 16,000 instances of book bans across 43 states and 415 public school districts.[4] In that time, over 6,000 unique

---

[4] Kasey Meehan, et. al., *Banned in the USA: Beyond the Shelves*, PEN America (November 1, 2024), https://pen.org/report/beyond-the-shelves/. *See also* Madison Markham & Tasslyn Magnusson, *Banned in the USA: Cover to Cover*, PEN America (Feb. 27, 2025), http://pen.org/report/cover-to-cover/.

titles were affected and the work of over 4,500 authors, illustrators, and translators was censored.[5] In the 2023-2024 school year alone, there were over 10,000 recorded instances of book bans across the country.[6] SF496 is one of many bills and statutes across the country aiming to restrict constitutionally-protected speech. These laws fail to accomplish their supporters' purported goal of "protecting children" from "harmful" content and instead broadly restrict First Amendment rights.

Like so much book banning legislation across the country, SF496 denies students access to critical literature and cultural expression. These censorial laws and edicts ban books that schools have long deemed both appropriate and valuable to students at different ages and educational levels. Indeed, banned books in Iowa and across the country include classic works, award-winning literature, historical fiction and nonfiction, and new and captivating works by emerging writers.

SF496 requires each school district in the state to establish a K-12 "library program" that "contains only age-appropriate materials[.]" Iowa Code Ann. § 256.11(9)(a)(2) (the "Library Restriction Program"). The

---

[5] Meehan, *supra* note 4.
[6] Sabrina Baêta, et al., *Banned in the USA: Narrating the Crisis*, PEN America (Apr. 16, 2024), pen.org/report/narrating-the-crisis.

Appellate Case: 25-1819    Page: 13    Date Filed: 08/01/2025 Entry ID: 5544013

statute defines "age-appropriate" content—including books, topics, messages and teaching methods—as that which does not include "*any material* with descriptions or visual depictions of a sex act" as defined by Iowa's criminal code as "any sexual contact between two or more persons" based on a list of examples. Iowa Code §§ 256.11(19)(a)(1), 702.17. The only exception is for certain religious books, like the Bible. Iowa Code §§ 256.11(19)(a)(2), 280.6.

The term "age-appropriate" is a deceptive misnomer, as the statute fails to make any distinction among different age groups. As a result, the statute restricts high schoolers to what is "age-appropriate" for kindergarteners. The Library Restriction Program also utterly ignores pedagogical, literary, or cultural value, in addition to differences in maturity across age and grade levels. Rather, it is so sweeping that it has been used to censor an extraordinarily wide range of literature. Indeed, nearly 3,400 books were removed from Iowa public school library shelves to comply with the Library Restriction Program following the passage of SF496, including nearly 1,000 unique titles.[7] In December 2024, the Des

---

[7] Samantha Hernandez et. al., *Iowa book ban's toll: 3,400 books, including "1984" and "To Kill a Mockingbird"*, The Des Moines Reg. (Updated December 30, 2024),

Appellate Case: 25-1819    Page: 14    Date Filed: 08/01/2025 Entry ID: 5544013

Moines Register reported that even following the district court's initial preliminary injunction, almost 2,000 books remained off the shelves.[8] The far-reaching censorship of books has been so egregious that it has even included canonical literature and books long considered rites of passage for middle- and high-schoolers, leading some Iowa school districts to strike such classics as *The Bluest Eye* by Nobel Prize winner Toni Morrison, *A Farewell to Arms* by Nobel Prize winner Ernest Hemingway, *The Catcher in the Rye* by J.D. Salinger, *I Know Why the Caged Bird Sings* by Pulitzer Prize-winner Maya Angelou, and Gustav Flaubert's *Madame Bovary*.[9]

Beyond even the book removals arguably (albeit unconstitutionally) contemplated by the statute, the passage of SF496 has created a still broader culture of fear that led schools to preemptively censor their own collections rather than potentially run afoul of this strikingly broad law.[10] This censorship and the inevitable self-censorship that accompanies such

---

https://www.desmoinesregister.com/story/news/education/2024/06/06/books-banned-in-iowa-3400-include-to-kill-a-mockingbird-and-1984/73643557007/.

[8] *Id.*

[9] LaFrance, *supra* note 3.

[10] *See id.*

Appellate Case: 25-1819    Page: 15    Date Filed: 08/01/2025 Entry ID: 5544013

sweeping bans deprives Iowa's youth of access to the written word and voices of some of the world's most treasured writers, artists, and thinkers.

SF496 is not the stuff of democracy, and its baleful impact has already caused significant harm. The law's restriction of students' access to literature flies in the face of First Amendment protections and the values promoted by those protections and sets a dangerous precedent for the suppression of art and thought. PEN America thus urges the Court to consider the harm the Library Restriction Program has already inflicted, the stunning overbreadth of its restrictive sweep, and the still more devastating impact it would have on free expression in Iowa should the preliminary injunction be lifted.

## II. Students have a First Amendment right to receive information in public schools.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This has long been a guiding principle for courts considering First Amendment rights in public schools. And, although First Amendment rights must be "applied in light

8

Appellate Case: 25-1819    Page: 16    Date Filed: 08/01/2025 Entry ID: 5544013

of the special characteristics of the school environment," students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

Targeting all—indeed, *any*—descriptions of sex is precisely the type of abuse of discretion in the name of orthodoxy that the Court has squarely condemned. *See Keyishian,* 385 U.S. at 603 ("[T]he First Amendment…does not tolerate laws that cast a pall of orthodoxy over the classroom") As explained below, students have a First Amendment right to receive information from public school library books that cannot be abridged due to the government's distaste for the content of those books  Nor can Appellants render their infringement of students' rights valid by completely ignoring the requirements of the obscenity doctrine. *See* §§  III(C) and III(D) *infra.*

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Students have a First Amendment right to receive the information and ideas that SF496 seeks to censor. The Supreme Court addressed students' First Amendment rights to receive

Appellate Case: 25-1819     Page: 17     Date Filed: 08/01/2025 Entry ID: 5544013

information with respect to school library materials in *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853 (1982). *Pico* concerned the removal of books from a school district's libraries on the basis that school board members found them "anti-American, anti-Christian, [anti-Semitic], and just plain filthy." *Id.* at 857. Justice Brennan's plurality opinion there, joined by Justices Marshall and Stevens, and in part by Justice Blackmun,[11] set forth the standard that local school boards "may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Id.* at 872. In drafting the plurality opinion, Justice Brennan reasoned that students' right to receive information is an "inherent corollary" of their right to free speech, *Id.* at 867, and that school boards may not remove books to "prescribe what shall be orthodox in politics, nationalism, religion, and other matters of opinion." *Id.* at 871 (quoting *Barnette*, 319 U.S. at 642).

---

[11] Justice Blackmun accepted the standard set forth by the plurality but wrote separately. In his view, the ban was improper not due to a right to receive information, but rather because the "State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." *Id.* at 878-89.

Appellate Case: 25-1819    Page: 18    Date Filed: 08/01/2025 Entry ID: 5544013

While circuits around the country are split on adopting *Pico*'s standard,[12] it provides useful guidance in establishing a standard by which to evaluate school library book removals. *Pico* draws explicitly from the lineage of caselaw on free speech in public schools, which consistently affirms the rights of students to certain free speech protections and access to information, while recognizing the discretion of local school boards concerning curriculum and instruction. *Pico*, 457 U.S. at 868-72.[13]

As Justice Brennan's opinion in *Pico* states, removing books in "a narrowly partisan or political manner" "stand[s] inescapably condemned by our precedents." 457 U.S. at 870.[14] This principle is also the logical

---

[12] *Compare, e.g., ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (declining to apply *Pico*) *and Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) (same) *with Arce v. Douglas*, 793 F.3d 968, 981-82 (9th Cir. 2015) (applying *Pico*); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) (same); *and Kreimer v. Bureau of Police*, 958 F.2d 1242 (3d Cir. 1992) (same).

[13] *See also Epperson v. Arkansas*, 393 U.S. 97,  104 (1968) ("Our courts…have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief.").

[14] It is also worth noting that seven out of nine justices in the *Pico* court agreed that books could not be removed in a "narrowly partisan or political manner," a fact Chief Justice Rehnquist "cheerfully concede[d]" in his dissent. 457 U.S. at 907 (Rehnquist, C.J., dissenting).

Appellate Case: 25-1819    Page: 19    Date Filed: 08/01/2025 Entry ID: 5544013

conclusion of decades of caselaw on the First Amendment and public education.[15]

*Pico*, the lineage of caselaw on which it draws (such as *Barnette, Tinker, Shelton, Keyishian*) and subsequent relevant cases all emphasize the importance of students' right to receive information and the dangers of state intervention to "strangle the free mind at its source." *Barnette*, 319 U.S. at 637. *See, e.g., Arce*, 793 F.3d at 981-84 (9th Cir. 2015); *see also cf. Mahanoy Sch. Dist. v. B.L. ex. rel. Levy*, 594 U.S. 180, 190 (2021) (holding that schools have "an interest in protecting a student's unpopular expression").[16] These cases and the foundational First

---

[15] This Court's recent opinion in *Walls v. Sanders* is inapposite to the instant case. In *Walls*, the parties had conceded that government speech was at issue when it came to the classroom curricula, which was the focus of that case. *Walls v. Sanders*, No. 24-1990, 2025 WL 1948450 (8th Cir. July 16, 2025). In contrast, this case focuses on school libraries, and the Court previously rejected Appellants' government speech argument.

[16] Courts have also recognized the unique quality of libraries in providing patrons and students with sites of individual and extracurricular exploration. *See, e.g., Pico*, 457 U.S. at 869 ("Libraries afford [students] an opportunity at self-education and individual enrichment that is wholly optional"); *Right to Read Defense Comm. v. Sch. Comm.*, 454 F.Supp. 703, 715 (Mass.1978) ("[A] student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum.... Th[e] student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom."); *Minarcini v. Strongsville City Sch.*

12

Amendment principles they reflect underscore that students have a right to receive information.

SF496 imposes on all public school children, whether kindergartners or high school seniors, a blanket ban of all "descriptions or visual depictions of a sex act," Iowa Code Ann. § 256.11(19)(a)(1), and does so regardless of context and without any consideration of artistic, intellectual, or cultural value. This has resulted in books being pulled from the shelves that have been regarded for decades as classics of youth literature —including not only those listed referenced *supra* at 7, but also *1984* by George Orwell, *Beloved* by Toni Morrison, *Invisible Man* by Ralph Ellison, *Brave New World* by Aldous Huxley, and *Night* by Elie Wiesel.

In short, the Library Restriction Program hinders access to vital content by preventing all students, of any age or grade level, from reading literature that grows alongside them, failing to recognize that as readers

---

*Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (holding that libraries are widely understood as a public good and a "mighty resource in the free marketplace of ideas"); *and Brown v. La.*, 383 U.S. 131 (1966) (recognizing the significance of the library as "a place dedicated to quiet, to knowledge, and to beauty).

Appellate Case: 25-1819     Page: 21     Date Filed: 08/01/2025 Entry ID: 5544013

mature, they need and have a right to access books with more mature and complex ideas.

### III. SF496 will have a chilling effect on writers and fails to abide by the obscenity doctrine.
#### A. SF496 will negatively impact writers' ability to reach their intended audiences.

Writers of children's and young adult books often speak of their work with a sense of vocation. Reaching young readers is of paramount importance to them and is essential to fulfill their artistic purpose. These authors write for different audiences, but SF496 is a blunt instrument that treats all public-school students as if they were the same age and thus carries significant repercussions for the authors.

Young children's book author Tamara Ellis Smith writes that "a book is not finished until the reader reads it. If I've done my job, I've left enough space to let this alchemy happen between the reader and the story."[17] Jarrett J. Krosoczka, National Book Award finalist for *Hey*

---

[17] *Author Tamara Ellis Smith & Illustrator Nancy Whitesides on Tackling Stories Close to the Heart*, Cynsations: Celebrating Children's & Young Adult Literature (November 2023), https://cynthialeitichsmith.com/2023/11/guest-post-author-tamara-ellis-smith-illustrator-nancy whitesides-on-tackling-stories-close-to-the-heart/.

14

Appellate Case: 25-1819    Page: 22    Date Filed: 08/01/2025 Entry ID: 5544013

*Kiddo*, wrote his middle-grade illustrated memoir to help young people feel less alone, based on his own experience. "Books are like life preservers," he writes. "I, along with my colleagues, write for the teenagers we once were. And we defend a [student's] right to read because we know these books would have made our lives that much easier growing up."[18]

Junauda Petrus, author of the young adult novel *The Stars and the Blackness Between Them*, writes that her work "is so love-filled and wants to affirm, and make people feel safe and included and like they exist," and echoes the sentiments of many children's and young adult authors who write because of what books meant to them when they were young. "There was just so much love that I put into [my book], because I was a kid who loved to read. To me books are where I went to feel safe."[19]

Laws that prevent or hinder their books from reaching school libraries foreclose one of the most important ways writers find and

---

[18] Jarret J. Krosoczka, *Difficult Truths in Life and on the Page*, Medium (November 14, 2021), https://medium.com/@studiojjk/difficult-truths-in-life-and-on-the-page-a8549e0f6492.

[19] Tom Crann, *'Nothing about my book that is anything but love': Mpls. author responses to Texas  book list*, MPR News (November 11, 2021), https://www.mprnews.org/story/2021/11/11/nothing about-my-book-that-is-anything-but-love-mpls-author-responds-to-texas-book-list.

Appellate Case: 25-1819     Page: 23     Date Filed: 08/01/2025 Entry ID: 5544013

engage with their audiences, and thus thwart their artistic goals, intended reach, and financial well-being. As the district court noted in its order granting plaintiffs' motion for preliminary injunction,

> The Supreme Court has recognized that authors and publishers have standing to challenge regulations that prohibit them from reaching their intended audience or impose financial disincentives on their work. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (holding that publishers could challenge prison regulations limiting access to written materials); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (explaining that publishers and authors are interchangeable with respect to making First Amendment challenge to laws that impose content-based restrictions).

App. 400-01; R. Doc. 113, 10-11. In order to reach their readers, writers rely on libraries, and by removing authors' books from school libraries, SF496 closes off a critical channel through which authors can find their audiences and a critical source of income. App. 278; R. Doc. 104-15, 3.[20] Without this avenue for reaching readers, authors' First Amendment rights are curtailed. This harm to authors is another reason why this court should affirm the preliminary injunction.

---

[20] *See also* EveryLibrary, *How Do Authors Feel About Libraries* (Aug. 17, 2023), https://action.everylibrary.org/how_do_authors_feel_about_libraries.

16

Appellate Case: 25-1819    Page: 24    Date Filed: 08/01/2025 Entry ID: 5544013

## B. SF496 may lead authors to abstain from writing age-appropriate material.

Legislation like SF496 will undoubtedly have a chilling effect on writers and their publishers. Blunt instruments like the Library Restriction Program's broad and indiscriminate ban restrict access for a huge population of students to only what is deemed appropriate for much younger students, and this likewise fundamentally restricts the reach of authors (and their publishers). As a result, publishers who rely on library sales may become cautious in what and whom they choose to publish, in turn further limiting and chilling authors' speech and reach, as well as their financial horizons. Authors will likewise be incentivized to self-censor to avoid their works being removed and stigmatized.

Writing children's and young adult books requires tailoring the material for the age range of the writer's intended audience: what kind of language their readers can understand, what kind of subjects may hold their interest, and what content is appropriate for them to read. This is the heart of the important artistic work that authors do in writing books for young children, middle graders, and young adults.

Freedom of expression and freedom of thought require young readers being able to access the material that is appropriate for them.

17

Appellate Case: 25-1819    Page: 25    Date Filed: 08/01/2025 Entry ID: 5544013

But SF496 does not allow for this necessary access. Instead, it limits all children to a narrow range of books in one of the bluntest and broadest ways possible, denying them the chance to grow and mature, at their own pace, with literature. The plurality opinion in *Pico*, by contrast, recognized that the important "opportunity at self-education and individual enrichment" that school libraries afford students is of particular concern to First Amendment values. 457 U.S. 853, 869 (1982) (plurality).

As a result of SF496 and similar laws writers hoping to maximize their reach may be incentivized to avoid more complex topics that may be of critical importance to young readers, as well as any topics that a legislature or executive has deemed distasteful. *See* App. 278; R. Doc. 104-15, 4. This chilling effect would be disastrous for children's and young adult literature, impeding writers' abilities to confront difficult ideas and truths and hampering students' abilities to grow and evolve as critical thinkers and readers. So many of the books we have come to treasure in this country's rich literary heritage and culture initially broke boundaries, introducing and guiding young people to and through the

18

world they encounter and often struggle to navigate.[21]

Preventing writers from reaching and speaking to their intended readers constitutes what may be seen as ancillary damage caused by SF496, but it is still enormous in its potential harm and chilling effect. It is thus an important corollary to the misguided and unconstitutional restriction on students' own rights to receive information and harms authors' constitutionally protected rights as well.

### C. SF496 completely disregards the obscenity doctrine as to minors.

The Library Restriction Program's complete ban of any "descriptions or visual depictions of a sex act," Iowa Code Ann. § 256.11, also constitutes far too broad[22] an intrusion into student and author First Amendment rights because it fails to properly apply an obscenity test for

---

[21] For example, *The Adventures of Huckleberry Finn* by Mark Twain, *The Catcher in the Rye* by J.D. Salinger, and *To Kill a Mockingbird* by Harper Lee were all controversial upon their publication and have remained subject to controversy and censorship.

[22] While PEN America focuses here primarily on SF496's violation of the obscenity doctrine for minors, we note that its overbreadth, made all the more problematic by its vagueness, also violates the First Amendment. The overbreadth doctrine prevents enforcement of a law that "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal citations omitted). This is manifestly applicable here, given the language and sweep of SF496.

19

Appellate Case: 25-1819   Page: 27   Date Filed: 08/01/2025 Entry ID: 5544013

minors. The result is that countless books have and will be mislabeled "inappropriate" for minors because a single instance of a sex act automatically renders a book age-inappropriate regardless of context.[23]

Obscenity, of course, is not protected speech. Under the general test for obscenity, famously articulated in 1973 in *Miller v. California*, a work is obscene—and thus unprotected—if (1) the "'average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest," (2) it "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law", and (3) the work, "taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24 (internal citations omitted).

The Supreme Court has clarified that because of the state interest in preventing minors' access to harmful material, the state may adjust standards of obscenity based on the recipient: "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined." *Ginsberg v. State of N. Y.*, 390 U.S. 629, 636 (1968). The *Ginsberg* Court

---

[23] See Des Moines Reg., *supra* note 7.

20

Appellate Case: 25-1819    Page: 28    Date Filed: 08/01/2025 Entry ID: 5544013

explained that "the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed." *Id.*

After *Ginsberg,* and continuing after *Miller* was decided a few years later, the Supreme Court continued to interpret the First Amendment rights of minors through the lens of *Ginsberg.* For instance, two years after the *Miller* decision, in *Erznoznik*, the Supreme Court struck down a local ordinance banning all movies with nudity from drive-in theaters, finding that "[c]learly all nudity cannot be deemed obscene even as to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975) (citing *Ginsberg)*. That decision held that "minors are entitled to a significant measure of First Amendment protection" and the legislature cannot ban minors from access to constitutionally protected information or speech simply because it finds it "unsuitable" for them. *Id.* at 212-14.

In *Reno v. ACLU*, the Supreme Court struck certain provisions of the Communications Decency Act, decrying the "unacceptably heavy burden on protected speech" because it was not narrowly tailored to serve the statute's stated interest in protecting minors from harmful information on the internet. 521 U.S. 844, 882 (1997). In so doing, the

21

Court specifically identified the lack of consideration of *Miller*'s third prong—the literary, artistic, political, or scientific value of the censored works.[24] *Id.*

The Eighth Circuit has applied an obscenity test for minors that aligns with Supreme Court precedent. In a case considering an ordinance prohibiting display of material "harmful to minors," the Eighth Circuit defined "harmful to minors" by weighing representations of sexual conduct through the *Miller* test as applied to minors. *See Upper Midwest Booksellers Ass'n v. City of Minneapolis,* 780 F.2d 1389, 1390–91 (8th Cir. 1985). This Circuit relied on *Ginsberg,* explaining that it is "an adaptation of the pre-*Miller* obscenity standard to require an assessment of whether the material was suitable for minors under prevailing community standards." *Id.* at 1392. The Eighth Circuit upheld the ordinance in part because it was "limited to only those materials that are obscene as to minors." *Id.* at 1393–94.

---

[24] The Supreme Court also acknowledged *Ginsberg's* continuing force in *Brown v. Ent. Merchants Ass'n*, where it explained that the State "possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." 564 U.S. 786,794 (2011) (internal citations omitted).

22

Appellate Case: 25-1819    Page: 30    Date Filed: 08/01/2025 Entry ID: 5544013

The above line of Supreme Court and Eighth Circuit cases shows that, in restricting minors' access to speech and information, courts must consider an obscenity standard tailored to minors rather than an all-out ban of sexual content. *See. e.g., Ginsberg*, 390 U.S. at 634-40 (1968), *Upper Midwest Booksellers Ass'n*, 780 F.2d at 1393–94.

Appellants seek to rescue their blanket ban by claiming that because the restrictions are viewpoint-neutral, they do not cast a "pall of orthodoxy." App. Br., No. 25-1819, at 46. This attempt fails under governing precedent. First, not considering literary and educational value has the impermissible effect of deeming all descriptions of sex inappropriate and harmful. *Cf. Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994) ("Our cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys."). Second, as the progeny of *Ginsberg*, including *Miller*, *Reno, Erznoznik, Brown,* and *Upper Midwest Booksellers*, reminds us, disgust and discomfort with sex are not valid justifications for infringing on minors' First Amendment freedoms.

23

Appellate Case: 25-1819     Page: 31     Date Filed: 08/01/2025 Entry ID: 5544013

### D. The standards in SF496 fail to account for *Miller*'s required consideration of the literary value of the books.

Sweeping restrictions on sexual conduct regardless of context and literary and pedagogical value, like that which undergirds the Library Restriction Program of SF496, are also inconsistent with First Amendment jurisprudence and free expression principles that protect the  literary and artistic process – that is, the ways in which artists use and develop language. Instead, SF496 flattens this impermissibly and unrecognizably to a brute and simplistic equation that *any material* that depicts sex is *a priori* obscene and age inappropriate and therefore must be banned for all children.  Among other problems, this reflects a facile understanding of literature that fails to account for artistic value and the meaning of the work as a whole, one that *Miller* and other Supreme Court precedent have rejected.

As a writer's organization, *Amicus* has a significant interest in protecting authors' artistic processes. The censorship of writers' work without consideration of literary value or authorial intent is a gross violation of artistic freedom and has a chilling effect on literary imagination. Writers count on robust First Amendment freedoms and the

24

Appellate Case: 25-1819     Page: 32     Date Filed: 08/01/2025 Entry ID: 5544013

value that our culture places on free expression when writing about new ideas and experimenting with form and style. *See Miller*, 413 U.S. at 23 (noting the "inherent dangers of undertaking to regulate any form of expression").[25] In the absence of these protections, writers may shy away from innovation and bold exploration of challenging topics. App. 278; R. Doc. 104-15, 4.

This failure to consider artistic meaning, the artistic expressiveness of language, and the literary value of a book as a whole are all detrimental to the public and to culture at large, with real and devastating effects for authors and readers alike—including students in Iowa's public schools. SF496 denies Iowa students critical access to complex literature and information, and every author whose works are implicated in the state's schools will experience the stigmatizing effect of

---

[25] *See also Cohen v. California*, 403 U.S. 15 (1971) ("[O]ne man's vulgarity is another's lyric. ... . [I]t is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual….[M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well.") *and U.S. v. One Book Called "Ulysses"*, 5 F.Supp. 182, 183 (S.D.N.Y. 1933), aff'd sub nom., *U.S. v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705 (2d Cir. 1934) (recognizing the necessity of a sophisticated understanding of how content functions artistically within a work in determining obscenity).

Appellate Case: 25-1819     Page: 33     Date Filed: 08/01/2025 Entry ID: 5544013

their books' removal and the adverse consequences of having their creative expression chilled.

This is not an abstract or theoretical danger. Prior to the preliminary injunction of the Library Restriction Program, SF496 resulted in nearly 3,400 books pulled from shelves across multiple school districts.[26] Young Iowans have been denied access to classic works such as:

- *1984* and *Animal Farm* by George Orwell
- *Beloved*, *The Bluest Eye*, *Song of Solomon and Sula* by Toni Morrison
- *Brave New World* by Aldous Huxley
- *The Color Purple,* by Alice Walker
- *The Handmaid's Tale*, by Margaret Atwood
- *I Know Why the Caged Bird Sings*, by Maya Angelou
- *Invisible Man* by Ralph Ellison
- *Maus* by Art Spiegelman
- *Night* by Elie Wiesel
- *The Picture of Dorian Gray* by Oscar Wilde
- *Slaughterhouse Five* by Kurt Vonnegut
- *Their Eyes Were Watching God* by Zora Neale Hurston[27]

This result is contrary to a First Amendment that demands that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young

---

[26] See Des Moines Reg., *supra* note 7.
[27] Lisa Tolin, *These 450 Books Were Banned in Iowa*, PEN America, https://pen.org/books-banned-in-iowa/; Des Moines Reg., *supra* note 7.

26

Appellate Case: 25-1819     Page: 34     Date Filed: 08/01/2025 Entry ID: 5544013

from ideas or images that a legislative body thinks unsuitable for them."
*Erznoznik*, 422 U.S. at 213–14. The Library Restriction Program's blanket discrimination against sexual content is exactly the kind of censorship the *Miller* test and obscenity standards for minors were designed to avoid. *See Brown*, 564 U.S. at 798; *Reno*, 521 U.S. at 865; *Ginsberg*, 390 U.S. at 636. SF496 fails to abide by the requirements of the obscenity doctrine that recognize the complexity of literature and its multiplicity of meaning and should remain enjoined.

## CONCLUSION

State mandated prohibitions of books are anathema to the First Amendment and its interest in public education's important role in American society. SF496 is nothing short of an intrusion on key liberties, harming Iowans and authors from around the world in violation of the First Amendment. We respectfully encourage this Court to affirm.

Respectfully submitted,
By: */s/ Diane Elizabeth Brinkley*
Diane Elizabeth Brinkley, N.Y. Bar No. 6217160
PEN American Center
120 Broadway, 26th North Floor
New York, NY 10271
Telephone: 646-989-3883
ebrinkley@pen.org
Attorney for Amicus Curiae

Appellate Case: 25-1819    Page: 35    Date Filed: 08/01/2025 Entry ID: 5544013

**CERTIFICATION OF COMPLIANCE
PURSUANT TO FED. R. APP. 32(g)**

I certify that, pursuant to Fed. R. App. P. 32(g) and Fed. R. App. P. 29(a)(5),), the attached amicus brief is proportionally spaced, has a typeface of 14 points and contains 5,474 words.

> Dated: July 25, 2025
> By: /s/ *Diane Elizabeth Brinkley*
> Diane Elizabeth Brinkley

**CERTIFICATION OF COMPLIANCE
WITH EIGHTH CIRCUIT RULE 28A(h)**

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of *Amicus Curiae* PEN America in support of Appellees and Affirmance has been scanned for viruses and is virus-free.

> Dated: July 25, 2025
> By: /s/ *Diane Elizabeth Brinkley*
> Diane Elizabeth Brinkley

**CERTIFICATE OF SERVICE**

I certify that on July 25, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

> /s/ *Diane Elizabeth Brinkley*
>
> Diane Elizabeth Brinkley

28

Appellate Case: 25-1819    Page: 36    Date Filed: 08/01/2025 Entry ID: 5544013