No. 25-1819

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

PENGUIN RANDOM HOUSE LLC, *et al.*,

*Plaintiffs-Appellees*,

v.

JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education, *et al.*,

*Defendants-Appellants*,

JASON MENKE, in his official capacity as a member of the Urbandale Community School District Board of Education, *et al.*

*Defendants*.

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:23-cv-478 (Hon. Stephen H. Locher)

**BRIEF OF *AMICI CURIAE* FREEDOM TO READ FOUNDATION, IOWA LIBRARY ASSOCIATION, and AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 218-3389
Fax: (917) 344-1394
owolfe@seyfarth.com

*Attorneys for Amici Curiae Freedom to Read Foundation, Iowa Library Association, and American Association of School Librarians*

Dated: July 24, 2025

# DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* disclose as follows:

1. Freedom to Read Foundation is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

2. Iowa Library Association is a not-for-profit organization under Section 501(c)(6) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

3. American Association of School Librarians is a not-for-profit organization and a division of the American Library Association, which is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code that, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock.

i

Appellate Case: 25-1819   Page: 2   Date Filed: 08/01/2025 Entry ID: 5544021

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ...................................................................................... i

TABLE OF CONTENTS .............................................................................................. ii

**I.** STATEMENT OF INTEREST ..........................................................................1

**II.** STATEMENT OF CONTRIBUTIONS ............................................................3

**III.** INTRODUCTION .............................................................................................4

**IV.** ARGUMENT ....................................................................................................6

    **A.** Libraries are crucial to American democracy ......................................6

    **B.** School libraries are critical to our democracy.....................................6

    **C.** Robust school libraries result in better student outcomes....................7

    **D.** Iowa recognized the importance of school libraries ............................8

    **E.** Librarians rely upon set standards to curate school libraries ...............9

    **F.** SF496 restricts hundreds of books notwithstanding their educational merit ........................................................................................12

        **1.** SF496 prohibits libraries from carrying books with significant merit ........................................................................13

        **2.** The State violated the First Amendment by requiring removal of books regardless of their merit .............................14

    **G.** Library curation is not school-sponsored or government speech .......17

        **1.** School libraries are extracurricular and are not "school-sponsored" speech.................................................................18

        **2.** The government does not speak through the contents of library shelves .........................................................................21

        **3.** The State relies upon inapposite cases...................................25

Appellate Case: 25-1819    Page: 3    Date Filed: 08/01/2025 Entry ID: 5544021

**H.** The purported availability of the books from other sources does not prevent a constitutional violation ...................................................26

**V.** CONCLUSION..........................................................................................30

iii

Appellate Case: 25-1819    Page: 4    Date Filed: 08/01/2025 Entry ID: 5544021

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bd. of Educ. v. Pico*,
    457 U.S. 853 (1982)......................................................................5, 16, 18, 25, 26

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011)....................................................................................18, 21

*Case v. Unified Sch. Dist. No. 233*,
    908 F. Supp. 864 (D. Kan. 1995).....................................................................19

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) ...........................................................................20

*Counts v. Cedarville Sch. Dist.*,
    295 F. Supp. 2d 996 (W.D. Ark. 2003) ..........................................................28

*Epperson v. State of Ark.*,
    393 U.S. 97 (1968).............................................................................................15

*Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas,*
    684 F. Supp. 3d 879 (W.D. Ark. 2023) .........................................6, 9, 15, 21, 28

*Ginsberg v. New York*,
    390 U.S. 629 (1968)....................................................................................16, 17

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
    114 F.4th 660 (8th Cir. 2024) .....................................................................5, 21, 23

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988)...........................................................................................20

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)...........................................................................................15

*Little v. Llano County*,
    138 F.4th 834 (5th Cir. 2025) .....................................................................26, 28

*Mahanoy Area Sch. Dist. v. B.L.*,
    594 U.S. 180 (2021)...........................................................................................28

Appellate Case: 25-1819    Page: 5    Date Filed: 08/01/2025 Entry ID: 5544021

*Mahmoud v. Taylor*,
2025 U.S. LEXIS 2500 (Jun. 27, 2025)..............................................4, 15, 18, 28

*Martin v. City of Struthers*,
319 U.S. 141 (1943)...................................................................................15

*Matal v. Tam*,
582 U.S. 218 (2017)...............................................................................22, 23

*Miller v. California*,
413 U.S. 15 (1973)............................................................................16, 17, 20

*Minarcini v. Strongville City Sch. Dist.*,
541 F.2d 577 (6th Cir. 1976) ....................................................................12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...................................................................................25

*Packingham v. North Carolina*,
582 U.S. 98 (2017)....................................................................................27

*Parents v. Rockford Public School District*,
2023 Mich. Cir. LEXIS 928 (Kent Cty. Cir. Ct. Oct. 25, 2023) ........................17

*PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*,
711 F. Supp. 3d 1325 (N.D. Fl. 2024) ...........................................................21

*Penguin Random House LLC v. Gibson*,
2025 U.S. Dist. LEXIS 57961 (M.D. Fl. Feb. 28, 2025)....................................21

*Right to Read Def. Comm. v. Sch. Comm.*,
454 F. Supp. 703 (D. Mass. 1978)...............................................................19

*Roberts v. Madigan*,
702 F. Supp. 1505 (D. Colo. 1989)............................................................4, 15

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)...........................................................................24, 27, 28

*Sheck v. Baileyville School Committee*,
530 F. Supp. 679 (D. Me. 1982)...........................................................17, 19, 28

Appellate Case: 25-1819    Page: 6    Date Filed: 08/01/2025 Entry ID: 5544021

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022)................................................................22, 23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969)................................................................15, 28

*U.S. v. Am. Library Ass'n*,
   539 U.S. 194 (2003)................................................................25, 26

*United States v. One Book Called Ulysses*,
   5 F. Supp. 182 (S.D.N.Y. 1933) ........................................................13

*Walls v. Sanders*,
   2025 U.S. App. LEXIS 17527 (8th Cir. July 16, 2025) ........................18, 20, 28

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)........................................................................16

**Other Authorities**

*12 Novels Considered The "Greatest Book Ever Written*,"
   BRITTANICA (June 13, 2025), available at
   https://www.britannica.com/list/12-novels-considered-the-greatest-
   book-ever-written..........................................................................14

*1988 Book Award*, Robert F. Kennedy Human Rights (Jan. 26, 2016),
   available at
   https://web.archive.org/web/20160123032124/http:/rfkhumanrights
   .org/who-we-are/awards/1988-book-award/........................................14

*AASL Standards Framework for Learners*, AM. ASS'N OF SCH.
   LIBRARIANS (2017), available at https://standards.aasl.org/wp-
   content/uploads/2017/11/AASL-Standards-Framework-for-
   Learners-pamphlet.pdf....................................................................11

*Access to Resources and Services in the School Library: An
   Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N
   (2014), available at
   http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/
   accessresources ........................................................................10, 11

Appellate Case: 25-1819    Page: 7    Date Filed: 08/01/2025 Entry ID: 5544021

*All-TIME 100 Novels: Beloved*, TIME MAGAZINE (Jan. 6, 2010),
   available at https://entertainment.time.com/2005/10/16/all-time-
   100-novels/slide/beloved-1987-by-toni-morrison/ ..............................................14

BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION
   SCIENCES, SCHOOL LIBRARIES (4th ed. 2017) .................................................7, 29

Briana Hovendick Francis, et al., *School Librarians Continue to Help
   Students Achieve Standards: The Third Colorado Study*, LIBRARY
   RESEARCH SERVICE (2010), available at
   https://files.eric.ed.gov/fulltext/ED514556.pdf .......................................................7

*Code of Ethics*, AM. LIBR. ASS'N (2021), available at
   https://www.ala.org/tools/ethics ................................................................9, 12

*Diverse Collections: An Interpretation of the Library Bill of Rights*,
   AM. LIBR. ASS'N (2019), available at
   http://www.ala.org/advocacy/intfreedom/librarybill/interpretations/
   diversecollections ...............................................................................................11

Douglas L. Achterman, *Haves, Halves, and Have-Nots: School
   Libraries and Student Achievement in California*, U. N. Tex.
   (2008), available at
   https://digital.library.unt.edu/ark:/67531/metadc9800/ .........................................7

*IFLA Guidelines for Library Services to Children aged 0-18*,
   INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND
   INSTITUTION (2d ed. 2018), available at https://www.ifla.org/wp-
   content/uploads/2019/05/assets/libraries-for-children-and-
   ya/publications/ifla-guidelines-for-library-services-to-
   children_aged-0-18.pdf ........................................................................................11

*Interpretations of the Library Bill of Rights*,
   AM. LIBR. ASS'N (2017), available at
   https://www.ala.org/advocacy/intfreedom/librarybill/
   interpretations ....................................................................................................10

IOWA DEPARTMENT OF EDUCATION, IOWA SCHOOL LIBRARY PROGRAM
   STANDARDS 3 (2019), available at
   https://educate.iowa.gov/media/4782/download?inline= ....................................8

vii

Appellate Case: 25-1819   Page: 8   Date Filed: 08/01/2025 Entry ID: 5544021

James Madison, *Letter from James Madison to W.T. Barry*, LIBRARY OF CONGRESS (Aug. 4, 1822), available at https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text ................... 26

Jared Gibbs, *"For Tomorrow Will Worry About Itself"*, 34 W. NEW ENG. L. REV. 381 (2012) ................................................................. 6

Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001), available at https://files.eric.ed.gov/fulltext/ED456861.pdf ..................................... 8

Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012), available at https://files.eric.ed.gov/fulltext/ED543418.pdf ............................... 7

Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018), available at http://kappanonline.org/lance-kachel-school-librarians-matter-years-research/ ........................................................................... 8

Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993) ........................................... 7

Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012), available at https://files.eric.ed.gov/fulltext/ED572250.pdf ..................................... 7

*Library Bill of Rights*, AM. LIBR. ASS'N (2019) (preamble), available at https://www.ala.org/advocacy/intfreedom/librarybill ................... 9, 10, 11, 12

*Pieces of Iowa's Past*, IOWA LEGISLATIVE SERVICES AGENCY (Apr. 4, 2018), available at https://www.legis.iowa.gov/docs/publications/TB/961350.pdf ...................... 10

Richard J. Peltz, *Pieces of Pico*, 2005 BYU EDUC. & L.J. 103 (2005) ..................... 6

viii

STATE LIBRARY OF IOWA & IOWA DEPARTMENT OF EDUCATION, IOWA SCHOOL LIBRARY GUIDELINES: LIBRARIES, LITERACY AND LEARNING FOR THE 21ST CENTURY 4 (2007), available at https://publications.iowa.gov/20503/1/0708_pk12_schoollibraryproguidelineshandout.pdf ...................................................................................8, 9

Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89 (1997) ......................................................................................................29

U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005), available at https://nces.ed.gov/pubs2005/2005324.pdf .........................................................7

*Ulysses*, BRITTANICA (June 13, 2025), available at https://www.britannica.com/topic/Ulysses-novel-by-Joyce...............................13

ix

Appellate Case: 25-1819     Page: 10     Date Filed: 08/01/2025 Entry ID: 5544021

# I.  STATEMENT OF INTEREST

The Freedom to Read Foundation ("FTRF") was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The Iowa Library Association ("ILA") fosters a community of library-related innovation and advocacy in Iowa, supporting and strengthening its members to promote libraries as an essential resource for all Iowans.  ILA endeavors to defend challenges to intellectual freedom and the freedom to read, while also advocating for critical funding, access to information, local control, and the importance of teacher-librarians in every school.

The American Association of School Librarians ("AASL") is the preeminent national professional association for school librarians.  All aspects of the association's work reflect its core values: learning; innovation; equity; diversity; inclusion; intellectual freedom; and collaboration.  AASL is committed to ensuring

1

Appellate Case: 25-1819     Page: 11     Date Filed: 08/01/2025 Entry ID: 5544021

that all learners have a school library collection that is physically and intellectually accessible and where access is best met at the time of need.

*Amici curiae* believe that viewpoint censorship violates the core value of preserving intellectual freedom and that students have an important First Amendment right to receive information. *Amici* thus have a strong interest in the outcome of this case.

Appellants and Appellees consent to the filing of this *amici curiae* brief.

Appellate Case: 25-1819    Page: 12    Date Filed: 08/01/2025 Entry ID: 5544021

## II. <u>STATEMENT OF CONTRIBUTIONS</u>

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici curiae* state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the *amici curiae*, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

Appellate Case: 25-1819    Page: 13    Date Filed: 08/01/2025 Entry ID: 5544021

### III.   INTRODUCTION

"The school library is a mirror of the human race, a repository of the works of scientists, leaders, and philosophers…. The school library offers the student a range of knowledge, from the world's great novels and plays to books on hobbies and how-to-do-it projects." *Roberts v. Madigan*, 702 F. Supp. 1505, 1512 (D. Colo. 1989).

Senate File 496 ("SF496") undermines the purpose of the school library. Contrary to the arguments of Defendants-Appellants (collectively, the "State"), the law is not limited to restricting depictions of "sex acts," which the District Court correctly found was an overbroad, vague phrase. The law also bans books deemed not to be "age appropriate," a similarly-vague standard not utilized by professional librarians, the extent and reach of which are intentionally unclear and which does not distinguish between elementary, middle, and high school. The District Court's approach, by which the government must take literary, educational, and artistic merit into account, is consistent with the First Amendment and the history and purpose of libraries.

The State contends that it has unlimited authority to restrict books in the school library, either because of its powers over the school curriculum or because library curation is "government speech," and thus the State can impose viewpoint-based directives on local library curation decisions. The State's power over the curriculum is not unlimited, however. The Supreme Court reaffirmed, in *Mahmoud*

4

*v. Taylor*, 2025 U.S. LEXIS 2500 (Jun. 27, 2025), that curriculum decisions cannot override First Amendment rights or impose what Justice Thomas called "ideological conformity." The State's powers over the school library collection are ***more*** limited because that collection is ***not*** the curriculum: although ***librarians*** provide crucial academic support for the entire school community, the school library ***collection*** is an ***extracurricular*** place of study for ***optional*** reading.

The State also effectively asks this Court to overrule its government speech holding in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024). Setting aside that the Court should follow its precedent, the State's argument is dangerous. Under that argument, it is not hyperbole to say that the First Amendment would permit Vermont to pass a law prohibiting school libraries from carrying books that mention President Trump; Massachusetts to require school libraries to only carry books that promote Democrats; and Texas to mandate inclusion of only books by Republicans. Governments would be empowered to impose "ideological conformity" and proceed "in [the] narrowly partisan or political manner" that a majority of Supreme Court justices agreed decades ago, in *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982), would be unconstitutional.

The District Court should be affirmed.

Appellate Case: 25-1819   Page: 15   Date Filed: 08/01/2025 Entry ID: 5544021

## IV. <u>ARGUMENT</u>

### A. Libraries are crucial to American democracy.

Public libraries predate our country's establishment, with Benjamin Franklin credited with founding the first American subscription library in 1731. Jared Gibbs, *"For Tomorrow Will Worry About Itself"*, 34 W. NEW ENG. L. REV. 381, 394 (2012). Colonial libraries developed as early as 1770. Richard J. Peltz, *Pieces of Pico*, 2005 BYU Educ. & L.J. 103, 112 (2005). "After the British burned Washington's congressional library during the War of 1812, Thomas Jefferson sold his personal collection…to start what is now the Library of Congress." *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 889 (W.D. Ark. 2023). "He famously said, 'I have often thought that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county….'" *Id.*

### B. School libraries are critical to our democracy.

The emergence of public libraries coincided with the rise of public education and, with it, school libraries. Melvil Dewey, inventor of the library cataloging system, asserted that:

> [a] collection of books in every schoolroom for everyday use is coming to be considered an essential part of a school building's furniture. These books introduce children to the best literature of the world; they interest them in other phases of any subject they may be studying than those set forth in their text-books…. [T]hey familiarize the children with books and their use; and, in any subject, they permit

6

> the beginning of that laboratory method which is now considered so essential in all educational work.

Peltz, *supra*, at 114.  Since the early 1950s, more than 30,000 school libraries have been established.  U.S. DEPARTMENT OF EDUCATION, AMERICA'S PUBLIC SCHOOL LIBRARIES: 1953-2000 1 (2005).

### C. Robust school libraries result in better student outcomes.

School libraries' positive impact on students is well-documented.  "Research studies" show "student success when schools had libraries, librarians, and resources."  BLANCHE WOOLLS, ENCYCLOPEDIA OF LIBRARY AND INFORMATION SCIENCES, SCHOOL LIBRARIES 4004 (4th ed. 2017).  The quality of, and access to, books at a school library is a powerful predictor of academic achievement. *See, e.g.*, Keith Curry Lance & Linda Hofschire, *Change in School librarian staffing linked with gains in student achievement, 2005 to 2011*, LIBRARY RESEARCH SERVICE (2012); Keith Curry Lance & Bill Schwartz, *How Pennsylvania School Libraries Pay Off: Investments in Student Achievement and Academic Standards*, PA SCHOOL LIBRARY PROJECT (2012); Briana Hovendick Francis, et al., *School Librarians Continue to Help Students Achieve Standards: The Third Colorado Study*, LIBRARY RESEARCH SERVICE (2010); Douglas L. Achterman, *Haves, Halves, and Have-Nots: School Libraries and Student Achievement in California*, U. N. Tex. (2008); Keith Curry Lance, et al., *The Impact of School Library Media Centers on Academic Achievement* (1993).

Appellate Case: 25-1819    Page: 17    Date Filed: 08/01/2025 Entry ID: 5544021

Research consistently confirms that strong library programs increase student achievement. Keith Curry Lance & Debra E. Kachel, *Why School Librarians Matter: What Years of Research Tell Us*, KAPPAN (2018); *see also, e.g.*, Keith Curry Lance, *Proof of the Power: Recent Research on the Impact of School Library Media Programs on the Academic Achievement of U.S. Public School Students*, ERIC CLEARINGHOUSE (2001).

**D. Iowa recognized the importance of school libraries.**

Historically, Iowa recognized the importance of diverse school library collections. "Good school library programs help students learn and help teachers teach. The best school libraries are centers of learning in their schools. They are permeated by a 'culture of literacy,' where the development of skills and interest in reading, writing, listening, speaking and thinking are promoted and practiced." STATE LIBRARY OF IOWA & IOWA DEPARTMENT OF EDUCATION, IOWA SCHOOL LIBRARY GUIDELINES: LIBRARIES, LITERACY AND LEARNING FOR THE 21ST CENTURY 4 (2007).

Having a teaching librarian "maximizes access to and promotes the use of high-quality and high-interest literature that reflects the diverse developmental, cultural, social, and linguistic needs of all learners." IOWA DEPARTMENT OF EDUCATION, IOWA SCHOOL LIBRARY PROGRAM STANDARDS 3 (2019). School librarians are empowered to "select[] high-quality and high-interest literature in

8

formats that reflect the diverse developmental, cultural, social, and linguistic needs of the range of learners and their communities." *Id.* at 11.

**E. Librarians rely upon set standards to curate school libraries.**

The American Library Association ("ALA") is the sole accrediting body for library and information science schools in the United States. *Fayetteville*, 684 F. Supp. 3d at 890. "Professional librarians hold advanced degrees from ALA-accredited institutions, and…are taught to adhere to the ALA's Code of Ethics and Library Bill of Rights in their professional lives." *Id.*

The ALA's Code of Ethics "guide[s] the work of librarians," focusing on "the values of intellectual freedom that define the profession of librarianship." *Code of Ethics,* AM. LIBR. ASS'N (2021). Chief among librarians' obligations is the duty ***not*** to limit access to information based on viewpoint:

> 1. We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.
>
> 2. We uphold the principles of intellectual freedom ***and resist all efforts to censor library resources***.
>
> ***
>
> 6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.
>
> 7. We distinguish between our personal convictions and professional duties ***and do not allow our personal beliefs to interfere*** with…the provision of access to their information resources.

9

*Id.* (emphasis added).

The ALA's Library Bill of Rights was originally drafted in Iowa in 1938 by the Des Moines Public Library's director. *Pieces of Iowa's Past,* IOWA LEGISLATIVE SERVICES AGENCY (Apr. 4, 2018). It sets forth the "basic policies [that] should guide [library] services." *Library Bill of Rights,* AM. LIBR. ASS'N (2019) (preamble). The Library Bill of Rights is unequivocal in its condemnation of censorship and attempts to limit information based on viewpoint:

> Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

> Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.

*Id.* §§ II, III. "'[A]ll people' and 'all points of view' should be included in library materials and information," with "no limiting qualifiers for viewpoint, origin, or politics." *Interpretations of the Library Bill of Rights,* AM. LIBR. ASS'N (2017).

These policies apply to school libraries. *Access to Resources and Services in the School Library: An Interpretation of the Library Bill of Rights,* AM. LIBR. ASS'N (2014). The school library "serves as a point of voluntary access to information and ideas and as a learning laboratory for students as they acquire critical thinking and problem-solving skills needed in a pluralistic society." *Id.* School library curation should be "unfettered by…personal, political, social, or religious views" so that

10

"[s]tudents and educators…have access to resources and services free of constraints resulting from personal, partisan, or doctrinal disapproval." *Id.*

The National School Library Standards emphasize the importance of the school library as an essential part of the learning community, preparing students for college, careers, and life. *See generally AASL Standards Framework for Learners,* AM. ASS'N OF SCH. LIBRARIANS (2017). School librarians are trained to curate collections in an inclusive, not exclusive, process. *See generally Diverse Collections: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N (2019). School librarians do not exclude materials because they are controversial or represent viewpoints with which they disagree, but include books that reflect a diversity of thought. *See id.* School librarians curate the library collection, and provide resources and learning tools for an entire school.

When following these principles, librarians are guided by the understanding that there is no "one size fits all" approach to what books are appropriate for a particular school and community:

> Children's libraries should provide a variety of developmentally appropriate materials in a variety of formats and to meet the needs of all age groups. There are no universal standards for the size and content of children's library collections…. A wide range of opinions, values and views should be reflected in the library stock and online accessible materials.

*IFLA Guidelines for Library Services to Children aged 0-18,* INTERNATIONAL FEDERATION OF LIBRARY ASSOCIATIONS AND INSTITUTION (2d ed. 2018).

11

Appellate Case: 25-1819     Page: 21     Date Filed: 08/01/2025 Entry ID: 5544021

Trained librarians curate library collections not to promote or restrict particular viewpoints, but to ensure that those collections serve as "a mighty resource in the free marketplace of ideas." *Minarcini v. Strongville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). A librarian engaging in viewpoint discrimination when making curation decisions acts contrary to their training; the Library Bill of Rights and Code of Ethics; and the First Amendment.

SF496 ignores the foregoing. It mandates restrictions of books with descriptions of "sex acts"—an overbroad and vague standard—and employs an "age appropriate" standard not used by librarians. Worse, the "age appropriate" standard does not differentiate between elementary, middle, and high schools. In curating school library collections, every professional librarian takes into account the grade level of the students at the school, and includes materials that are developmentally appropriate for the range of students for whom the collection is intended. SF496 prevents librarians from curating diverse collections for their communities, contrary to the history, purpose, and function of school libraries.

## F. SF496 restricts hundreds of books notwithstanding their educational merit.

SF496's restrictions are contrary to well-established curation principles and the First Amendment. SF496 prohibits school libraries from carrying books that, *inter alia*, are award-winners, best-sellers, or otherwise have well-recognized

12

Appellate Case: 25-1819    Page: 22    Date Filed: 08/01/2025 Entry ID: 5544021

merit—the types of books a trained librarian would be expected to select for the school library collection.

### 1. SF496 prohibits libraries from carrying books with significant merit.

Even using the State's interpretation (*see* App.Vol.II.414-15, R.Doc.113 at 24-25), SF496 requires the removal of hundreds of books that would otherwise be found on school library shelves. *See* App.Vol.II.396, 416-17, 420-21, R.Doc.113 at 6, 26-27, 30-31. Two examples underscore the problem.

One of the books barred by SF496 is *Ulysses* by James Joyce. *See id.* "Stylistically dense and exhilarating, it is regarded as a masterpiece and has been the subject of numerous volumes of commentary and analysis." *Ulysses*, BRITTANICA (June 13, 2025). Judge John M. Woolsey found that *Ulysses* "is not pornographic." *United States v. One Book Called Ulysses*, 5 F. Supp. 182, 183 (S.D.N.Y. 1933). Judge Woolsey famously wrote:

> Joyce sought to make a serious experiment in a new, if not wholly novel, literary genre…. Joyce has attempted—it seems to me, with astonishing success—to show how the screen of consciousness with its ever-shifting kaleidoscopic impressions carries, as it were on a plastic palimpsest, not only what is in the focus of each man's observation of the actual things about him, but also in a penumbral zone residua of past impressions, some recent and some drawn up by association from the domain of the subconscious.
>
> …
>
> [W]hen such a great artist in words, as Joyce undoubtedly is, seeks to draw a true picture of the lower middle class in a European city, ought it to be impossible for the American public legally to see that picture?

13

Appellate Case: 25-1819    Page: 23    Date Filed: 08/01/2025 Entry ID: 5544021

*Id.* at 183-84.

Another book barred by SF496 is *Beloved* by Nobel Prize-winning author Toni Morrison.  App.Vol.II.420-21, 426, R.Doc.113 at 30-31, 36.  *Beloved* is one of the greatest novels of all time and won the Pulitzer Prize in 1988.  *12 Novels Considered The "Greatest Book Ever Written,"* BRITTANICA (June 13, 2025).  Time Magazine wrote that *Beloved* is:

> [r]ich with historical, political and above all personal resonances, written in prose that melts and runs with the heat of the emotion it carries, *Beloved* is a deeply American, urgently important novel that searches for that final balance between grief, anger and acceptance.

*All-TIME 100 Novels: Beloved*, TIME MAGAZINE (Jan. 6, 2010).  One writer stated that "I can't imagine American literature without it."  *See 1988 Book Award*, Robert F. Kennedy Human Rights (Jan. 26, 2016).

*Amici* could recite similar facts about other books barred by SF496.  The law restricts hundreds of books with significant literary or educational merit that are of interest to students in Iowa schools.

### 2. The State violated the First Amendment by restricting books regardless of their merit.

SF496 requires that Iowa students "imagine American literature without" *Beloved* and that "it [ought] to be impossible for [students] legally to" find *Ulysses* in school.  By ignoring the educational value of the banned books, the State violated the First Amendment.

14

Appellate Case: 25-1819     Page: 24     Date Filed: 08/01/2025 Entry ID: 5544021

"Our founding fathers understood that 'novel and unconventional ideas might disturb the complacent'; yet in authoring the First Amendment, they sought "to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Fayetteville*, 684 F. Supp. 3d at 891-92 (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)). With respect to schools, "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us…. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

"First Amendment rights[ are] not 'shed…at the schoolhouse gate.'" *Mahmoud*, 2025 U.S. LEXIS 2500, at *34 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969)). There "can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any…sect or dogma." *Epperson v. State of Ark.*, 393 U.S. 97, 106 (1968). "[T]o justify prohibition of a particular expression of opinion, [the State] must…show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Otherwise, the government could restrict viewpoints from any part of the political, religious, or

15

social spectrum.  *See, e.g., Roberts*, 702 F. Supp. at 1512-13 (rejecting attempts to remove the Bible from a school library).

"[T]he First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library." *Pico*, 457 U.S. at 866.  "Access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868.  "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (plurality) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).  Because the First Amendment "does not permit the official suppression of *ideas*," a majority of the Supreme Court agreed that the removal of books from school library shelves "in a narrowly partisan or political manner" is unconstitutional. *Id.* at 870-71 (plurality); *id.* at 907 (Rehnquist, J., dissenting) ("cheerfully" conceding this point).

SF496 violates the First Amendment because, among other things, it ignores the literary or educational merit of the affected books. *See, e.g., Miller v. California*, 413 U.S. 15, 22-23 (1973) ("in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression"); *Ginsberg v. New York*, 390 U.S. 629,

16

Appellate Case: 25-1819     Page: 26     Date Filed: 08/01/2025 Entry ID: 5544021

632 (1968) (law prohibiting speech "utterly without redeeming social importance for minors" constitutional).

Where "every book identified by Plaintiffs has either received accolades or been on best seller lists," a school cannot "establish they are harmful to minors pursuant to the *Miller* test." *Parents v. Rockford Public School District*, 2023 Mich. Cir. LEXIS 928, at \*10-11 (Kent Cty. Cir. Ct. Oct. 25, 2023); *see also Sheck v. Baileyville School Committee*, 530 F. Supp. 679, 687 (D. Me. 1982) (in the school library, "the state may not impede individual expression even on obscenity grounds except in accordance with judicially-supervised standards requiring a showing that the challenged expression, taken as a whole, lacks 'serious literary, artistic, political, or scientific value' and 'appeal(s) to the prurient interest in sex,'" citing *Miller* and *Ginsberg*).

Library bookshelves have limited space and cannot include every book published. Certified, trained librarians make decisions about which books should be included based upon the needs of the students and communities they serve. The State overrode those decisions and restricted books without giving any weight to their merit, violating the First Amendment.

**G. Library curation is not school-sponsored or government speech.**

The State attempts to justify its actions through two arguments: ***first***, the government's selection of items for the curriculum is "school-sponsored" speech, so

17

school library curation must be too; and *second*, selecting what books go on or off library shelves is akin to selecting a public monument or issuing a license plate for a vehicle. *See* State Br. 17-32, 59-70. These arguments are meritless.

### 1. School libraries are not "school-sponsored" speech.

The State's argument (State Br. 17-32), that selecting the school curriculum is "school-sponsored" speech, and therefore curating a school library collection is too, fails. "No doubt a State possesses legitimate power to protect children from harm," but "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794-95 (2011) (Scalia, J.).

Even where the government is acting in connection with the curriculum, "[g]overnment schools…may not place unconstitutional burdens on" First Amendment rights. *Mahmoud*, 2025 U.S. LEXIS 2500, at *24. Schools cannot use the curriculum to "exert upon children a psychological 'pressure to conform' to…specific viewpoints." *Id.* at *39; *see also id.* at *76 (Thomas, J., concurring) (school may not use curriculum to "pursue…ideological conformity").

In any event, the government's power over curriculum is not relevant because school libraries are *extracurricular*. Library books are not required reading but are available for students to explore with the guidance of trained librarians. *See Pico*, 457 U.S. at 862 (Brennan, J.) ("the only books at issue…are *library* books that by

18

Appellate Case: 25-1819    Page: 28    Date Filed: 08/01/2025 Entry ID: 5544021

their nature are optional rather than required reading"); *Walls v. Sanders*, 2025 U.S. App. LEXIS 17527, at \*14-15 (8th Cir. July 16, 2025) ("distinguish[ing] the school library from the classroom"; although plaintiffs conceded that curriculum decisions at-issue were government speech, "books in a library" are different than "in-classroom instruction and materials"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875-76 (D. Kan. 1995) (school officials do not have "absolute discretion beyond the compulsory environment of the classroom into the school library," where "the regime of voluntary inquiry…hold[s] sway"); *Sheck*, 530 F. Supp. at 689 (discussing "the extracurricular environment of the school library"; "[t]he information and ideas in books placed in a school library by proper authority are protected speech and the first amendment right of students to receive that information and those ideas is entitled to constitutional protection").

As another court explained:

> The student who discovers the magic of the library is on the way to a life-long experience of self-education and enrichment…. [A] library is a place to ***test or expand upon ideas*** presented to him, ***in or out of the classroom***. The most effective antidote to the poison of mindless orthodoxy is ready access to a broad sweep of ideas and philosophies. There is no danger in such exposure. The danger is in mind control.

*Right to Read Def. Comm. v. Sch. Comm.*, 454 F. Supp. 703, 715 (D. Mass. 1978) (emphasis added). Although school librarians support the entire school community and are instrumental beyond the library, school library collections are not part of the curriculum.

*Hazelwood Sch. Dist. v. Kuhlmeier* (State Br. 17-32) is inapposite because it involved articles in a school-created, school-sponsored newspaper, integrated into "the educational curriculum" and controlled by the school's journalism teacher. 484 U.S. 260, 268 (1988); *see also Chiras v. Miller*, 432 F.3d 606, 615-16 (5th Cir. 2005) (cited in State Br. 63) (selection of textbooks for use ***in the classroom***). Here, the books on school library shelves were not printed or edited by the government. Moreover, this Court held that *Hazelwood* applies to the "regulation of *student* speech in school-sponsored settings," but library books are obviously not "student speech." *Walls*, 2025 U.S. App. LEXIS 17527, at \*17 (italics in original). *Hazelwood* is inapplicable.

*Hazelwood* would not help the State, however; it requires that the government's actions be "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. Here, the State issued a blanket prohibition on books that include descriptions of "sex acts" or are otherwise not "age appropriate"—vague phrases that have sown confusion—without taking into account the merit of the books affected or the age and maturity of the students. *See* App.Vol.II.394-96, R.Doc.113 at 4-6 (State provided no guidance on meaning of "age appropriate" and only limited guidance on meaning of "sex acts," leading to "uncertainty among school districts and school officials").

20

It cannot be that a school can restrict library books merely to "avoid controversy," as the State claims. *See* State Br. 30-31. If that were true, a Democratic-controlled school board could remove books describing President Trump's policies without violating the First Amendment, and a Republican-controlled school board could do the same with books about Democratic policies. That argument is anathema to the First Amendment.

The State's actions were a forbidden attempt to exercise a "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95. The District Court should be affirmed.

> ### 2. The government does not speak through the contents of library shelves.

The State's attempt to equate library curation to government speech fails. *See* State Br. 59-70. This Court rejected that argument last year. *GLBT Youth*, 114 F.4th at 667-68 ("placement and removal of books in public school libraries" not government speech). This Court should not overrule its precedent, which is consistent with decisions by many other courts.[1]

---

[1] *See Penguin Random House LLC v. Gibson*, 2025 U.S. Dist. LEXIS 57961, at *20-24 (M.D. Fl. Feb. 28, 2025) ("the Court cannot find that the selection or removal of books in a public school library is government speech"); *PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fl. 2024) ("The Court is not persuaded that decisions regarding the content of school libraries is 'government speech' that is not subject to any constitutional constraints"); *Fayetteville*, 684 F. Supp. 3d at 909 (discussing lack of "legal precedent to suggest that the state may

21

"[T]he real question in government-speech cases [is] whether the government is *speaking* instead of regulating private expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 262 (2022) (Alito, J., concurring). Justice Alito warned that "it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint'" and cautioned that "the government-speech doctrine becomes 'susceptible to dangerous misuse.'" *Id.* at 262-63; *see also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints").

The Supreme Court articulated three factors to determine whether an action is government speech: "[1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; and [3] the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 244.

In *Matal*, the Supreme Court held that the government's registration of trademarks is not government speech. 582 U.S. at 235-39. The Court reasoned that "[t]he Federal Government does not dream up these marks, and it does not edit marks

censor non-obscene materials in a public library because such censorship is a form of government speech").

Appellate Case: 25-1819    Page: 32    Date Filed: 08/01/2025   Entry ID: 5544021

submitted for registration." *Id.* at 235. If the marks were government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *Id.* at 236; *see also GLBT Youth*, 114 F.4th at 668. The Court held that "[t]rademarks have not traditionally been used to convey a Government message…[a]nd there is no evidence that the public associates the contents of trademarks with the Federal Government." *Matal*, 582 U.S. at 238; *see also, e.g., Shurtleff*, 596 U.S. at 254-56 (city did not control messages on flags on government property and public would not believe city endorsed those messages).

The State did not "dream up" or "edit" the books in the school library. *See Matal*, 582 U.S. at 235. If putting books on a shelf is government speech, then the government "is babbling prodigiously and incoherently" and "saying many unseemly things." *See id.* Libraries are not sending any cognizable message by, *e.g.*, including on their shelves both *Mein Kampf* and books celebrating Jewish faith.[2]

The government has not traditionally conveyed messages to the public through library shelves. *See id.* at 238. Rather, as set forth above at pgs. 6-12, *supra*, the State's actions are antithetical to school libraries' history and mission. Nor would the public reasonably perceive that the government speaks by placing

---

[2] *See Mein Kampf*, Des Moines Public Library, https://catalog.dmpl.org/Record/153913?searchId=5917665&recordIndex=1&page=1&referred=resultIndex; *Judaism Is About Love*, Des Moines Public Library, https://catalog.dmpl.org/Record/389251?searchId=5938906&recordIndex=6&page=1&referred=resultIndex.

Appellate Case: 25-1819   Page: 33   Date Filed: 08/01/2025 Entry ID: 5544021

particular books on library shelves.  Selecting books for libraries is a situation where the government "expends funds to encourage a diversity of views from private speakers."  *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 833-34 (1995) (cited in State Br. 63).  That conduct is ***not*** government speech.  *Id.* at 833-86.

The State argues that the government is not speaking through books, but through placing certain books, but not others, on the shelves.  *See* State Br. 60-63.  Unlike a private actor who curates newspaper articles, television programs, or social media posts expressing certain viewpoints or content, however, one of a library's major objectives is to make available a wide array of books, regardless of viewpoint.  *See* pgs. 9-12, *supra*.

The State's assertion that the government historically used the library to convey messages—such as, *e.g.*, novels are "trashy" (State Br. 64-65)—is wrong.  As set forth above, libraries curate collections based upon the interests of the communities they serve.  *See* pgs. 9-12, *supra*.  As those interests evolve over time, so too do the books on the shelves.  For example, as set forth above, *Ulysses* was originally targeted as "obscene," but is now recognized as a literary classic found in many libraries.  *See* pg. 13, *supra*.

The fact that certain books interest a community does not mean that the government is expressing a viewpoint through library shelves.  No reasonable person

24

would view the presence or absence of certain books as communicating a particular viewpoint. A patron visiting an Alabama library and finding books about Alabama history but not Ohio history, would not perceive a government message that Ohio history is "trashy." Nor would anyone seeing *Mein Kampf* on the shelves think the government is trying to convey that the book is an "appropriate" book everyone should read. *Cf.* State Br. 63-66. Library curation does not send any comprehensible message to the public. It is not government speech.

### 3. The State relies upon inapposite cases.

The State relies heavily upon *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *See* State Br. 60-63. There, the Court held that private social media platforms' aggregation of third-party social media posts based upon particular viewpoints or content constitutes protected "expression" under the First Amendment. 603 U.S. at 728. The case did not address "government speech" or libraries, let alone whether library curation is "government speech." *See id.*

The State also relies (State Br. 64-66) upon plurality and concurring opinions in *U.S. v. Am. Library Ass'n*, 539 U.S. 194 (2003) ("*ALA*"). The State's argument is ironic because it urges the Court to ignore the *Pico* plurality opinion. *See* State Br. 44. In any event, *ALA* is inapposite.

The plurality in *ALA* never held that the government speaks through library shelves. *See ALA*, 539 U.S. at 206. The case involved filters on Internet-enabled

25

Appellate Case: 25-1819  Page: 35  Date Filed: 08/01/2025 Entry ID: 5544021

computers in libraries meant to block three categories of **unprotected** speech: "'visual depictions' that constitute 'obscenity' or 'child pornography,' and…'visual depictions' that are 'harmful to minors.'" *See, e.g., id.* at 201, 208-09. *ALA* says nothing about whether library curation constitutes "government speech."

The State's argument is the sort of "dangerous misuse" of the "government speech" doctrine about which Justice Alito warned. The Court should adhere to its prior holding.[3]

### H. The purported availability of the books from other sources does not prevent a constitutional violation.

The District Court properly rejected the State's argument that students can obtain the barred books from other sources. *See* App.Vol.II.424-25, R.Doc.113 at 34-35. The State's argument ignores the First Amendment right to receive information.

The "right to receive information and ideas" is protected by the Constitution because it is an "inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Pico*, 457 U.S. at 867. As James Madison explained, "[a] popular Government, without popular information, or the

---

[3] A minority (7 of 17 judges) of the *en banc* Fifth Circuit argued otherwise. *See Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025). That minority opinion is not binding anywhere, including the Fifth Circuit, and was *dicta* because the majority dismissed plaintiffs' claims on other grounds. *See id.* at 850-51. In any event, the *Llano* minority's analysis was flawed for the same reasons as the State's argument.

Appellate Case: 25-1819     Page: 36     Date Filed: 08/01/2025 Entry ID: 5544021

means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both."

James Madison, *Letter from James Madison to W.T. Barry*, LIBRARY OF CONGRESS (Aug. 4, 1822). The Supreme Court recognized this right before and after *Pico*: "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak ***and listen***…." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (emphasis added); *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (recognizing "the right to receive information and ideas"); *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences").

Accordingly, once the government opens a library, patrons have rights that the government cannot take away without complying with the Constitution. *See, e.g., Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983) ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum"); *Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum…the State must [not]…discriminate against speech on the basis of its viewpoint").[4] Where "the government, acting as censor, undertakes selectively to

---

[4] School libraries should be considered "designated" or "limited" public forums that the government has designated for access to a broad range of extracurricular information. *See, e.g., Perry*, 460 U.S. at 45-46 (where government "has opened" forum "for use by the public…content-based prohibition[s] must be narrowly drawn to effectuate a compelling state interest"). Even if content-based restrictions in the

27

Appellate Case: 25-1819     Page: 37     Date Filed: 08/01/2025 Entry ID: 5544021

shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power." *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975).

This right applies to minors in schools. *See, e.g., Fayetteville*, 684 F. Supp. 3d at 909-10 ("it is well established that 'minors are entitled to a significant measure of First Amendment protection' and the government may restrict these rights 'only in relatively narrow and well-defined circumstances'"); *see also Mahmoud*, 2025 U.S. LEXIS 2500, at *34 (reaffirming *Tinker*); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187 (2021) ("Minors are entitled to a significant measure of First Amendment protection" (internal quotation and brackets omitted)); *Walls*, 2025 U.S. App. LEXIS 17527, at *11 (recognizing "reciprocal right to receive…information," which "do[es] not disappear inside public schools"); *Sheck*, 530 F. Supp. at 689 ("the first amendment right of students to receive that information and those ideas is entitled to constitutional protection"). The fact that students "cannot simply go in the library, take the books off the shelf and thumb through them…is a restriction on

---

school library only needed to be "reasonable," SF496 is still unconstitutional because it is unreasonable to exclude works of significant literary and educational merit, given the role of the school library to make available a broad array of content of use and interest to students. *See* pgs. 6-12, *supra*.

Appellate Case: 25-1819     Page: 38     Date Filed: 08/01/2025 Entry ID: 5544021

[their] access" and an "impermissible infringement[] of First Amendment rights." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003).[5]

The State also ignores the fact that some children cannot visit public libraries or purchase books. "[G]etting to the public library may be difficult for children and for those who live in homes without Internet access, the school library may be their only access to the digital world." WOOLLS, *supra*, at 4004. "Because many families cannot afford to purchase children's books, it becomes all the more important to make community resources…easily and readily available…." Tamara G. Halle, et al., *Family Influences on School Achievement in Low-Income, African American Children*, J. OF EDUC. PSYCH. 89, 527-37 (1997).

School libraries and librarians are critical resources for children. For many students, the school library is their primary or only means of accessing books. The fact that restricted books ***might*** be available elsewhere is not a substitute for students' access in the school library.

---

[5] The Fifth Circuit reached a different result, seemingly because of fear that a contrary holding would permit plaintiffs to sue libraries for refusing to purchase certain books. *Llano*, 138 F.4th at 845-51. That fear is misplaced. No one asserts that an individual can force a library to buy a particular book. The point is that all curation decisions are subject to the First Amendment and, as such, the government's conduct must be viewpoint-neutral, with content-based restrictions subject to strict scrutiny. *See, e.g., Rosenberger*, 515 U.S. at 829 (content-based restrictions are "presumed unconstitutional"). Librarians consider content only to the extent needed to provide materials of interest to their community.

29

# V. <u>CONCLUSION</u>

It is no mere rhetorical flourish to say that school libraries are citadels of American democracy. The State's actions undermined those citadels, in violation of the First Amendment. The District Court should be affirmed.

Respectfully submitted,

**FREEDOM TO READ FOUNDATION, IOWA LIBRARY ASSOCIATION, AND AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS**

By their attorneys,

*/s/ Owen R. Wolfe*

Owen R. Wolfe
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Tel: (212) 218-3389
Fax: (917) 344-1394

*Attorneys for Amici Curiae,*
*Freedom to Read Foundation, Iowa Library*
*Association, and American Association of*
*School Librarians*

Dated: July 24, 2025

30

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS AND VIRUS-FREE CERTIFICATION

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) and FED. R. APP. P. 32(a)(7) because the brief contains 6,487 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface; footnotes appear in 14-point Times New Roman typeface.

*/s/ Owen R. Wolfe*
Owen R. Wolfe

Dated: July 24, 2025

31

Appellate Case: 25-1819    Page: 41    Date Filed: 08/01/2025 Entry ID: 5544021

**CERTIFICATE OF SERVICE**

I certify that on July 24, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Owen R. Wolfe*
Owen R. Wolfe

32

Appellate Case: 25-1819    Page: 42    Date Filed: 08/01/2025 Entry ID: 5544021