IN THE

# United States Court of Appeals for the Eighth Circuit

PENGUIN RANDOM HOUSE LLC, *ET AL.*,
*Plaintiffs-Appellees*

*v.*

JOHN ROBBINS, *ET AL.*,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Southern District of Iowa, Case No. 4:23-cv-478
(The Hon. Stephen H. Locher)

## BRIEF OF THE NATIONAL EDUCATION ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE

Alice O'Brien
Jason Walta
Katherine E. Lamm
Chad Nowlan
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7067
klamm@nea.org

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(4)(a), Amicus Curiae National Education Association ("NEA") states that it is a nonprofit corporation. Amicus NEA states further that it is not a subsidiary of any corporation, and that it does not have any stock that can be owned or held by a publicly held corporation.

/s/ Katherine E. Lamm

July 28, 2025

Appellate Case: 25-1819    Page: 2    Date Filed: 08/07/2025 Entry ID: 5545903

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES...........................................................................ii

STATEMENT OF AMICUS CURIAE......................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................3

ARGUMENT ................................................................................................5

I. Local school officials and educators are properly entitled to deference in managing speech and content in public schools, including in their libraries. ......................................................5

    a. Precedent confirms that local school officials and educators are the rightful primary moderators of speech and content in the public-school setting. ......................................................6

    b. Iowa law gives significant authority over the content of school libraries to local school officials and educators ...........9

    c. The Library Restriction improperly hobbles local school officials' and educators' exercise of discretion over library collections. ...............................................................................11

II. The Library Restriction needlessly limits school officials' and educators' authority and expertise to select library holdings, as robust measures for preventing and challenging inappropriate content already exist. .............................................................16

III. The Library Restriction's vague and overbroad ban on content that describes or depicts a "sex act" harms students and educators...............................................................................................21

Appellate Case: 25-1819     Page: 3     Date Filed: 08/07/2025 Entry ID: 5545903

a. The Library Restriction inhibits students' ability to receive books that may be crucial to their development academically, personally, and as members of a pluralistic, democratic society. ..................................................................................22

b. The Library Restriction creates a culture of fear and censorship for educators attempting to comply with its vague requirements. ..................................................................................27

CONCLUSION ..................................................................................33

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION AND TYPEFACE AND TYPESTYLE REQUIREMENTS ..................................................................................34

CERTIFICATE OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(H)..................................................................................35

CERTIFICATE OF SERVICE..............................................................36

Appellate Case: 25-1819     Page: 4     Date Filed: 08/07/2025 Entry ID: 5545903

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. 853 (1982)...................................................................................8

*Bethel Sch. Dist. No. 403 v. Fraser,*
478 U.S. 675 (1986)................................................................................8, 9

*Fleming v. Jefferson Cnty. Sch. Dist. R-1,*
298 F.3d 918 (10th Cir. 2002)...............................................................12

*GLBT Youth in Iowa Schs. Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024) ................................................. 13, 14, 15

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (8th Cir. 1988).......................................................9, 12, 13

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.,*
200 F.3d 1128 (8th Cir. 1999)..............................................8, 9, 12, 13

*Lacks v. Ferguson Reorganized Sch. Dist. R-2,*
147 F.3d 718 (8th Cir. 1998)...................................................................12

*Matal v. Tam,*
582 U.S. 218 (2017)..................................................................................15

*Milliken v. Bradley,*
418 U.S. 717 (1974)....................................................................................7

*Poling v. Murphy,*
872 F.2d 757 (6th Cir. 1989)..............................................................7, 8

Appellate Case: 25-1819   Page: 5   Date Filed: 08/07/2025 Entry ID: 5545903

*San Antonio Ind. Sch. Dist. v. Rodriguez,*
411 U.S. 1 (1973) ..................................................................7

*Shurtleff v. Boston,*
596 U.S. 243 (2022)..............................................................14

*Stephenson v. Davenport Cmty. Sch. Dist.,*
110 F.3d 1303 (8th Cir. 1997)...............................................9

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969)...............................................................7

*Walls v. Sanders,*
No. 24-1990 (8th Cir. July 16, 2025) ............................. 13, 14

*Zykan v. Warsaw Comm. Sch. Corp.,*
631 F.2d 1300 (7th Cir. 1980)...............................................8

**Statutes**

Iowa Code § 256.11(9)(a)(2).....................................................3

Iowa Code § 256.11(9)(a)(3)......................................... 4, 30, 31

Iowa Code § 256.11(19) ..........................................................28

Iowa Code § 279.27.................................................................4

Iowa Code § 279.77...............................................................18

Iowa Code § 280.6.................................................................29

Iowa Code § 702.17............................................................3, 28

Iowa Code § 728.2.................................................................19

Appellate Case: 25-1819     Page: 6     Date Filed: 08/07/2025 Entry ID: 5545903

**Regulations**

Iowa Admin. Code 281-12.2(256) ...........................................................10

Iowa Admin. Code 281-12.3(10)(256) ....................................................10

Iowa Admin. Code 281-12.3(10)(a)(256)............................................ 10, 18

Iowa Admin. Code 282-25.3(256) ...................................................... 18, 31

Iowa Admin. Code 282-25.3(6)(a)(256)...................................................11

Iowa Admin. Code 282-26.2(256) ...................................................... 10, 30

Iowa Admin. Code 282-26.3(256) ...................................................... 11, 30

**Other Authorities**

Ezekial 23:5–8 (New Int'l Version) .......................................................29

Genesis 19:33–36, 38:8–9 (New Int'l Version) ......................................29

*Getting Credit and Placement*, College Board (last visited July 21,
   2025), https://apstudents.collegeboard.org/getting-credit-placement . 23

Julie Gorlewski, *Censorship Hinders Critical Thinking and Infringes on
   Readers' Rights*, Learn Magazine (October 2023),
   https://ed.buffalo.edu/magazine/issues/fall-2023/censorship.html......26

Nat'l Cent. for Educ. Stats., *Teacher Turnover: Stayers, Movers, and
   Leavers*, Inst. of Educ. Sciences (2024),
   https://nces.ed.gov/programs/coe/indicator/slc/teacher-turnover ........32

Appellate Case: 25-1819    Page: 7    Date Filed: 08/07/2025 Entry ID: 5545903

## STATEMENT OF AMICUS CURIAE

This amicus curiae brief is submitted by the National Education Association ("NEA").[1] NEA is the nation's largest labor organization, representing approximately three million members who serve as educators, counselors, and education support professionals in our nation's public schools and institutions of higher education. Thousands of those members work in Iowa's K–12 public schools.

NEA has a profound interest in its members' ability to go to work every day with confidence that they can do their jobs with integrity and professionalism, and without fear of discipline or termination for alleged violations of vague, overbroad state laws that inhibit instruction and invite arbitrary enforcement. In addition, since its founding over a century-and-a-half ago, NEA has worked to build and strengthen the quality of public education available to students nationwide.

---

[1] Amicus NEA submits this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2). NEA states that no party's counsel authored the brief in whole or in part, no party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than NEA, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. *See id.* 29(a)(4)(E).

1

NEA's membership has resolved that promoting freedom of thought in public schools is essential to students' academic success and the development of democratic values. *See, e.g.*, NEA Resolution B-82 ("School Library Media Programs"); NEA Resolution E-4 ("Selection and Challenges of Materials and Teaching Techniques"); NEA Resolution E-8 ("Academic and Professional Freedom").[2] NEA believes that educators, including library staff and classroom teachers, are uniquely well suited—by training and experience—to curate library content for their schools. Educators must be able to select freely from appropriate materials, without censorship or legislative interference, in order to provide all students with the excellent education that they deserve. NEA also believes that an atmosphere of unrestrained free inquiry and learning in public schools is essential to fostering the values needed to sustain our nation's social, economic, and democratic structures.

These values are at stake in this appeal from the district court's decision enjoining part of Iowa's Senate File 496, which broadly censors school library content. NEA submits this brief to urge this Court to

---

[2] The resolutions are formal expressions of NEA's opinion, intent, belief, or position, as adopted by NEA's membership.

2

Appellate Case: 25-1819    Page: 9    Date Filed: 08/07/2025 Entry ID: 5545903

affirm, because the law violates the First Amendment and needlessly harms students and educators.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This appeal arises from a challenge to part of Iowa's Senate File 496, a law that censors instruction, expression, and other content in Iowa schools, including through what this brief refers to as a "Library Restriction." The Library Restriction requires every K–12 public school to maintain a "library program" containing "only age-appropriate materials," which excludes "any material with descriptions or visual depictions" of a "sex act." Iowa Code § 256.11(9)(a)(2), (19)(a)(1). The term "sex act" is defined by reference to the criminal code, which contains a list of activities "between two or more persons." *Id.* § 702.17.

It is anyone's guess whether a specific book's mention of sexual activity, however fleeting or oblique, constitutes an unlawful "description" or a "depiction" of an enumerated "sex act." But educators must remove that book regardless of its literary merit, relevance to a legitimate topic of study, or the age of students to whom it is available. If not, educators risk becoming the subject of an Iowa Department of Education investigation, which can lead to consequences including a

3

Appellate Case: 25-1819    Page: 10    Date Filed: 08/07/2025 Entry ID: 5545903

warning, discipline up to discharge, and even the suspension or loss of license. Iowa Code §§ 256.11(9)(a)(3)(a)–(b)(ii), 256.146(13)(a), 279.27.

The district court correctly held that Library Restriction is overbroad and violates the First Amendment. App. 429; R. Doc. 113, at 39. NEA submits this brief to amplify themes that support this conclusion. First, local school officials and educators have a special role in managing the public-school environment, and precedent rightly reflects deference to these local authorities in light of the expertise and sensitivity to local norms that they bring to this task. This Court should reject the State's efforts to free itself of the First Amendment's confines through inapt adaptations of the school-sponsored speech and government-speech doctrines to justify its attempt to override the decision-making of those closest to schools and students.

Second, and relatedly, Iowa law and regulations already contain robust requirements for school boards, administrators and educators to select library content, to make that content known to the community, *and* to receive and consider challenges to that content. Given all this, the overbroad Library Restriction is not a reasonable measure to prevent

4

inappropriate materials from reaching students or to prevent controversy from reaching school communities.

Finally, the Library Restriction harms students and educators, as its vagueness and overbreadth have led to confusion, fear, and the needless elimination of important texts from school shelves. Students have lost access to materials they need to excel academically and to develop into mature adults and citizens of a democracy. Educators are hard-pressed to understand the Library Restriction's proper scope or how it comports with their other professional obligations, but they must operate in fear of discipline or termination if they fail to comply with its mandate to purge library and classroom holdings. The resulting demoralization may drive educators from the profession.

These grounds all support the district court's decision, which this Court should affirm.

## ARGUMENT

I. **Local school officials and educators are properly entitled to deference in managing speech and content in public schools, including in their libraries.**

The thrust of the State's argument on appeal is that it should have virtually unchecked power to regulate the school environment, relying on novel applications of the school-sponsored speech and government-

Appellate Case: 25-1819      Page: 12      Date Filed: 08/07/2025 Entry ID: 5545903

speech doctrines to erase First Amendment rights for students and educators. *See* State Br. 17–32, 59–67. It is only by dismissing the central role of local school officials and educators in public-school matters—and the meaningful responsibility for content control that Iowa vests in them—that the State reaches its desired outcome of degrading the First Amendment's guarantees and overriding the will of local communities. This is deeply concerning to NEA, which has long held that local school boards are chiefly responsible for ensuring that every student receives an excellent education, and must actively incorporate the views and expertise of educators to achieve that promise. *See* NEA Resolution A-6 ("School Boards"); NEA Resolution E-4 ("Selection and Challenges of Materials and Teaching Techniques"); NEA Resolution E-5 ("Development of Curriculum").

### a. Precedent confirms that local school officials and educators are the rightful primary moderators of speech and content in the public-school setting.

The First Amendment provides meaningful rights within public schools, limited chiefly by local officials' and educators' authority to moderate the educational environment. As the Supreme Court has long and "unmistakabl[y]" held, neither "students [n]or teachers shed their

Appellate Case: 25-1819     Page: 13     Date Filed: 08/07/2025 Entry ID: 5545903

constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Consequently, "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," or "confined to the expression of those sentiments that are officially approved." *Id.* at 511.

A robust precedent of local control over education and deference to educators animates how courts approach constitutional challenges in the school setting. The Supreme Court has observed that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools." *Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974); *see also, e.g.*, *Poling v. Murphy*, 872 F.2d 757, 762–763 (6th Cir. 1989) (similar). This approach promotes community participation, the tailoring of "school programs to fit local needs," and "experimentation, innovation, and a healthy competition for educational excellence." *Ibid.* (quoting *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973)).

When called to answer questions about the First Amendment's application, specifically, this Court and many others similarly have emphasized the central role that belongs to school boards and educators.

7

*See Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1132 (8th Cir. 1999) (noting that "teachers, parents, and elected school officials" have "control" of the school system) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986)). "Virtually every judicial body that has commented on the matter has acknowledged the need for broad discretionary powers in local school boards." *Zykan v. Warsaw Comm. Sch. Corp.*, 631 F.2d 1300, 1305 (7th Cir. 1980) (collecting cases); *see also Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 868–69 (1982) (plurality) ("This Court has long recognized that local school boards have broad discretion in the management of school affairs.") (collecting cases). The reason for this deference is that "local discretion . . . means the freedom to form an opinion regarding the instructional content that will best transmit the basic values of the community." *Ibid.*; *see also Poling*, 872 F.2d at 761 (explaining that the court must defer to local officials who are "steeped in the culture of the place" and familiar with "the atmosphere of the school or of the sense of propriety of those who work and study there").

This Court gives special weight to the judgments of school officials and educators, in particular. This is because the Court's "perspective of

Appellate Case: 25-1819   Page: 15   Date Filed: 08/07/2025 Entry ID: 5545903

the public schools is necessarily a more distant one than that of *the individuals working within these schools* who must 'prepare pupils for citizenship in the Republic.'" *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1306 (8th Cir. 1997) (emphasis added) (quoting *Bethel Sch. Dist. No. 403*, 478 U.S. at 681); *see also, e.g.*, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270–71 (8th Cir. 1988) (discussing "school officials'" and "educators'" control over student expression); *Henerey*, 200 F.3d at 1132 (same as to "schools" and "school officials"). Educators' attunement to the school community's needs and educational goals renders them uniquely well qualified for the task of moderating speech and content in light of this country's tradition of local control.

### b. Iowa law gives significant authority over the content of school libraries to local school officials and educators.

In keeping with this tradition, many aspects of Iowa law do in fact empower school boards, administrators, and teacher librarians to lead the sensitive task of determining what belongs in school libraries. Each school board is required to establish a "library program," defined as a "library or media program that enhances student achievement and is integral to the school district's curricula and instructional program."

Appellate Case: 25-1819    Page: 16    Date Filed: 08/07/2025 Entry ID: 5545903

Iowa Admin. Code 281-12.2(256); 281-12.3(10)(256). The school board is to establish library policies that, as relevant here, "address selection and reconsideration of school library materials." Iowa Admin. Code 281-12.3(10)(a)(256).

While a school board creates and makes policy for a school library program, that authority is complemented by the leadership and judgment of the school's librarian. Iowa regulations provide that a "library program" is to be "planned and implemented by a qualified teacher librarian working collaboratively with the district's administration and instructional staff." Iowa Admin. Code 281-12.2(256). A library program's functions include offering "a diverse *and appropriate* school library collection." *Ibid.* (emphasis added).

Although teacher librarians are, of course, required to abide by state law dictating any limitations on their discretion, they are also bound by state professional ethics and standards. These include the right "to exercise professional judgment in the evaluation, selection, and use of teaching methods and instructional materials appropriate to the needs, abilities, and background of each student." Iowa Admin. Code 282-26.2 (256). They include, as well, the responsibility, absent "just cause," not to

10

"restrain a student from independent action in the pursuit of learning" or to "deny a student access to varying points of view." Iowa Admin. Code 282-26.3(256); 282-25.3(6)(a)(256). Educators report acting on these rights and responsibilities to ensure that students can access books in library and classroom collections that will foster their interests and development, without delivering material that is age-inappropriate. *See* App. 181–83, 184, R. Doc. 104-1 ¶¶ 6–10, 12; App. 194–96. R. Doc. 104-2 ¶¶ 6–12; App. 7–8, 12–13, R. Doc. 34-10 ¶¶ 8–10, 20–21.

Thus, even as the State now endeavors to impose system-wide limitations on what material students may access, it does so against a state-law backdrop that already caters to the needs and sensitivities of young readers through the judgment of the officials and teachers closest to them.

### c. The Library Restriction improperly hobbles local school officials' and educators' exercise of discretion over library collections.

In defending the Library Restriction, the State asks this Court to give it virtually unbridled authority to overrule local officials' and educators' selection of materials for their students. The State only reaches its desired outcome through novel applications of the school-

Appellate Case: 25-1819    Page: 18    Date Filed: 08/07/2025 Entry ID: 5545903

sponsored speech and government speech doctrines, which risk undermining the traditional balance reflected in precedent and even in the Iowa law described above.

1. The State attempts to cloak itself in the school-sponsored speech doctrine without due regard to the fact that the precedents it invokes involve school officials' efforts to control the school environment (*i.e.*, students' behavior)—not the State's efforts to override school officials' and educators' decision-making and expertise. *See* State Br. 17–32.

The authorities on which the State primarily relies—the Supreme Court's opinion in *Hazelwood* and this Court's in *Henerey*—stand for the proposition that a school has a strong interest in ensuring that expressive content bearing the school's imprimatur serves its educational mission. *See Hazelwood*, 484 U.S. at 266–67; *Henerey*, 200 F.3d at 1132. In such cases, courts inquire only whether limits on speech in a "school-sponsored activity" are "reasonably related to legitimate public concerns." *Henerey*, 200 F.3d at 273 (quoting *Hazelwood*, 484 U.S. at 273); *see also, e.g., Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998); *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 925 (10th Cir. 2002).

Appellate Case: 25-1819     Page: 19     Date Filed: 08/07/2025 Entry ID: 5545903

The *Henerey/Hazelwood* test is favorable to a school officials' ability to regulate certain speech. But, as this Court recently acknowledged, that test applies specifically "to the government's regulation of *student* speech in school-sponsored settings." *Walls v. Sanders*, No. 24-1990 (8th Cir. July 16, 2025), Slip Op. 10. The *Walls* Court concluded that "in-classroom instructional speech" was government speech not controlled by precedents surrounding student speech, but the Court expressly distinguished "books in a library" from instruction. *Ibid.*, Slip Op. 9. A doctrine that typically protects school boards from student challenges to speech-related restrictions or discipline has no clear application to the State-directed removal of library books selected by school librarians.

2. The State's assertion of government speech as another route to quashing local discretion in filling library shelves is almost an afterthought. State Br. 59–67. This may be because this Court already ruled in this case that "placement and removal of books in public school libraries" is not government speech, *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024). The State appears to have barely referenced the point in proceedings on remand.

13

Appellate Case: 25-1819    Page: 20    Date Filed: 08/07/2025 Entry ID: 5545903

*See* Appellee Br. 45–46. Law of the case and waiver aside, this Court's analysis of the factors for assessing whether the doctrine applies is both correct and bolstered by the discussion above regarding local discretion to control school libraries.[3]

Those factors are: "(1) the history of the expression at issue; (2) the public's likely perception as to who is speaking; and (3) the extent to which the government has actively shaped or controlled the expression." *GLBT Youth*, 114 F.4th at 667 (citing *Shurtleff v. Boston*, 596 U.S. 243, 252 (2022)).  As applied to the context of stocking library shelves, this Court found all three factors counseled against government speech, as library shelves have not been used historically to convey government messages, nor does the jumble of materials and viewpoints represented there convey a governmental message. *Id.* at 667–68. This Court also found that the final factor did not support government speech, "as

---

[3] This Court's subsequent decision in *Walls* should not alter the analysis. As noted in Part I.c.1., *Walls* acknowledged the distinction between the school library and the school curriculum. *Walls*, Slip Op. 9. The State cites only one opinion concluding that the placement of books in a public library is government speech, and it is a non-binding opinion joined by a minority of judges on the Fifth Circuit, *Little v. Llano Cnty.*, 138 F.4th 834, 865 (5th Cir. 2025), which *Walls* acknowledged but did not analyze (Slip Op. 7).

Appellate Case: 25-1819   Page: 21   Date Filed: 08/07/2025 Entry ID: 5545903

historically the government of Iowa has not asserted extensive control over removing books from public school libraries." *Id.* at 668.

It is true, of course, that the government of Iowa seeks to exert control over library shelves through the Library Restriction and other modifications to state law and regulation regarding school libraries contained in Senate File 496. *See GLBT Youth*, 114 F.4th at 665 (referencing changes to Iowa Code section regarding school libraries). But the discussion in Part I.b., *supra* pp. 9–11, shows that, even today, Iowa leaves substantial discretion to local school boards and officials to create and execute protocols for including and excluding books, and to teacher librarians to carry out the library programs. It cannot be that simply by *deciding* to regulate an aspect of some form of content—here, passing a law to purge library holdings, but potentially many other forms of censorship—a state may transform that content into unassailable government speech. To condone such an approach might have far-reaching, "dangerous" consequences, as it could disable normal judicial checks against governmental discrimination and silencing of certain viewpoints. *See Matal v. Tam*, 582 U.S. 218, 235 (2017).

15

This Court should reject the State's effort to upset the traditional balance of authorities and to shield itself from scrutiny under the First Amendment.

**II. The Library Restriction needlessly limits local school officials' and educators' authority and expertise to select library holdings, as robust measures for preventing and challenging inappropriate content already exist.**

Although the State claims that the Library Restriction is "reasonably related to legitimate pedagogical concerns over sexually explicit materials in public schools" and avoiding any related "controversy," State Br. 37, the law is little more than a solution seeking a problem. Indeed, NEA's view is that educators' use of judgment and expertise in selecting materials, combined with orderly and objective review processes—not bans and censorship—ensures that library holdings are age-appropriate and tailored to community needs. *See* NEA Resolution B-82 ("School Library Media Programs"); NEA Resolution E-4 ("Selection and Challenges of Materials and Teaching Techniques").

Here, remarkably, the State identifies as the impetus for the ban only the fact that "[s]ome parents" were unsuccessful in petitioning for the removal of two specific books. State Br. 5. Although the State certainly has an interest in keeping inappropriate sexual content out of

Appellate Case: 25-1819    Page: 23    Date Filed: 08/07/2025 Entry ID: 5545903

schools, there is little reason to believe—especially from this tepid reference to dissatisfied parents—that the State required even more extensive prevention and controversy-management measures than already exist. As the district court concluded, "unrebutted evidence shows that school officials already limited the access of younger readers to unsuitable books" before the legislature enacted the Library Restriction. App. 421; Doc. 113, at 31. Not only does Iowa law already ban the provision of obscene materials to children, it also contains robust measures for enabling parents to review and challenge library holdings. Moreover, educators are ethically bound and committed to ensuring that children are exposed only to materials suited to their maturity level.

A first layer of defense against inappropriate materials in school libraries lies in Iowa's criminal law. It is already a crime for an adult to "knowingly disseminate[] or exhibit[] obscene material to a minor." Iowa Code § 728.2. The definition of "obscene material," which is keyed to First Amendment principles, includes not only descriptions or depictions of "sex acts" (covered by the Library Restriction), but also "genitals . . . masturbation, excretory functions or sadomasochistic abuse" that, on the whole, would be "patently offensive" under "community standards." Iowa

17

Code § 728.1(5). Educators who violate state law are subject to discipline as a general matter under the professional ethics code, and convictions under Section 728.2 are "disqualifying"—meaning that they will result in the denial or revocation of licensure. Iowa Admin. Code 282-25.3(256). Thus, educators who are unscrupulous in stocking library or classroom shelves already are at risk of losing their livelihoods, even absent the Library Restriction.

Beyond this, Iowa has chosen to adopt mechanisms for members of the community to review and challenge the materials made available in public schools. Each school board is required to "adopt policies to address selection and reconsidering of school library materials." Iowa Admin. Code 281-12.3(10)(a)(256). And since 2023, each school district has been required to adopt additional "transparency" measures with respect to libraries, including posting online: (1) an explanation of how parents may request the removal of library materials and how decisions on such request are made; and (2) a "comprehensive list of all books available to students in libraries operated by the school district." Iowa Code § 279.77(1), (3). Indeed, protocols for community members to challenge specific library materials are readily available on the websites of school

18

Appellate Case: 25-1819    Page: 25    Date Filed: 08/07/2025 Entry ID: 5545903

districts large and small across Iowa, many of which outline detailed, multi-step review processes.[4] As the State's brief acknowledges, parents are able to use these mechanisms, even if the results are not always to their liking. *See* State Br. 5.

This comprehensive regime of sanctions, challenge processes, and transparency—even without the Library Restriction—makes it unsurprising that Iowa teachers with years of experience report never

---

[4] *See, e.g.*, Des Moines Independent Community School District, Series 600 Procedures (last visited July 24, 2025), https://dmschools.b-cdn.net/wp-content/uploads/2024/03/Procedures-Series-600.pdf; Cedar Rapids Community School District, Reconsideration of Instructional Material – Regulation (last visited July 24, 2025), https://simbli.eboardsolutions.com/Policy/ViewPolicy.aspx?S=36031509 &revid=ZaUWslshaKmEXtVdEGeplusyAZFg==&PSID; Iowa City Community School District, Policy 605.3R1, Objection to Instructional Materials – Reconsideration of Instructional Materials Regulation (last visited July 24, 2025), https://www.iowacityschools.org/our-district/school-board/board-policies/board-policies-details/~board/board-policies/post/6053r1-objection-to-instructional-materials-reconsideration-of-instructional-materials-regulation; Villisca Community School District, Policy 605.03, Objection to Instructional and Library Materials (last visited July 24, 2025), https://www.southwestvalley.org/files/600_series_villisca_26992.pdf; Mormon Trail Community Schools, Regulation 605.03-R(1): Objection to Instructional and Library Materials - Reconsideration of Instructional Materials Regulation (last visited July 24, 2025), https://simbli.eboardsolutions.com/Policy/ViewPolicy.aspx?S=36031484 &revid=jzF0lUHVLHHa2CgVsslshcvtA==&ptid=32KLL9yXgp6hQwr5w FSRcQ==&secid=9t7rnSbZnwbC3yMblDeXHA==&PG=6&IRP=0&isPn dg=false.

having encountered pornography or obscenity in school book collections in their districts. App. 187–88, R. Doc. 104-1 ¶ 19; App. 196, R. Doc. 104-2 ¶ 13. One teacher with more than 15 years' tenure attributed this not only to her colleagues' rigorous exercise of professional judgment to "curate" developmentally appropriate collections, but also to the processes for challenges to specific books, in which voices from across the school and local community can participate. App. 187–88; R. Doc. 104-1 ¶ 19. Moreover, evidence in the record shows that, as a practical matter, Iowa educators are committed to respecting parent preferences as to the material their children receive. App. 184–85, R. Doc. 104-1 ¶ 13; App. 196, R. Doc. 104-2 ¶ 14; App. 13, R. Doc. 34-10 ¶ 21. Some districts, in fact, already have policies that allow parents to restrict their children's access to specific books by request. App. 196, R. Doc. 104-2 ¶ 14; App. 13, R. Doc. 34-10 ¶ 21.[5]

---

[5] Many districts provide simple forms for making such a request on their public websites. *See, e.g.*, Pleasant Valley Comm. Sch. Dist., *Request to Prohibit a Student from Checking Out Specific Library Materials* (Oct. 9, 2023), https://campussuite-storage.s3.amazonaws.com/prod/1558581/36935742-09df-11e9-a7fa-120325f15f88/2713603/ad2dc7b8-99de-11ee-93dd-0a58a9feac02/file/603.08E4%20Request%20to%20Prohibit%20a%20Stu dent%20From%20Checking%20out%20Specific%20Library%20Material

20

Appellate Case: 25-1819    Page: 27    Date Filed: 08/07/2025 Entry ID: 5545903

Given all the tools that the State and local officials already have deployed prophylactically, the overbroad censorship of the Library Restriction is a patently unreasonable measure to prevent inappropriate materials from reaching children and causing controversy.

**III. The Library Restriction's vague and overbroad ban on content that describes or depicts a "sex act" harms students and educators.**

The State minimizes the Library Restriction's impact on the basis that it does not prohibit students from reading or discussing any books (State Br. 68–70), failing to acknowledge the harm that mandating a purge of school shelves already has and continues to deliver. The District Court found that some school districts removed as many as 629 books under the Library Restriction, immediately impairing students' access to a vast array of quintessential titles from the American literary canon,

---

s.pdf; North Linn Comm. Sch. Dist., *Request to Prohibit a Student from Accessing Specific Instructional and Library Materials* (last visited July 22, 2025), https://north-linn.iowaschoolfinance.com/policy/60503e5-request-prohibit-student-accessing-specific-instructional-and-library-materials; Sibley-Ocheyedan Comm. Sch. Dist., *Request to Prohibit a Student from Checking Out Specific Library Materials* (Jan. 15, 2024), https://simbli.eboardsolutions.com/Policy/ViewPolicy.aspx?S=150075&revid=DJhe3QY63p40fZ4hslsh4K6vQ==&ptid=FLIvly1a230LTslshi25yNEHA==&secid=&PG=6&IRP=0&isPndg=false; *see also, e.g.*, App. 248, R. Doc. 104-9, at 2.

21

contemporary award-winners, and historical and educational texts. App. 396–97, 401; R. Doc. 113, at 6–7, 11. The Library Restriction also injures educators who are forced to remove important pieces of literature from library and classroom shelves and "are at risk of termination, loss of licensure, or other consequences if they are deemed to have violated" the Library Restriction. App. 400, 430; R. Doc.113, at 10, 40. These impacts are of grave concern to NEA, which firmly believes that an atmosphere of open inquiry is essential to fostering democratic values and that educators' freedom to select appropriate materials appropriate for their students is essential to quality teaching. *See* NEA Resolution E-4 ("Selection and Challenges of Materials and Teaching Techniques"); NEA Resolution E-8 ("Academic and Professional Freedom").

> **a. The Library Restriction inhibits students' ability to receive books that may be crucial to their development academically, personally, and as members of a pluralistic, democratic society.**

The Library Restriction inhibits students' ability to fully engage with mainstays of national and local curricula and hinders their ability to expand their worldview by cutting them off from new and different viewpoints. First, the removal of books puts Iowa public-school students at a disadvantage as compared to their peers in other states who still

Appellate Case: 25-1819     Page: 29     Date Filed: 08/07/2025 Entry ID: 5545903

have access to these materials. Second, many of the now-banned titles teach student readers about themselves and about the world in ways that will help them grow into mature and engaged participants in a pluralistic and democratic society.

1. The Library Restriction puts Iowa public-school students at risk of falling behind their peers in other states—and even behind their own state and local officials' previous expectations—by denying them access to important curricular material. For instance, the Library Restriction bars several books commonly used in teaching Advanced Placement (A.P.) courses and preparing for the end-of-year A.P. exams. *See* App. 423, 426; R. Doc. 113, at 33, 36. Contrary to the State's claims, this deficit is not remedied by students' theoretical ability to acquire books from other sources, as the school library *is* students' source for such materials. *See* App. 185-186; R. Doc. 104-1, ¶ 15. Losing the ability to perform their best on A.P. exams would harm many students, as high scores can excuse students from certain requirements—and even save them money—if they choose to pursue post-secondary education. *Getting Credit and Placement*, College Board (last visited July 24, 2025), https://apstudents.collegeboard.org/getting-credit-placement.

23

Appellate Case: 25-1819    Page: 30    Date Filed: 08/07/2025 Entry ID: 5545903

Moreover, the Library Restriction overrides what many school districts already have decided is valuable to include in the curriculum or otherwise to make available to their students. Apparently "dissatisfied with local decision-making by local officials," Iowa's legislature stepped in to supplant those judgments with its own when it passed the Library Restriction. App. 411; R. Doc. 113, at 21. In Indianola, Iowa, for example, *The Kite Runner* by Khaled Hosseini has been on the mandatory reading list for students enrolled in an upper-level English course. App. 426; R. Doc. 113, at 36. Under the Library Restriction, however, the school may not retain copies of *The Kite Runner*, regardless of the age of the students who might receive it, because it contains what the state legislature has deemed an impermissible "sex act." *Ibid.*

This is merely one example of what are surely many, as the removed books include classic pieces of literature that feature prominently in many high-school literature courses, like *Brave New World* by Aldous Huxley, *1984* by George Orwell, and *Leaves of Grass* by Walt Whitman. Other timeless titles that have been found to "include an explicit description of a sexual act or intercourse" are *Ulysses* by James Joyce, *Slaughterhouse Five* by Kurt Vonnegut, *I Know Why the Caged*

24

Appellate Case: 25-1819   Page: 31   Date Filed: 08/07/2025 Entry ID: 5545903

*Bird Sings* by Maya Angelou, *To Kill a Mockingbird* by Harper Lee, and *The Scarlet Letter* by Nathaniel Hawthorne. *Ibid.* Many of these titles have been staples of the curriculum for decades, and yet Iowa public-school students today may have less access to these classics than their similarly situated peers around the country—or even their parents or grandparents once had in school. As one student plaintiff explained: "[b]y restricting the scope of books that I have access to . . . the State has left me at a deficit compared to my peers across the country . . . who have access to books that contain facts and histories that are critical to our participation in society." App. 283; R. Doc. 104-16, ¶ 9; *see also* App. 397; R. Doc. 113, at 7.

2.  Students prohibited from accessing certain books in their school libraries may struggle to develop the social and life skills necessary to grow into successful adults who can fully participate in a pluralistic, democratic society. Books are tools through which students may learn more about themselves and process events they have experienced in their own lives. *See* App. 185–87, R. Doc. 104-1, ¶¶ 14–18; App. 195, R. Doc. 104-2, ¶ 8. Popular and age-appropriate books that discuss sensitive but important topics such as abuse, human sexual development, and growing

Appellate Case: 25-1819    Page: 32    Date Filed: 08/07/2025 Entry ID: 5545903

up in today's technology-driven society have been removed from multiple Iowa public schools as a result of the Library Restriction. App. 188–91; R. Doc. 104-1, ¶¶ 20–23. As one teacher explained, these books can be a "lifeline" for students experiencing these same realities, as "reading about these experiences can help them understand that they are not alone" and "help[] them develop agency to talk about their experience with a trusted adult." App. 186; R. Doc. 104-1, ¶¶ 16–17. When students see reflections of themselves in literature, they are able to better understand their own experiences, discuss them in healthy and productive ways, and make better-informed decisions in the future. App. 186–87; R. Doc. 104-1, ¶¶ 16–18.

Many of the books that fall victim to the Library Restriction also help students learn important lessons about being active and engaged members of a civic society. *See* Julie Gorlewski, *Censorship Hinders Critical Thinking and Infringes on Readers' Rights*, Learn Magazine (Oct. 2023), https://ed.buffalo.edu/magazine/issues/fall-2023/censorship.html. Even if students do not see themselves reflected in a given piece of literature, engaging with the text can prove beneficial to develop the "educated populace . . . exposed to diverse ideas" that is

Appellate Case: 25-1819    Page: 33    Date Filed: 08/07/2025 Entry ID: 5545903

required to maintain a "thriving democracy." *Ibid.* Book purges that "obstruct[] dialogue and inhibit[] informed discussion" are a disservice to learners who need to grapple with challenging content and alternative perspectives for "authentic participation in our society." *Ibid.* The Library Restriction prevents Iowa's public-school students from encountering critically important perspectives that will shape them into adults prepared to engage in a contemporary society full of differing viewpoints and perspectives.

**b. The Library Restriction creates a culture of fear and censorship for educators attempting to comply with its vague requirements.**

The Library Restriction also creates a culture of fear and censorship for educators attempting to comply with the law's vague requirements to avoid serious adverse consequences. Whether it is through the fear of being terminated, losing their professional licensure, or drawing fire to their districts and leadership, teachers have been forced to engage in rigorous enforcement of the Library Restriction to gut their library shelves of material that might run afoul of this amorphous law.

1. The Library Restriction is cripplingly vague and challenging for educators to interpret, as it is ill-defined, self-contradictory, and in tension with other obligations imposed on educators. Per the statute's

Appellate Case: 25-1819    Page: 34    Date Filed: 08/07/2025 Entry ID: 5545903

plain text, educators must ensure that library books contain no "descriptions" or "depictions" of "sex acts as defined in" Iowa's criminal law. *See* Iowa Code § 256.11(19). Although the cross-referenced criminal statute enumerates certain "sex acts," the law does not define what constitutes a "description" or "depiction." It is wholly unclear what manner of reference to a sex act would run afoul of the Library Restriction. This exact problem has led school districts with similar book selections to pull wildly different numbers of book because of the Library Restriction. *See* App. 9; R. Doc. 34-10, ¶ 13.

And the law contains other confounding features that make an educator's responsibilities under the Library Restriction even less clear. The enumerated list of prohibited "sex acts," for example, is drawn from a criminal provision that includes only forms of "sexual contact between two or more persons." Iowa Code § 702.17. Where does this leave a description of sexual activity that is *not* between two or more persons, such as masturbation? Must an educator assess such a reference only in light of the general "age-appropriate" requirement? *Id.* §§ 256(11)(9)(a)(2), 256.11(19)(a)(1).

Appellate Case: 25-1819      Page: 35      Date Filed: 08/07/2025 Entry ID: 5545903

Further, the statute creates a wholesale exception for "[r]eligious books, such as the Bible, Torah, and the Koran." Iowa Code § 280.6. But some of these texts contain graphic depictions of sexual activity that would be hard to construe as "age appropriate" for young children. For example, passages in the Bible include descriptions of two daughters having intercourse with their father to "preserve [his] seed;" explicit instructions from Judah for a man to marry and have sexual relations with his brother's wife, only for that man to "spill[] his semen on the ground to keep from providing offspring for his brother;" and accounts of an "insatiable . . . prostitute" who "defiled" herself by having men "caress[] her virgin bosom and pour[] out their lust on her." *See* Genesis 19:33–36, 38:8–9 (New Int'l Version); Ezekial 23:5–8 (New Int'l Version). These passages from one religious text exemplify the vague and inconsistent applications of the Library Restriction that teachers and librarians must contend with as they navigate whether books may remain on shelves or must be purged.

It also bears mention that fulsome enforcement of the Library Restriction runs in tension with educators' obligations under the state professional ethics code. As noted in Part I.b., *supra* pp. 9–11, educators

29

Appellate Case: 25-1819    Page: 36    Date Filed: 08/07/2025 Entry ID: 5545903

are entitled to use their "professional judgment" in selecting "teaching methods" and "instructional materials," and they are prohibited from restraining students' independent "pursuit of learning" or denying students' "access to varying points of view." Iowa Admin. Code 282-26.2(256); 282-26.3(256). Removing large quantities of previously-retained books based on mere reference to a sex act—but without regard to the context of the prohibited content, or the age, needs, and interests of the reader—is plainly inconsistent with these ethical obligations. In this way, as well, the Library Restriction puts educators in a bind as to whether and how they can carry out their work with integrity and within the bounds of the law.

2. The uncertainty caused by the Library Restriction's vagueness leaves educators fearful of adverse professional consequences if they do not enforce the law to its fullest possible extent. Both school districts and school employees are subject to graduated penalties for failing to remove age-inappropriate materials from school library programs. *See* Iowa Code § 256.11(9)(a)(3). The Iowa Department of Education investigates alleged violations, and its findings can result in consequences ranging from a written warning to a hearing with possible disciplinary outcomes that

Appellate Case: 25-1819   Page: 37   Date Filed: 08/07/2025 Entry ID: 5545903

include termination of employment and license suspension or revocation. *Ibid.*

These risks are amplified by the fact that the Library Restriction gives school administrators strong incentives to over-enforce, as they themselves are subject to potential revocation of their professional licenses for allowing violations to occur. *See* Iowa Admin. Code 282-25.3(256). Further, the Library Restriction explicitly provides that a district's superintendent may be referred to the Board of Educational Examiners for discipline for a *school's* "knowing[]" violation of the ban. Iowa Code § 256.11(9)(a)(3).

Faced with such grave repercussions for themselves, administrators, and superintendents, educators have reasonably felt they must construe the Library Restriction's scope broadly to protect themselves, their colleagues, and their districts. Both members and the President of NEA's Iowa affiliate, the Iowa State Education Association (a plaintiff here), have reported that educators operate in fear of the consequences of Library Restriction enforcement. App. 196, R. Doc. 104-2, ¶10–11; App. 254, R. Doc. 104-10, ¶12; App. 10, R. Doc. 34-10, ¶15.

31

Appellate Case: 25-1819   Page: 38   Date Filed: 08/07/2025 Entry ID: 5545903

This confusion and pressure has caused some to consider leaving the teaching profession altogether. App. 254; R. Doc. 104-10, ¶12.

At a time when educators have been fleeing the field in record numbers, the last thing public schools need is an additional layer of fear and anxiety to contribute to staff attrition. *See* Nat'l Cent. for Educ. Stats., *Teacher Turnover: Stayers, Movers, and Leavers*, Inst. of Educ. Sciences (2024), https://nces.ed.gov/programs/coe/indicator/slc/teacher-turnover.

Appellate Case: 25-1819     Page: 39     Date Filed: 08/07/2025 Entry ID: 5545903

## CONCLUSION

For the foregoing reasons, the judgement of the District Court should be affirmed.

Respectfully submitted,

/s/ Katherine E. Lamm
Alice O'Brien
Jason Walta
Katherine E. Lamm
Chad Nowlan
NATIONAL EDUCATION
ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7067
klamm@nea.org

*Counsel for Amicus Curiae*

July 28, 2025

33

Appellate Case: 25-1819    Page: 40    Date Filed: 08/07/2025 Entry ID: 5545903

## CERTIFICATE OF COMPLIANCE WITH
## TYPE VOLUME LIMITATION AND
## TYPEFACE AND TYPESTYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,170 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Century Schoolbook 14-point font.

/s/ Katherine E. Lamm

July 28, 2025

Appellate Case: 25-1819     Page: 41     Date Filed: 08/07/2025 Entry ID: 5545903

# CERTIFICATE OF COMPLIANCE
# WITH EIGHTH CIRCUIT RULE 28A(H)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this Brief of Amicus Curiae National Education Association has been scanned for viruses and is virus-free.

/s/  Katherine E. Lamm

July 28, 2025

Appellate Case: 25-1819    Page: 42    Date Filed: 08/07/2025 Entry ID: 5545903

# CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Katherine E. Lamm

July 28, 2025

Appellate Case: 25-1819     Page: 43     Date Filed: 08/07/2025 Entry ID: 5545903