IN THE

# United States Court of Appeals for the Eighth Circuit

---

PENGUIN RANDOM HOUSE, LLC; *et al.*,

*Plaintiffs-Appellees*,

v.

JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education; *et al.*,

*Defendants-Appellants*,

JASON MENKE, in his official capacity as member of the Urbandale Community School District Board of Education; *et al.*,

*Defendants*.

---

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:23-cv-478
(The Honorable Stephen H. Locher)

---

## REPLY BRIEF OF DEFENDANTS-APPELLANTS

---

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*


August 8, 2025

PATRICK C. VALENCIA
*Deputy Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES .................................................... iii

INTRODUCTION ................................................................... 1

ARGUMENT ............................................................................ 3

I.    If the Free Speech Clause Regulates the Library Section, Then the School-Sponsored-Speech Standard Applies .................................................... 3

    A.    Plaintiffs do not defend the district court's reasons for disregarding *Hazelwood/Henerey*. ....................................... 4

    B.    The school-sponsored-speech standard is not limited to local decisions. ............................... 4

    C.    Plaintiffs' alternative Free Speech standards are inapposite. ............................ 7

    D.    Applying *Hazelwood/Henerey*, a facial injunction is improper. ................................ 10

II.    Plaintiffs Failed to Carry Their *NetChoice* Burden Under Any Free Speech Standard. ......................... 11

    A.    The district court erroneously narrowed the law's scope at *NetChoice* step one. .............................. 14

    B.    Plaintiffs fail *NetChoice* steps two and three because the factual record does not establish the law's unconstitutional applications. ............................................... 18

III.    The Library Section Regulates Government Speech. .................................................. 23

IV.   The Other Factors Do Not Support Preliminary Injunctive Relief. ............................................... 30

V.   The Injunction Is Overbroad ................................................. 31

CONCLUSION ........................................................................ 35

CERTIFICATE OF COMPLIANCE ........................................ 36

CERTIFICATE OF SERVICE ................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arkansas Educ. Television Comm'n v. Forbes,*
   523 U.S. 666 (1998)................................................................26

*Auer v. Trans Union, LLC,*
   902 F.3d 873 (8th Cir. 2018)................................................32

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
   457 U.S. 853 (1982)...........................................................7, 8

*Brockett v. Spokane Arcades, Inc.,*
   472 U.S. 491 (1985)................................................................33

*California Tchrs. Ass'n v. State Bd. of Educ.,*
   271 F.3d 1141 (9th Cir. 2001)..............................................6

*Free Speech Coal., Inc. v. Paxton,*
   145 S. Ct. 2291 (2025)..........................................................23

*GLBT Youth v. Reynolds,*
   114 F.4th 660 (8th Cir. 2024) ................................... *passim*

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988)..........................................................3, 10

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.,*
   200 F.3d 1128 (8th Cir. 1999) ..............................................3

*Little v. Llano Cnty.,*
   138 F.4th 834 (5th Cir. May 23, 2025) ..................... *passim*

*Matal v. Tam,*
   582 U.S. 218 (2017)........................................................29, 30

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)............................................... *passim*

*Ng v. Board of Regents of Univ. of Minn.,*
   64 F.4th 992 (8th Cir. 2023) ..............................................30

*Org. for Black Struggle v. Ashcroft,*
   978 F.3d 603 (8th Cir. 2020)..............................................31

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
   530 F.3d 724 (8th Cir. 2008).........................................25, 30

*Powell v. Noble,*
   798 F.3d 690 (8th Cir. 2015)..............................................30

*Pratt v. Independent School District No. 831,*
   670 F.2d 771 (8th Cir. 1982)................................................7

**Page(s)**

*Rust v. Sullivan,*
   500 U.S. 173 (1991) ............................................................ 8

*Trump v. CASA, Inc.,*
   145 S. Ct. 2540 (2025) ................................................. 31, 32

*United States v. Am. Libr. Ass'n, Inc.,*
   539 U.S. 194 (2003) ...................................................... 9, 28

*United States v. Skrmetti,*
   145 S. Ct. 1816 (2025) ....................................................... 6

*Univ. of Texas v. Camenisch,*
   451 U.S. 390 (1981) ......................................................... 25

*Walls v. Sanders,*
   2025 WL 1948450 (8th Cir. July 16, 2025) ................ *passim*

**Statutes**

Iowa Code § 4.12 ................................................................... 33
Iowa Code § 256.11 ........................................................... 5, 33

**Regulations**

Iowa Admin. Code r.281—12.2(256) ........................................ 5
Iowa Admin. Code r.281—12.3(256) ........................................ 5

## INTRODUCTION

This Court should vacate this second preliminary injunction for at least three reasons.

*First*, when this Court vacated the earlier facial injunction, it invoked the school-sponsored-speech standard to apply on remand. The district court declined to apply that standard. To the district court's credit, it said if that standard applied, then Plaintiffs fail. On appeal, Plaintiffs do not dispute that conclusion. Nowhere do Plaintiffs argue that, if the school-sponsored-speech standard applies, the Library Section still violates the Free Speech clause. Their argument instead is only that the school-sponsored-speech standard does not apply. So the question is simple: does the school-sponsored-speech standard govern the Library Section? If yes, then Plaintiffs' challenge fails.

*Second*, the Library Section regulates government speech because it regulates governmental curation. Plaintiffs characterize the expression at issue as the message in each library book. But this Court already said the expression at issue was "the placement and removal of books in public school libraries." *GLBT Youth v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024). And because the government makes those decisions based on what

1

books it determines worthy of school reading, the government is the speaker. This Court should follow the Fifth Circuit plurality and hold that governmental library curation is government speech. *See Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. May 23, 2025).

*Third*, this Court vacated the first facial injunction because the district court failed to apply *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). Rather than develop a record to establish the law's scope and compare unconstitutional and constitutional applications, Plaintiffs presented the district court on remand with the same underdeveloped record then asked for—and received—the same facial relief.

The district court feared *NetChoice*'s burden is too harsh for Plaintiffs. Plaintiffs on appeal adopt that same distorted view of facial challenges, arguing that a facial challenge is not supposed to be a "mass-scale as-applied challenge." Resp. Br. 12. But if Plaintiffs wanted a lesser burden, they could have sought more targeted relief on remand. They instead chose to litigate a "facial challenge[]" and that choice "comes at a cost." *NetChoice*, 603 U.S. at 723. The district court should not have relieved Plaintiffs of their burden by treating this case like an as-applied claim receiving facial relief.

**ARGUMENT**

## I. If the Free Speech Clause Regulates the Library Section, Then the School-Sponsored-Speech Standard Applies.

After citing *Hazelwood* and *Henerey*, this Court gave guidance for remand: "Given the pedagogical mission and the policy making authority possessed by Iowa, it is important in conducting a review and analysis to bear in mind that Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." *GLBT Youth*, 114 F.4th at 670; *see Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1132 (8th Cir. 1999) ("[A] school need not tolerate speech that is inconsistent with its pedagogical mission, even though the government could not suppress that speech outside of the schoolhouse."); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (similar). Applying that school-sponsored-speech standard, Iowa may categorically prohibit books with descriptions of sex acts.

Plaintiffs do not argue that the Library Section fails that standard. Instead, they argue that standard does not apply at all.

### A.    Plaintiffs do not defend the district court's reasons for disregarding *Hazelwood/Henerey.*

The district court gave four reasons for why it would not apply *Hazelwood/Henerey*. State Defendants explained why each was wrong. Opening Br. 19–23. Plaintiffs do not defend those four reasons:

Plaintiffs do not explain why this Court would have invoked *Hazelwood/Henerey* if those cases were inapplicable. Opening Br. 19–20.

Plaintiffs abandon the district court's reasoning that *Hazelwood/Henerey* governs only student speech. Opening Br. 20.

So too the conclusion that *Hazelwood/Henerey* applies only when speech was disseminated in captive settings. Opening Br. 20–21.

Nor do Plaintiffs argue that *Hazelwood/Henerey* could not apply here because this Court rejected State Defendants' government-speech argument so that forecloses the school-sponsored-speech argument. Opening Br. 21–23.

### B.    The school-sponsored-speech standard is not limited to local decisions.

Rather than defend the district court's four arguments against applying *Hazelwood/Henerey*, Plaintiffs provide a fifth: the school-sponsored-speech doctrine governs decisions made only by "schools and

their educators." Resp. Br. 22. The doctrine is inapplicable, Plaintiffs say, when it comes to statewide policy making. Resp. Br. 11, 18, 21–24.

So even though this Court said "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children" because of its "pedagogical mission and the policy making authority" it possesses, *GLBT Youth*, 114. F.4th at 670, Plaintiffs now argue Iowa has no such statewide policy making authority. *But see* Iowa Code § 256.11(9)(*a*)(2) (requiring school library programs to comply with State educational standards); Iowa Admin. Code r.281—12.3(256) (same); Iowa Admin. Code r.281—12.2(256) (purpose of public-school libraries is to advance the school curriculum). Plaintiffs' novel contention is the State plays no role in making policy for the school libraries the State establishes.

Yet Plaintiffs cite no holding—of this Court or any other—limiting *Hazelwood*/*Henerey* in that way. This Court recently had occasion to review another State's education law, where parties and amici invoked *Hazelwood*. *See Walls v. Sanders*, 2025 WL 1948450, at *5–*6 (8th Cir. July 16, 2025). And this Court did not determine *Hazelwood* was inapplicable because the challenged state law was not a local decision.

Instead, this Court declined to apply *Hazelwood* because the speech at issue was the government's, so the government-speech doctrine applied. *Id.*; *see also, e.g., California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1148–50, 1154 (9th Cir. 2001) (applying *Hazelwood* to reject challenge to state law). *Hazelwood* and *Henerey* do not apply only when local decisions are on review.

One final point: Courts understand that when a State possesses policy making authority, courts should not override that authority due to blanket deference to so-called experts. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1836–37 (2025). Asking for such deference improperly asks courts to issue policy-based vetoes of laws regulating where States possess authority. Plaintiffs here object to the Legislature's policy decision. And Plaintiffs may prefer deference to local officials and librarians than their State funders. But such a preference is no entitlement to a facial preliminary injunction. Courts "leave questions regarding its policy to the people, their elected representatives, and the democratic process." *Id.*

**C. Plaintiffs' alternative Free Speech standards are inapposite.**

If the Free Speech Clause governs the Library Section at all, then this Court already pointed to the school-sponsored-speech standard. The first step is to determine what speech is at issue and who is the speaker. State Defendants believe there is an easy answer: the Library Section regulates government speech. Opening Br. 59–67. But assuming here that is wrong, then *Hazelwood*'s school-sponsored-speech standard is the next best. Opening Br. 24–27.

1. Plaintiffs assert students' "right to receive information." App.Vol.I.57–58, R.Doc.88 at ¶¶ 159–160. But any such right is "reciprocal" of a "speaker's ability to disseminate information." *Walls*, 2025 WL 1948450, at *3. And it "cannot be used to require the government to provide a message it no longer is willing to say." *Id.* (citing *Little*, 138 F.4th at 842–847).

The district court applied *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), and *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir. 1982), to student Plaintiff's right to receive. App.Vol.II.408–409, R.Doc.113 at 18–19. But the court did not have the benefit of *Walls*, which held that the

Supreme Court's government-speech cases abrogated *Pratt*. 2025 WL 1948450, at *6. *Walls* also reasoned that *Pico* "lacks any holding as to the First Amendment." *Id.* at *4. Indeed, because any student's right to receive a book on a library shelf here is reciprocal of a speaker's right to place that book on the shelf, *Pico* is of little use.

2. Because a student's right to receive runs into *Walls*, the inquiry returns to determining the speaker and the speaker's asserted right. Plaintiffs assert publisher and author Plaintiffs' right to communicate by preventing their books from being removed from school-library shelves.

Yet Plaintiffs concede they have no "right to have school districts acquire any particular book." Resp. Br. 36 n.13. That is reasonable. *Cf. Pico*, 457 U.S. at 887 n.3 (Berger, C.J., dissenting) ("[I]t is perfectly clear that, unwise as it would be, the board could wholly dispense with the school library, so far as the First Amendment is concerned."); *Rust v. Sullivan*, 500 U.S. 173, 201 (1991) ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected.").

Plaintiffs instead distinguish book placement from removal to salvage those Plaintiffs' status as speaker. But *Walls* erased any such

distinction: this Court "see[s] no basis in the Free Speech Clause to conclude the students would have a right to prevent something from being removed from the curriculum based on ideology if they do not also have a right to require the school to add materials." *Walls*, 2025 WL 1948450, at *6. Indeed, there is no principled basis for "locating in the First Amendment a distinction between refusing to purchase certain books [] and removing them." *Little*, 138 F.4th at 867 (Ho, J., concurring). Because Plaintiffs concede no right to force school libraries to acquire a book, they lack any reciprocal right to prevent its removal.

3. Failing to engage with that key part of *Walls*, Plaintiffs pivot to two standards that apply outside the school setting.

Plaintiffs first generally invoke nonpublic-forum standards, which the district court did not apply. And for good reason: the Supreme Court has said library shelves are not forums for authors to speak. *See United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (plurality op.); *see also Little*, 138 F.4th at 859 ("Library shelves are not a community bulletin board: they are not places set aside for public expression." (quotation marks omitted)).

Plaintiffs then fall back on the district court's application of its novel obscenity-light standard. Resp. Br. 19–21. But restrictions on school speech are subject to different standards. *See Hazelwood*, 484 U.S. at 266–267. Indeed, neither *Henerey* nor *Hazelwood* nor *Fraser* applied an obscenity-light standard, even though each case considered obscenity. Opening Br 41–42. Plaintiffs have no response.

While Plaintiffs ask this Court to extend non-school cases to the "special characteristics of the school environment," *Hazelwood*, 484 U.S. at 266, State Defendants ask this Court to find Iowa's law regulates school-sponsored speech. The Court should not read into *Miller* a novel application here. Opening Br. 39–43.

## D. Applying *Hazelwood/Henerey*, a facial injunction is improper.

The district court concluded that if the *Hazelwood/Henerey* school-sponsored-speech standard does apply, then the Library Section survives. App.Vol.II.428–429, R.Doc.113 at 38–39. In the district court's words, "under the *Hazelwood* standard, it appears that schools (or, in this instance, a state legislature) can categorically prohibit sexual content or profanity in schools without running afoul of the First Amendment." App.Vol.II.428, R.Doc.113 at 38.

Plaintiffs do not contest this alternative conclusion on appeal. *See, e.g.*, Resp. Br. 37–45 (applying only the obscenity-light standard to evaluate unconstitutional applications). It is therefore conceded for purposes of this appeal that, if this Court determines its earlier cited *Hazelwood*/*Henerey* cases govern the Library Section, then Plaintiffs' claim fails. Opening Br. 25–32.

## II. Plaintiffs Failed to Carry Their *NetChoice* Burden Under Any Free Speech Standard.

Ordinarily plaintiffs must carry a heavy burden to establish a likelihood of success on the merits, because they chose to bring a facial overbreadth challenge rather than a targeted as-applied challenge. Because of that choice, they face a "daunting, if not impossible, task." *NetChoice*, 603 U.S. at 745 (Barrett, J., concurring). This is true no matter the Free Speech standard that applies.

The facial-overbreadth analysis requires first determining "the full scope of the law's coverage." *Id.* at 744 (majority op.). Then the court must "decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* The inquiry "means asking, again as to each thing covered, whether the [law] unduly burden[s] expression." *Id.* at 725. When "the record is

underdeveloped," courts cannot answer those necessarily factual questions. *Id.* at 726.

Plaintiffs repeat the district court's error at step one, which infects the remainder of the analysis. Plaintiffs and the district court treat the law as having certain realistic, or "heartland," applications, and "confine[] their battle to that terrain." *Id.* at 724; Resp. Br. 34–36. The problem with that approach is that it "treat[s] th[is] case[] more like [an] as-applied claim[] than like [a] facial one[]." *NetChoice*, 603 U.S. at 724. Improperly narrowing the scope of the law's full range of applications erodes the denominator central to the facial-overbreadth analysis.

That legal error evolves into a record deficiency. Plaintiffs fail to establish the full range of the law's constitutional and unconstitutional applications because they focus at step one on only a subset of the law's applications. Unbound from the law's text—and instead beholden to certain cherry-picked examples of how non-State Defendants have applied the law—Plaintiffs offer no evidence that any alleged-removed books contain descriptions of sex acts. Even worse, the spare record establishes nonparties incorrectly and inconsistently applying the law statewide—an odd basis to enter a facial injunction. Without that

threshold evidence, it is unclear whether Plaintiffs' removed-books list includes any books within the law's scope, as defined by the Library Section's text. This Court on appeal thus faces a deficiency the district court overlooked: No evidence that any removed book violates the law.

Worse, the district court (after briefing and argument, leaving State Defendants no chance to engage) took judicial notice of some books of which it was "independently aware," to conclude that all 500 books, except one, were unconstitutionally removed. App.Vol.II.420, R.Doc.113 at 30. Like Plaintiffs, the court did not identify any passage of any book bringing that book within the law's textual scope. Despite Plaintiffs' underdeveloped record, Plaintiffs—like the district court—conclude by asserting the burden to prove constitutionality rests on State Defendants. Resp. Br. 36, 44; App.Vol.II.425, R.Doc.113 at 35. That is backwards.

And all of this cheapens the "price of [Plaintiffs'] decision to challenge the law[] as a whole." *NetChoice*, 603 U.S. at 744. Plaintiffs' deficient record would not be enough for an as-applied challenge to any of the 500 books alleged to have been unconstitutionally removed. Yet that bare record won them facial relief to stymie removal of any book—

including even one book all parties agree may be constitutionally removed. App.Vol.II.421, R.Doc.113 at 31 n.5. This Court should require more before granting extraordinary facial relief.

## A. The district court erroneously narrowed the law's scope at *NetChoice* step one.

*NetChoice*'s first step is to analyze the law's scope. 603 U.S. at 724. That "includes consideration of what activities by what actors do the laws prohibit or regulate." *GLBT Youth*, 114 F.4th at 669. In a facial challenge, this step is defined by the law's text, not by how non-Appellants have applied the law.

The Library Section applies to "the placement and removal of books in public school libraries." *Id.* at 667. Plaintiffs and the district court set aside the law's text, limiting their inquiry to book removal; they did not consider books they deemed "hypothetical-but-unrealistic" to appear in public-school libraries. App.Vol.II.421, R.Doc.113 at 31; Resp. Br. 36.

That approach is wrong: For any covered books that Plaintiffs or the district court find "unrealistic" to appear in a school library, the State may enforce the Library Section against an employee who placed that book in the school library. *Id.* "Realistic" or not, if the book contains a

description of a sex act, as defined by Iowa law, then it is within the law's scope and must be included in the overbreadth-analysis denominator.

Plaintiffs and the district court thus err at step one. They disregard the law's text and seek to define the scope, for purposes of this facial challenge, by how the law "has been" applied. App.Vol.II.422, R.Doc.113 at 32. The district court did "not consider hypothetical-but-unrealistic applications." App.Vol.II.421, R.Doc.113 at 31. But some actual books on shelves are outrageous enough to beggar belief. Any textual application should be included.

This reflects the "heartland" error the Supreme Court identified in *NetChoice*, 603 U.S. at 724. That case reversed decisions relying on parties that "treated the laws as having certain heartland applications, and mostly confined their battle to that terrain." *Id.* The reversed courts of appeals "also mostly confined their analysis in that way." *Id.* But in focusing on "heartland" applications, the courts did not address "the full range of activities the laws cover." *Id.* Even if significant applications were likely unconstitutional, limiting the facial-injunction analysis to only the law's "heartland" applications was enough to require vacatur. *Id.* The Supreme Court characterized that error—looking for

unconstitutional applications then judging the scope of sought relief more narrowly—as "treat[ing] these cases more like as-applied claims than like facial ones." *Id.*

Here, the district court chose to consider only some of the law's applications. It is not even clear that those are the "heartland" applications. By improperly narrowing its facial-injunction analysis at step one in that way, the district court effectively gerrymandered the facial claim to ensure a denominator at step three that would allow injunctive relief. That error alone justifies vacatur. *Id.* at 724.

Even if how the law "has been" applied could define the proper scope of a facial challenge, determining how the law has been applied is impossible here. Problematically—yet not addressed by the district court—some books have been removed for reasons having nothing to do with the Library Section. ISS Plaintiffs Amici Br. at 5; App.Vol.I.115, R.Doc.102 at 11 (collecting examples). Plaintiffs concede as much. App.Vol.I.150, R.Doc.104 at 7 n.4 (The list of removed books that Plaintiffs and the district court rely on includes "books that school districts erroneously removed under other provisions of SF496, including a provision that concerns gender identity and sexual orientation in the

context of grades K-6."). And Plaintiffs' amici report that non-State Defendants' Library Section enforcement has been "wildly inconsistent." ISS Plaintiffs Amici Br. at 5. So defining the law's scope by how the law has been applied necessarily means, at least in part, adopting an erroneous scope.

Finally, Plaintiffs seek to dodge their factual burden at *NetChoice* steps two and three by claiming such evidence is needed only when the law's scope is "far from clear" at step one. Resp. Br. 27–28. And here, Plaintiffs initially say "the scope of the Library Restriction is readily apparent," so no "additional evidence is needed." Resp. Br. 28. Yet just a few pages later, Plaintiffs emphasize over and over that the Library Section is "vague." *Compare* Resp. Br. 31 ("The Library Restriction Is Broad And Vague.") *and* Resp Br. 31, 32, 33, 34, 44, 45 (emphasizing law's "vagueness"), *with* App.Vol.II.402, R.Doc.113 at 12 n.4 (district court noting that Plaintiffs did not press their void-for-vagueness claim at this stage). Though Plaintiffs' analytical approach highlights the flaw in relying at step one on evidence of how nonparties have applied the law, rather than on the law's text, their vagueness assertions, if taken seriously, mean that "additional evidence is needed." Resp. Br. 28. But

Plaintiffs failed to provide that evidence. And to receive a facial injunction the burden is theirs. Though step one is a statutory question, Plaintiffs' fail to properly establish the law's scope.

**B.** **Plaintiffs fail *NetChoice* steps two and three because the factual record does not establish the law's unconstitutional applications.**

The second and third steps of the facial overbreadth analysis require Plaintiffs to carry their factual burden of establishing the law's unconstitutional applications, then showing that those substantially outweigh the law's constitutional applications. *NetChoice*, 603 U.S. at 725–726. This fact-intensive inquiry "is the price of [plaintiffs'] decision to challenge the laws as a whole." *Id.* at 744. The bare record highlights Plaintiffs' need to carry their factual burden at steps two and three. Under any Free Speech standard, Plaintiffs failed that burden.

1. The *NetChoice* numerator should include only those applications of the law that Plaintiffs establish (1) are included within the law's textual scope and (2) likely violate the Free Speech Clause. Plaintiffs have never identified passages establishing that the 500 removed books include descriptions of sex acts. Nor did the district court, not even after it supplemented Plaintiffs' factual deficiencies by taking judicial notice

of books it was "independently aware" of. App.Vol.II.420, R.Doc.113 at 30. Had State Defendants been given the opportunity to highlight the district court's flawed approach, it would have done so; but the court did not give State Defendants that chance. App.Vol.II.342, R.Doc.112 at 39:3–15 (State "would appreciate the opportunity to brief that" if district court took post-briefing-and-hearing judicial notice of books).

An example illustrates the deficiency: Plaintiffs claim the Library Section has been applied to a list of more than 500 books, yet they concede that books on that list were "erroneously removed under other provisions of SF496"—and thus are not within the Library Section's scope. App.Vol.I.150, R.Doc.104 at 7 n.4. Once again, Plaintiffs' and the district court's analysis "treat[s] these cases more like as-applied claims than like facial ones." *NetChoice*, 603 U.S. at 724.

The only book the district court determined could be constitutionally removed, *Gender Queer*, happens to be one of only three removed books it could analyze on this record. App.Vol.II.421, R.Doc.113 at 31 n.5. And that was only because State Defendants, despite not bearing the burden to do so, put examples in the record of descriptions of sex acts from those books, which were on school-library shelves.

R.Doc.45-1 at 93–106 (images from *Gender Queer*); App.Vol.I.106–107,

R.Doc.102 at 2–3 (collecting other examples).

For the only other two removed books that can be analyzed on this record, the district court understood those books included descriptions of sex acts—thus covered by the law—and were on school-library shelves. App.Vol.II.425, R.Doc.113 at 35. But it considered those as unconstitutional applications because "the books apparently sat passively and harmlessly on the shelves except as to students who wanted to read them." *Id*. Plaintiffs similarly claim there is "no support" to show those books were ever made available to elementary school students. Resp. Br. 36. Not only do Plaintiffs fail to explain with authority why whether books "sat passively and harmlessly" on library shelves is relevant to the inquiry, but they ignore the record. Opening Br. 56–57. As Plaintiffs' amici admit, "some Iowa school districts do not maintain separate elementary and secondary school libraries." *ISS v. Reynolds*, S.D. Iowa No. 4:23-cv-474, R.Doc.1 at 14 ¶ 48.

Perhaps recognizing their evidentiary deficiencies at steps two and three, Plaintiffs rest their claims in part on the incorrect assertion that State Defendants "admit" that "every book removed" was "properly

removed." Resp. Br. 6, 30, 44. The district court adopted this view too. App.Vol.II.416, R.Doc.113 at 26. That supposed concession comes from State Defendants' brief in the prior appeal in the parallel case, where State Defendants characterized the *district court*'s finding. *See* Defendants-Appellants' Opening Brief at 59, No. 24-1074 (8th Cir. Mar. 11, 2024). State Defendants, quoting the district court to try to vacate an injunction, did not "admit[]" quite so much. *Id.*

Indeed, a review of State Defendants' briefing across both cases in the district court and this Court, reveals a consistent sequence: Plaintiffs claim the Library Section applies to a list of over 500 removed books. But State Defendants have not directed removing any specific book from any school, so they do not know the content of each of the 500-plus books Plaintiffs claim were removed by local school districts. Plaintiffs do not offer evidence that those books contain descriptions of sex acts. State Defendants repeatedly spotlight *1984* by George Orwell, asking, what passage violates the law? Plaintiffs never say. Opening Br. 47; App.Vol.I.114, R.Doc.102 at 10. Despite being given many chances to answer this evidentiary question as to just one book, Plaintiffs again invoke *1984* then move on without answer. Resp. Br. 6, 41, 42.

Determining the law's unconstitutional applications requires Plaintiffs to show that the 500 removed books, as a matter of fact, fall within the Library Section's scope. That means identifying a statutorily proscribed sex act. But Plaintiffs have not—and likely cannot—produce evidence showing the books at issue are covered by the Library Section, no less that they are examples of unconstitutional applications of the law. And again, the burden of proof is theirs.

2. The *NetChoice* denominator should include "each thing covered" by the law. 603 U.S. at 725. Because the district court erred at step one, it ended up with an unnaturally narrow denominator at step three. Properly interpreted, Iowa's law applies to any book available for purchase that describes sex acts, not just those books that are already on school library shelves. That vast number of books outweighs any number of books alleged to have been unconstitutionally removed, yet the district court did not include those books in its analysis.

Plaintiffs concede the State's legitimate interest in removing obscene books. Resp. Br. 10, 19. At a minimum, those books should be included in the denominator; nothing prohibits Iowa from regulating the same conduct in its education laws that it already regulates under its

criminal code. *Cf. Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2299 (2025) (state law requiring websites with sexually explicit content to verify age of visitors, in effort to prevent children from accessing such content, survives intermediate-scrutiny Free Speech challenge, despite preexisting state law already criminalizing distribution of sexually explicit content to children). Yet the district court disregarded obscene books in its analysis. That vast number of books substantially outweighs the few—if any—unconstitutional applications Plaintiffs established on this record.

## III.  The Library Section Regulates Government Speech.

The "expression at issue is the placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. That expression, which can be referred to as curation of public-school libraries, is the government's expression. There is no coherent argument for any entity other than the government to be responsible for public-school-library curation. Because the Library Section regulates government speech, it is not subject to Free Speech challenge.

Plaintiffs counter that State Defendants waived this argument, that this Court already rejected the argument, and that the messages

conveyed in school-library books do not amount to government speech. They are wrong at each turn.

1. Plaintiffs argue State Defendants waived the government-speech argument. Resp. Br. 46. But just a few lines before that, Plaintiffs cite where State Defendants preserved the argument in the district court. App.Vol.I.118, R.Doc.102 at 14 n.1. State Defendants then expressly "preserv[ed] it for appeal" at the preliminary-injunction hearing, to which the district judge responded "Understood." App.Vol.II.372, R.Doc.112 at 69:18–23. Yet Plaintiffs did not argue then that the argument was waived. And that makes sense. The parties have briefed the issue many times; first in the district court, then to this Court. Plaintiffs even responded to the argument in the district court. App.Vol.II.298, R.Doc.107 at 8. If there is any waiver here, it is Plaintiffs' waiver of their waiver argument on appeal.

2. This Court has not yet determined Plaintiffs' likelihood of success on the merits of the government-speech argument. This Court's earlier government speech decision related only to standing. The Court did not reach the merits, vacating the previous injunction on other merits

grounds first. Yet Plaintiffs argue this Court already rejected the government-speech argument. Resp. Br. 45.

Plaintiffs misunderstand the important distinction between standing and merits. When assessing standing, this Court considered whether Plaintiffs' alleged "intended future conduct" was "arguably affected with a constitutional interest." *GLBT Youth*, 114. F4th at 667. The Court characterized that standard as "lenient and forgiving." *Id.*

But the preliminary-injunction merits standard is not so forgiving. It "require[s] a more rigorous threshold showing that [Plaintiffs are] likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008). Just because a plaintiff may be able to satisfy the "lenient and forgiving" standing inquiry does not mean they necessarily satisfy the rigorous preliminary-injunction merits standard.

And as State Defendants argued in opening, "a prior panel's preliminary-injunction stage decision is not binding on the later merits." Opening Br. 60 (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Plaintiffs did not respond to that argument, nor do they engage

with *Camenisch*. This Court's preliminary-injunction stage decision is not binding on the government-speech question.

3. On the merits, the key question is whether the expression at issue is the "messages conveyed in school-library books," as Plaintiffs put it, Resp. Br. 48–49, or the message conveyed by "the placement and removal of books in public school libraries," as this Court put it. *GLBT Youth*, 114 F.4th at 667. The latter is correct.

The government makes placement and removal decisions and is therefore the speaker. Government entities—not any publisher, author, or student—"speak[] by selecting some books over others and presenting that collection to the public." *Little*, 138 F.4th at 837. Such "collection decisions have traditionally expressed libraries' own views about what constitutes worthwhile literature." *Id.* at 865 (analyzing the *Shurtleff* factors as applied to public libraries).

Although the Supreme Court has not yet determined whether school-library curation is government speech, it has repeatedly held that when the government curates its own compilation of private third-party speech, its curation decisions are its own expressive activity. *See, e.g.*, *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673–675

(1998). Applying that principle here, when Iowa curates public-school libraries it regulates its own speech.

Outside the government-speech context, the Supreme Court has affirmed the key distinction between a curated compilation and the third-party speech being curated. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). So Plaintiffs are right that private speech, not government speech, was at issue in *NetChoice*. Resp. Br. 50–51. But what *NetChoice* highlights, as relevant here, is the careful distinction between a curated compilation and the third-party speech being curated. That distinction applies all the same here.

Only after properly characterizing the expression at issue may the analysis turn to *Shurtleff*. After all, *Shurtleff*'s factors consider "(1) the history of the expression at issue; (2) the public's likely perception as to who is speaking; and (3) the extent to which the government has actively shaped or controlled the expression." *GLBT Youth*, 114 F.4th at 667. Without understanding what expression is at issue or who is speaking, it is impossible to assess those factors. Indeed, that is in part why this Court recently concluded *Pratt* was abrogated. *Walls*, 2025 WL 1948450,

at *5–6 ("*Pratt* omitted the crucial step of considering whether the speech at issue was the government's and therefore not subject to the Free Speech Clause's restrictions.").

Plaintiffs analyze the *Shurtleff* factors as if the expression at issue is the message in each library book. Resp. Br. 48–49. Because of that flawed start, their analysis misses the mark. For example, Plaintiffs (and the district court) reason under *Shurtleff*'s second factor that, because library books "are diverse and often contradictory," and because the government does not "edit" books, no one would interpret the "messages conveyed in school-library books" as being government endorsed. Resp. Br. 48–49.

Refocusing the lens, "[t]he expression at issue is the placement and removal of books in public school libraries." *GLBT Youth*, 114 F.4th at 667. And it is "the *government* who conveys that message, nobody else." *Little*, 138 F.4th at 866 (cleaned up). A government-curated library collection conveys to the public that the State believes its selected materials have the "requisite and appropriate quality." *Am. Libr. Ass'n, Inc.*, 539 U.S. at 206. That speech is not the message in each individual book, but the message that the collection of books is worth reading. "That

is what it means to be a library—to make judgments about which books are worth reading and which are not." *Little*, 138 F.4th at 838. Even truer in the school-library context, where the State's purpose in curating school-library collections "is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school." *GLBT Youth*, 114 F.4th at 670.

Plaintiffs argue that the government-speech "doctrine does not extend to speech that expresses 'contradictory views.'" Resp. Br. 48 (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)). The Supreme Court's government-speech cases prove that wrong. Indeed, as amici highlight, "[i]f including diverse viewpoints meant editorial decisions could not be government speech, then *Walker* would have come out the other way." State Coalition Amici Br. at 9 n.5. Just as the City of Pleasant Grove was not "speaking as God" when it displayed the Ten Commandments, *Little*, 138 F.4th at 864–865, Iowa is not "babbling prodigiously and incoherently" through each book on public-school-library shelves, *GLBT Youth*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 236).

Finally, *Matal* is further distinguishable because the government there was not curating a uniform, overarching message through each

individual trademark approval. 582 U.S. at 234–239. Rather, the expression there involved near-rote registration of trademarks. The government made "clear that registration d[id] not constitute approval of a mark." *Id.* at 237. That is nothing like the State curating a collection of private third-party speech to place on school-library shelves: When the State curates public-school libraries, it is approving those "books [that] are worth reading and which are not." *Little*, 138 F.4th at 838.

## IV. The Other Factors Do Not Support Preliminary Injunctive Relief.

Plaintiffs' lack of success on the merits dooms their motion. *Rounds*, 530 F.3d at 732. So too does their inability to show that they face a threat of irreparable harm. *Powell v. Noble*, 798 F.3d 690, 702–703 (8th Cir. 2015).

State Defendants raised in opening that Plaintiffs' delays in seeking preliminary injunctive relief undercut their irreparable-harm argument. Opening Br. 69. In response, Plaintiffs fail to acknowledge their delay. The only irreparable-harm argument Plaintiffs make turns on their success on the merits. Resp. Br. 53.

But Plaintiffs' delay "undermines a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." *Ng v. Board*

*of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (cleaned up). More, because of their repeated delays, the status quo has become enforcement of the law: The Library Section has been in effect for about 13 months total. The district court's second preliminary facial injunction destabilizes, rather than preserves, the status quo.

Worse, every day under the injunction the State "suffers a form of irreparable injury." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (quotations omitted). An injunction thus goes against the public interest.

Even if this Court remands, it should vacate the preliminary injunction. There is no imminent and irreparable injury; only continued irreparable harm suffered by the State.

## V. The Injunction Is Overbroad.

Even if an injunction were proper, the injunction as crafted by the district court, is overbroad.

*First*, the injunction purports to prohibit State Defendants from enforcing the Library Section against Plaintiffs and nonparties. But "universal" injunctions are disfavored and likely beyond a federal court's authority. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548 (2025). When a

federal court grants nonparty relief, "it improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties." *Id.* at 2561. (cleaned up). Courts instead should craft injunctions no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 2562–63.

And here, Plaintiffs do not require nonparty relief to get complete relief. State Defendants do not concede that each Plaintiff has standing. Even if State Defendants are enjoined from enforcing the Library Section as to publisher and author Plaintiffs' books and against educator Plaintiffs, those Plaintiffs would have complete relief. Relief for nonparty publishers, authors, and educators does not further Plaintiffs' relief.

As to the sole student represented in this case, in September 2024 she was alleged to be a senior in high school. App.Vol.I.26, R.Doc.88 at ¶ 28. It is plausible to infer that she graduated high school and therefore that Plaintiff Van Gundy no longer has standing on behalf of her now-graduated, non-student child. *See Auer v. Trans Union, LLC*, 902 F.3d 873, 877 (8th Cir. 2018) (standing cannot be waived or forfeited because it is jurisdictional).

*Second*, the district court failed to apply Iowa's statutory rules of interpretation. "[S]everability of a state statute is a matter of state law, and state-law severability provisions are binding on federal courts." A.F. Legal Amicus Br. 21–23 (collecting cases). "[F]acial invalidation of the statute [is] . . . improvident" where a state statute—like Iowa Code § 4.12—imposes a severability requirement. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 & n.14 (1985). The court should have preserved every constitutional application of the Library Section.

Plaintiffs do not dispute that courts have a duty to apply state law severability. Plaintiffs instead respond that "there is no term that could be excised" from the Library Section, so there was no need to sever any constitutional applications. Resp. Br. 53. That is wrong.

The Library Section covers more than "descriptions" of a sex act. The law defines "age appropriate" to exclude "descriptions or visual depictions of a sex act as defined in section 702.17." Iowa Code § 256.11(19)(*a*)(1). Plaintiffs limited their "facial" challenge to the "descriptions" part of the law. App.Vol.I.145–146, R.Doc.104 at 2–3. Yet the injunction enjoins Defendants "from enforcing or acting in furtherance of the provisions of Senate File 496 that require the removal

of books from school libraries that are not 'age-appropriate.'" App.Vol.II.430, R.Doc.113 at 40. So it enjoins enforcement of the "visual depictions" part of the law too. At a minimum, the district court should have preserved the law's applications to "visual depictions of a sex act."

The district court should have also preserved every application of the Library Section to obscene books. Plaintiffs and the district court concede that the State can, at a minimum, prohibit placement and require removal of library books that arise to obscenity under their preferred *Miller* standard. *See, e.g.*, Resp. Br. 10, 19 (conceding State's interest in removing obscene books from school libraries). So at least the law's applications to obscene books should be preserved. As should all applications of the law to book placements, because the district court analyzed the law's constitutionality as applied only to book removals.

# CONCLUSION

For these reasons, this Court should vacate the preliminary injunction.

August 8, 2025

BRENNA BIRD
Attorney General of Iowa

Respectfully submitted,

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,498 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

August 8, 2025

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on August 8, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

August 8, 2025

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for Defendants-Appellants*